```
                                              Page 1
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4                ~~~~~~~~~~~~~~~~~~~~

 5       IBRAHIM SHARQAWI,

 6                    Plaintiff,

 7            vs.           Case No. 1:20-cv-00271

 8       THE KIRBY COMPANY,

 9                    Defendant.

10                ~~~~~~~~~~~~~~~~~~~~

11              The Videotaped deposition of

12                   IBRAHIM SHARQAWI

13

14

15

16                   May 26, 2022

17                    10:15 a.m.

18

19                   Taken at:

20                 Littler Mendelson

21            127 Public Square, Suite 1600

22                  Cleveland, Ohio

23

24

25              Cynthia Sullivan, RPR
```

Page 2

1 APPEARANCES:
2
3      On behalf of the Plaintiff:
4          Caryn Groedel & Associates, by
5          CARYN M. GROEDEL, ESQ.
6          31000 Woodall Drive
7          Cleveland, Ohio  44139
8          (440) 230-3808
9          cgroedel@groedel-law.com
10
11      On behalf of the Defendant:
12          Littler Mendelson, by
13          RYAN J. MORLEY, ESQ.
14          MORENA L. CARTER, ESQ.
15          127 Public Square
16          Suite 1600
17          Cleveland, Ohio  44114
18          (216) 623-6106
19          rmorley@littler.com
20          mlcarter@littler.com
21          ~ ~ ~ ~ ~
22 ALSO PRESENT:
23          Halle Sminchak, Esq.
24          Heidi Alten, Esq.
25          Alex Cook, Videographer

Page 3

1          TRANSCRIPT INDEX
2
3 APPEARANCES................................    2
4
5 INDEX OF EXHIBITS .......................    4
6 EXAMINATION OF IBRAHIM SHARQAWI
7
8 By Mr. Morley...........................    8
9
10 REPORTER'S CERTIFICATE...................  230
11
12 EXHIBIT CUSTODY
13 EXHIBITS RETAINED BY COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          INDEX OF EXHIBITS
2 NUMBER         DESCRIPTION          MARKED
3 Exhibit 1   The Second Amended Complaint.. 170
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          INDEX OF VIDEO OBJECTION
2 OBJECT                         PAGE
3 objection................................    12
4 objection................................    13
5 objection................................    13
6 you don't have to answer.................    14
7 objection................................    79
8 the same limitation......................    80
9 objection................................  134
10 objection...............................  140
11 objection...............................  144
12 objection...............................  147
13 objection...............................  168
14 objection...............................  169
15 objection...............................  188
16 objection...............................  189
17 objection...............................  197
18 objection...............................  198
19 objection...............................  199
20 objection...............................  199
21 objection...............................  204
22 objection...............................  205
23 objection...............................  206
24 objection...............................  208
25 objection...............................  209

2 (Pages 2 - 5)

Page 6

1 AFTERNOON SESSION......................... 120
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        THE VIDEOGRAPHER:  We are going on
2 the record.  The time is 10:16 a.m.  Today's
3 date is May 26th, 2022.  Please note that the
4 microphones are sensitive, and they pick up
5 whispers, private conversations, and cellular
6 interference.  This is media unit number one in
7 the video recorded deposition of Ibrahim
8 Sharqawi taken by defense in the matter of
9 Ibrahim Sharqawi vs. Kirby Company, filed in
10 the United States District Court, Northern
11 District of Ohio, Eastern Division, Case No.
12 1:20-cv-00271.
13        This deposition is being held at
14 Littler Mendelson located at 127 Public Square,
15 Suite 1600, Cleveland, Ohio, 44114.  My name is
16 Alex Cook from the firm Veritext Legal
17 Solutions.  I'm the videographer.  The court
18 reporter is Cynthia Sullivan from Veritext
19 Legal Solutions.
20        Will counsel please identify
21 themselves for the record.
22        MR. MORLEY:  Ryan Morley, Littler
23 Mendelson.
24        MS. CARTER:  Morena Carter, Littler
25 Mendelson.

Page 8

1        MS. GROEDEL:  Caryn Groedel, Caryn
2 Groedel & Associates.
3        THE VIDEOGRAPHER:  Will the court
4 reporter please swear in the witness.
5        MS. GROEDEL:  Can we just identify
6 the other people?
7        MS. SMINCHAK:  Sure.  I'm Halle
8 Sminchak with the Kirby Company.
9        MS. ALTEN:  I'm Heidi Alten of
10 Scott Fetzer.
11        MS. GROEDEL:  Thank you.
12    IBRAHIM SHARQAWI, of lawful age, called
13 for examination, as provided by the Federal
14 Rules of Civil Procedure, being by me first
15 duly sworn, as hereinafter certified, deposed
16 and said as follows:
17        EXAMINATION OF IBRAHIM SHARQAWI
18 BY MR. MORLEY:
19    Q.   We are here today for the
20 deposition of Ibrahim Sharqawi by notice of
21 deposition and agreement of the parties in the
22 lawsuit of Ibrahim Sharqawi versus the Kirby
23 Company and the Scott Fetzer Company filed in
24 the United States District Court for the
25 Northern District of Ohio, Eastern Division,

Page 9

1 Case No. 1:20-cv-00271.
2        Please state and spell your name
3 for the record.
4    A.   Ibrahim Sharqawi, I-B-R-A-H-I-M,
5 S-H-A-R-Q-A-W-I.
6    Q.   Do you go by the nickname Abe?
7    A.   Yes.
8    Q.   May I call you Abe during the
9 deposition?
10    A.   Yes.
11    Q.   Abe, we're going to go over some
12 ground rules before we get into it.  As you can
13 probably see, the court reporter is taking down
14 everything that is said while we talk, so it is
15 important that you verbalize your answers.
16 Therefore, I will ask you to avoid shaking your
17 head or shrugging and avoid responses such as
18 uh-huh and uh-uh because they cannot be
19 recorded.  Can you do that?
20    A.   Okay.  I understand.
21    Q.   Also, it is not possible for the
22 court reporter to transcribe testimony when
23 more than one person is talking at a time, so
24 please do not begin to answer a question until
25 I have completed it, and I will try to extend

1 you the same courtesy.  Do you understand?
2     A.    Yes.
3     Q.    Because as humans we have a
4 tendency to pick up on what the other one is
5 saying and finish others' sentences, so just be
6 mindful of that.
7         If you do not hear a question, just
8 say so, and I will repeat it.  If you do not
9 understand a question, let me know, and I will
10 rephrase it.  If you answer the question, I
11 will assume that you heard it, understood it,
12 and answered it completely and truthfully.  Do
13 you understand?
14     A.    Yes.
15     Q.    As you know, the court reporter
16 swore you in, so this deposition is being taken
17 under oath.  That means this is just like being
18 a witness in court.  You are swearing to tell
19 the truth.  Do you understand that?
20     A.    Yes.
21     Q.    If you need a break, please feel
22 free to ask me for a break.  However, please
23 answer the question before taking the break.
24 Do you agree today to do that?
25     A.    Yes.

1     Q.    Do you understand the instructions
2 I have just given you?
3     A.    Yes.
4     Q.    Do you have any medical condition
5 that would affect your memory?
6     A.    No.
7     Q.    Are you taking any medications that
8 would affect your memory?
9     A.    No.
10     Q.    Do you have any medical condition
11 that would affect your ability to understand
12 questions?
13     A.    No.
14     Q.    Do you have any medical condition
15 that would affect your ability to testify
16 accurately?
17     A.    No.
18     Q.    Are you taking any medications that
19 would affect your ability to understand
20 questions?
21     A.    No.
22     Q.    Are you taking any medications that
23 would affect your ability to testify
24 accurately?
25     A.    No.

1     Q.    What medications or drugs have you
2 taken today?
3         MS. GROEDEL:  Objection.  No,
4 uh-uh, no.  You don't have to answer that.
5     Q.    You can answer the question.
6         MR. MORLEY:  Your objection is
7 noted.
8         MS. GROEDEL:  He's not answering
9 that.  No.  It's confidential.  He doesn't have
10 to say what medicine he took if it's --
11         MR. MORLEY:  Yes, he does.  If it
12 impacts his ability to testify accurately or
13 truthfully or impacts his memory, he does.
14         MS. GROEDEL:  No.
15         MR. MORLEY:  Caryn, I don't want to
16 start this off with getting the court involved.
17 It's a standard question asked in every
18 deposition.
19         MS. GROEDEL:  No, it's not.
20         MR. MORLEY:  Yes, it is.
21         MS. GROEDEL:  Maybe in your
22 experience; not in mine.  It's personal.  Only
23 if he's claiming one of the four things;
24 intentional infliction of emotional distress,
25 permanent injury, he has retained an expert, or

1 he has an IIED claim.  Otherwise, you don't get
2 that information.
3         MR. MORLEY:  Well, we're going to
4 come back to that later.
5     Q.    Have you consumed any alcohol
6 today?
7     A.    No.
8     Q.    How about yesterday?
9     A.    Yes.
10     Q.    What did you consume yesterday?
11     A.    Wine.
12     Q.    How many glasses?
13     A.    Two.
14     Q.    What type?
15         MS. GROEDEL:  Objection to the
16 relevance of these questions.  Go ahead and
17 answer.
18     A.    Red wine.
19     Q.    Are you currently prescribed
20 medication?
21         MS. GROEDEL:  Objection.  You can
22 answer that.  If you're prescribed, just answer
23 that.
24         MR. MORLEY:  Caryn, we're going to
25 let him answer questions.

1        MS. GROEDEL:  No, we're not --
2        MR. MORLEY:  You can just object,
3 and then we move on.  That's what the rules
4 allow.
5        MS. GROEDEL:  Not with the medical.
6 Sorry, Ryan.
7        MR. MORLEY:  That's wrong.
8    Q.  Go ahead.  What prescription
9 medications do you take?
10        MS. GROEDEL:  You don't have to
11 answer that question.
12        MR. MORLEY:  Caryn, this is going
13 to go a long time, and we're going to get the
14 court involved pretty early if you keep on this
15 track.
16        MS. GROEDEL:  Then we'll do it.
17 Then we'll do it.
18    Q.  Did you bring any documents with
19 you to the deposition?
20    A.  No.
21    Q.  What documents were you reviewing
22 in that office by yourself when I walked by you
23 earlier this morning?
24    A.  Just some paperwork I have with me.
25    Q.  What paperwork was that?

1    A.  Just some personal stuff.
2    Q.  So it has nothing to do with this
3 lawsuit?
4    A.  No.
5    Q.  Okay.  So when I asked you earlier
6 whether you brought documents with you to the
7 deposition, the answer to that question should
8 have been yes, I brought documents, but they're
9 not related to this matter?
10    A.  I misunderstood the question.
11    Q.  Okay.  Do you have your cell phone
12 with you?
13    A.  Yes.
14    Q.  Is it on or off?
15    A.  It's on.
16    Q.  Are you recording this deposition
17 with your cell phone?
18    A.  No.
19    Q.  All right.
20    A.  I can turn it off.
21    Q.  Please, do.
22    A.  Yeah, no problem (indicating).
23 It's off.
24    Q.  Are you prepared to continue?
25    A.  Yes.

1    Q.  I'm going to ask you some questions
2 about how you prepared for your deposition
3 today.  I am not asking you to reveal any
4 communications with your attorney that are
5 covered by the attorney-client privilege.  How
6 did you prepare for your deposition?
7    A.  I came in to tell the truth.
8    Q.  Other than coming in here today,
9 did you look at any documents?
10    A.  Yes.
11    Q.  What documents did you look at?
12    A.  Text messages.
13    Q.  What text messages?
14    A.  Text messages I had with
15 Mr. Reitmeier.
16    Q.  Are those text messages on your
17 phone?
18    A.  No.  I printed them.  I believe we
19 submitted them to you.
20    Q.  That was my next question.  Those
21 text messages, were they provided to your
22 attorney as part of this litigation?
23    A.  Yes, sir.
24    Q.  How many text messages were there?
25    A.  I don't recall.  A lot.

1    Q.  What do you mean by a lot?
2    A.  I don't understand the definition
3 of a lot.
4    Q.  So does a lot to you mean five?
5 Does it mean 25?  What are you -- when you say
6 a lot, what does that mean?
7    A.  Whatever number it was we had the
8 entire year of 2018.
9    Q.  So you looked at every text message
10 between you and Kevin Reitmeier for the year of
11 2018.  Is that what you're testifying?
12    A.  From what I recall, I believe I
13 looked at every single one, yes, the last few
14 days, yes.
15    Q.  And did you bring those text
16 messages with you?
17    A.  No.
18    Q.  And you live in Florida, correct?
19    A.  Correct.
20    Q.  When did you arrive in Ohio?
21    A.  Yesterday.
22    Q.  And did you review these messages
23 yesterday?
24    A.  I removed -- I reviewed some.
25    Q.  So you brought them with you to

1 Ohio?
2     A.   I have screen shots on my phone.
3     Q.   Okay. So when I asked you whether
4 you reviewed them on your phone earlier, the
5 answer to that question is yes, you did?
6     A.   It depends what timeline.
7     Q.   What about yesterday?
8     A.   On my phone.
9     Q.   So when I asked you earlier if the
10 messages are on your phone, the answer to that
11 question is yes, they are on your phone?
12     A.   Yes, they are on my phone, yes.
13     Q.   What other documents did you review
14 in preparation for your deposition?
15     A.   Other communications.
16     Q.   What do you mean by other
17 communications?
18     A.   Group, group chat.
19     Q.   What's group chat?
20     A.   On WhatsApp.
21     Q.   What is WhatsApp?
22     A.   It's a communication app.
23     Q.   And who is on that app?
24     A.   At the time Mr. Reitmeier and all
25 the divisional supervisors.

1     Q.   And is this also on your phone?
2     A.   Yes.
3     Q.   Did you review these messages on
4 your phone?
5     A.   Yes, of course.
6     Q.   What other documents did you review
7 in preparation for your deposition today?
8     A.   I think -- I think that's all from
9 what I can recall.
10     Q.   All right. Listen carefully to
11 this next question. Without revealing the
12 content of your communications, did you speak
13 with your attorney, Caryn Groedel, in
14 preparation for this deposition?
15     A.   Yes.
16     Q.   And have you produced all of the
17 WhatsApp messages that you reviewed?
18     A.   Yes.
19     Q.   And are those messages for all of
20 2018?
21     A.   I believe so from what I can
22 recall, yes.
23     Q.   And other than Ms. Groedel, did you
24 speak to anyone else in her office in
25 preparation for this deposition?

1     A.   No.
2     Q.   When did you speak with Ms. Groedel
3 in preparation for your deposition?
4     A.   Yesterday.
5     Q.   And where did you meet with
6 Ms. Groedel?
7     A.   Her home office.
8     Q.   Did you talk to anyone else about
9 having your deposition taken today?
10     A.   Not that I can recall.
11     Q.   You testified a few minutes ago
12 about text messages that you reviewed for
13 purposes of this deposition and WhatsApp
14 messages. What other means did you use in your
15 business communications during the term of your
16 divisional supervisor agreement at issue in
17 this lawsuit?
18     A.   I'm not sure I understand the
19 question.
20     Q.   So you are claiming as part of this
21 lawsuit a breach of contract action relating to
22 your divisional supervisor agreement that you
23 entered into with the defendant, correct?
24     A.   I believe so, yes.
25     Q.   You don't know?

1     A.   I just don't understand what you're
2 saying.
3     Q.   Let's take a step back.
4     A.   Okay.
5     Q.   We're here today because you filed
6 a lawsuit, correct?
7     A.   Correct, yes.
8     Q.   Okay. Why did you bring this
9 lawsuit?
10     A.   Several reasons.
11     Q.   Okay. List them.
12     A.   Breach of contract, retaliation.
13 After I retained an attorney, I was retaliated
14 against and fired.
15     Q.   What else?
16     A.   Retaliation, a second retaliation,
17 a countersuit a year later, approximately a
18 year later, national origin discrimination, and
19 unjust enrichment.
20     Q.   And you entered into a divisional
21 supervisor agreement with the defendants that
22 lasted from approximately 2018 to -- 2010 to
23 2018; is that correct?
24     A.   I believe so, yes.
25     Q.   So my question to you is, during

Page 22

1 the term of that agreement, what was the method
2 by which you would have business
3 communications?
4    A.   Emails, WhatsApp, and texting.
5    Q.   What about phone?
6    A.   Yes, voice call, phone calls, yes.
7    Q.   All right.  Let's start with the
8 phone.  Is this a cellular phone?
9    A.   Whose cellular phone?  I don't
10 understand.
11    Q.   You.  We're talking about you.
12    A.   Okay.
13    Q.   What was your method of
14 communication?
15    A.   Yes.  I used my cell phone, yes.
16    Q.   All right.  And what is that cell
17 phone number?
18    A.   (904) 449-0000.
19    Q.   And is this the same cell phone
20 number that you used throughout the duration of
21 2010 to 2018?
22    A.   Yes.
23    Q.   Is it the phone that is with you
24 today?
25    A.   Yes.

Page 23

1    Q.   Is that the same phone that you've
2 had since 2010?
3    A.   Yes.  Repeat that, please.
4    Q.   Is the phone that's right next to
5 you the same phone that you've had since 2010?
6    A.   No.
7    Q.   What phone did you have in 2010?
8    A.   I don't understand the question.
9    Q.   So what phone is that, what type of
10 phone is that?
11    A.   That's the new iPhone Pro 13.
12    Q.   Right.  So in 2010 what type of
13 phone did you have if you did not have the
14 iPhone Pro 13?
15    A.   I don't recall exactly the model.
16    Q.   How long did you have that phone,
17 from 2010 until when?
18    A.   I don't recall.  I mean, it's hard
19 to answer that question.
20    Q.   Have you had the same cell phone
21 provider from 2010 to 2018?
22    A.   Yes.
23    Q.   And who is that?
24    A.   AT&T.
25    Q.   And when you get your phone

Page 24

1 upgraded, do you purchase that phone through
2 AT&T?
3    A.   Sometimes, yes.
4    Q.   When you purchase a new phone, do
5 you take the existing data information that was
6 on the phone and have all of it transferred to
7 the new phone?
8    A.   Not all the time.
9    Q.   When would you not do that?
10    A.   When there was no data in the Cloud
11 to transfer over.  At one point I didn't make a
12 few payments and lost an account.
13    Q.   When was that?
14    A.   I don't recall.
15    Q.   How long have you had the iPhone
16 Pro 13?
17    A.   When they first -- when that model
18 first came out several months, but I'm not
19 exactly sure what month.
20    Q.   And what phone did you have prior
21 to your current model?
22    A.   An iPhone 10, I believe.
23    Q.   And how long did you have that
24 iPhone 10?
25    A.   Approximately maybe two years.

Page 25

1    Q.   Do you recall what type of phone
2 you had in 2018?
3    A.   No, I don't.  It was an iPhone.
4    Q.   And in 2018 after your divisional
5 supervisor agreement was terminated, did you
6 retain all of the information on that model of
7 phone that was in use in 2018 when your
8 divisional supervisor agreement was terminated?
9    A.   I believe the majority was.
10    Q.   When you say the majority, what
11 does that mean?
12    A.   Sometimes if you lose your phone
13 or, you know, drop it and something happens to
14 it, it's possible to lose information between
15 backups.
16    Q.   Did you have your phone dropped at
17 any point in time from the time your divisional
18 supervisor agreement was terminated in 2018 to
19 the present?
20    A.   I'm just trying to recall.  I know
21 it's definitely happened throughout the last
22 ten years.  I just can't recall when.  But,
23 yes, I've dropped my phone and it's been
24 damaged, or it's on occasion dropped in a pool.
25 One time I was in the river, it fell in the

7 (Pages 22 - 25)

1 river, and sometimes these things happen.
2    Q.    And have you, putting aside any of
3 these accidental things that may or may not
4 have happened to you, have you at any time
5 removed any of the data or information from
6 your devices?
7    A.    No.
8    Q.    And is the iPhone your primary
9 method of communication for business?
10    A.    Yes.
11    Q.    Did you have any other phones that
12 you used during the term of your divisional
13 supervisor agreement?
14    A.    What type of phone?
15    Q.    Other than the cellular phone and
16 number that you provided to me, did you have
17 any other phone lines or phones that you would
18 use for your business?
19    A.    Occasionally.
20    Q.    What do you mean by occasionally?
21    A.    It depends on the year.  It depends
22 on the timeline.  I had office phones.
23    Q.    In 2018 did you have an office
24 phone?
25    A.    Yes.

1    Q.    What was that number?
2    A.    I don't recall.
3    Q.    Where was your office in 2018?
4    A.    It was downtown Jacksonville.
5    Q.    Do you have an address?
6    A.    I can get it.  It was one of those
7 shared offices.
8    Q.    So what do you mean by it was one
9 of those shared offices?
10    A.    Where I rent an office in the
11 building.
12    Q.    And did you have a lease agreement
13 for that rental office space?
14    A.    Yes.
15    Q.    Okay.  And do you still have a copy
16 of that lease agreement for that office space?
17    A.    No, sir.
18    Q.    Where is it?
19    A.    I have no idea.
20    Q.    What were the terms of your lease
21 agreement for that office space in 2018?
22    A.    A monthly payment.
23    Q.    What was the monthly payment?
24    A.    I don't recall exactly.
25    Q.    And where would you have paid that

1 out of?
2    A.    I don't understand.
3    Q.    A checking account?  Savings
4 account?  Business account?
5    A.    A business account.
6    Q.    And who would that payment be made
7 to?
8    A.    To a company I rented the office,
9 the shared office space from.
10    Q.    And what was the name of that
11 company?
12    A.    I don't recall at this moment.
13    Q.    Do you have a means by which to
14 determine who that company was?
15    A.    Yes.
16    Q.    What is that means?
17    A.    Probably Google it.  I know where
18 the location was.
19    Q.    What is the location?
20    A.    Downtown Jacksonville in the -- I'm
21 just trying to recall.  I don't recall at this
22 second, but I'm --
23    Q.    What's -- what is -- define for me
24 the terms of the shared office arrangement.
25    A.    I'd have I can't remember how many

1 square feet, but I have my own office with my
2 own desk and a door that I can close and work
3 similar to the room you had me in earlier.
4    Q.    And how many people shared this
5 office space with you?
6    A.    That space was all mine, that one
7 room.
8    Q.    So you rented one room in an office
9 building?
10    A.    Yes.
11         MS. GROEDEL:  Sorry to interrupt.
12 What's the password and log-in to use your
13 guest WiFi?
14         MR. MORLEY:  We can go off the
15 record.
16         MS. GROEDEL:  Thanks.  I just need
17 to log on.
18         THE VIDEOGRAPHER:  One moment.
19 Going off the record.  The time is 10:38.
20         (Brief recess.)
21         THE VIDEOGRAPHER:  We are back on
22 the record.  The time is 10:40.
23    Q.    Before we took a quick break, we
24 were talking about the office space that you
25 leased in 2018, and I was asking you whether it

8 (Pages 26 - 29)

Page 30

1  was a shared office space, and you said that
2  you had one individual office that was just
3  yours, correct?
4      A.   The office with the door I used was
5  not shared.  That was my office.
6      Q.   So you had an entrance that you
7  could go into and it was your office when you
8  entered the building, or you had to enter the
9  building and then go to a particular office
10 that was just yours?
11     A.   Enter the building and go to a
12 particular office that was just mine.
13     Q.   And did you go to this office every
14 day?
15     A.   No.
16     Q.   How often would you go to this
17 office?
18     A.   As far as I can remember, every day
19 I didn't travel I was the majority of time
20 there.
21     Q.   So how many times a week would you
22 be at this office?
23     A.   I don't recall.
24     Q.   And is this the office where you
25 had an office phone?

Page 31

1      A.   Yes.
2      Q.   And was this an office phone that
3  you paid for?
4      A.   Yes.
5      Q.   And who was the provider?
6      A.   It was included in the lease.
7      Q.   I'm going to ask you to get a copy
8  of that lease for me or at least identify the
9  leasing company at some point in time, okay?
10     A.   Okay.
11     Q.   Other than the cell phone number
12 you provided and this office phone, did you use
13 any other phone in your business dealings
14 during the term of your divisional supervisor
15 agreement?
16     A.   I believe so.
17     Q.   What other phones did you use?
18     A.   I'm just trying to recall.  I used
19 the phone when I was renting space in Ocala.
20     Q.   When was this?
21     A.   I -- I don't recall exactly.
22     Q.   Was this also an office phone?
23     A.   Yes.  I was -- I was forced to work
24 with my admin, and her husband had a
25 distributorship, so I got permission to go

Page 32

1  there, drive two hours from my house to
2  there every day to work.  I was forced to
3  actually.
4      Q.   And who are you referring to?  What
5  is this person's name?
6      A.   This is Jason Ellis and Deshae
7  Ellis.  Deshae was my admin for many years.
8      Q.   When you said you were forced to go
9  there, who forced you to go there?
10     A.   The Kirby Company.
11     Q.   Who in particular at the Kirby
12 Company forced you to go there?
13     A.   It was a Kirby Company policy where
14 you be next -- when you go to your office, you
15 had to be next to your admin, which was
16 confusing because I thought I was a 1099
17 employee.
18     Q.   Was there a written policy that
19 said you had to do this?
20     A.   Yes, sir.
21     Q.   Have you provided a copy of this
22 written policy?
23     A.   Yes, I believe so.
24     Q.   And when did this policy get
25 enacted?

Page 33

1      A.   I believe there was an email sent
2  in 2014 from the president of the Kirby
3  Company.
4      Q.   And who was that?
5      A.   I believe at the time it was Bud
6  Miley.
7      Q.   So just so I'm clear, you're not
8  referring to a written policy.  You're talking
9  about an email, correct?
10     A.   A mandatory, demanding email, yes.
11 It pretty much said if you don't do this, you
12 don't have a job.
13     Q.   That's what the email said?
14     A.   Similar.  Not in those exact words,
15 but that's how everyone took it.
16     Q.   And did the Kirby Company tell you
17 who to hire as an administrative assistant?
18     A.   I don't understand.  Like tell me
19 the exact person, the name of the person?
20     Q.   I'm asking you --
21     A.   Yes.
22     Q.   -- did someone from the Kirby
23 Company tell you who to hire as an
24 administrative assistant, or was that your
25 choice, who to have as an administrative

9 (Pages 30 - 33)

1 assistant?
2     A.   It was my choice.
3     Q.   So my follow-up question to you is,
4 what makes more sense, hiring an administrative
5 assistant who is located by you, or hiring an
6 administrative assistant that's two hours away
7 from you?
8     A.   Well --
9     Q.   Answer my question.
10    A.   Would you repeat it, please?
11    Q.   Sure.  What makes more sense,
12 hiring an administrative assistant that's
13 closer in proximity to you or hiring one that's
14 two hours away?
15    A.   It depends on how you look at it.
16    Q.   So you made the affirmative
17 decision to hire one that was two hours away,
18 correct?
19    A.   She was already working for me.
20    Q.   Yes or no, you made the decision to
21 hire an admin that was two hours away from you?
22    A.   I don't know if I can answer that
23 question clearly.
24    Q.   Who hired her, you or someone else?
25    A.   I did.

1     Q.   Thank you.  And you chose to hire
2 her, and, in fact, you just said you hired her
3 before this decision was made, correct?
4     A.   But at the time I didn't -- we
5 didn't have to work together.  It was
6 following.  I had her working for me for almost
7 three years, and all of a sudden out of nowhere
8 they said, well, you guys have to be right next
9 to each other.
10    Q.   And you chose -- and you chose to
11 continue working with her, correct?  That was
12 your choice?
13    A.   Yes.
14    Q.   Thank you.  And Jason Ellis, he was
15 a factory distributor; is that correct?
16    A.   Yes.
17    Q.   We talked about text messages.  We
18 talked about WhatsApp.  Did you use email as
19 part of your business communications during the
20 term of your divisional supervisor agreement?
21    A.   Yes.
22    Q.   What was your email address?
23    A.   Bmibdivision@gmail.com, and
24 throughout the eight years there might have
25 been another one as well.

1     Q.   You can't recall?
2     A.   Maybe bm -- bmibdiv@gmail.
3     Q.   And Deshae Ellis wasn't just your
4 admin, correct?
5     A.   I don't understand.
6     Q.   Did Deshae Ellis provide admin
7 services to anyone other than you?
8     A.   At which timeline are you asking?
9     Q.   During the timeline in which she
10 was your admin.
11    A.   Possibly sometimes.
12    Q.   Possibly sometimes?
13    A.   Yes.
14    Q.   What does that mean?
15    A.   I believe so, but not -- not the
16 entire term.
17    Q.   Who else was she an admin for?
18 I'll give you an easy one.
19    A.   Oh, Jason Ellis.
20    Q.   Jason Ellis?
21    A.   Yes, yes, yes.  I thought you were
22 referring to supervisors.
23    Q.   What other either FD or DS did
24 Deshae Ellis provide admin services to?
25    A.   I believe she -- she trained some,

1 but -- or, you know, might have helped some
2 other supervisors in certain timelines, but she
3 pretty much worked for me full time.  She --
4     Q.   Go ahead.  Finish your statement.
5 So full time, how many hours a week is full
6 time that she was employed by you?
7     A.   Forty hours.
8     Q.   And how much would you pay her as
9 an employee?
10    A.   I believe from what I could -- best
11 that I could remember, maybe 40,0000 or 45,000
12 a year.
13    Q.   And did you provide her with any
14 benefits as your employee?
15    A.   No.
16    Q.   And the term of your divisional
17 supervisor lasted from 2010 to 2018.  Was she
18 your administrative assistant throughout the
19 entirety of this time frame?
20    A.   No, not the entirety.
21    Q.   From what time frame?
22    A.   I believe up until the end of '17,
23 from what I can remember.
24    Q.   So is it fair to say from 2010
25 until on or around the end of 2017?

Page 38

1    A.   Yes, sir.
2    Q.   Did you hire a new administrative
3 assistant in 2018?
4    A.   That was part of the shared office
5 services.
6    Q.   So you had an admin provided to you
7 by the shared space?
8    A.   Yes, sir.
9    Q.   And who was that person?
10   A.   Oh, lord.  I don't recall exactly
11 her name.  It was a few years back.
12   Q.   And her wages were included in the
13 amount you were paying as part of this lease
14 agreement?
15   A.   Yes.  Correct.
16   Q.   What else was included as part of
17 that lease agreement in 2018?
18   A.   Internet, fax, electric, admin
19 services --
20   Q.   And -- I'm sorry.  Go ahead.
21   A.   -- and a direct line for me, a
22 phone, a phone line.
23   Q.   Is it fair to say, though, that the
24 primary method of communication that you used
25 was that cellular phone that you identified

Page 39

1 earlier?
2    A.   Yes.
3    Q.   What type of electronic device
4 other than your phone did you use during the
5 term of the divisional supervisor agreement?
6    A.   A laptop.
7    Q.   What laptop?  What type of laptop?
8    A.   It's changed.  It's changed
9 throughout the years.
10   Q.   All right.  What -- what type of
11 laptop was it in 2018?
12   A.   I believe it was a PC.
13   Q.   And what was the brand?
14   A.   HP.
15   Q.   And do you know what the model is?
16   A.   No, sir.
17   Q.   Is that laptop currently in use?
18   A.   No.
19   Q.   What did you do with that laptop?
20   A.   Threw it away.
21   Q.   Why did you throw it away?
22   A.   Because PCs are garbage, they
23 didn't last, and I ended up going back to
24 Apple.
25   Q.   Did you save or preserve the data

Page 40

1 that was on that device?
2    A.   No.
3    Q.   When did you throw it away?
4    A.   I think it was like June.
5    Q.   Of what year?
6    A.   May -- I'm trying to remember.  I
7 don't know the exact timeline.  I know that
8 computer didn't last long, and I went right
9 back to Apple.
10   Q.   So are we talking June of '21?
11 June of '20?  What are we talking about?
12   A.   I don't recall.
13   Q.   And then you switched from that to
14 what?
15   A.   An Apple laptop.
16   Q.   A Mac?
17   A.   Yes, sir.
18   Q.   And is that the same version you
19 currently own?
20   A.   Yes, sir.
21   Q.   The same model?
22   A.   The same, same model.
23   Q.   And when did you get that?
24   A.   About a year-and-a-half ago.
25   Q.   Is it fair to say that once you got

Page 41

1 rid of the HP, you immediately replaced it with
2 this Apple Mac?
3    A.   No, I didn't.
4    Q.   How long were you without a
5 computer?
6    A.   Quite a while.  I didn't need a
7 computer.  I had an iPad.
8    Q.   And how long have you had that
9 iPad?
10   A.   Many years.
11   Q.   How many years?
12   A.   If I had to estimate, approximately
13 five, six years.
14   Q.   And you still have that currently,
15 correct?
16   A.   Yes.
17   Q.   And has all of the data and
18 information been preserved on that iPad since
19 the termination of your divisional supervisor
20 agreement in 2018?
21   A.   For the most part.
22   Q.   What do you mean, for the most
23 part?
24   A.   That iPad got replaced once.
25   Q.   And when did it get replaced?

11 (Pages 38 - 41)

Page 42

1     A.    Whenever the -- or approximately
2  when the new iPad Pro came out.  I don't know
3  if it was a year or two years ago.
4     Q.    And did you use your iPad for Kirby
5  business?
6     A.    Yes.
7     Q.    Did you use any other means of
8  business communication during the term of the
9  divisional supervisor agreement other than what
10  we've discussed?
11     A.    Not that I can recall.
12     Q.    What happened to the iPad that you
13  had to replace a year or two ago?
14     A.    I believe it had a cracked screen.
15  My son dropped it, and the screen cracked, so I
16  did an insurance replacement.
17     Q.    And who did you file the claim
18  with?
19     A.    Through AT&T.  I had insurance
20  through them.
21     Q.    Who have you communicated with
22  about this lawsuit?
23     A.    My brother.
24     Q.    Who is your brother?
25     A.    George.

Page 43

1     Q.    George, what is his last name?
2     A.    Sharqawi, S-H-A-R-Q-A-W-I.
3     Q.    And what did you communicate about
4  this lawsuit with George?
5     A.    Just that I was involved in a
6  lawsuit.
7     Q.    Is George someone who has been
8  affiliated with the Kirby Company at any point
9  in time?
10     A.    Yes.
11     Q.    How?
12     A.    As a salesperson, as a dealer.
13     Q.    When?
14     A.    It's been on and off maybe
15  from -- I mean, it's been he's been in and out
16  of the business.
17     Q.    When is the last time that you can
18  recall that he was a dealer?
19     A.    I believe, from what I can
20  remember, maybe 2013.
21     Q.    And which factory distributors did
22  he work or act as a dealer for?
23     A.    Which timeline?
24     Q.    Any -- any that you can recall.
25     A.    Myself.

Page 44

1     Q.    From when to when?
2     A.    Approximately 2005 to 2010, from
3  what I can remember.
4     Q.    And what was the name of your
5  distributorship?
6     A.    Syatt of Jacksonville.
7     Q.    Spell that for me.
8     A.    S-Y-A-T-T of Jax.
9     Q.    And what type of company is that?
10     A.    S corp.
11     Q.    And how did you pay George?
12     A.    How did I pay him?
13     Q.    Was he a 1099?  A W-2?
14     A.    It depends what position he's in.
15     Q.    Well, you said dealer, so how was
16  he paid for that?
17     A.    That, a 1099.
18     Q.    What other roles did he have in
19  Syatt of Jacksonville?
20     A.    DPS.
21     Q.    And how was he paid as a DPS?
22     A.    W-2.
23     Q.    And when was he a DPS?
24     A.    It was a short period.  I can't
25  recall.  Somewhere between '06 and '09

Page 45

1  possibly, 2006 or somewhere around there.  It
2  was just a short period.
3     Q.    Do you know whether he was a dealer
4  for any other FD?
5     A.    Yes.
6     Q.    Who?
7     A.    Jeff Roberts.
8     Q.    Do you know when?
9     A.    I don't recall exactly what year.
10     Q.    Anyone else?
11     A.    Not that I can recall, no.
12     Q.    And how did you communicate with
13  your brother about this lawsuit?
14     A.    In -- in person.
15     Q.    How often?
16     A.    Very rare.
17     Q.    Do you recall when?
18     A.    No, I don't.
19     Q.    Do you recall what you discussed?
20     A.    Our discussion was very brief.
21     Q.    And what -- what was said in that
22  discussion?
23     A.    That I'm in a legal battle with
24  Kirby Company.
25     Q.    Other than your brother, who else

12 (Pages 42 - 45)

Page 46

1 have you communicated with about this lawsuit?
2    A.   I don't recall.  I keep to myself.
3    Q.   So as you sit here today, other
4 than your brother, George, you cannot recall
5 another person who you communicated with about
6 this lawsuit; is that correct?
7    A.   I have talked to --
8         THE VIDEOGRAPHER:  Sir, you just
9 lost your mic.  You bumped into it.  It's down
10 a bit lower.
11        THE WITNESS:  Is that good?
12        THE VIDEOGRAPHER:  Yes.
13    A.   I've talked to Carl.
14    Q.   Carl who?
15    A.   Emert.
16    Q.   When did you talk to Carl?
17    A.   Approximately 60 days ago.
18    Q.   And how did you -- how did you
19 communicate with Carl?
20    A.   In person.  That was in person.
21    Q.   And where was that?
22    A.   In Orange Park, Florida.
23    Q.   I'm sorry?
24    A.   Orange Park, Florida.
25    Q.   And where in Orange Park Florida?

Page 47

1    A.   At my retail store.
2    Q.   And what store is that?
3    A.   Budzburn.
4    Q.   And what type of store is that?
5    A.   It's -- it's a smoke shop.
6    Q.   And how long has Budzburn been in
7 Orange Park, Florida?
8    A.   We -- we opened October of 2021.
9    Q.   And what is the address of that
10 location?
11    A.   1871 Wells Road, Orange -- Suite
12 200, Orange Park, Florida, 32073.
13    Q.   And is the name of the store
14 Budzburn?
15    A.   Yes.
16    Q.   How do you spell that?
17    A.   B-U-D-Z-B-U-R-N.
18    Q.   And do you own that business?
19    A.   Yes.
20    Q.   And what's the company that owns
21 that business?
22    A.   I don't understand.
23    Q.   Is the name of the company
24 Budzburn?
25    A.   Yes.

Page 48

1    Q.   And what type of company is that?
2    A.   S corp.
3    Q.   And when did you incorporate
4 Budzburn?
5    A.   From what I can recall, it was
6 summer or end of the summer of '19.
7    Q.   And does Budzburn have any other
8 locations?
9    A.   No.
10    Q.   And what -- was there a specific
11 reason Carl met with you at that location?
12    A.   He called me prior to that.
13    Q.   And what did he want?
14    A.   He just wanted to say hi to me and
15 see how I was doing.
16    Q.   Where does Carl live?
17    A.   I think somewhere in Ohio, if I
18 recall, he told me.
19    Q.   So he called you because he wanted
20 to see how you had been, and then he ends up
21 visiting you in Florida?
22    A.   He was down there on business.
23    Q.   And what did you and Carl talk
24 about when you met?
25    A.   How he loved my location.

Page 49

1    Q.   What about as it relates to your
2 lawsuit?
3    A.   Not much.  It was very brief.
4    Q.   Well, tell me what you talked
5 about.
6    A.   It's been a long, stressful three
7 years, and I can't believe what happened.
8    Q.   Anything else?
9    A.   We talked about the financial
10 strain it put me in, the emotional stress that
11 I went through.  That's what we talked about.
12    Q.   Does Budzburn do anything else
13 other than operate as a smoke shop?
14    A.   Yes.
15    Q.   What else does it do?
16    A.   On-line store.
17    Q.   What does it sell on line?
18    A.   Budzburn products.  It's our own
19 brand.
20    Q.   What's the web address?
21    A.   Budzburn.com.
22    Q.   All right.  Did you communicate
23 with anyone else about this lawsuit?
24    A.   Tim.
25    Q.   Tim Updegraph?

13 (Pages 46 - 49)

Page 50

1    A.    Yes, sir.
2    Q.    When did you communicate with Tim?
3    A.    A long time ago.  It had to have
4 been at least, and I'm just guessing,
5 approximately a year-and-a-half, two years ago.
6 We haven't talked since then.
7    Q.    And how -- how did you communicate
8 with Tim?
9    A.    On my cell phone.
10   Q.    And what did you discuss?
11   A.    We talked about the hemp business
12 for a little bit.
13   Q.    What about as it relates to this
14 lawsuit?
15   A.    He just told me that he's got a
16 case against Kirby as well.
17   Q.    Were you unaware of this until this
18 conversation?
19   A.    I don't recall.
20   Q.    Did you talk to Tim prior to the
21 last time you just identified for me about this
22 lawsuit?
23   A.    Possibly, yes.
24   Q.    How many times?
25   A.    I don't recall.

Page 51

1    Q.    Other than Carl and Tim and your
2 brother, George, have you communicated with
3 anyone else about this lawsuit?
4    A.    Yes.
5    Q.    Who?
6    A.    Bud Miley.
7    Q.    And when did you communicate with
8 Bud about this lawsuit?
9    A.    Several months ago.
10   Q.    In 2022 or --
11   A.    2022, yes.
12   Q.    Approximately when in 2022?
13   A.    The first quarter.
14   Q.    What did you discuss?
15   A.    Just that my case is still going.
16 I have never discussed details with anyone,
17 specific details, that is.
18   Q.    Other than the people you have
19 already identified, have you communicated with
20 anyone else about this lawsuit?
21   A.    Yes.
22   Q.    Who?
23   A.    Rob Terwilliger.
24   Q.    When did you communicate with Rob
25 about this?

Page 52

1    A.    From what I recall -- you want the
2 last time?
3    Q.    Yes.
4    A.    Right around the approximate
5 timeline that I got fired which -- around that
6 time.
7    Q.    So you're talking about in 2018?
8    A.    Yes.
9    Q.    When your DS agreement was
10 terminated?
11   A.    When I got fired, yes.
12   Q.    When did -- how did you communicate
13 with him?
14   A.    Cell phone.
15   Q.    Call or text?
16   A.    It was a call.
17   Q.    And what was discussed on that
18 call?
19   A.    That he considered -- he was upset
20 at the Kirby Company, and if he was going to
21 get fired, he was going to sue them, too.
22 That's what Rob told me.
23   Q.    When was the last time you spoke to
24 Rob?
25   A.    That was it that I can recall.

Page 53

1    Q.    Do you recall talking to Bud about
2 this lawsuit at any time prior to the last
3 conversation you had in the first quarter of
4 2022?
5    A.    No, I don't.
6    Q.    Have you communicated with anyone
7 else about this lawsuit other than the
8 individuals you've identified?
9    A.    Not that I can recall.
10   Q.    Who is Joyce Conway?
11   A.    My ex-wife.
12   Q.    When did you get divorced?
13   A.    I believe it was sometime in 2014,
14 I believe, from what I remember.
15   Q.    And how long were you married?
16   A.    Approximately two years.
17   Q.    And do you have any kids from this
18 relationship?
19   A.    Yes.
20   Q.    How many?
21   A.    One.
22   Q.    And who is that?
23   A.    My son.
24   Q.    What is your son's name?
25   A.    Noah.

14 (Pages 50 - 53)

Page 54

1    Q.    Sharqawi?
2    A.    Yes, sir.
3    Q.    And how old is Noah?
4    A.    Eleven.
5    Q.    Did you ever communicate with Joyce
6    about this lawsuit?
7    A.    Yes.
8    Q.    When did you communicate with Joyce
9    about this lawsuit?
10    A.    Multiple times.
11    Q.    And what did you discuss with her?
12    A.    How I was being discriminated
13    against, this was before I got fired, and how
14    her friends were being treated different
15    because they are American and white.
16    Q.    Who are her friends?
17    A.    Marcus and Rachael Quinn, best
18    friends. I discussed with her how I was being
19    harassed by the company, how I made complaints
20    and I was ignored, and Marcus was recruiting
21    100 percent of distributors affecting my
22    division, affecting the company, and nothing is
23    being done, but I'm the only one being
24    harassed.
25    Q.    Who was harassing you?

Page 55

1    A.    Kevin Reitmeier.
2    Q.    How was he harassing you?
3    A.    Phone calls, text messages,
4    discriminating comments, being aggressive on
5    the phone with me, being aggressive in person.
6    Q.    Okay.  Tell me -- tell me what
7    comments he made to you.
8    A.    He said -- there was a week that I
9    cancelled my travel, and he was micromanaging
10    me, treating me like an employee, called the
11    distributor, found out I wasn't there, and
12    called all upset asking me why I didn't travel.
13    And I explained to him that my granddaughter
14    had a seizure, and he said, Well, aren't
15    seizures only one or two minutes?
16        I was really upset, and my
17    granddaughter almost died, and if it wasn't for
18    the retired doctor next door, she would have
19    died.  So I cancelled my trip, and my daughter
20    was very upset.  And a few months later when
21    Kevin asked me to resign, I said, Why?  He
22    said, Maybe you want to spend more time with
23    your granddaughter.
24    Q.    So that -- are those the only
25    comments where you say he discriminated against

Page 56

1    you?
2    A.    No.
3    Q.    And when did these comments occur?
4    A.    Throughout the year, throughout
5    2018.
6    Q.    When did your granddaughter have a
7    seizure?
8    A.    Maybe spring.
9    Q.    Spring of?
10    A.    2018.
11    Q.    And what is your granddaughter's
12    name?
13    A.    Ellie.
14    Q.    What is the last name?
15    A.    Sharqawi.
16    Q.    And who -- you said it's your
17    daughter's daughter?
18    A.    Yes.  Yes, sir.
19    Q.    What is your daughter's name?
20    A.    Natalie.
21    Q.    And how old is Ellie?
22    A.    Oh, lord, I think she's five now.
23    Q.    How old is Natalie?
24    A.    Twenty-seven.
25    Q.    Do they live with you?

Page 57

1    A.    No.
2    Q.    Who is the doctor next door?
3    A.    He's a -- he was a doctor for the
4    military.  He's a veteran.
5    Q.    What's his name?
6    A.    I've only met him once.  I don't
7    recall.
8    Q.    Where -- what is the address where
9    your daughter lives?
10    A.    She's moved from there since then,
11    but I can get it for you.  I don't recall the
12    exact address.  At the time she was living
13    there with her boyfriend, but now she's moved
14    out.
15        MS. GROEDEL:  All he asked is do
16    you have the address.
17        MR. MORLEY:  Caryn, he's
18    testifying.
19        MS. GROEDEL:  Okay, I understand,
20    but --
21    Q.    What's the boyfriend's name?
22    A.    Jordan Kelly.
23    Q.    Is Jordan the father of your
24    granddaughter?
25    A.    Yes.

15 (Pages 54 - 57)

Page 58

1    Q.   Other than comments made in
2 relation to that incident, what other comments
3 did Kevin make?  And were those comments, just
4 to be clear, in the spring of 2018?
5    A.   In the summer.
6    Q.   Any other comments that you allege
7 Kevin made?
8    A.   Yes.  I mean, he's asked me if I
9 lent my daughter money, and I told him,
10 Respectfully, it's none of your business.  I
11 didn't know the corporate world controls
12 private people's money.
13    Q.   Any other comments?
14    A.   Yes.  There is many others.  I'm
15 just trying to recall right now.  You know,
16 when he was -- when he was being aggressive
17 with me, I called other supervisors and
18 distributors and asked them if he was calling
19 them questioning them, and they said, no, they
20 hadn't heard from him, and he was being
21 relentless about my -- if I was involved in a
22 CBD store.
23    Q.   Who are you referring to when you
24 say you contacted other supervisors?
25    A.   Other gentlemen you sued.  Marcus

Page 59

1 Quinn, Charlie Nugent, Will Vance, Tony -- I'm
2 trying to remember Tony's last name -- Tony
3 Bryant, Johnny Davis, and there is others.  I
4 just don't recall right now.  But I called all
5 these people and asked them if they were being
6 harassed about being involved in CBD, and they
7 said no.
8    Q.   When did you call them?
9    A.   At different timelines.
10    Q.   And were these individuals FDs or
11 DSs?
12    A.   Factory distributors.
13    Q.   And --
14    A.   And there is --
15    Q.   Hold on.
16    A.   I'm sorry.
17    Q.   And you said you called them at all
18 different times?  I just want to make sure I
19 heard what you said correctly.
20    A.   Yeah.  I didn't -- we didn't do a
21 group call.
22    Q.   And do you have the cell phone
23 numbers for each of these individuals?
24    A.   Yes, I do.
25    Q.   What are they?

Page 60

1    A.   I don't know them offhand, sir.
2    Q.   Are they saved in your phone as a
3 contact?
4    A.   Yes, sir.
5    Q.   All right.  When we get on a break,
6 I'm going to ask you to provide these
7 individuals' contact information to me from
8 your phone.
9         And when do you believe that you
10 first started calling these people?
11    A.   I would say the summer of '18.
12    Q.   Summer of '18?
13    A.   The summer between June and July.
14    Q.   Any other comments that you allege
15 Kevin made to you?
16    A.   Yeah.  When we traveled together
17 the last week of August in my division, we went
18 to see Tony Bryant, Charlie Nugent, and Will
19 and Callie Vance.  After we did our job per
20 Kirby and went to these offices and worked, he
21 would ask me to take him to his hotel room and
22 wanted me to go to these factory distributors'
23 alleged CBD stores, and I told him I felt
24 uncomfortable, and it had nothing to do with my
25 job, and I'm not a private investigator.

Page 61

1         He said, It is part of your job.
2 And I said, Well, I don't want any of these
3 gentlemen to retaliate or try to hurt me
4 physically.
5         And he walked away and did some
6 type of phone call, came back and said, Are you
7 afraid of physical harm?  And I said, Yes.  I
8 said, What if one of these guys get pissed and
9 says what are you doing in my store?  You know,
10 this is not Kirby.  This is my private
11 business.  And Kevin insisted that I kept on
12 going there.
13    Q.   So that's --
14    A.   And I asked him, I told him, I'm
15 going to call Mr. Lamb and complain.  I said, I
16 don't feel comfortable doing this.  Please,
17 don't make me do it, and as I thought I was a
18 1099, too, and I shouldn't be forced to do
19 things.
20    Q.   Did you go?
21    A.   I wouldn't go to Charlie's.  I know
22 Charlie.  I definitely fear him.  I know he
23 would try to fight, physically fight me.  I
24 refused to do that.  He ended up talking me
25 into driving by -- I wouldn't go inside, but he

16 (Pages 58 - 61)

1 had me drive by Tony Bryant's store.
2        And I'm like, Why don't you come
3 with me? He's like, Just drop me off at my
4 hotel. It was very weird and very
5 uncomfortable.
6        So I drove by there, and then I had
7 to come back and tell him, No, I didn't see
8 Tony in there. Then he wanted me to go to
9 Will's store, and I didn't. I refused. I was
10 afraid. I was afraid these guys might
11 retaliate and hurt me.
12    Q.   All right. So is it fair to say
13 that you didn't go into any of these
14 individuals' stores; Marcus Quinn, Charlie
15 Nugent, Will Vance, Tony Bryant, and Johnny
16 Davis; is that correct?
17    A.   That week, correct. I didn't walk
18 in there that week, correct.
19    Q.   Did you walk in there at any other
20 point in time?
21    A.   Yes.
22    Q.   When?
23    A.   I think it was previous to that I
24 walked into Will and Callie Vance's store. I
25 believe it might have been June or July. They

1 were showing me their CBD store which I
2 reported to Mr. Reitmeier. I mean, I reported
3 a lot of people in the CBD business to
4 Mr. Reitmeier. Apparently it wasn't important.
5    Q.   So after this August 2018 -- after
6 August 2018 when you allege Kevin wanted you to
7 go into these FDs' CBD stores, you never did,
8 correct?
9    A.   I didn't physically walk in there,
10 no.
11    Q.   Well, what did you do?
12    A.   Drove by.
13    Q.   You just drove by Will's -- or
14 Tony's. Sorry.
15    A.   I drove by Tony's, drove by Will's,
16 never went anywhere near Charlie's, but never
17 walked into any of them that week.
18    Q.   So you're alleging that Kevin told
19 you to go into these stores, correct?
20    A.   He 100 percent told me to go into
21 the stores, yes.
22    Q.   And you didn't, correct?
23    A.   No. I was afraid. It wasn't part
24 of my job duties.
25    Q.   Did Kevin make any other comments

1 to you?
2    A.   Yes.
3    Q.   What?
4    A.   After that my mom, she was
5 diagnosed or sometime that year she was
6 diagnosed with leukemia, and at the end of
7 August, she was going to visit family in LA.
8 Since she lives in Toronto, Canada, and I work
9 80, 100 hours a week in Kirby, she asked me if
10 I can -- since she was going to see her brother
11 up there, asked if I can fly out there and see
12 her. She was going through chemo.
13        So I went out there in the
14 last -- I submitted the text messages of what
15 Kevin said. But in the last few days in
16 August, I was working trying to get the orders
17 in. He says, What the hell are you doing in
18 LA? I said, well, and I explained to him the
19 situation with my mother.
20        And he says, Well, did you really
21 need to go out there? I said, Well, Kevin, I
22 can work on my phone and get the orders in.
23 And he started harassing me and putting me down
24 for going out there to visit my mom.
25        I'm like, It's the weekend. Why

1 can't I come out here? What's the big deal?
2 Oh, you should travel more often. You should
3 work more often. I'm like, Kevin, you call me
4 at 7:00 in the morning and at 10:00 at night.
5 What do you want from me. You made me feel
6 like you didn't care about my daughter or my
7 granddaughter having a seizure, and my mom is
8 dying and he's telling me to travel more? And
9 I thought I was a 1099 employee, but I was
10 treated like an employee. It was terrible.
11    Q.   And he communicated this to you,
12 you said, in a text message?
13    A.   Not all of it in a text message,
14 not everything I just said, no.
15    Q.   What is your mom's name?
16    A.   Nina.
17    Q.   Sharqawi?
18    A.   Yes, sir.
19    Q.   Any other comments that you allege
20 Kevin made to you?
21    A.   No, but Rob Terwilliger did.
22    Q.   Rob Terwilliger made comments to
23 you?
24    A.   Yes, sir.
25    Q.   And is Rob affiliated with Kirby?

Page 66

1    A.    At the time he was a divisional
2  supervisor, one of my peers.
3    Q.    And what comments did he make to
4  you?
5    A.    It was in the -- from what I can
6  recall, it was at the supervisor meeting.  I
7  believe it was July of 2018 from what I can
8  recall.  And right after the supervisor meeting
9  was over, he pulled me aside and said, You
10 better watch out.  You better watch your back.
11   Q.    Where was this supervisor meeting?
12   A.    They are always in Cleveland.  I
13 can't recall the hotel, but it was a hotel in
14 Cleveland.
15   Q.    And did he say to you why you
16 allegedly needed to watch your back?
17   A.    He said, They are coming after you.
18   Q.    Who?
19   A.    I asked.  I said, Who is coming
20 after me?  He said, They are coming after you.
21 You better watch your back.
22   Q.    And did he go on?
23   A.    He said, You're involved in your
24 CBD store; aren't you?  I said, Yes.  He said,
25 You better watch your back.  I said, I'm not

Page 67

1  worried about it because there is about 100
2  other people that have stores, so I don't see
3  what you're talking about.  He said, I was
4  telling you as a friend you better watch your
5  back.
6        I left that meeting, and I called
7  David Lamb that night.
8    Q.    What was the name of your CBD
9  store?
10   A.    CBD American Shaman.
11   Q.    And when did you open that store?
12   A.    I don't recall the exact date.
13   Q.    Prior to July of 2018, though?
14   A.    Yes.
15   Q.    And what was the name of the
16 company that operated that store?
17   A.    Nln Enterprises.
18   Q.    Was that another S corp?
19   A.    Yes.  An S corp, yes, sir.
20   Q.    And how many stores did you have
21 for CBD American Shaman?
22   A.    One.
23   Q.    Where was that store located?
24   A.    Orange Park, Florida.
25   Q.    And what was the address?

Page 68

1    A.    1871 Wells Road, Suite 100.
2    Q.    And did you lease the office space
3  there, or did you own it?
4    A.    Lease.
5    Q.    And who was your landlord?
6    A.    MPI; MPI Orange Park, Inc.
7    Q.    And do you have a copy of that
8  lease agreement?
9    A.    No.
10   Q.    How long did you lease that office
11 space for?
12   A.    Three years.
13   Q.    When did that lease expire?
14   A.    A little over a year ago.
15   Q.    So is it fair to say that you
16 leased that space from approximately 2018 to
17 2021?
18   A.    Yes.
19   Q.    And was it an office or a store or
20 both?
21   A.    I don't understand the question.
22   Q.    So we were talking earlier about
23 how you had a shared office space where you
24 would just walk in and you had your own
25 individual office.

Page 69

1    A.    Yes.
2    Q.    So is this an office like that, or
3  is it a storefront?
4    A.    No.  It's a retail store.
5    Q.    A retail store?
6    A.    A retail store, yeah.
7    Q.    Like in a strip mall-type setting?
8    A.    Yes, yeah, yeah.
9    Q.    And going back to your conversation
10 with Rob, did he at any point in time during
11 that conversation identify to you who allegedly
12 was coming after you?
13   A.    He wasn't clear.  He wouldn't be
14 clear.
15   Q.    And when did Nln Enterprises get
16 incorporated?
17   A.    I don't recall exactly.
18   Q.    Was it prior to 2018?
19   A.    No, I don't believe so.
20   Q.    Sometime in 2018?
21   A.    I believe so, yes.
22   Q.    Anyone -- oh, sorry.  All right.
23 So other than the comments you allege Kevin
24 made to you and the comment you allege Rob made
25 to you after that DS meeting in Cleveland in

18 (Pages 66 - 69)

Page 70

1 July of 2018, any other comments that you can
2 think of that Kevin made or anyone else relayed
3 to you?
4    A.  Yes.
5    Q.  Okay.  Tell me about those.
6    A.  It was in Cleveland.  We were at
7 the nice steakhouse restaurant right across the
8 street from the airport.
9    Q.  When was this?  I'm sorry.
10    A.  I'm trying to recall the year.  It
11 was the year where the company, instead of
12 doing one supervisor meeting, they would do two
13 or three.  They separated us.  So they would do
14 like three supervisor meetings for three
15 separate groups.  It was that year.  So I
16 don't -- I can't recall if it was '16 or '17.
17        But we were at dinner, and I know
18 Halle in the room, and the president at the
19 time called me a Paki.  He said, Abe is fine.
20 Just don't call him a Paki.  He gets really
21 upset.  And I did get upset.
22    Q.  Who -- who made that comment?
23    A.  Bud Miley.  I remember looking at
24 Halle and just feeling horrible.  I said, I'm
25 I'm Palestinian.  I'm not Pakistinian [sic].

Page 71

1    Q.  And did you do anything after that
2 comment was made?
3    A.  No.  I was scared.  I'm a very
4 loyal person.
5    Q.  You were scared of Bud Miley?
6    A.  I just --
7    Q.  Yes or no, were you scared of Bud
8 Miley?
9    A.  I was scared to make a complaint.
10    Q.  Because you were scared of Bud
11 Miley?
12    A.  I was -- I feared what would happen
13 if I made a complaint.
14    Q.  And you feared what would happen,
15 meaning you were concerned if you made a
16 complaint that Bud would terminate your DS
17 agreement?
18    A.  I don't know what would happen.  I
19 just was a loyal person, and I kind of put my
20 tail between my legs and went home --
21    Q.  I understand that --
22    A.  -- you know.
23    Q.  -- but I'm trying to -- you're
24 saying that Bud Miley made this comment, and
25 you were scared.  So I asked you were you

Page 72

1 scared of Bud Miley, the person who made the
2 comment, and you didn't really answer that
3 question.  So were you scared of Bud Miley, the
4 person who you allege made this comment about
5 you, or were you not scared of him?
6    A.  I'm not scared of him.
7    Q.  Were you scared of what Bud would
8 do if you said something about the comment you
9 allege he made?
10    A.  I was scared what might have
11 happened.  I was scared of losing my position
12 with the company.  That's what I was scared of.
13    Q.  And by saying this, and you tell me
14 if I'm wrong here, was your alleged fear that
15 Bud would terminate your DS agreement?
16    A.  I didn't know what would happen.  I
17 can't speculate on it.
18    Q.  Well, what else could happen that
19 would be bad?
20    A.  I don't know.  I didn't want to
21 find out.
22    Q.  Do you not get along with Bud
23 Miley?
24    A.  I got along what everybody that
25 worked for the company.  I was a loyal team

Page 73

1 player.
2    Q.  Would you consider yourself a
3 friend of Bud Miley's?
4    A.  No.
5    Q.  Do you not like Bud?
6    A.  Once you get -- I'm a very easy
7 person.  I like everybody, especially when it
8 comes to business and work.  You can ask
9 anybody.  I get along with everyone.  I'm a
10 loyal person, a hard worker.
11    Q.  So did you get along with Bud or
12 not?
13    A.  Yeah.  I get along with everybody.
14 Yes.
15    Q.  Do you not trust Bud?  Yes or no,
16 do you trust Bud Miley or not?
17    A.  I don't know.  I don't know how I
18 feel about that.
19    Q.  Well, that's why I'm asking you.
20    A.  And I don't know.
21    Q.  So why don't you know?  It's either
22 you trust him or you don't trust him.
23    A.  I probably -- you know, I don't
24 know.  At one point I -- I trusted everybody.
25    Q.  Okay.  Do you have a reason not to

19 (Pages 70 - 73)

Page 74

1 trust him?
2    A.   No.
3    Q.   What was your relationship like or
4 what is your relationship like with Bud?  You
5 said you just talked to him a few months ago.
6    A.   Yes.
7    Q.   So do you have a good relationship
8 with him?
9    A.   I've never had a personal
10 relationship with him, never had -- asides from
11 work.  I've never been to his house, never went
12 on vacation with him.  He was never a friend.
13    Q.   Did Bud ever make any other
14 comments about you that you recall?
15    A.   Yes.
16    Q.   What?
17    A.   We were in a supervisor meeting
18 with everyone this time in Cleveland.
19    Q.   Do you recall when?
20    A.   No, sir, but I know it was one of
21 the big meetings.  International was there,
22 domestic supervisors were there, Bob McBride
23 was there, Mike Nichols, Bud Miley.  And Bud
24 was using a laser pointer, which he did many
25 times to point at his PowerPoint in the

Page 75

1 meeting, and he put the laser dot on my head.
2    Q.   And?
3    A.   And said, Abe gets really pissed
4 off when you call him a Paki.
5    Q.   This was a different time than
6 the --
7    A.   A different meeting, a different
8 time.  After this question, can we take a
9 little break?
10    Q.   I just have one quick question, and
11 then we can take a break.
12    A.   Sure.
13    Q.   Did Kevin Reitmeier ever call you a
14 Paki or make any comments similar in nature to
15 what you're alleging Bud did?
16    A.   No.  It was worse.
17    Q.   It was worse?
18    A.   Yeah.
19    Q.   What did Kevin say?
20    A.   He didn't have to say it.  It was
21 the way he treated me.
22    Q.   Okay.  But my -- my question was,
23 did Kevin Reitmeier make any comments to you
24 about being a Paki or anything else similar in
25 nature to what Bud said to you?

Page 76

1    A.   Not that I can recall.
2        MR. MORLEY:  All right.  We can
3 take a break.
4        THE VIDEOGRAPHER:  We're going off
5 the record.  The time is 11:43.  This is the
6 end of media unit number one.
7        (Brief recess.)
8        THE VIDEOGRAPHER:  We are back on
9 the record.  The time is 12:07.
10    Q.   When did you first contact an
11 attorney regarding the claims in your lawsuit?
12    A.   I don't -- I don't recall the exact
13 date.
14    Q.   Do you recall who you contacted?
15    A.   Caryn.
16    Q.   Did you ever contact anyone else
17 other than Caryn?
18    A.   No.
19    Q.   And how did you go about finding
20 Caryn as your attorney?
21    A.   Google.
22    Q.   And when did you retain Caryn as
23 your attorney?
24    A.   Retain her?  I don't know the exact
25 day I retained her.  I don't recall the exact

Page 77

1 day.
2    Q.   Do you recall what you entered into
3 Google when you were looking for an attorney?
4    A.   Not exactly.  Maybe top employment
5 lawyer.
6    Q.   Have you recommended Caryn to
7 anyone else?
8    A.   Yes.
9    Q.   Who have you recommended Caryn to?
10    A.   It was Tim.
11    Q.   And when did you recommend Tim to
12 Caryn?
13    A.   I don't recall.  He called me and
14 asked me who my attorney is.
15    Q.   And you don't recall when he called
16 you?
17    A.   Not exactly, no, sir.
18    Q.   Do you know why he called you
19 asking for a recommendation for an attorney?
20    A.   I don't recall.  He told me he was
21 having some issues.
22    Q.   And what issues did he say he was
23 having?
24    A.   Just with regard to some issues
25 with the Kirby Company.  What is your lawyer's

20 (Pages 74 - 77)

Page 78

1  name?  I gave him Caryn's name.
2      Q.   Do you know if Tim filed a lawsuit
3  against Kirby Company?
4      A.   I believe he has.
5      Q.   How do you know that?
6      A.   He told me.
7      Q.   When did he tell you that?
8      A.   Sometime after I gave him Caryn's
9  name.
10     Q.   And what did he say was the reason
11 for his lawsuit?
12     A.   Misclassification.
13     Q.   And what does that mean?
14     A.   What's that mean?
15     Q.   Yes.
16     A.   Being paid as a subcontractor when
17 he should have been -- when he was treated as
18 an employee.  That's what I believe it means.
19 employee.  That's what I believe it means.
20     Q.   Any other reason he identified to
21 you why he filed a lawsuit against Kirby
22 Company?
23     A.   No, sir, not to me.
24     Q.   Was his -- was he also a divisional
25 supervisor?

Page 79

1      A.   Yes.
2      Q.   Was his divisional supervisor
3  agreement also terminated by the Kirby Company?
4      A.   I don't know.  I didn't discuss it
5  with him.
6      Q.   And as a divisional supervisor, he
7  had the same role as you did, correct?
8      A.   Yes.
9      Q.   Other than this lawsuit, have you
10 been involved in any other legal matters?
11     A.   No.
12     Q.   You've never been involved in any
13 criminal matters?
14     MS. GROEDEL:  Objection.
15     Q.   You can answer.
16     MS. GROEDEL:  Criminal matters
17 within the last ten years that involve fraud or
18 dishonesty.
19     A.   No.
20     MR. MORLEY:  No, that is not the
21 question.
22     MS. GROEDEL:  Yeah, that's what
23 it's limited to, and that's what I'm
24 instructing him to answer.
25     A.   The answer would be no.

Page 80

1      Q.   Have you ever been arrested?
2      MS. GROEDEL:  The same limitation.
3      A.   No.
4      Q.   Have you ever been deposed as a
5  witness other than your current deposition?
6      A.   Yes.
7      Q.   And what was that in relation to?
8      A.   Divorce.
9      Q.   And when was that?
10     A.   When Joyce Conway and I got
11 divorced, I believe the divorce was final
12 sometime in 2014, but I don't recall when the
13 deposition was taken.
14     Q.   Were you ever involved in any other
15 civil litigation matters?
16     A.   Not that I can recall.
17     Q.   Have you ever filed for bankruptcy?
18     A.   Yes.
19     Q.   Isn't that a civil litigation
20 matter?
21     A.   I didn't -- I don't understand
22 that.
23     Q.   When was the bankruptcy?
24     A.   I believe it was the first quarter
25 of 2016, I think.

Page 81

1      Q.   And when did the bankruptcy wrap
2  up?
3      A.   Shortly -- I don't know.  Just
4  shortly after.  I can't remember.
5      Q.   In 2016?
6      A.   The same year, yes, sir.
7      Q.   Were you represented by an attorney
8  in that bankruptcy?
9      A.   Yes, I was.
10     Q.   Who was your attorney?
11     A.   I don't recall her name.  It was a
12 female in Jacksonville.
13     Q.   And you filed this in Florida?
14     A.   Yes, sir.
15     Q.   And what type of bankruptcy was it?
16     A.   A Chapter 7.
17     Q.   And were you filing as an
18 individual, or were you filing with someone
19 else in that bankruptcy filing?
20     A.   Individual.
21     Q.   What is your Social Security
22 number?
23     MS. GROEDEL:  He doesn't have to
24 report -- saying that right here on the record
25 in front of all these people.  You don't have

21 (Pages 78 - 81)

Page 82

1 to tell him.
2      MR. MORLEY:  I can take it off the
3 record.  That's fine.
4      THE VIDEOGRAPHER:  Going off the
5 record.  We're off the record.
6      (Discussion off record.)
7      THE VIDEOGRAPHER:  Back on the
8 record.  The time is 12:15.
9   Q.   What is your date of birth?
10  A.   April 30th, '71.
11  Q.   Where were you born?
12  A.   Israel.
13  Q.   Where in Israel?
14  A.   I don't know.
15  Q.   And what is your national origin?
16  A.   Israeli, Palestinian.
17  Q.   And is Ibrahim Sharqawi your full
18 name?
19  A.   It is.
20  Q.   Have you ever gone by any other
21 names?
22  A.   Abe.
23  Q.   Are there different ways to spell
24 your name?
25  A.   The proper spelling of my first

Page 83

1 name is I-B-R-A-H-I-M.  The last name is
2 S-H-A-R-Q-A-W-I.
3   Q.   Did you attend high school?
4   A.   Yes.
5   Q.   Where did you go to high school?
6   A.   Runnymede High in Toronto, Canada.
7   Q.   Did you graduate?
8   A.   No.
9   Q.   When did you stop going to high
10 school?
11  A.   The last year of high school, the
12 grade 12.
13  Q.   And what year approximately was
14 that?
15  A.   Oh, lord.  Maybe approximately
16 1990.
17  Q.   Are you currently married?
18  A.   No.
19  Q.   Joyce Conway is your ex-wife; is
20 that correct?
21  A.   Yes, sir.
22  Q.   Were you married to anyone else
23 before Joyce?
24  A.   Yes.
25  Q.   Who was that?

Page 84

1   A.   Denise Keegan.
2   Q.   How do you spell the last name?
3   A.   K-E-E-G-A-N.
4   Q.   When were you married to Denise
5 Keegan?
6   A.   I believe from what I can -- the
7 best I can recall is 1994 to maybe '98.
8   Q.   And did you have any children with
9 Denise?
10  A.   Yes.
11  Q.   And who are those children?
12  A.   Natalie.
13  Q.   Other than Denise and Joyce, have
14 you been married to anyone else?
15  A.   No.
16  Q.   What about domestic partnerships?
17  A.   Yes.
18  Q.   And who is that?
19  A.   Please define domestic partnership.
20  Q.   Are you living with someone
21 currently --
22  A.   No.
23  Q.   -- that you're not married to?
24 Have you lived in the past with someone who you
25 did not marry?

Page 85

1   A.   Yes, sir.
2   Q.   Okay.  And did you have any kids
3 with that person?
4   A.   Yes.
5   Q.   Who is that person?
6   A.   Amber.  She's got -- she's married
7 now.  Which last name do you want?
8   Q.   I'll take both.  What was her last
9 name when you had children together?
10  A.   Amber Suthpin.  I think it's S-U --
11 I believe it's S-U-T-H-P-I-N, and she's married
12 now, and her married name is Hysler,
13 H-Y-S-L-E-R.
14  Q.   And how many children did you have
15 with Amber?
16  A.   One.
17  Q.   Who is that?
18  A.   Layla.
19  Q.   How do you spell Layla?
20  A.   L-A-Y-L-A.
21  Q.   How old is Layla?
22  A.   Sixteen.
23  Q.   Does Layla live with you or Amber?
24  A.   Amber.
25  Q.   And where does Amber live?

22 (Pages 82 - 85)

Page 86

1    A.   A half mile from my house.
2    Q.   What's the address?
3    A.   I think when you drive there all
4 the time you don't remember the address. I
5 think it's 415 Heathcliff maybe, Orange Park.
6 Heartcliff? I can get it for you.
7    Q.   What is your current address?
8    A.   539 Longmill Lane, Orange Park,
9 Florida, 32065.
10   Q.   And does your son live with Joyce
11 or with you?
12   A.   Joyce.
13   Q.   Where does Joyce live?
14   A.   She's in the process of moving, but
15 she's at 315 Rivercliff, one word, Rivercliff,
16 St. Augustine, Florida, but she's in the
17 process of moving, and so is Amber. They are
18 both just buying houses. They haven't
19 physically moved yet, but in the next several
20 weeks.
21   Q.   And is Joyce staying in the
22 St. Augustine area?
23   A.   She's staying. Yes, she's
24 remaining in that area, yes.
25   Q.   And is Amber remaining in the

Page 87

1 Orange Park area?
2    A.   Yes, sir, she is.
3    Q.   Have you or a business you owned or
4 operated ever employed any of these women?
5    A.   Yes.
6    Q.   Which, which woman and which
7 business?
8    A.   Both, both women. So --
9    Q.   So -- go ahead.
10   A.   Joyce worked in my factory
11 distributorship for approximately six months.
12   Q.   What was the name of that one? I'm
13 sorry.
14   A.   Joyce Conway.
15   Q.   No. What was the name of that?
16   A.   Distributorship?
17   Q.   Yes.
18   A.   I believe it was the -- I believe
19 it was the Syatt.
20   Q.   Oh, Syatt.
21   A.   Syatt of Jax, yeah. The Syatt of
22 Jax, that was my distributorship.
23   Q.   She worked for six months. What
24 was she doing?
25   A.   Admin work.

Page 88

1    Q.   Did she ever work for any other
2 business of yours?
3    A.   No.
4    Q.   Just to be clear, Denise Keegan,
5 she never worked with you?
6    A.   Never.
7    Q.   Going back to Amber, which business
8 did she work for of yours?
9    A.   Same, Syatt of Jax.
10   Q.   And what did she do?
11   A.   Some office work.
12   Q.   Like similar to --
13   A.   Joyce.
14   Q.   -- Joyce?
15   A.   Yes, sir.
16   Q.   And how long did she work there?
17   A.   A short while, just a temporary few
18 months, and then she got a job in a short
19 while.
20   Q.   And did you pay Joyce when she was
21 working for you for Syatt?
22   A.   Yes, of course.
23   Q.   And Amber as well?
24   A.   Yes.
25   Q.   Other than Amber and Joyce working

Page 89

1 in administrative roles for Syatt of
2 Jacksonville, did you own any business entities
3 with either one?
4    A.   No, never.
5    Q.   And did you pay them as 1099 or as
6 W-2 employees?
7    A.   W-2.
8    Q.   Have any of your children ever
9 worked for you?
10   A.   In Kirby?
11   Q.   At anything.
12   A.   Yes.
13   Q.   Okay. Who?
14   A.   Natalie.
15   Q.   And what did she -- which business
16 did she work for you?
17   A.   Nln Enterprises.
18   Q.   And did you pay her as a W-2
19 employee or 1099?
20   A.   W-2.
21   Q.   Did Natalie ever work for you when
22 you owned Syatt of Jacksonville?
23   A.   She was just a baby --
24   Q.   Okay.
25   A.   -- so no.

23 (Pages 86 - 89)

Page 90

1   Q.   Any other businesses you owned that
2  contracted with Kirby where Natalie worked for
3  you?
4   A.   Never.
5   Q.   Do you have any stepchildren?
6   A.   Please, explain that.
7   Q.   I don't know.  Do you -- did
8  you -- in your relationships with these other
9  women, did they have children from someone else
10  who you would consider yourself like a
11  stepfather figure?
12   A.   No, sir.
13   Q.   And I know you identified the one
14  granddaughter.  Do you have any other
15  grandchildren?
16   A.   No, sir.
17   Q.   And I know you referred to your
18  mother earlier.  Is she still alive?
19   A.   Yes.
20   Q.   And where does she live?
21   A.   Toronto, Canada.
22   Q.   And did your mom ever work for any
23  business that you owned or operated?
24   A.   Never.
25   Q.   Did you mom ever have an ownership

Page 91

1  interest in any business that you owned or
2  operated?
3   A.   No.
4   Q.   Is your father still alive?
5   A.   Yes.
6   Q.   And what is your father's name?
7   A.   Jack.
8   Q.   Sharqawi?
9   A.   Yes, sir.
10   Q.   And where does he live?
11   A.   Toronto, Canada.
12   Q.   Is he still married to your mom?
13   A.   Yes.
14   Q.   And did your father ever work for
15  any business you owned or operated?
16   A.   Never.
17   Q.   Did you ever work for a business
18  your father owned or operated?
19   A.   No.
20   Q.   Has your father ever been involved
21  as an owner in any business you've owned or
22  operated?
23   A.   No, never.
24   Q.   I know you identified your brother
25  earlier, George.

Page 92

1   A.   Yes.
2   Q.   Do you have any other siblings?
3   A.   Yes.
4   Q.   Who are those individuals?
5   A.   Tammy.
6   Q.   And how old is Tammy?
7   A.   Oh, man tough, question.  Can you
8  start with Rula.
9   Q.   Sure.
10   A.   Rula is 49.  She's my sister, Rula,
11  R-U-L-A.
12   Q.   Okay.
13   A.   And Tammy is probably, and I'm just
14  guessing, she would kill me if she was here,
15  42.
16   Q.   What about George?  I don't think I
17  asked you that before.
18   A.   Just turned 37, I believe.
19   Q.   And have you employed Rula or Tammy
20  in any of your businesses?
21   A.   Never.
22   Q.   Do Rula or Tammy have any ownership
23  interest in any of your businesses?
24   A.   No.
25   Q.   And I think we covered this before

Page 93

1  with George, but I just want to make sure I
2  didn't miss it.  Does George have any ownership
3  interest in any of your businesses?
4   A.   No, sir.
5   Q.   Are there any other family members,
6  whether by blood or marriage, who have any
7  ownership interest in any of your businesses?
8   A.   No, not at all.
9   Q.   Any others who worked for you other
10  that Natalie?  I know George.
11   A.   You mean family?
12   Q.   Yes.
13   A.   No.  They didn't want to.
14   Q.   So I just want to go over where you
15  lived during the term of your divisional
16  supervisor agreement.  So starting in 2010, do
17  you recall where you lived in 2010?
18   A.   Yes.
19   Q.   And where did you live?
20   A.   In Fleming Island.
21   Q.   Do you have an address there?
22   A.   307 Oak Drive South.
23   Q.   And who did you -- is that a home
24  or a condo?
25   A.   A home.

24 (Pages 90 - 93)

Page 94

1     Q.    And did you own that home or rent
2  it?
3     A.    Owned at the time.
4     Q.    Did you own it with anyone else?
5     A.    Nope.
6     Q.    Did you live there with anyone else
7  in 2010?
8     A.    Yes.
9     Q.    Who did you live there with?
10    A.    Joyce.
11    Q.    And did any children live with you
12  in that home in 2010?
13    A.    Yes.
14    Q.    Who?
15    A.    Well, my son was born in 2011, so
16  not in 2010.  Sorry.
17    Q.    That's okay.  And did you operate
18  any businesses out of this 307 Oak Drive,
19  Fleming Island, address?
20    A.    I did.
21    Q.    And what business did you operate
22  out of there?
23    A.    I was a supervisor.
24    Q.    This is the Jax business?
25    A.    I think, from what I recall, when I

Page 95

1  became a supervisor, that's when my corporation
2  turned into BMIB Division, Inc.  I had a home
3  office.
4     Q.    And when you started these
5  businesses, did you have any help in creating
6  the businesses?
7     A.    I don't understand.
8     Q.    Did you -- did you file
9  paperwork -- this is all in Florida, correct?
10    A.    Florida, yes, sir.
11    Q.    So did you have to file paperwork
12  with the State of Florida to operate a business
13  there?
14    A.    Yes.
15    Q.    And did you have someone help you
16  set up your businesses?
17    A.    A CPA.
18    Q.    And do you know who that person is?
19    A.    Yes.
20    Q.    Who is that person?
21    A.    Don Biroschik.  I don't know how to
22  spell it, but he's -- he's my CPA.
23    Q.    And has he been your CPA for a long
24  time?
25    A.    Yes.

Page 96

1     Q.    Was he your CPA prior to 2010?
2     A.    Yes.
3     Q.    And he assisted you with setting up
4  the business?
5     A.    Yes.
6     Q.    And did he assist you in
7  determining how to structure the business?
8     A.    Please, explain.
9     Q.    Meaning I think you had testified
10  earlier that, and I apologize if I'm wrong
11  about this, but I thought every business I
12  asked you about you said it was an S corp; is
13  that correct?
14    A.    Correct.
15    Q.    And did he help you set it up as an
16  S corp?
17    A.    Yes.
18    Q.    And in 2010 when you were working
19  out of your home office, were any employees
20  physically working from that address other than
21  you?
22    A.    No.
23    Q.    Who -- who else was working for you
24  in 2010?
25    A.    Deshae, Deshae Ellis.

Page 97

1     Q.    Just Deshae?
2     A.    Just Deshae, yes, sir.
3     Q.    All right.  Fast forward to 2011.
4  Are you still living in the same Oak Drive
5  address?
6     A.    Yes.
7     Q.    And are you still working out of
8  that as your home office?
9     A.    Yes, sir.
10    Q.    And are you the only employee in
11  that location?
12    A.    Myself and Deshae.
13    Q.    Was Deshae physically at that
14  location in 2011, or you're just saying she was
15  the only employee in 2011?
16    A.    She was not in that location, just
17  the only -- only employee asides from me.
18    Q.    And in 2012 were you still at the
19  Oak Drive address?
20    A.    Yes.
21    Q.    And I should have asked this when I
22  was discussing 2011, but I think you said your
23  son was born in 2011.
24    A.    Yes.
25    Q.    So in 2011 and 2012, it was you,

25 (Pages 94 - 97)

Page 98

1 Joyce, and your son living at that location?
2     A.   Correct.
3     Q.   No one else?
4     A.   There might have been my brother
5 for like a couple months when he was moving to
6 a new place.
7     Q.   Was this -- I'm sorry.  Was this
8 2011 or 2012?
9     A.   From what I recall, I believe it
10 was 2012 just for maybe two months.
11     Q.   And were you the only person
12 working out of that home address at that time?
13     A.   Yes.
14     Q.   And Deshae was --
15     A.   Remotely.
16     Q.   -- remotely the only other
17 employee?
18     A.   Yes.
19     Q.   What about in 2013, were you still
20 living at the Oak Drive address?
21     A.   Yes.
22     Q.   And were you working out of that
23 Oak Drive address in 2013?
24     A.   I believe so, yes.
25     Q.   And was just Deshae the only other

Page 99

1 employee in 2013?
2     A.   Yes, sir.
3     Q.   And she was working remotely as
4 well, correct?
5     A.   Correct.
6     Q.   In 2014 were you still living at
7 the Oak Drive address?
8     A.   Yes, sir.
9     Q.   And I should have asked this
10 before, but I -- I didn't.  During the time
11 frame we've covered, 2010 to 2014, did you own
12 any other property, either commercial or
13 residential?
14     A.   No.
15     Q.   And in 2014 is it still Joyce and
16 you and your son?
17     A.   No, because -- actually, I want to
18 make a correction.  I believe in the beginning
19 of '13 -- in the beginning of '13 or end of '12
20 is when our divorce started.
21     Q.   Okay.  And did that impact your
22 living situation?
23     A.   Yes.
24     Q.   So did you move out, or did she
25 move out?

Page 100

1     A.   I moved out for a year, and
2 then -- and then once the divorce was final, I
3 moved back in the house.
4     Q.   All right.  And where were you
5 living when you moved out?
6     A.   On my boat.
7     Q.   And is there an address for the
8 boat?
9     A.   Not really.  I had a -- it was
10 docked at a marina in Jacksonville.
11     Q.   What was the name of the marina?
12     A.   I don't recall.  I can look it up,
13 but I don't recall at this minute.
14     Q.   And what type of boat?
15     A.   A 32-foot Monterey.
16     Q.   And did you own that boat?
17     A.   Yes.
18     Q.   When did you purchase it?
19     A.   I believe 2010.
20     Q.   So for some period of time, either
21 end of '12 to some point in '13 or in '13, you
22 were living on your boat, correct?
23     A.   Correct.
24     Q.   And then after --
25     A.   Well --

Page 101

1     Q.   Go ahead.
2     A.   For a short while, and then I
3 rented a house.
4     Q.   Do you recall where you rented the
5 house?
6     A.   Yes.
7     Q.   Where?
8     A.   Off of Timber Corner Road in
9 Jacksonville.
10     Q.   Do you recall the address?
11     A.   Not exactly, no, sir.
12     Q.   This was in Jacksonville, you said?
13     A.   Yes.  So I was on the boat under
14 maybe six months.
15     Q.   And then when did you move back
16 into the Oak Drive home?
17     A.   Well, we settled on the divorce
18 approximately I believe sometime either end of
19 '13 or beginning of '14.
20     Q.   And then after the divorce was
21 finalized, was anyone living in the home other
22 than you?
23     A.   Just me.
24     Q.   And were you still working out of
25 that home?

26 (Pages 98 - 101)

1    A.   Not -- not the entire time,
2 but -- I mean, yes, I was.  When I was staying
3 there, yes.
4    Q.   In 2014?
5    A.   Yes, yes.
6    Q.   Did you have another place that you
7 were working out of in 2014?
8    A.   I don't recall.  It was whenever
9 the email came out that -- it was either '14 or
10 '15, but there was an email that came out
11 saying it's mandatory that you have to go to
12 your office where your admin is, and that's
13 when I started driving to Ocala because that's
14 where Deshae was, so I started going out there.
15    Q.   And how often were you going there?
16    A.   Every day I didn't travel I went
17 there.  If I was traveling in the field, I
18 wasn't there.  Monday through Friday.
19    Q.   And in 2015 were you still living
20 at the Oak Drive address?
21    A.   Yes.  I believe so, yes.
22    Q.   Just by yourself?
23    A.   Yes, sir.
24    Q.   And were you working out of that
25 location?

1    A.   No.  That's when I was traveling to
2 Ocala.
3    Q.   How about in 2016, were you still
4 at the Oak Drive address?
5    A.   No.  I believe I sold the house.
6    Q.   When did you sell the house?
7    A.   Roughly September, October of '15,
8 I believe, from what I can recall.
9    Q.   And where did you move to?
10    A.   To the 539 Longmill where I
11 currently reside.
12    Q.   And did you buy that house?
13    A.   No.
14    Q.   Do you rent that house?
15    A.   Yes.
16    Q.   Who do you rent it from?
17    A.   Invitation Homes.
18    Q.   And do you have a lease agreement
19 with Invitation Homes?
20    A.   Yes, sir.
21    Q.   And are you the only individual who
22 is a party to that lease agreement?
23    A.   Me and my two children.
24    Q.   Your two children are on the lease
25 agreement, or your two children live with you

1 there?
2    A.   I had to put them on the agreement
3 so we get pool privileges in the area, so they
4 have to be on the lease.  I mean, they don't
5 live with me all the time.
6    Q.   And the lease is in your name
7 individually, though?
8    A.   Correct, yes.
9    Q.   It's not in any business name?
10    A.   No.
11    Q.   You've been there since 2016?
12    A.   Yes, sir.
13    Q.   So in 2016 did you work out of that
14 location?
15    A.   I believe I moved in there
16 September of 2015 when I sold the house.
17    Q.   And were you working out of that
18 location?
19    A.   Yes.
20    Q.   And in 2017 were you working out of
21 the house as well?
22    A.   Yes.
23    Q.   And what about in 2018?
24    A.   That's when I rented the shared
25 office building in downtown Jacksonville, in

1 January of 2018.
2    Q.   And what changed in January of 2018
3 where you decided to rent the shared office
4 space?
5    A.   Well, I was told by Mr. Reitmeier
6 that it's mandatory that I get an office and go
7 to it every day that I'm not traveling and must
8 have an admin there.  I talked to Deshae.  She
9 was in Ocala, but at that time she had moved to
10 the Sarasota area, and there is -- you know,
11 there is no way she could travel there, and she
12 didn't want to come up every week.
13       So at that point I had no other
14 choice.  I was forced to get an office with an
15 admin, or I was going to lose my job.
16    Q.   And how was this communicated to
17 you?
18    A.   In meetings, on the phone.  At
19 almost every meeting we talked about having an
20 office and going to it.  It was public.  You
21 know, it was everybody knew about it.  Emails.
22    Q.   And you don't recall what you paid
23 for this office space; is that correct?
24    A.   That's correct.  I don't recall
25 exactly.  Yes, sir, I don't recall.

Page 106

1  Q.  And when did you stop paying for
2  that office space?
3  A.  Approximately 30 or 60 days after I
4  got fired.
5  Q.  And how did you terminate the lease
6  agreement in 2018 30 to 60 days after your DS
7  agreement was terminated by the Kirby Company?
8  A.  I believe it was like a
9  month-to-month agreement, and from what I
10  recall, as long as you give them 30 days, you
11  pay -- excuse me -- 60 days notice, you pay for
12  the 60 days, and you can leave.  It wasn't a
13  yearly agreement at that place.
14  Q.  And was it something where you paid
15  in advance, or would you pay after each month
16  based upon how much time you used it?
17  A.  No.  Well, no, there were different
18  options.
19  Q.  What option did you use?
20  A.  The -- the option where no one
21  shares my office, my personal office.  It was
22  not -- that was not shared with anybody.  So I
23  paid the highest dollar amount to make sure I
24  could be in my office 40 hours a week every
25  week if I needed to.  I made sure of that.

Page 107

1  Then the conference room and break rooms were
2  shared, but my office was not shared, and my
3  phone number was not shared.
4  Q.  In 2018 did you have any other
5  office space or location?
6  A.  Not that I can recall, no.
7  Q.  How about in 2019, did you have
8  office space in 2019?
9  A.  No.
10  Q.  What about in 2020?
11  A.  No.
12  Q.  What about in 2021?
13  A.  No.
14  Q.  What about in 2022?
15  A.  No.
16  Q.  Have you filed your tax returns for
17  2021?
18  A.  No.
19  Q.  Why not?
20  A.  I just haven't gotten around to it.
21  Money has been tight.  I've been pretty busy.
22  My -- my accountant filed an extension.
23  Q.  When did you first begin your
24  association with Kirby?
25  A.  I believe it was 1990.

Page 108

1  Q.  And how did you learn about Kirby?
2  A.  It was an ad in the newspaper.
3  Q.  And this was in Canada?
4  A.  Yes, sir.
5  Q.  And tell me about the ad.
6  A.  It was a carpet shampoo ad that
7  I -- that's all I can remember, just hiring for
8  carpet shampooers.
9  Q.  So who ended up hiring you?
10  A.  Larry Ell.
11  Q.  How do you spell the last name?
12  A.  I think it's, I don't know, E-L-L
13  or E-L-I, Larry Ell, a distributor who first
14  hired me.
15  Q.  And this is in Toronto?
16  A.  Yes.
17  Q.  And what was your position with
18  Larry Ell?
19  A.  Dealer.
20  Q.  And did Larry Ell have a company?
21  A.  I would assume so.
22  Q.  You don't recall the name, though,
23  of his distributorship?
24  A.  No, sir, I don't.
25  Q.  And how long were you a dealer with

Page 109

1  Larry?
2  A.  I don't recall.  Approximately one
3  year maybe.
4  Q.  Have any of your other family
5  members been involved with Kirby other than
6  George?
7  A.  No, never.
8  Q.  Have you performed services as a
9  dealer for any other factory distributors other
10  than Larry?
11  A.  Myself personally?  You're asking
12  for myself personally?
13  Q.  Yes, you.
14  A.  Yes.
15  Q.  Who?
16  A.  John Hickman.
17  Q.  And did John Hickman have a
18  distributorship?
19  A.  Yes, sir.
20  Q.  And what was the name of that
21  distributorship?
22  A.  I think it was Hickman something,
23  like Hickman.
24  Q.  And when did you perform services
25  for Hickman's distributorship?

28 (Pages 106 - 109)

Page 110

1    A.   I believe it was '91 and '92
2  approximately.
3    Q.   And were you also acting as a
4  dealer?
5    A.   At one point when I was there, I
6  was promoted to distributor in training.
7    Q.   And then after Hickman did you
8  perform services for another FD?
9    A.   Yes.
10   Q.   Who was that?
11   A.   I can't remember his name.  It was
12  in Virginia.  I know his name.  I just can't
13  remember it at this second.  Maybe I'll think
14  about it in a few minutes.  But I did work for
15  another distributor, yes.
16   Q.   Any others that you can think of?
17   A.   After that distributor?
18   Q.   Correct.
19   A.   Yes.
20   Q.   And who is that?
21   A.   Brian Anderson.
22   Q.   And what was the time frame in
23  which you performed services for the
24  distributor whose name you can't recall?
25   A.   Tim, that was Tim.  Tim -- Tim

Page 111

1  Torry.  He was in, I believe, Manassas,
2  Virginia.
3    Q.   And where was Hickman located?  I
4  don't think I asked you.
5    A.   Hickman was in Ottawa, Canada.
6    Q.   And when did you perform services
7  for Torry's distributorship?
8    A.   Approximately 1993.
9    Q.   Did you move to the United States
10  in '93?
11   A.   Yeah.  Well, I got married to
12  Denise and then moved to the States, yes.
13  Denise was an American citizen.
14   Q.   Where was she from?
15   A.   The U.S.
16   Q.   But where specifically in the U.S.?
17   A.   I think Long Island.  That's where
18  she grew up.
19   Q.   And when did you -- for Torry were
20  you a dealer, also?
21   A.   Yes.
22   Q.   And when did you stop being a
23  dealer for Torry, Torry's distributorship?
24   A.   Approximately sometime near the end
25  of 1994.

Page 112

1    Q.   And then you started performing
2  services for Brian Anderson's distributorship;
3  is that correct?
4    A.   Correct.
5    Q.   And do you recall the name of his
6  distributorship?
7    A.   No, not at all.
8    Q.   And were you performing services as
9  a dealer for that distributorship?
10   A.   A team leader.
11   Q.   And how long were you a team
12  leader?
13   A.   Four-and-a-half, five years
14  approximately.
15   Q.   So from '94 to '98 or '99?
16   A.   Yes, sir.
17   Q.   And in '99 did you leave to go
18  perform services for a different distributor?
19   A.   Yes, but not right away.
20   Q.   So what -- what did you do after
21  you stopped performing services for Anderson's
22  distributorship?
23   A.   I just took a few months off.
24   Q.   And did you not work at all or do
25  anything?

Page 113

1    A.   Just about two months at the time
2  Anderson got terminated.
3    Q.   And what happened after those two
4  months?
5    A.   I went to work for a different
6  distributor.
7    Q.   And which distributor did you
8  perform services for after the two months?
9    A.   I worked for Rob Makarski.
10   Q.   And where -- what was the name of
11  Rob's distributorship?
12   A.   I don't recall.
13   Q.   And where was that distributorship
14  located?
15   A.   Jensen Beach, Florida.
16   Q.   And was that in '99, 2000?
17   A.   '99, 2000, 2001.
18   Q.   And did you relocate to Florida
19  from -- were you living in Virginia?
20   A.   For Tim, working for Tim, yes, sir.
21   Q.   And then with Anderson's
22  distributorship, where was that?
23   A.   Melbourne, Florida.
24   Q.   And for each of these
25  distributorships, unless you've told me

29 (Pages 110 - 113)

Page 114

1 otherwise, you're performing services as a
2 dealer?
3    A.   Dealer/team leader.
4    Q.   And are your services being
5 compensated as a 1099?
6    A.   1099.
7    Q.   And then in 2001 what happened?
8    A.   I was with -- still with Rob.
9    Q.   Okay.  What about 2002?
10    A.   I got promoted to DT, distributor
11 trainee.
12    Q.   And how long were you a distributor
13 trainee?
14    A.   Five months.
15    Q.   And then what happened after five
16 months?
17    A.   I got promoted to factory
18 distributor.
19    Q.   And is that when you incorporated
20 Syatt?
21    A.   Correct.  I incorporated Syatt when
22 I became a DT.
23    Q.   Oh, a DT?
24    A.   Yes, sir.
25    Q.   That's approximately 2002?

Page 115

1    A.   August of 2002.
2    Q.   And then you entered into a factory
3 distributorship agreement with Kirby in 2002;
4 is that correct?
5    A.   December of 2002.
6    Q.   And how long were you a factory
7 distributor?
8    A.   Until I got promoted to divisional
9 supervisor which I believe was November 1st of
10 2010.
11    Q.   Prior to becoming a DT, did you
12 have any other jobs, did you work as an
13 independent contractor, do anything else, or
14 were you involved in any other business
15 activities?
16    A.   Not that I can recall.
17    Q.   What about the time frame within
18 which you were a distributor trainee?
19    A.   Not that I can recall, no.
20    Q.   What about as an FD?
21    A.   Can you repeat the question for me?
22    Q.   Sure.  When you were an FD, did you
23 have any business interests outside of Kirby,
24 or did you do anything else that produced
25 income other than acting as an FD?

Page 116

1    A.   Not that I can recall.
2    Q.   What about when you were a DS,
3 other than the CBD store we talked about?
4    A.   No.
5    Q.   When you were a factory
6 distributor, did you have any employees?
7    A.   Yes.
8    Q.   How many?
9    A.   It varies throughout the timeline.
10    Q.   And what would be the category of
11 employees that you employed when you were a
12 factory distributor?
13    A.   It was based on local law, what
14 local laws allowed.  You know, if someone was
15 an employee, they were a W-2.  If they were a
16 dealer, they were a 1099.  That was per
17 training from the Kirby Company.
18    Q.   Other than dealer, what other
19 positions did you have when you were an FD for
20 individuals?
21    A.   A team leader.
22    Q.   And was a team leader a W-2
23 employee, or was that person --
24    A.   A 1099.
25    Q.   -- a 1099?  What else?

Page 117

1    A.   A secretary.
2    Q.   Was that a W-2?
3    A.   W-2.
4    Q.   And who was your secretary at that
5 time?
6    A.   Sir, that changes over the years,
7 you know.  I had different ones.
8    Q.   But that person was always a W-2?
9    A.   100 percent, yeah.
10    Q.   How many did you have during that
11 time frame?
12    A.   The time frame of being an FD?
13    Q.   Correct.  That's like December of
14 2002 to August of 2011 or so.
15    A.   Approximately anywhere from maybe
16 three or four different secretaries, different
17 people.
18    Q.   And what other positions did you
19 have at that time?
20    A.   DPS.
21    Q.   And how was that person --
22    A.   W-2.
23    Q.   Any others?
24    A.   A sales manager; W-2.
25    Q.   Any others?

30 (Pages 114 - 117)

Page 118

1    A.   Oh, yes, a service manager; W-2.
2    Q.   Any others?
3    A.   That's all -- that's all I can
4 think of.  I believe that's everybody.
5    Q.   Were these the same people
6 throughout your time as an FD, or did various
7 people --
8    A.   No, sir.
9    Q.   -- fill the roles?
10    A.   Various people.  You know, people
11 quit, things happen.
12    Q.   With your factory distributor
13 agreement, who were the parties to the
14 agreement?
15    A.   Can you please clarify the
16 question?
17    Q.   Sure.  You signed a factory
18 distributor agreement with Kirby Company or
19 Scott Fetzer, correct?
20    A.   Correct.
21    Q.   Who were the parties to the
22 agreement?  Was it you personally, or was it
23 the Syatt Inc. of Jacksonville?
24    A.   That's a good question.  I don't
25 know.  I really don't know what they had me

Page 119

1 sign.  I don't remember.
2        THE VIDEOGRAPHER:  Mr. Morley, can
3 we go off the record?
4        MR. MORLEY:  Sure.
5        THE VIDEOGRAPHER:  Off the record
6 at 1:02.
7        (Luncheon recess taken.)
8            - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 120

1        THE VIDEOGRAPHER:  We are back on
2 the record.  The time is 2:18.  This is the
3 beginning of media unit two.
4            AFTERNOON SESSION
5    CONTINUED EXAMINATION OF IBRAHIM SHARQAWI
6 BY MR. MORLEY:
7    Q.   Abe, before we went on our last
8 break, we were talking about your agreement
9 with Kirby, the factory distributor agreement.
10 During the time you were a factory distributor,
11 did you have any other agreements with Kirby or
12 Scott Fetzer?
13    A.   I believe I did.
14    Q.   And what were those other
15 agreements?
16    A.   I believe I was what they called at
17 the time division manager.  I was promoted to
18 division manager in January 2005 maybe.
19    Q.   And what -- what is a division
20 manager?  Did you still also have --
21    A.   The distributorship?  Yes, sir.  I
22 was still a factory distributor.  The division
23 manager program, from what I can recall, was
24 because I was -- what do you call it.  I was a
25 center of excellence is the term they used

Page 121

1 because it was claimed that I ran a great
2 distributorship.  So as a division manager, the
3 company would send other distributors, other
4 distributors' people, employees, subcontractors
5 to my place of business so we could train them.
6        So we were doing training, sales
7 rallies, meetings.  It's -- that's why I kind
8 of describe it as, I don't know, kind of like a
9 supervisor, but you get to keep your
10 distributorship.
11    Q.   And did you have another business
12 entity that was operating when you were
13 division manager?
14    A.   Yes, I did.
15    Q.   And what was the name of that
16 business?
17    A.   Only for a few years.  I think
18 that's the one that I -- that I incorporated,
19 BMIB Division, BMIB Division, Inc.
20    Q.   An S corp?
21    A.   Yes, sir.
22    Q.   Registered in Florida?
23    A.   Yes, sir.
24    Q.   Any employees?
25    A.   No.

31 (Pages 118 - 121)

1    Q.    Anyone who you paid as a 1099
2 independent contractor?
3    A.    No.  Just me.
4    Q.    And then did you enter into your
5 divisional supervisor agreement after you
6 stopped being a division manager?
7    A.    Yes.  They -- they ended the whole
8 program so that I wasn't division manager I
9 believe in 2008 -- oh, no -- yeah, 2008 from
10 what I can recall, and then approximately 20 or
11 24 months later is when I became a division --
12 divisional supervisor in November of 2010.
13    Q.    So is it fair to say once you
14 stopped acting in the role of this divisional
15 manager while you were also running your
16 factory distributorship, there was a two-year
17 period of time that you were just running the
18 factory distributorship?
19    A.    Yes.
20    Q.    And did you sign a formal agreement
21 with Kirby when you were doing the division
22 manager stuff?
23    A.    Yes.
24    Q.    And as divisional supervisor, your
25 only employee was Deshae Ellis; is that

1 correct?
2    A.    From what I can recall, yes, sir.
3    Q.    Who is Nicole Harris?
4    A.    Oh, that's -- perfect.
5 That's -- that's the young lady that was my
6 admin in 2018 when I was in the rented -- the
7 office downtown that we discussed, that's
8 right.
9    Q.    And that's the individual who was
10 given to you by the office management company?
11    A.    Yes.
12    Q.    And was she performing work for you
13 exclusively, or did she work for other people
14 who rented out office space there?
15    A.    She worked for others, but -- she
16 worked for others, yes, not just me.
17    Q.    What would she do for you?
18    A.    Well, I had to train her.  I
19 trained her to do all -- pretty much all the
20 reporting, the positive grams, the magazines,
21 collecting data from my distributors for sales,
22 collecting data for trips, for sales rallies,
23 helped me set up sales rallies, helped me set
24 up trips, pretty much a lot -- you know, a lot
25 of the admin work that needed to be done in the

1 division.
2    Q.    Is this the same type of work that
3 Deshae was doing for you?
4    A.    Similar, but she wasn't anywhere
5 near as good as Deshae.
6    Q.    Was that because she just didn't
7 have the same amount of experience as Deshae?
8    A.    Possibly.
9    Q.    And when you were acting as a
10 divisional supervisor pursuant to the terms of
11 your divisional supervisor agreement with
12 Kirby, what were you doing?
13    A.    I was following the Kirby Company
14 divisional supervisor handbook.
15    Q.    And what does that mean?
16    A.    I was following the instructions of
17 the company.
18    Q.    And what were those instructions?
19    A.    There's a lot.
20    Q.    Tell me about them.
21    A.    One thing was reporting.  We had to
22 report sales.  We had to report field activity.
23 We had to report compliance while we were in
24 the field.  Which with compliance, I've
25 reported several times on serious compliance

1 and just got ignored.
2    Q.    Wait.  Wait.  Hold on.  You're
3 saying a lot.  Stop for a second.
4    A.    Yes, sir.
5    Q.    You said compliance.  What are
6 you -- what are you talking about when you say
7 compliance?
8    A.    Well, there is a whole department
9 of compliance, so there is multiple things.
10 For example, making sure our distributors are
11 pulling backgrounds on their dealers is a small
12 part of it, warranty cards, running ethical
13 distributorships, taking care of customers the
14 proper way, who is supposed to be 1099 or W-2
15 in the distributorship, and there is much more.
16 I'm just trying to think of it, the rest.
17    Q.    And is it fair to say that your
18 testimony is that you were responsible for
19 these compliance issues you just identified?
20    A.    No.  I wouldn't state it that way.
21    Q.    How would you state it?
22    A.    I was responsible to report it to
23 the company.  I wasn't responsible for
24 compliance, but to report it to the company.
25    Q.    And how would you know what to

1 report?
2    A.   We were trained on what to look for
3 in our divisional supervisor meetings from what
4 I can recall.
5    Q.   And how often would you have these
6 meetings?
7    A.   The divisional supervisor meetings?
8    Q.   Whatever meeting you just referred
9 to.
10    A.   The divisional supervisor meetings
11 were four times a year in Cleveland.  They
12 conducted by headquarters, headquarters of
13 Kirby Company, and there were many times there
14 was Scott Fetzer employees would attend.
15    Q.   And how long would these meetings
16 that happened four times a year last?
17    A.   Anywhere from a minimum two days or
18 one-and-a-half days, sometimes two full days
19 from what I can remember.
20    Q.   And when you say that you were
21 responsible to report the compliance issues you
22 identified to the company, how would you obtain
23 the information that you would be reporting?
24    A.   By going to the distributor's
25 office is one way.

1    Q.   Go ahead.
2    A.    By emailing distributors and asking
3 them to send reports to my office.  Also
4 trained by running factory distributor meetings
5 that we were responsible to pay for even when
6 we shouldn't have.
7    Q.   And how often would you have those
8 factory distributor meetings?
9    A.   A minimum of three times a year.
10 So we would have a supervisor meeting, go over
11 what's expected from us, pretty much review
12 what they want us to share with the field, and
13 then send us back with information.  Then
14 shortly after, I'd have to set up a meeting,
15 pay for everything, pay for the food, the
16 hotel, everything, and send our message to the
17 factory distributors.
18    Q.   So I'm going to make a statement,
19 and you tell me if this is a fair and accurate
20 statement.  You would meet four times a year
21 for a divisional supervisor meeting, and then
22 at the conclusion of that divisional supervisor
23 meeting, you would then schedule a factory
24 distributor meeting and meet with factory
25 distributors to discuss issues raised at the

1 divisional supervisor meeting.  Is that a fair
2 statement?
3    A.   Yes.
4    Q.   So those factory distributor
5 meetings would be three or four times a year,
6 sometimes in close proximity after the
7 divisional supervisor meeting?
8    A.   Correct.
9    Q.   What is the KDA?
10    A.   KDA was a divisional fund that the
11 Kirby Company factory distributors elected to
12 be in it which was about 100 percent,
13 99 percent of them.  And the Kirby Company will
14 surtax or charge extra per unit per Kirby
15 vacuum.  So when distributors ordered, bought
16 these Kirby vacuums, X amount of money would at
17 the end of the month be sent to a KDA fund.
18       The KDA fund, the board members
19 were factory distributors.  I would have to be
20 in the meetings.  This money was for the
21 distributors to set up for Kirby vacations.
22 Kirby VIP clubs is what they called them.
23       There was a controversy for a while
24 in the company where supervisors, some
25 supervisors, not all, would use that money to

1 pay for factory distributor meetings.  We were
2 specifically told, and I did the right thing,
3 specifically told you have to use your money,
4 not the KDA, to pay for factory distributor
5 meetings multiple times in multiple divisional
6 supervisor meetings.
7    Q.   Do you recall who told you that and
8 when?
9    A.   At almost every divisional
10 supervisor meeting we were told that.
11    Q.   But who told you that?
12    A.   Every president that I was
13 underneath.  It was there was a -- there was a
14 division manager, it was Frank Venditti; when I
15 first became a supervisor it was Bud Miley; and
16 Kevin Reitmeier.  Every single one of them said
17 them, when then were supervisors, they paid for
18 the factory distributor meeting.
19       They also told us it had to be a
20 nice meeting.  You have to buy them food and
21 drinks.  It would cost us thousands every
22 meeting.  Everybody told us.  It was very well
23 known.
24    Q.   So when you were a divisional
25 supervisor, was there a particular KDA

1 divisional fund that you were the divisional
2 supervisor of?
3     A.   Yes.
4     Q.   What was that KDA?
5     A.   It was whatever territory I had at
6 the time.
7     Q.   And so your territories changed
8 over the time?
9     A.   Correct.
10    Q.   So in 2010 when you first entered
11 into your divisional supervisor agreement, what
12 territory were you responsible for?
13    A.   That's going to be tough.  I know I
14 had the southeast coast.  From what I can
15 recall, I had the Caribbean islands, Puerto
16 Rico, Florida, Georgia, South Carolina,
17 Mississippi, maybe Alabama, I cannot recall,
18 but I think it started with that territory when
19 I first started.
20    Q.   And is your territory something
21 that would change on an annual basis, or did
22 you keep the territory for a certain period of
23 time, and then it would get changed?
24    A.   It's something that I definitely
25 disagreed with, but it was something that the

1 executives at Kirby Company allegedly had the
2 right to change it whenever they felt like
3 changing it.
4     Q.   Okay.  So let's go back and answer
5 the question I asked you which is in 2010 you
6 were assigned a territory.  How long did you
7 keep that territory?  Was it changing every
8 year, or did you keep it for a certain period
9 of time and then it was changed?
10    A.   It was inconsistent when it
11 changed.
12    Q.   How would you get notice that it
13 had changed?
14    A.   From what I recall, they would fly
15 me up there on short notice.  Say, hey, Abe,
16 you've got to come up and see me next week.  It
17 would be a one-on-one meeting in most cases,
18 and they would just go through this is your
19 territory, and we're changing it to this.
20    Q.   So you were verbally told this?
21    A.   Yeah.  But then we got our maps.  I
22 mean, it was more -- it was verbal to start,
23 but we also received a new map, new coverage.
24 We would receive a list of the -- so if they
25 added to my -- sometimes they would just add,

1 or take these two states away and add these two
2 states.  So in most all cases I kept the
3 majority of it, but they would add and subtract
4 from here and there for I don't know what
5 reason.
6         Then they would send an email to
7 the field pretty much saying -- like if I don't
8 have South Carolina anymore, they would send
9 all the distributors in South Carolina, hey, as
10 of, you know, September 1st, X year,
11 Mr. Sharqawi is not your supervisor.  Mr. Jones
12 is now.  Then the new territory, they would
13 say, hey, Mr. Smith is not your supervisor.
14 Mr. Abe is now.
15    Q.   And did that ever get formalized
16 into a separate written document?
17    A.   Yes.
18    Q.   And what was that?
19    A.   I believe it's territory documents,
20 I believe.  I don't know exactly what it was
21 called.  But we would definitely get documents
22 showing, hey, this is your new map.  This is
23 your new territory.
24    Q.   And if you -- and you had to
25 sign -- you signed that document, correct?

1     A.   I don't recall.
2     Q.   Well, do you have a reason to
3 recall why you wouldn't have signed it?
4     A.   I don't know if we were required to
5 sign it.  I can't remember.
6     Q.   Well, do you recall signing any
7 documents relating to your territories?
8     A.   I recall signing my employment
9 agreement, and then attached with it was,
10 what's it called, exhibits.  So here is
11 Exhibit A which is your territory kind of deal
12 I think is how it went down.
13    Q.   And did you have to sign a separate
14 place on that document that you're saying was
15 attached to your divisional supervisor
16 agreement?
17    A.   Possibly.  I just -- I really just
18 don't remember.
19    Q.   And you referred to it just now as
20 an employment agreement.  I'm referring to it
21 as a divisional supervisor agreement.
22 Irrespective of the title, is that agreement or
23 document what you believe governed what you
24 were supposed to do in your role as divisional
25 supervisor?

34 (Pages 130 - 133)

Page 134

1    A.    No.
2    Q.    Why do you say that?
3    A.    Because things changed very quickly
4  once I accepted the position.
5    Q.    Well, what do you mean by that?
6    A.    Just the daily and weekly control
7  of where I had to be, where I need to be.  I'd
8  submit my calendar, and they would say, well,
9  that's not good enough.  You have to travel
10  more.  Or why aren't you traveling this?  Would
11  you travel this date?  Just total, total
12  control.
13        That's why I consider it -- it was
14  just a way that the Kirby Company with 1099
15  people to save money so they didn't have to pay
16  for travel, for an office for me, for my admin.
17  It was a total manipulation is what it was.
18    Q.    And didn't you benefit financially
19  from being a 1099 and having an S corp to run?
20        MS. GROEDEL:  Objection to the
21  question, but you can answer.
22    A.    Absolutely not.  I mean, for all
23  the money that came to me and stayed with me
24  potentially, by the time you paid for
25  distributor meetings, paid for admin, paid for

Page 135

1  travel, I had to pay and spend my own money for
2  expenses when I came up for meetings here.  Any
3  time I went on a trip, I had to spend money for
4  my own expenses even from the KDA.  They paid
5  for my hotel room, but I had to spend money on
6  flights and all my -- my personal expenses.
7  That should not have happened.
8    Q.    But you agreed that that's the way
9  in which you would be compensated under the
10  agreement, correct?
11    A.    I signed the agreement, yes, but I
12  was definitely mislead.  I wasn't the only
13  supervisor or the first supervisor ever hired
14  in 100 years that the company has been in
15  business, and I believe they have a
16  responsibility to sit down and explain to me
17  the potential expenses that I can incur.
18        My understanding was, okay, I was
19  going to get 250 grand a year, and we're good.
20  That was my understanding of it.  I didn't
21  know.  I did not realize the extent -- the
22  extent of all the expenses.  By the time I did
23  all my expenses, I was lucky to end up with
24  80,000, 90,000 a year.  It was terrible.
25    Q.    And you entered into this agreement

Page 136

1  in 2010, correct?
2    A.    Yes.
3    Q.    And it was so terrible that you
4  continued to abide by the terms of the
5  agreement until 2018 when the company
6  terminated it?
7    A.    I did abide by it, yes.
8    Q.    Right.  So at any point in time,
9  you could have decided you didn't want to do
10  that, right?  It's a yes or no question.
11        MS. GROEDEL:  Let him think.  Give
12  him a minute.
13    A.    Yeah, it's I was under the
14  impression that I'd be making half a million, a
15  million dollars a year.  I was referred
16  to -- when I was pitched on the position, I was
17  referred -- the president was showing me, Look,
18  this gentleman is making 700 grand a year.
19  This gentleman made 1 million a year.  I said,
20  I'm happy making 400,000, 450,000 a year in my
21  distributor.  They're like, Abe, we'll start
22  you at a 250 salary.  Within a year to two, you
23  could be making up to a million a year.
24        Then I was told, which as a
25  subcontractor I should never have been told

Page 137

1  this, I was told that I have to dissolve my
2  distributorship, and there's three other, three
3  other Americans that didn't have to dissolve
4  their distributorship, but I did.
5    Q.    And who are those individuals?
6    A.    Still probably active today.  I
7  know Jeff Thomas, Jim Chosie, Mark Bauhofer,
8  and there is -- there is -- there is others,
9  too.  I just don't recall in this second.
10    Q.    And you know this how?
11    A.    Because I talked to them.  You
12  would see it.  You would see their name as a
13  divisional supervisor and then their name in
14  the Kirby magazine as a distributor.  It was
15  talked about in the supervisor meetings.  It
16  was blatantly obvious, and nobody tried to hide
17  any of it.
18        Believe me, I was very upset
19  because I spent years building my
20  distributorship, and to build a
21  distributorship, I'm talking 80, 100 hours a
22  week of me training salespeople.  It's all
23  salespeople.
24        Then I was being a team player, and
25  to help the company, I took my key people in my

35 (Pages 134 - 137)

Page 138

1 distributorship, dissolved it.  I had six
2 months to dissolve it which I thought was the
3 worst thing that ever happened to me, and I
4 promoted I think six or seven factory
5 distributors out of my main office which helped
6 the company, helped everybody.
7      So by two -- and then that first
8 year I did get some bonuses for promoting these
9 guys, but two, three years into it, I was
10 standing there one day, and I was like
11 what -- what the hell did I let these people
12 convince me to do.
13      Q.    So why would you stay five more
14 years doing this?
15      A.    Because at that point it was a
16 tough choice.  First of all, I was loyal.  I
17 didn't like to quit.  Second of all, going back
18 to being a distributor and starting over would
19 have been a huge financial burden.
20      I mean, you know, going -- you
21 know, as a new distributor, new distributors,
22 sometimes it takes them a year just to make one
23 penny.  It's like a new business.  It takes
24 time to build a business.  If I would have
25 known that, if it was explained to me better,

Page 139

1 if they would have taken responsibility to
2 explain the position and what the expense could
3 be, I probably wouldn't have taken the job.
4      Q.    Abe --
5      A.    Yes.
6      Q.    -- you had to have known this was
7 the deal at least after a year of doing this if
8 what you're telling me is true, so why not just
9 do something else?
10      A.    Because I put my whole life into
11 this business.  My goal was to be the president
12 of the company.  It was my ultimate goal.
13 That's why when a lot of things happened, I
14 kind of kept my mouth shut and said let me just
15 pull through it.  Let me just keep on working
16 hard.  I'm going to be loyal.  Good things will
17 happen is the way I looked at it, and I was
18 trying to stick it out.
19      Q.    Right.  So everything you're
20 telling me is just based on your personal
21 choice.  You could have left at any time.  You
22 chose not to.
23      A.    Well, I couldn't have left.
24      MS. GROEDEL:  Wait.  There is no
25 question pending.  Wait for the question,

Page 140

1 please.
2      Q.    Irrespective of your motives or
3 your decision-making process, you affirmatively
4 made the choice to continue operating as a DS
5 for over eight years, correct?
6      A.    Correct.
7      Q.    And you wanted to be president of a
8 company that you dislike so much?
9      A.    I was hoping I could change things
10 when I get up there.
11      Q.    And what would you have changed?
12      A.    The way people are treated.
13      Q.    The way people are treated by whom?
14      A.    All the way down the line from
15 president to supervisor to the way distributors
16 would treat dealers.
17      Q.    And how are they treated?
18      A.    There is a lot of
19 misrepresentation.
20      Q.    What does that mean?
21      MS. GROEDEL:  Objection, asked and
22 answered.  You can answer again.
23      MR. MORLEY:  He didn't answer it.
24      MS. GROEDEL:  Yes, he did.  Go
25 ahead.  Answer it again.

Page 141

1      A.    There was a lot of people that were
2 misled when they were hired in Kirby at every
3 level.
4      Q.    Misled about what?  What are you
5 saying they were misled about?
6      A.    We were trained to recruit dealers
7 to work for us, and we were trained to tell
8 them they are just shampooing carpets, and they
9 are going to make X amount of money per week,
10 but the reality is it's a commissioned job.  If
11 you don't do -- it's a performance job.  If you
12 don't do certain things, you could work two
13 weeks, 60, 70, 80, 90 hours over two weeks and
14 get zero money.  That's one of the
15 misrepresentations at that level.
16      Q.    And is that something that you
17 participated in?
18      A.    No.
19      Q.    You never recruited a dealer when
20 you were an FD doing or saying what you just
21 described to me?
22      A.    I definitely recruited dealers, and
23 we did the best we can to be very blunt with
24 them and explain to them how the business works
25 despite of what we were told to say.

36 (Pages 138 - 141)

1    Q.    So you participated in this
2  misrepresentation even if you disagreed with
3  it?
4    A.    I was told that's the way the
5  business model works.
6    Q.    But you again had an independent
7  choice to make as it related to the recruitment
8  of your independent dealers for your own
9  business and distributorship, and you chose to
10  make misrepresentations to them based on what
11  you just told me.
12    A.    There was nothing independent about
13  it. I would have my supervisor come in and
14  say, Abe, this is how you have to hire. We
15  would get ads, and they'd say you have to use
16  these ads to hire people.
17    Q.    And by doing this you just
18  testified you were making half a million
19  dollars a year, right?
20    A.    At least one of the years I did,
21  yes.
22    Q.    So you benefitted from this,
23  correct?
24    A.    Yes.
25    Q.    Did you ever attend compliance

1  presentations about the types of recommended
2  ads and that they needed to be truthful?
3    A.    Yes, I have, which has changed over
4  the years multiple times. When I first
5  started, it was okay to run an ad saying you're
6  a carpet shampooer, and you get paid 400 bucks
7  a week to shampoo carpets. Did that eventually
8  change, yes, but that's where I started.
9    Q.    And when did it change?
10    A.    I can't recall.
11    Q.    Did it change when you were a DS or
12  prior to that?
13    A.    Prior to that.
14    Q.    Right. So when you were operating
15  as a DS, that wasn't an issue, correct?
16    A.    It was still an issue in some
17  places that I tried to fix, some distributors.
18    Q.    Where?
19    A.    I don't recall. Multiple different
20  distributors, different states.
21    Q.    Name them.
22    A.    It's hard to recall.
23    Q.    What did you do?
24    A.    I did my best to convince them to
25  be compliant and recruit people the proper way.

1    Q.    And how did you do this?
2    A.    By spending time with the
3  distributor, getting them to trust me, getting
4  them to believe in me, by performing like a
5  leader.
6    Q.    All right. Going back to the stuff
7  that we were talking about that you were doing
8  as a divisional supervisor, you said you would
9  report issues to compliance, and nothing was
10  done. Who did you report these issues to?
11    A.    Let me think. One was to Halle.
12    Q.    You reported something to Halle,
13  and Halle didn't do anything about it; is that
14  your testimony?
15    A.    I'm not sure what Halle did.
16    Q.    Well, tell me what you reported to
17  Halle because I've got to tell you, Halle is
18  probably the most honest and trustworthy person
19  that I have ever done business with, so I'm
20  curious to hear what you have to say about what
21  you reported to her and that she didn't do
22  anything about it.
23        MS. GROEDEL: Objection to your own
24  personal testimony in the question.
25        MR. MORLEY: It doesn't matter.

1        MS. GROEDEL: I'm objecting, and
2  let me object.
3        MR. MORLEY: All you do is object.
4  You say object, and then we move.
5        MS. GROEDEL: Okay.
6        MR. MORLEY: Thank you.
7        MS. GROEDEL: So don't tell me what
8  to do and how to object.
9        MR. MORLEY: Why?
10        MS. GROEDEL: Because I won't
11  listen to you.
12        MR. MORLEY: Obviously.
13        MS. GROEDEL: Don't ask him
14  inappropriate questions.
15        MR. MORLEY: I can ask him whatever
16  I want.
17        MS. GROEDEL: Okay. Then I'll
18  object.
19        MR. MORLEY: Good, and that's all
20  you say is object. See, you just learned
21  something.
22        MS. GROEDEL: Thanks, Ryan.
23    A.    Well, I mean, there is one person
24  in particular, Jacob Bush, who is a felon who
25  has jumped from distributor to distributor

1 who -- and there is multiple felons that work
2 for the company that I reported to Halle.  And
3 I'm not saying Halle did or didn't do anything,
4 but I reported to Halle, and I know there is
5 only so much she can do, but I can tell you if
6 it wasn't Halle, the company as a whole turned
7 a blind eye to it and let these people work.
8     Q.    And what did you report about Jacob
9 Bush to Halle?
10     A.    Well, we looked at his background,
11 and according to Kirby Company policies, he's
12 not to be selling Kirbys.
13     Q.    And what was in his background that
14 prevented him?
15     A.    I don't recall.  I just recall
16 something not acceptable.  I didn't memorize
17 people's backgrounds.  I looked at thousands of
18 backgrounds over the years, so I don't recall
19 his exact background.
20     Q.    So you think that Kirby turns a
21 blind eye to people with questionable
22 backgrounds or character issues; is that what
23 you're saying?
24     A.    I know they do.
25     Q.    Pardon?

1     A.    I know they do.
2     Q.    Because you were one of them,
3 right?
4     A.    No.
5     Q.    You weren't?
6     A.    No.
7     Q.    You weren't involved in a sexting
8 scandal with an underaged person and still
9 retained?
10     A.    Absolutely not, no.
11     Q.    Is that your testimony truthfully
12 under oath?
13     A.    Yes.
14     Q.    And you never had issues with
15 domestic violence?
16     A.    No.  I had allegations, but no.
17     Q.    You were never arrested and charged
18 with domestic violence?
19         MS. GROEDEL:  Objection.
20     Q.    Answer the question.
21         MS. GROEDEL:  He doesn't have to
22 answer.
23         MR. MORLEY:  He does --
24         MS. GROEDEL:  No, he doesn't.
25         MR. MORLEY:  -- because he just

1 opened the door, Caryn.
2     Q.    Answer my question, yes or no?
3     A.    Yes.
4     Q.    On multiple occasions, correct?
5     A.    No.
6     Q.    No?  You sure about that answer?
7     A.    Yes.
8     Q.    All right.  You were arrested
9 December 29th, 2008, for hitting your then
10 girlfriend, Joyce Conway, in the mouth,
11 correct?
12     A.    That's incorrect.
13     Q.    You were not arrested for that?
14     A.    I was arrested.
15     Q.    On March 28th, 2011, you were
16 arrested for aggravated assault-handgun,
17 threats and harassment involving your new wife,
18 Joyce Sharqawi, yes or no?
19     A.    I was not arrested.
20     Q.    On July 31st, 2012, you were
21 arrested for injuring your then wife Joyce
22 Conway's wrist and arrested for domestic
23 violence, correct?
24     A.    I did not go to jail.  I was not
25 arrested.

1     Q.    And on June 24th, 2013, you were
2 arrested on a probation violation, correct?
3     A.    That's correct.
4     Q.    And here you were, still with Kirby
5 that whole time?
6     A.    Well, Kirby goes by convictions.
7 All those got dropped due to false allegations.
8 I have zero convictions for domestic violence.
9 In Kirby Company, just like the laws in
10 America, you cannot go by allegations or
11 arrests.  It goes by convictions.
12         And we have convicted felons.  We
13 even have a convicted pedophile that the Kirby
14 Company knowingly put the distributorship in
15 their wife's name, a convicted pedophile that
16 would go on trips.
17     Q.    Who is that?
18     A.    I'm trying to remember his name.
19 Sean Mallory.  A lot of people at headquarters
20 knew it was Sean Mallory's distributorship.
21 They put the distributorship in his name -- his
22 wife's name, excuse me, a convicted felon, who
23 at one of the trips sat at the same table as
24 Bob McBride.  That's a fact.  Multiple felons
25 worked for Kirby.

Page 150

1    Q.   Do you have a contract with
2  American Shaman?
3    A.   I did.
4    Q.   Why haven't you produced it as part
5  of this litigation?
6    A.   I wasn't aware, and I no longer
7  have that contract.
8    Q.   Why?  What happened to it?
9    A.   I ended up getting out of it.  It
10  was a franchise agreement, and we ended up
11  doing a mutual -- mutually dissolving it.
12    Q.   When did you enter into it?
13    A.   I'm trying to recall.
14    Q.   March of 2018; does that sound
15  about right?
16    A.   I don't recall.
17    Q.   Do you have a reason to believe it
18  wasn't in March of 2018?
19    A.   It was probably around that time.
20    Q.   Isn't that why you started Nln
21  Enterprises in March of 2018?
22    A.   That's correct.
23    Q.   When did the franchise agreement
24  terminate?
25    A.   I think probably sometime, if I can

Page 151

1  remember, maybe the first quarter of '21.
2    Q.   And how was that relationship
3  terminated?
4    A.   I don't understand what you mean by
5  how.
6    Q.   Well, did you terminate your rights
7  under the franchise agreement?  Did the
8  franchisor terminate your rights under the
9  franchise agreement?
10    A.   They terminated.  I guess they sent
11  me a cancellation or termination agreement
12  letter.
13    Q.   Where is that?
14    A.   I don't know.
15    Q.   Well, where would it be?
16    A.   I don't know.  I don't even think I
17  retained it.  I think I might have thrown it
18  out or threw it out.  Pardon me.
19    Q.   When did you lose your agreement
20  with American Shaman?
21    A.   It was that time.
22    Q.   You threw it out once the
23  termination letter came?
24    A.   I'm sorry.  Which agreement?
25    Q.   The agreement that -- the franchise

Page 152

1  agreement that you entered into with American
2  Shaman.
3    A.   Yes.
4    Q.   Where is that agreement?
5    A.   The original one?
6    Q.   Or a copy of it.  Do you have a
7  copy of it?
8    A.   The one from the beginning of '18?
9    Q.   Yes.
10    A.   Okay.  I could have sworn I sent it
11  to -- I thought I sent it to my attorney.
12    Q.   So you have a copy of it?
13    A.   Yes.  On my email, yes, sir.
14    MS. GROEDEL:  I thought she sent
15  it.  If she didn't --
16    THE WITNESS:  I might have sent it.
17    MS. GROEDEL:  I'll look.  I'll ask
18  her.
19    MR. MORLEY:  Yeah.  Please have
20  that sent.
21    MS. GROEDEL:  I thought she did.
22    Q.   Did you only enter into one
23  agreement with American Shaman in March of
24  2018?
25    A.   Yes.

Page 153

1    Q.   Did you enter into any other
2  agreements with American Shaman from March of
3  2018 until the franchise agreement was
4  terminated by American Shaman?
5    A.   Was there other agreements is what
6  you're asking me?
7    Q.   Yes.  Is the agreement that you
8  entered into with American Shaman in March of
9  2018 that you just testified was terminated in
10  early 2021, is that the only agreement you
11  entered into with them?
12    A.   No.
13    Q.   So the March 2018 agreement, when
14  was that terminated?
15    A.   At that time, around the first
16  quarter of 2021.
17    Q.   And then you entered into a
18  subsequent agreement with them; is that what
19  you're saying?
20    A.   No, no, no.  No, sir.  I got a
21  couple other locations after that and entered
22  an agreement with that.  That's what I -- I was
23  confused.
24    Q.   So the original agreement you
25  signed in March of 2018 was for one particular

Page 154

1 location?
2     A.   Correct.
3     Q.   Where was that location?  Was that
4 the one you told me about earlier?
5     A.   Yes, sir.
6     Q.   When was the next location
7 entered -- agreement entered into?
8     A.   I believe it was
9 November -- October, November -- November of
10 2018 and December of 2018.  There was two more
11 in those two months.
12     Q.   So October or November of 2018; is
13 that what you said?
14     A.   I would say November and December
15 of 2018.
16     Q.   Do you have a copy of that
17 agreement?
18     A.   I should, yeah.  I believe so.
19     Q.   I want that, too, yep.  And then
20 when was the third location?
21     A.   That was the second and third
22 location.
23     Q.   Oh, that was for two locations at
24 the same time?
25     A.   No, sir.  There was one agreement

Page 155

1 signed in November and one agreement signed in
2 December.
3     Q.   And when did you start
4 investigating doing business with American
5 Shaman?
6     A.   I believe sometime beginning of
7 2018.
8     Q.   And who were you communicating with
9 at American Shaman in the beginning of 2018?
10     A.   Vince Sanders.
11     Q.   Vince Sanders?
12     A.   Yes, sir.
13     Q.   S-A-N-D-E-R-S?
14     A.   Yes.
15     Q.   And what is Vince Sanders' position
16 with American Shaman?
17     A.   He's the I think either president
18 or CEO.
19     Q.   And how did you come in contact
20 with Vince Sanders?
21     A.   I had some Kirby guys, Kirby
22 distributors, that were in the CBD business
23 that mentioned to call him.  It might be a good
24 investment if me or --
25     Q.   Go ahead.  I'm sorry.

Page 156

1     A.   If me or any family members would
2 be interested.
3     Q.   And who are these FDs that you're
4 referring to?
5     A.   Let me think.  I know there was
6 Jason Kodak -- Todak -- Kodak, K-O-D-A-K maybe,
7 Kodak, Matt Boyd.  I know there were definitely
8 others.  Jeff Roberts.  There is others.  I
9 just don't recall at this second.
10     Q.   And then what was the reason for
11 the termination in early 2021?
12     A.   With the American Shaman?
13     Q.   Correct.
14     A.   They said it was a conflict because
15 I started my Budzburn business.
16     Q.   And how did they find out about the
17 Budzburn business?
18     A.   It wasn't a secret.  It was my
19 business.  I didn't try to hide it from
20 anybody.
21     Q.   Is the Budzburn, is that just on
22 line, or is there also a storefront?
23     A.   There is both now.  Originally when
24 it first started it was on line.
25     Q.   And I apologize because I'm not

Page 157

1 well-versed in CBD.
2     A.   That's all right.
3     Q.   Is it the same type of product
4 that -- is Budzburn, are you selling the same
5 type of product that American Shaman sells?
6     A.   You know, at the time that I
7 started Budzburn, it's no.  We were selling CBD
8 flower and --
9     Q.   CBD flour like baking flour?
10     A.   No.  The flower you smoke, flowers,
11 flowers, CBD hemp flowers that you smoke.  It's
12 a smokeable.
13     Q.   Continue.  Sorry.
14     A.   In several of their stores
15 over -- like over the course of a year, they
16 started buying it from Budzburn.  Their policy
17 at the time was, you know, you can -- you can
18 get other CBD products.  You just can't sell a
19 different brand if we were to carry it, and
20 American Shaman did not carry hemp flower, CBD
21 flower.
22         So it was fine for a while, but
23 then I think they realized a lot of their
24 people were buying from me, and I ended up
25 talking to Vince, and he was really nice, and

40 (Pages 154 - 157)

Page 158

1 he just says, Look, he was like, you know,
2 You've got to stop selling to my people. I was
3 like, I don't know if I want to. It's you
4 know -- I mean, it's sales. They go on line,
5 and they buy.
6        He was like, Well, I'm going to
7 give you a choice. You either stop selling to
8 them, or we're going to terminate your
9 franchise agreement. I said, I'd prefer you
10 terminate my franchise agreement. He goes,
11 Okay, no problem, and then he just -- that was
12 it. It was a mutual agreement, and then I got
13 out of American Shaman, and I pursued my career
14 with Budzburn.
15     Q.   So were all three franchise
16 agreements terminated in 2021?
17     A.   Yes. Yeah, everything, yes, sir.
18 They were all terminated, yes.
19     Q.   And I'm sorry if we've already
20 covered this, but when did the Budzburn start?
21     A.   It was incorporated approximately
22 in September, October of 2019. In 2019 we
23 really didn't do much business. Like we were
24 just trying to get the business going.
25     Q.   And that was all on line?

Page 159

1     A.   Yes. It was on line. We started.
2 As soon as we started it, we had a website. So
3 it was on line. Not much was happening on
4 line, but we had an on-line store that wasn't
5 doing much. So then in 2020 we went out and
6 started getting wholesale accounts and selling
7 to stores.
8     Q.   So your product would go into --
9     A.   Like a smoke shop, for example, or
10 other CBD stores.
11     Q.   And are the store locations that
12 you were using for American Shaman now the
13 store locations where Budzburn is?
14     A.   Just one of them.
15     Q.   Which one is that?
16     A.   The Wells Road, the Orange Park,
17 1871 Wells Road. Well, the American Shaman,
18 the other locations are gone. This location,
19 this 1871 Wells Road, Suite 200, but American
20 Shaman was Suite 100, so we kind of moved next
21 door; do you know what I mean?
22     Q.   Yeah. American Shaman was --
23     A.   Suite 100. We closed that down,
24 and we opened Suite 200 for Budzburn.
25     Q.   And you just rent that storefront,

Page 160

1 correct?
2     A.   Yes.
3     Q.   And what -- what is the -- what are
4 the lease agreement terms? Is it monthly?
5     A.   Five years.
6     Q.   Oh, five years?
7     A.   Yes.
8     Q.   And I think I know the answer to
9 this, but I'm going to ask it anyway. So the
10 Budzburn business was generating more revenue
11 and income than American Shaman?
12     A.   At which point are you asking?
13     Q.   I'm assuming the point at which
14 your agreement was terminated. Otherwise, you
15 wouldn't have allowed that to happen, right?
16     A.   It was probably close, maybe even
17 less, but I saw an opportunity in Budzburn and
18 believed that I would have a better choice
19 going with Budz -- you know, in getting rid of
20 American Shaman and just doing my own brand
21 which that's what we've been doing.
22     Q.   And was that the right choice?
23     A.   You know, growing a new business is
24 tough. It takes a lot of time and hard work to
25 start seeing a profit.

Page 161

1     Q.   So what -- let's just talk 2021.
2 What are the sales -- what were the sales
3 revenue for Budzburn?
4     A.   I don't know offhand.
5 We -- we -- you got the wholesale and the
6 retail store. I don't know exactly off the top
7 of my head. I think I sent you guys the
8 general ledger. I just don't want to guess.
9 We haven't had a chance to file the tax returns
10 yet.
11     Q.   What about 2020?
12     A.   2020 was -- I do recall that
13 because the return is filed on that. I believe
14 the gross revenue was $138,000, and the net
15 profit was $646 or something around there.
16     Q.   Well, what about 2019?
17     A.   It was I think we did 20 or 30
18 gross, and it all went right back in. There
19 was no profit. We were only open a couple
20 months.
21     Q.   And then what about for American
22 Shaman, what about in that first year, 2018?
23     A.   Jeez, I don't -- I don't recall.
24 It's on the tax returns I sent you guys.
25     Q.   I'm just asking what you know.

41 (Pages 158 - 161)

Page 162

1    A.   I don't recall, sir.  I'm sorry.
2    Q.   What about in 2019 for American
3 Shaman?
4    A.   I really -- I really
5 don't -- what's the question; net profit, gross
6 profit?  What's your question?
7    Q.   Just what was the revenue?  What
8 were the total volume of sales?  I don't care
9 what the accountant does in its calculation.
10 I'm just looking at top line dollar amount.
11 What are we talking about?
12    A.   I don't recall.
13    Q.   Was Bud Miley ever involved with
14 American Shaman?
15    A.   I believe so.
16    Q.   What do you know about it?
17    A.   He worked there for a little while,
18 and then he left.  That's all I know.
19    Q.   Was Bud working for American Shaman
20 at the time that you became a franchisee?
21    A.   No.  No, definitely not.
22    Q.   It was before that?
23    A.   He started working for them well
24 after.  I think it wasn't until maybe 2019, I
25 believe.

Page 163

1    Q.   So Bud started working there well
2 after you already were a franchise operator,
3 correct?
4    A.   Yes.
5    Q.   And do you know what his role was
6 there?
7    A.   President.
8    Q.   And in his role as president, did
9 you have any interactions with him?
10    A.   Yes.
11    Q.   And how is that?
12    A.   All on the phone.
13    Q.   How did you interact with him?
14    A.   Called him on his cell phone.
15    Q.   Oh, that was it, called the cell
16 phone?
17    A.   Yeah.
18    Q.   Did you meet face to face?
19    A.   In 2019?
20    Q.   At any point in time in which he
21 was the president of American Shaman and you
22 were an American Shaman franchisee.
23    A.   I believe we met one time.  They
24 had a -- and I think this may be the end of the
25 year or beginning of 2020.  They had a little

Page 164

1 meeting, conference thing, and I went up there,
2 and I saw Bud there.
3    Q.   Were you scared?
4    A.   Was I scared?
5    Q.   Yeah.  Were you scared of Bud?
6    A.   No.  I never said I was scared of
7 Bud.  I said I was scared to report to the
8 company.  I never said I was scared of Bud.
9    Q.   Did you tell Vince Sanders about
10 your prior experience with Bud with Kirby?
11    A.   No.
12    Q.   You weren't afraid that Bud would
13 say anything to American Shaman about you?
14    A.   I'm not afraid about anybody saying
15 anything about me.
16    Q.   We talked earlier about your 2016
17 bankruptcy.  Did you also file for bankruptcy
18 in 2002?
19    A.   Yes.
20    Q.   Is there anyone who you had a
21 relationship with through Kirby who is involved
22 in Budzburn?
23    A.   Oh, yes.
24    Q.   Who is that?
25    A.   Ryan Lamont.

Page 165

1    Q.   And who is Ryan Lamont?
2    A.   L-A-M-O-N-T, Lamont.
3    Q.   And who is Ryan Lamont?
4    A.   He's Ryan Lamont.  What do you
5 mean, who is Ryan Lamont?  I don't understand.
6    Q.   What is your connection to him
7 through Kirby?
8    A.   Oh, many years ago he was a
9 distributor.
10    Q.   Was he a distributor in your
11 territory when you were a divisional
12 supervisor?
13    A.   Yes.
14    Q.   And is he still a Kirby FD?
15    A.   Oh, no.  He resigned many years
16 ago.
17    Q.   And how long has he been involved
18 with Budzburn?
19    A.   I would say it was seven months.
20    Q.   And what does he -- is he your
21 employee?
22    A.   Yes.
23    Q.   And what is his job title?
24    A.   Sales manager.  I would say account
25 manager.  He just deals with our wholesale

42 (Pages 162 - 165)

Page 166

1 accounts.
2     Q.   And do you pay him a salary?
3     A.   I don't know why that's relevant,
4 what I pay him.
5     Q.   I'm not asking that.  I'm asking if
6 you pay him a salary.
7     A.   Yes.
8     Q.   And did he work for you for
9 American Shaman?
10     A.   No.
11     Q.   Did anyone who you had a
12 relationship with through Kirby work with you
13 with American Shaman?
14     A.   No.
15     Q.   Other than Ryan Lamont, is there
16 anyone else who you had a relationship with
17 through Kirby who is working with you with
18 Budzburn?
19     A.   No, sir.
20     Q.   What other FDs that were in your
21 territory when you were a divisional supervisor
22 worked -- or had a -- had a CBD business with
23 American Shaman?
24     A.   In my division?
25     Q.   Correct.

Page 167

1     A.   I don't know.  They all
2 went -- they were all recruited by Marcus Quinn
3 that you guys sued.  So all my -- 90 percent of
4 my division was taken by Marcus Quinn.  I don't
5 know of anybody that went to American Shaman.
6     Q.   What was Marcus Quinn's --
7     A.   Your CBD Store, and Kirby sued him.
8     Q.   And was Marcus Quinn an FD in your
9 division?
10     A.   No, not my division, no, sir, but
11 he was -- when I was sent to investigate all
12 these stores, they all had stores underneath
13 Marcus.  That's when I complained, and I was
14 just -- since I'm brown, I was neglected.
15 Nobody cared.  Nobody cared except for my
16 store.  Nobody cared about the white people's
17 store.  Multiple stores I should say.
18     Q.   So is your testimony that you are
19 the only person who had a CBD store and also
20 was affiliated with Kirby and whose agreement
21 with Kirby was terminated?
22     A.   Please, repeat that one more time.
23     Q.   Sure.  You just made a comment --
24     A.   Yes.
25     Q.   -- about your involvement with CBD

Page 168

1 as it relates to other people.  So my question
2 was, is your testimony here today that you are
3 the only person who had an agreement with Kirby
4 whose agreement was terminated because of
5 involvement with CBD?  Is that what you're
6 saying?
7     A.   Yes.  It wasn't until after I
8 retained counsel approximately 30 days later
9 the Kirby Company came out with a policy.  How
10 do you fire somebody when you don't even have a
11 policy?
12     Q.   Well, according to you, Kirby never
13 followed any policies, so I guess you can
14 imagine how that could have happened.
15     MS. GROEDEL:  Objection.
16     A.   Yeah.  It's called discrimination.
17     Q.   Do you know if Lamont was an
18 employee or franchisee of American Shaman?
19     A.   I'm not aware.
20     MR. MORLEY:  Let's take a quick
21 break.
22     THE VIDEOGRAPHER:  We're going off
23 the record.  The time is 3:21.  This is the end
24 of media unit number three.
25         (Brief recess.)

Page 169

1     THE VIDEOGRAPHER:  We are back on
2 the record.  This is the beginning of media
3 unit number four, and the time is 3:49.
4     Q.   All right.  Abe, we were talking
5 earlier about some personal incidents involving
6 you, and I'd asked if you had ever been
7 convicted, and you said no, and then you
8 subsequently testified that you were arrested
9 on a probation violation.
10     Q.   Why would you be on probation if
11 you've never had any criminal convictions?
12     A.   When there is a pending domestic
13 violence charge, they put you I guess on a like
14 a temporary probation.
15     Q.   How long was this temporary
16 probation?
17     A.   I don't recall.
18     Q.   You had one incident in March of
19 2011 and one in July of 2012.  Which incident
20 were you placed on probation?
21     MS. GROEDEL:  Objection to this
22 line of questioning.  I'll just have a standing
23 objection.
24     MR. MORLEY:  That's fine.
25     A.   Do I need to answer?

43 (Pages 166 - 169)

Page 170

1    Q.   Yes, you do.
2    A.   Oh, okay.  I didn't know.  I
3  believe it was the July '11 or '12, whatever
4  July was, I think.  It's hard to remember.
5    Q.   So you were arrested almost a year
6  later.  So what did you do to violate the terms
7  of your probation?
8    A.   Allegedly there was a no caller ID
9  phone call which I guess was enough to violate
10  it, but eventually I got everything dropped in
11  court.
12    Q.   So your ex-wife was alleging
13  that --
14    A.   I called -- she alleged that I
15  called her from a blocked number and no caller
16  ID.  You know, like if someone called from a
17  blocked number.  That was the terms of the
18  violation.
19          - - - - -
20      (Thereupon, Deposition Exhibit 1,
21      the Second Amended Complaint, was
22      marked for purposes of
23      identification.)
24          - - - - -
25      MR. MORLEY:  Can I have this marked

Page 171

1  as Exhibit 1, please?
2    Q.   Go ahead and hand that to your
3  attorney.  All right.  You've been handed
4  what's been marked for identification as
5  Defendant's Exhibit 1.  I want you to take some
6  time and review that document, and then I want
7  you to let me know when you've had an
8  opportunity to review it, please.
9    A.   Okay.  I reviewed it.
10    Q.   And prior to you just reviewing
11  this Exhibit 1, which is your second amended
12  complaint, right here right now, had you
13  previously reviewed this document?
14    A.   Yes.
15    Q.   Your first allegation is that Kirby
16  breached its contract with you.  What evidence
17  do you have that Kirby breached its contract
18  with you?
19    A.   I have a lot of evidence of Kirby
20  exerting control.
21    Q.   Such as?
22    A.   An official email from the
23  president stating that all supervisors, it's
24  mandatory they immediately have an office.
25  Every day they are not traveling they must be

Page 172

1  in their office between 9:00 and 5:00.  They
2  must have an admin work in house or in
3  the -- under the same roof.  That was just a
4  small part of it.  Demands, call me now, call
5  me.  You know, you can't have other businesses.
6      I believe subcontractors don't have
7  to do any of that.  I remember as a supervisor
8  having the company teach us compliance where we
9  can't tell a dealer to show up 9:00 to 5:00 or
10  he can't be there, be on time.  You can't give
11  him money to show up on time or show up at a
12  certain time, and they can't do the same thing
13  at this level, I think.
14    Q.   Is there any other evidence that
15  you have that Kirby breached its divisional
16  supervisor agreement with you?
17    A.   Yes.  I have, and I'm pretty sure I
18  submitted it, the -- what the Kirby Company
19  referred to as the divisional supervisor
20  handbook which almost every page in there acts
21  as if they are dealing with an employee and not
22  a subcontractor, the divisional supervisor
23  handbook.  I also have plenty of text messages,
24  plenty of emails exerting control.
25    Q.   And have you provided us all of

Page 173

1  those text messages and emails?
2    A.   I believe I did, sir.
3    Q.   Anything else?
4    A.   I'm sure there is other stuff.  I
5  just don't recall everything.  I mean, just all
6  the meetings that were ran exerting control,
7  when we have to do things, how, how much time
8  to spend in the field, how many hours to work,
9  let alone a salary is supposed to be for 40
10  hours a week.  For years I worked 70, 80,
11  90 hours a week.  What about overtime?
12      Being in stores, sending -- how
13  about it's mandatory that we send pictures
14  where we're at?  When you get to a place, take
15  a picture with them?  That pretty much sounds
16  like control to me.  Take pictures with the
17  distributor.
18      I have messages that I'm pretty
19  sure I sent in.  Abe is doing a great job
20  working on a Sunday.  Abe is doing a great job.
21  Praising me for months before I was asked to
22  resign, how great of a job.  I got dozens and
23  dozens of messages of how great of a job I'm
24  doing.  You know, being -- being in a
25  distributor's office from 8:00 in the morning

44 (Pages 170 - 173)

1 until 10:00 at night.
2    Q.   Do you think it's fair to say that
3 you were -- putting aside whether you think you
4 were an employee or not, do you think that once
5 you became involved with the CBD business that
6 it was impacting your role as a divisional
7 supervisor?
8    A.   I don't believe that at all, no.
9    Q.   So it's your testimony that your
10 territory and your territory sales were the
11 same or consistent once you became more heavily
12 involved in CBD?
13    A.   You know, sales in the Kirby
14 business are never consistent.  They are always
15 going up and down.  I've never had the same
16 month as I did the year before or the year
17 prior to that.  Territories change, so sales
18 change.  There have been years where they would
19 add territory to my division and make me look
20 worse the next year.
21    Q.   Let's just talk about 2018.  Let's
22 talk about the time frame say from March, April
23 of 2018 until the time when your divisional
24 supervisor agreement was terminated.
25    A.   Yes, sir.

1    Q.   Were your sales -- because that's
2 the time you got involved in CBD, correct,
3 March of 2018?
4    A.   Yes, sir.
5    Q.   So would you say that your
6 territory sales were the same or consistent
7 throughout the time frame as to what they were?
8    A.   I would say they were consistent.
9 You know, in 2017 they added territory, and
10 they gave me territory with distributors that
11 were already gone, terminated.  So those
12 numbers show -- so when they added territory,
13 my division was doing say X.  When they added
14 territory, now it's doing X1, 2.  But then by
15 the time I took over that territory, I realized
16 seven, eight locations don't even exist
17 anymore.  Either they quit, went out of
18 business, or got terminated.
19        So the following year, if you're
20 looking at from one year to last year, it's
21 like, oh, you had more stores and more sales,
22 but I never had those stores, never had those
23 sales.  I took over sales that were never there
24 which could potentially make sales the
25 following year look different and not

1 consistent.
2    Q.   So in 2018 did you have the same
3 territories that you had in 2017?
4    A.   No, sir.
5    Q.   What territories were different in
6 2018 from 2017?
7    A.   It's been a long time.  I don't
8 recall the states, but I know it definitely
9 changed.  I know I believe -- I don't want to
10 misspeak, but I do believe like Kentucky and
11 Tennessee was added, and by the time I went
12 through the territory near the end of '17 with
13 Kentucky and Tennessee, a huge number of
14 locations weren't even there.  Like they were
15 just gone.  So those numbers placed on that
16 year are going to be on that year.
17        So if they merge me or add to my
18 division let's just assume in August of 2017,
19 the next year from January 1st of '17 to
20 December 31st of '17 are going to be my
21 numbers.  But when you take over a territory
22 when a bunch of people are already gone, now
23 you have got these numbers that were fictional,
24 were never there, and then that's why numbers
25 can possibly be non-consistent with necessarily

1 sales dropping.
2    Q.   So I just want to make sure I'm
3 understanding what you're saying.
4    A.   Yes, sir.
5    Q.   So are you saying that the way in
6 which Kirby calculated or cataloged sales
7 within territories, they didn't look at you
8 individually, but they looked at whatever
9 territories were in that time frame regardless
10 of who had them, and that's what those were in
11 comparison to?
12        And what I mean by that is let's
13 say you had ten states in 2018, but someone
14 else had those ten states in 2017.  Are you
15 telling me when they are looking at your 2018
16 numbers, they are looking at someone else's
17 2017 numbers in comparison to yours?
18    A.   If that -- yes, if that territory
19 was added to my territory.  For example, this
20 is my current ten states, and then they add
21 three states, not at the beginning of the year,
22 the beginning of the year is a little bit
23 different, but added them -- I believe in
24 August or September they added, I'm trying to
25 recall, three states.

45 (Pages 174 - 177)

1       So here's the three states they
2   added.  Starting in January of '18, they are
3   going to take these three states, merge them
4   with my current division, my current states,
5   and, yes, even if I took these three states
6   over let's just assume in September of 2017,
7   they are going to take the numbers from January
8   1st of 2017 to September 1st of 2017 and merge
9   them into my entire numbers for '18 which is
10  totally never worked.
11      Because when I took over this
12  division, they said, oh, you have 20 stores.
13  By the time I called everybody, went and
14  visited there, there is, and I'm estimating,
15  from what I can recall almost half were gone.
16  So when those ten people were gone or ten
17  locations were gone, those ten locations had
18  sales from January 1st to September 1st.  They
19  had sales whether it's 100, 20, 500.  Those
20  sales are now on the books in my new division
21  combined for 2018.
22      So if those people are gone before
23  I took them, yes, they are counting those sales
24  as a negative towards my division that I didn't
25  have.  It was terrible.

1   Q.   Any other evidence of the company
2   exercising control?
3   A.   I mean, there is the pictures, the
4   text messaging, the demands to call.  You know,
5   Abe, call corporate now.  Abe, call me now.
6   9:00, 10:00 at night text messages, Abe, you
7   need to call me right now.  Abe, you're missing
8   two numbers from two distributors on your sales
9   reports.  You need to immediately fix this.  At
10  9:00 at night you need to immediately fix this
11  and turn it into me in the next 30 minutes.  I
12  felt that was pretty controlling.
13      Calling?  If I said I was going to
14  go see Mr. Jones on May 5th, on many occasions
15  Mr. Reitmeier would call that location to make
16  sure I'm there.  That seemed like control to
17  me.  And there is many other multiple
18  situations I just can't really think of right
19  now.
20  Q.   Going back to the office, that
21  alleged office requirement wasn't throughout
22  the entirety of your DS agreement, correct?  I
23  think you said it happened in about 2015, and
24  then you said you didn't have an office in 2016
25  or '17, and then you were told to have an

1   office again in 2018; is that correct?  I just
2   want to make sure I'm remembering that
3   correctly.
4   A.   I believe so.  I know it's changed.
5   It's --
6   Q.   Well, I'm just talking about when
7   you were a DS from 2010 to 2018.
8   A.   Yes, sir.
9   Q.   My recollection of your prior
10  testimony was you only had an office space in
11  2015 and then again in 2018.  Otherwise, you
12  were working out of your home.
13  A.   I might have misspoken.  In 2010 I
14  still had my factory distributorship office,
15  and I finished the year working out of there
16  dissolving my distributorship.  That was -- I
17  apologize.  I know I said it was my house, but
18  2010 my -- no, we did it.  It was 2011.  It was
19  November 2010.  So they gave me six months into
20  2011 to dissolve my distributorship.  I was in
21  an office in Orange Park off of Blanding
22  Boulevard.  I apologize.  I forgot about that.
23  Q.   But that was your choice, though.
24  No one told you at that point in time that you
25  had to.

1   A.   At that point, yes, it was my
2   choice.  Yes, sir.
3   Q.   So it wasn't until 2015 where you
4   said -- I think you said Bud sent an email and
5   you had to be in an office, and then you were
6   not in an office in 2016 and 2017, and then you
7   said again in 2018; is that correct?
8   A.   Yes.  It's I think when they sent
9   that email out is when I started going to
10  Ocala.
11  Q.   And then in 2018, March of 2018,
12  you open up your American Shaman franchise.
13  How often were you there?
14  A.   It was May, I believe, mid May of
15  2018 when that store opened up.
16  Q.   And how much time were you spending
17  there a week?
18  A.   Not a lot of time.  Sometimes I
19  would pop in there on the weekends or the
20  evening time after I got done working downtown
21  in my office.
22  Q.   So it was your --
23  A.   I've never -- I've never -- I'm
24  sorry.  Go ahead.
25  Q.   No, you go ahead.

46 (Pages 178 - 181)

Page 182

1    A.  I've never stood in the retail
2 store and worked the retail side.  I've never
3 worked the store.  I did some business
4 operations in the back end.
5    Q.  So is it your testimony that you
6 never were in your American Shaman store at any
7 point in time working in 2018?
8    A.  Never been in it?  I'm not saying
9 I've never been in it.
10    Q.  No, but I mean working.  If I
11 understood what you just said correctly, and
12 you correct me if I misunderstood you, I
13 thought you said if you were in the store, you
14 were in the back doing stuff.  You weren't
15 working.  Is that what you said, or am I
16 misunderstanding you?
17    A.  That's correct.  I have never stood
18 up front and worked the retail shop.  I've
19 popped in there on maybe a Saturday or Sunday,
20 but I've always had an employee running the
21 store, running the retail.
22    Q.  When you say an employee, is it an
23 employee who -- again, I'm not well-versed in
24 this --
25    A.  Yes, sir.

Page 183

1    Q.  -- but I go in there and want to
2 buy whatever product.  I think before you were
3 talking about hemp flowers maybe or that was
4 the other one.
5    A.  CBD oil.
6    Q.  CBD oil.  So I go and want CBD oil,
7 and I pick it out from a counter or whatever,
8 and then there is an employee there that cashes
9 me out; is that how it works?
10    A.  Yes.  Yes.
11    Q.  And what were the store hours at
12 that American Shaman location?
13    A.  They have changed over the years,
14 but I believe at the time in '18, from what I
15 can remember, it was 10:00 in the morning until
16 8:00 p.m.
17    Q.  With your office space in
18 2018 -- I'm sorry.  I lost that question.  I'll
19 withdraw the question.
20        Is that daily 10:00 a.m. to
21 8:00 p.m. at the American Shaman store?
22    A.  That was Monday through Friday.
23    Q.  And what were the weekend hours?
24    A.  Saturday I believe it was 10:00 to
25 6:00 and Sunday 12:00 to 5:00.

Page 184

1    Q.  All right.  Going back to the
2 question I was going to ask you before, for the
3 office space you rented in 2018, how would you
4 get into that office?
5    A.  It was a building similar to this.
6 It was a big building, and I would park my car
7 in the designated for people that, you know,
8 have a lease or whatever in that area, and then
9 I had a key card where you scan it.  You had to
10 scan to get in the elevator.  It was high up.
11 I can't remember the exact floor.  It kind of
12 reminds you of this, similar to this.
13        You would walk in.  There was a
14 reception.  You know, there is one of the rooms
15 is my office which would always be locked, and
16 I'd use my card to unlock my personal office, a
17 shared bathroom, a shared break, kitchen area.
18    Q.  And you don't recall the name of
19 the building or the management company?
20    A.  I can -- I'll definitely get it for
21 you, but I don't recall.
22    Q.  Okay.  Yes, I would like you to get
23 that for me, please.
24    A.  As a matter of fact, Mr. Reitmeier
25 came to visit me in my office there.  At a

Page 185

1 minimum once, maybe twice that year he came to
2 visit me in my office, and we sat and worked in
3 my office.
4    Q.  Other than a couple of times you
5 mentioned Kevin coming and visiting with you,
6 when you were performing services as a DS, were
7 you by yourself?
8    A.  You mean asides from Kevin visiting
9 me?
10    Q.  Correct.
11    A.  Yes.
12    Q.  If you were holding a rally, you
13 were the one doing it?
14    A.  Correct.
15    Q.  If you were visiting an FD, you
16 were the one doing it?
17    A.  Correct.
18    Q.  And did anyone tell you what you
19 had to do when you were holding a rally or
20 visiting an FD?
21    A.  Yes.
22    Q.  Who told you, and what did you have
23 to do?
24    A.  It was in supervisory meetings from
25 the president ever since really 2005 until '18.

47 (Pages 182 - 185)

Page 186

1 Show up early the night before. If the
2 distributor is available, ask him and if he or
3 she has a spouse if they would like to meet for
4 dinner to talk business, how to discuss
5 business at the business meeting, only drink
6 one or two drinks when you're at dinner with
7 them, go to a -- don't go to an expensive
8 place, not the most expensive, but go to a nice
9 restaurant, conduct some meeting plan at the
10 dinner, what you're going to plan tomorrow for
11 the meeting which -- talk to the distributor
12 about how to -- to pick out what salespeople
13 you want to talk to to put them on a program to
14 promote them to DT or talk to DTs to promote to
15 FD.
16      I mean, there is books and books of
17 every single day, every single minute of what
18 to say and what to do while you're there. Show
19 up in the morning, greet everybody, come in
20 early, have the distributor talk about their
21 sales and then introduce me, introduce my
22 sales, bring me up there. I talk to everybody.
23      Before everybody leaves, I sit down
24 with the distributor, program their people. We
25 have program sheets. Here's the sheets you

Page 187

1 use. Have them fill these out. Then you
2 submit them to us so we can promote people.
3      Then after that sit with the
4 distributor as long as it takes was the
5 instructions, whether it's one hour or eight
6 hours, help the distributor get sales approved,
7 look at their backgrounds, look at their
8 recruiting department, look at everything,
9 pretty much completely train the distributor.
10     Q.   And you keep saying that you were
11 required to do this or it was mandated because
12 Kirby was controlling you.
13     A.   Yes.
14     Q.   Were they really mandates or
15 recommendations, or were they more best
16 practices?
17     A.   Let me give you an example. I
18 would get a phone call from the president at
19 the time. He would say, Mr. Sharqawi, I just
20 reviewed your calendar, and I think you need to
21 travel. I'd go, What do you mean? Well,
22 you're traveling X amount of days. I want you
23 to travel five more days. I want you to go see
24 these people.
25      We actually even at one point -- it

Page 188

1 changed over the years, but we had a list, and
2 they'd put up in the meeting and with like a
3 checkmark all the distributors' names and a
4 checkmark of where I've been and the procedure,
5 policy, I don't know, whatever you want to call
6 it, but we were told you have to see every
7 single person within 90 days. Within every 90
8 days, you have to see every single factory
9 distributor in your division.
10     Q.   So let me ask you a question. The
11 Kirby Company was paying you $250,000 a year,
12 correct?
13     A.   Correct.
14     Q.   What were you supposed to do for
15 $250,000, sit on your hands?
16     A.   No.
17      MS. GROEDEL: Objection to the form
18 of the question. You can answer.
19     A.   No. Of course I didn't expect to
20 sit on my hands.
21     Q.   Weren't you expected to travel?
22     A.   Sure.
23     Q.   Weren't you expected to meet with
24 the FDs?
25     A.   Yes.

Page 189

1     Q.   Weren't you expected to do all the
2 things you described for the $250,000?
3     A.   Yes, but I should have been W-2'ed.
4 Kirby Company should have paid for an office
5 for me, should have paid for my admin, should
6 have paid for my travels and executive. It
7 was -- it was a rumor for many years, and there
8 was corporate guys saying these vacuum guys are
9 too stupid to do anything about it, just keep
10 on 1099'ing them, and I just got tired of it.
11     Q.   You make it sound like you were
12 making minimum wage. You were paid $250,000,
13 right?
14     A.   I barely made 100,000 a year.
15      MS. GROEDEL: Excuse me. Just
16 wait. Objection to the form of the question.
17 Please give me three seconds to object.
18      THE WITNESS: I'm sorry.
19     Q.   So you barely made ends meet; is
20 that what you're saying?
21     A.   Yeah.
22     Q.   Didn't you own a Maserati?
23     A.   I did.
24     Q.   Didn't you live on a boat that you
25 owned?

48 (Pages 186 - 189)

Page 190

1     A.   I did.
2     Q.   Didn't you live on $1 million
3  waterfront property?
4     A.   Yes.
5     Q.   Yeah, it must have sucked.
6     A.   I lost all that after I became
7  supervisor.
8          MS. GROEDEL:  Please, Ryan, please.
9  Please don't.
10    A.   That was all made when I was a
11 Kirby distributor.
12    Q.   So just so I'm understanding you
13 correctly, you knew for years that you thought
14 you were misclassified?
15    A.   I didn't know right off the bat,
16 no.  I didn't realize it, not immediately.
17    Q.   Well, you just said you guys had
18 been talking about it for years.  So which was
19 it, were you talking about it for years or --
20    A.   I mean, how many years are you
21 referring to?  Be detailed with the question,
22 please.
23    Q.   So when did you know?
24    A.   Roughly probably about 20 -- 2014
25 is when I realized I'm being very controlled.

Page 191

1  My -- it's once -- it's not $250,000 a year.
2  That was a lie.  Once you pay all the things
3  you're supposed to pay and you're supposed to
4  do, it's about 80, 90 grand a year.
5     Q.   And who did you complain to about
6  this?
7     A.   I complained to Bud Miley.
8     Q.   When did you complain to Bud?
9     A.   It was around the time when he sent
10 the email demanding mandatory get an office or
11 be a distributor.
12    Q.   How did you complain to him?
13    A.   I called him.
14    Q.   And what did you ask him to do?
15    A.   I complained.  I said this is not
16 enough money.  I said 250 grand a year, by the
17 time you pay for distributor meetings, I get an
18 office, I already pay an admin, and you add all
19 this stuff, it's like selling 50 Kirbys a month
20 as a distributor.  I was selling 200 Kirbys a
21 month to do this, and then you guys offer me
22 this job to put me in a position where, look, I
23 just was totally mislead with -- if it
24 was -- if I was W-2'ed, it would have been
25 totally fine.  I would have made a lot more

Page 192

1  money.
2          Like no one wants to get an
3  executive job and then have to pay for
4  everything.  Oh, run a meeting.  By the way,
5  you're paying for it.
6     Q.   So if I'm hearing you correctly,
7  you didn't complain until four years into doing
8  this?
9     A.   Correct.
10    Q.   And you didn't ask him to do
11 anything to address your complaint, correct?
12    A.   I did.
13    Q.   What did you ask him to do?
14    A.   I said this isn't enough money.  I
15 said, by the time I travel and take all these
16 expenses out, I ain't making crap.  His answer
17 was then be a distributor.
18    Q.   Didn't they pay for your travel at
19 some point?
20    A.   Part of it, yes.
21    Q.   Did you ever follow-up with anyone
22 else about it?
23    A.   No.
24    Q.   When you had to sign your new
25 agreement as it relates to your territories,

Page 193

1  did you try to negotiate for more money?
2     A.   They tried to take away my 3,000 a
3  month expense account, and I negotiated to keep
4  that when Kevin became president in 2018.
5     Q.   So Kevin allowed you to keep the
6  expense account?
7     A.   Yes.  I had a 3,000 a month
8  allowance.
9     Q.   Any other evidence you have
10 relating to Kirby's breach of the divisional
11 supervisor agreement?
12    A.   The mandatory meetings that we had.
13    Q.   The four we talked about
14 previously?
15    A.   Okay.  So I think we covered -- we
16 might have covered it.  There might be
17 something else.  I just can't recall right now.
18    Q.   You selected your office, correct?
19    A.   Yes.
20    Q.   And you selected what kind of phone
21 you were going to use, correct?
22    A.   Correct.
23    Q.   You selected what kind of car you
24 were driving, correct?
25    A.   Correct.

49 (Pages 190 - 193)

Page 194

1    Q.   You selected the locations for all
2 of your sales meetings and the decisions
3 regarding the details of your food, et cetera,
4 correct?
5    A.   Correct.
6    Q.   You selected how many employees you
7 were going to have and who you would hire as
8 those employees, correct?
9    A.   Not correct.
10   Q.   Did someone tell you who to hire?
11   A.   No.  They told me I needed to hire
12 someone, and they needed to -- I needed to have
13 an office, and they had to work in my office,
14 they couldn't be remote, which I thought was
15 ridiculous.
16   Q.   And that wasn't until 2018, though
17 correct?
18   A.   That's happened before, but I
19 argued back and forth and said, Look, Deshae,
20 she did a great job, and I don't want to lose
21 her.  They made exceptions for me on occasion.
22   Q.   But in 2018 you didn't employ an
23 admin.  It just was part of your --
24   A.   Because they wouldn't let me.  They
25 controlled me, and they said you cannot have

Page 195

1 Deshae three hours away from you.  You have
2 to -- she or you have to show up in the same
3 location every single day.  And that totally
4 affected my division, too, because she was so
5 great with everything, and all of a sudden now
6 I'm starting over having to train a new admin
7 because the Kirby Company controlled me and
8 told me I had fire her.
9         She was really upset.  She couldn't
10 believe it happened, either.  I guess there's
11 your other example of control.
12   Q.   And you said you terminated her
13 employment?
14   A.   I was forced to, yes.
15   Q.   And how did you go about
16 terminating her employment?
17   A.   I gave her a call, and I said,
18 Deshae, you've been great.  Over the phone is
19 how I terminated her.  I said, The Kirby
20 Company has a new policy, and it's mandatory
21 that you have to come to my office.  I'm
22 getting an office in downtown Jacksonville.  I
23 know you live -- I think she lived in
24 St. Petersburg, Sarasota, Tampa, that area.
25         And I said, Before I say anything

Page 196

1 else, are you willing to drive three-and-a-half
2 hours every day to work?  She goes, Are you
3 being serious?  I said, Look, I'm sorry.
4 You're awesome.  I don't want to lose you, but
5 the Kirby Company said if you and I don't meet
6 in the same location every single day, you
7 cannot be my admin, and she was literally in
8 tears.
9         It caused a lot of stress for me
10 especially the first couple months trying to
11 train the new lady at that location.  It just
12 was chaos.  I wish I has been able to keep her.
13   Q.   Did you have insurance?
14   A.   What type of insurance?
15   Q.   Any type of insurance.
16   A.   Yes.
17   Q.   Who selected your insurance?
18   A.   I selected my insurance.
19   Q.   When you traveled did you decide
20 how you were going to get to your locations?
21   A.   Yes.
22   Q.   Did you decide who and when you
23 were going to visit?
24   A.   Most cases, yes, most times.
25   Q.   Did you decide how much you were

Page 197

1 going to spend on travel-related expenses?
2    A.   I guess.
3        MS. GROEDEL:  Don't guess.
4    A.   I mean, sometimes you didn't have a
5 choice.  If I was told you need to be -- you
6 need to go see Mr. Distributor in Tennessee, I
7 had to get on a flight or drive, and I had to
8 spend that money to get there.
9    Q.   Other than those one-off occasions,
10 you were the one determining, correct?
11   A.   Yes, sir.  Yes, sir.
12   Q.   Have you asked your accountant to
13 run an analysis of your taxes if you were
14 properly classified, in your words, as a W-2
15 employee?
16   A.   No, I never have.
17   Q.   Would you be surprised to learn
18 that you would owe more in taxes than what you
19 paid?
20       MS. GROEDEL:  Objection to the form
21 of the question.
22   Q.   You can answer it.
23   A.   I'm surprised how a big company
24 gets away without paying W-2 wages.  I know the
25 government doesn't take too kindly over that.

50 (Pages 194 - 197)

1    Q.   So if you are in fact misclassified
2 as you claim, are you going to go back and
3 amend your taxes and refile them for those tax
4 years?
5    A.   I think you guys would have to do
6 that, right, pay all my taxes so I get a tax
7 return?  You were my employer.
8    Q.   Are you testifying that you don't
9 think you owe taxes if you're an employee?
10    A.   I'm not testifying that, no.
11    Q.   Right.  So my question to you was,
12 are you as an individual taxpayer going to go
13 back and refile your taxes as an employee?
14    A.   Am I going to do it personally?
15    Q.   Yeah, are you.
16    A.   No.
17    Q.   Why not?
18    A.   It's not my responsibility.
19    Q.   It is as a taxpayer.
20        MS. GROEDEL:  Objection.  You're
21 not to tell him what his responsibility is as a
22 taxpayer, please.
23    Q.   So if it's determined that you were
24 misclassified and should have been an employee,
25 are you going to go back and amend your taxes

1 and pay what you owe as a W-2 employee as
2 opposed to the taxes that you paid as an
3 S corp?
4    A.   I don't know the answer to that.
5    Q.   Okay.  Well, if you would owe more
6 money in taxes, are you going to go and fix
7 that?
8        MS. GROEDEL:  Objection.
9    Q.   You can answer.
10    A.   That's something -- look, I'm not
11 an accountant.  That's something I would want
12 advice from my accountant.
13    Q.   You don't need to be an accountant
14 to answer my question.
15    A.   Yeah, I do.  I'm not an accountant.
16        MS. GROEDEL:  He answered your
17 question.
18        MR. MORLEY:  No, he didn't.
19        MS. GROEDEL:  Yes, he did.
20    Q.   My question is, if you owe more in
21 taxes, are you going to pay those taxes or not?
22 It's a yes or no question.  You don't need to
23 be an accountant.  You just have to answer my
24 question.
25        MS. GROEDEL:  Objection.

1    A.   What kind of taxes; state tax,
2 federal tax, income taxes?
3    Q.   All of the above.  If it's
4 determined that you were an employee and you
5 owe more in taxes than what you paid, are you
6 going to go and correct that?
7    A.   I think that the Kirby Company
8 would be responsible to go back and pay me the
9 proper way since I was misclassified.  If I was
10 deemed misclassified, I'm sure there will be
11 fines.  There will be penalties on the Kirby
12 Company, not on me.
13    Q.   My question to you, and if you're
14 not going to answer my question, we will get
15 the court involved, and the court will instruct
16 you --
17        MS. GROEDEL:  Yes.  Let's do that.
18 Let's get the court involved.  Asking him a
19 hypothetical, if he's over in taxes what's he
20 going to do, and he said he's not an accountant
21 and he doesn't know what he is going to do, if
22 you want more of an answer, call the court.
23        MR. MORLEY:  Are you done?
24        MS. GROEDEL:  Yes, done.
25        MR. MORLEY:  Great.

1    Q.   Okay.  What evidence do you have
2 that you -- that -- for your claim of unjust
3 enrichment?
4    A.   I believe it was in the best
5 interest of Kirby Company to 1099 me instead of
6 paying proper wages and withholding taxes from
7 my check that would have saved them money.
8 Naturally, everybody knows it benefits somebody
9 to 1099 someone because that way you're not
10 paying unemployment tax, federal tax, state
11 taxes.
12        I believe that was very wrong for
13 the company to do, and they just did it to
14 benefit themselves which I'm sure saved them
15 hundreds of millions over the years of
16 supervisors they didn't pay properly.
17    Q.   And you yourself 1099'ed people in
18 your companies, correct?
19    A.   That's correct.
20    Q.   And it benefited you, correct?
21    A.   Correct.  It was the way I was
22 trained from the Kirby Company what to do, but,
23 at the same time, I was told with Kirby if they
24 are a secretary, a DPS, a service manager, W-2
25 them.  I did exactly per their instructions.

51 (Pages 198 - 201)

Page 202

1 As a first-time business owner not
2 understanding how everything works, I followed
3 their instructions and did exactly what they
4 asked.
5     Q.    And take a look at page 9 of your
6 second amended complaint, paragraph 46.
7     A.    Yes.
8     Q.    It says you were required to pay
9 hundreds of thousands of dollars including
10 payroll taxes.  Whose payroll taxes were you
11 paying?
12     A.    I'm sorry.  Tell me where I'm
13 supposed to look, page 9?
14     Q.    Yep, paragraph 46, No. 46.  What
15 payroll taxes did you pay?
16     A.    Payroll taxes for my W-2, my
17 admin's W-2.  That's what I believe is payroll
18 taxes.
19     Q.    We talked about some of this other
20 stuff.  What equipment leases did you have?
21     A.    For several years I leased a
22 photocopy machine.  I think it was a five-year
23 lease, and it was a $15,000 copier.
24     Q.    Do you have a copy of that lease?
25     A.    No, sir.  I've tried to get a lot

Page 203

1 of stuff.  Most companies, after three to five
2 years, they have no records of nothing.  I
3 mean, I spent hours.
4         MS. GROEDEL:  He just asked you a
5 question.
6         THE WITNESS:  All right.
7     A.    No.
8     Q.    When did you have this photocopier
9 that you leased?
10     A.    I don't recall the exact dates.  It
11 was when I became a supervisor.
12     Q.    How much did you pay in Workers'
13 Compensation?
14     A.    I don't know the exact amount.
15     Q.    Did you carry Workers'
16 Compensation?
17     A.    I believe I did.
18     Q.    Do you have a policy evidencing
19 that you did?
20     A.    No.
21     Q.    Because I'm pretty sure under
22 Florida law you don't need to cover it unless
23 you have more than four employees, so I'd be
24 shocked if you had Workers' Compensation
25 coverage.

Page 204

1         MS. GROEDEL:  Objection to your
2 testimony.
3     Q.    Does that help refresh your memory
4 about whether you had Workers' Comp coverage?
5     A.    I don't recall.
6     Q.    Well, would you have records of
7 paying for Workers' Comp coverage?
8     A.    No.  I don't have any records.
9     Q.    Did you ever see the policy that
10 you had Workers' Comp coverage?
11     A.    I might have the first year when I
12 was in the transition of dissolving my
13 distributorship and becoming a supervisor in
14 2011.
15     Q.    Because as an FD you would have had
16 enough employees?
17     A.    I had enough employees, yes, sir.
18     Q.    So when you were DS, you probably
19 didn't have the coverage?
20     A.    Not for the whole term, no.
21     Q.    What about unemployment
22 compensation, what evidence do you have of
23 making payments for unemployment compensation?
24     A.    Unemployment came out of -- I
25 believe, unless I'm not understanding

Page 205

1 unemployment compensation, it is automatically
2 taken out of payroll through payroll services.
3     Q.    And that would be for you as your
4 own employee and the admin?
5     A.    Yes, sir.
6     Q.    Not for the 2018 admin, though,
7 correct?
8     A.    That's correct, not that year.
9 That was included in the -- in the monthly
10 payment with the other services.
11     Q.    Did you collect or try to collect
12 unemployment compensation in 2018?
13     A.    I don't understand.
14     Q.    After your divisional supervisor
15 agreement was terminated, did you collect or
16 attempt to collect unemployment?
17     A.    Absolutely not.
18     Q.    You allege that the agreement was
19 procured in bad faith.  What evidence do you
20 have of that?
21         MS. GROEDEL:  Objection, asked and
22 answered.  You can answer again.
23     A.    That when I was -- when I sat down,
24 it was explained to me the position of the
25 divisional supervisor position would be 250,000

52 (Pages 202 - 205)

Page 206

1 a year salary, and it was not explained in
2 detail.  It was misrepresented how much money I
3 was going to be spending out of that 250 grand
4 to actually work and get the job done.
5     Q.    All right.  Your third count,
6 national origin discrimination, what evidence
7 do you have of national origin discrimination?
8         MS. GROEDEL:  Objection, asked and
9 answered.  You can answer again.
10    A.    I reported to Mr. Lamb, reported to
11 Kevin.  There was dozens and dozens of
12 Americans that were affiliated with the Kirby
13 Company that had CBD stores.  As a matter of
14 fact, even ten days before Mr. Reitmeier asked
15 me to resign, he had me going, traveling with
16 him investigating these other people with CBD
17 stores to find out it was only a problem with
18 me.  Everybody had a store.  I never thought it
19 was an issue.
20    Q.    And you told us that you had a CBD
21 store when you were complaining about being
22 treated differently?
23    A.    At a certain timeline, yes.
24    Q.    Okay.  When did you tell us that
25 you had a CBD store?

Page 207

1     A.    I believe it was sometime around
2 June.
3     Q.    And who did you tell that you had a
4 CBD store?
5     A.    Mr. Reitmeier, and a few days after
6 that I talked to Mr. Lamb.
7     Q.    And you told Mr. Lamb that you had
8 a CBD store?
9     A.    Yeah.  I said I opened a store to
10 help my daughter make some money.  I'm not in
11 there.  Kevin has been busting my chops about
12 it.  I've talked to other supervisors and
13 distributors that have other businesses and CBD
14 stores, and they never received one phone call.
15        All the way up to the end of July,
16 I talked to at least a dozen people that never
17 got one phone call from Kevin, and I got half a
18 dozen calls concerning if I invested money, do
19 I go there, how much money I put into it, do I
20 get money out of it.  No one else was talked
21 to.  No one else was harassed but me.
22    Q.    And you keep referring to these
23 other individuals --
24    A.    Yes.
25    Q.    -- as Americans, but do you know

Page 208

1 what their actual national origin is?  Because
2 you're technically Canadian, right?
3         MS. GROEDEL:  Objection.
4     A.    I have a Canadian citizenship, yes,
5 yeah.
6     Q.    So when you keep calling these
7 people Americans, I mean, do you know that, or
8 are you just saying that because they are
9 white?
10    A.    No.  I know that.
11    Q.    And how do you know that?
12    A.    Because I've known a lot of these
13 people for over 20 years.  I've been in the
14 business 27 years.  I know a lot of these
15 people.  At one point I knew almost everyone,
16 almost everybody at Kirby.
17    Q.    And everyone at Kirby knew your
18 national origin, also, right?
19    A.    I would assume so.  I don't know.
20 That's a question for them.
21    Q.    Other than your claim that you told
22 Mr. Reitmeier and Mr. Lamb, do you have any
23 knowledge or evidence that other people were
24 aware of your national origin, or are you just
25 saying that they were aware of it?

Page 209

1     A.    I'm sorry.  Can you say that again?
2     Q.    Yeah.  Do you have any evidence
3 that others besides the two people you
4 identified actually had knowledge of your
5 national origin?
6     A.    If they had knowledge?  I don't
7 know if they had knowledge.  I don't know.
8     Q.    So who subjected you to alleged
9 adverse employment actions?
10    A.    I don't understand the question.
11        MS. GROEDEL:  Objection to the form
12 of the question using legal terminology, and
13 he's not a lawyer.
14    Q.    All right.  In the paragraph 59 of
15 your complaint, it says, "Defendants took
16 adverse employment actions against plaintiff."
17 Who are you talking about?  Was that Kevin, or
18 was that someone else?
19    A.    Oh, I'm referring to Kevin.
20    Q.    And Kevin never said anything to
21 you or texted you anything relating to your
22 national origin, correct?
23    A.    He didn't have to.
24    Q.    So he didn't, correct?
25    A.    He didn't.  No, he didn't text.

53 (Pages 206 - 209)

Page 210

1    Q.   All right.  Your next allegation is
2 retaliation for reporting discriminatory
3 conduct.  What protected activity did you
4 engage in?
5    A.   Well, in June, approximately June
6 or July or the end of June, the beginning of
7 July, is one of the times I called Mr. Lamb,
8 and I said, Mr. Lamb, I feel like I'm being
9 discriminated against.  He goes, What are you
10 talking about, Abe?  I said, Well, Kevin has
11 been calling me non-stop asking me personal
12 questions about having a side business, which
13 as a subcontractor, I'm supposed to have any
14 business I want on the side if anybody wanted
15 to.
16       I explained to him how other
17 supervisors have side businesses.  How
18 international, the vice president of
19 international -- Jon Solomon, had an extended
20 warranty plan which is a huge violation of
21 Kirby Company policies.  Everybody knew about
22 that.  How Tony Hay was extending the warranty
23 program as well.  Everybody knew about that.
24 He was selling 50 a month, driving Ferraris and
25 Lamborghinis, and he was probably getting -- I

Page 211

1 talked to him.  He told me he was getting 40 or
2 50 grand a month which is illegal.  In Europe,
3 I don't know the name of him, but the state
4 attorney of Europe wasn't happy about it and
5 was investigating it to my knowledge.  I
6 brought that up.
7    Q.   You told this to Mr. Lamb?
8    A.   Mr. Lamb, yes, sir.  I sure did.
9 And I said, I've called.  At that point I was
10 telling him I talked to several people.  He
11 said, Like who?  I said, Like Charlie Nugent,
12 Tony, Marcus.  Not one of them received a phone
13 call from Kevin.  Or even CBD, what are you
14 doing, how much money are you spending, like
15 all the questions I got, and I feel like I'm
16 being picked on or being discriminated on.  And
17 he says, Abe, I'm sure that's not the case.
18 I'll get back with you.
19       He called me back one or two days,
20 I can't recall, one or two days later and says,
21 Abe, we just want you to, you know, just focus
22 on your division and do your best efforts and
23 everything will be fine.  I said, Okay.  I just
24 don't want to be bothered about what I do with
25 my personal money.  I don't think that's

Page 212

1 anybody's -- anybody's business, and I just
2 feel very upset that a bunch of other people
3 are doing the exact same thing, but nobody has
4 got one phone call.
5    Q.   So you told him?
6    A.   Mr. Lamb that.
7    Q.   You told Mr. Lamb I have a CBD
8 business, I know other people have a CBD
9 business, and I feel like I'm the only one who
10 is having a problem because I have a CBD
11 business; is that fair to say?
12    A.   Yes, sir.
13    Q.   And then what are you saying
14 happened after you talked to Mr. Lamb?
15    A.   The retaliation got worse.  Kevin
16 would start calling me.  I have -- I sent you
17 all the text messages.  On WhatsApp -- so
18 here's what happened on WhatsApp in July and
19 August.  On WhatsApp he would sit there and
20 tell everybody how great of a job I'm doing.
21 Look at Abe traveling.  Look how hard he's
22 working.  Look at all the people he's
23 promoting.  Great job, Abe.
24       With all my peers, there is a group
25 text or group messaging platform I guess you

Page 213

1 could say, and, you know, if you need me to
2 resubmit them, I'll be more than happy to
3 resubmit every single message.  Abe is doing a
4 great job.  Abe is working on a Sunday.  Abe is
5 working late on a Saturday.  Abe is promoting.
6       Kevin is praising me over weeks,
7 and then -- and I've got the personal text
8 messages between me and Kevin.  So here's the
9 WhatsApp messages.  I got the personal text
10 messages the same day.  You could see him, Oh,
11 Abe is doing a great job, and then he's texting
12 me, What are you doing, Abe?  You need to work
13 more.  You need to call me right now.
14       I know at one point, you know,
15 speaking about terminating people, on the
16 WhatsApp, which I'm sure nobody saw but the
17 supervisors, and I'm just trying to do the
18 right thing, but a couple of supervisors and
19 Mr. Reitmeier said, Great job.  This was the
20 beginning of August.  Great job.
21       Abel Rodriguez, he was the
22 distributor that the company recently
23 terminated for bad compliance.  They are
24 saying, Oh, he's got 28 personal sales, and
25 they are praising him.  So I put on the

54 (Pages 210 - 213)

Page 214

1 WhatsApp's, I said, I'm confused. The Kirby
2 Company just terminated this man, and you guys
3 are praising him? I said that right on the
4 WhatsApp's.
5        Then a couple minutes later on my
6 text message, Abe, do not go against me on
7 WhatsApp. If you have a problem, you call me.
8 I'm like, I just don't understand. We just
9 terminated this man a few weeks ago, and now
10 you're praising him and I get in trouble for
11 saying why are we praising this guy we just
12 terminated? It's all right there. So I'm just
13 starting to get harassed back and forth with
14 Mr. Reitmeier. It was just never ending.
15        Then right after in the biggest
16 devastating blow was that last week I traveled
17 with Mr. Reitmeier I think about four or five
18 days, the week he wanted me to go and
19 investigate these other people with CBD stores
20 that was nothing was happening. I even have a
21 text message July 31st. I got frustrated.
22 Mr. Reitmeier said, Abe, you need to call me
23 immediately. I said, Why? I don't want to
24 talk to you. Marcus Quinn has recruited over
25 half my division to go to his business, and

Page 215

1 you're doing nothing about it, but you want to
2 call me and bust my chops? It's in a text
3 message.
4        And then we traveled, and then
5 right after we traveled, Oh, we're going to get
6 rid of you, Abe? Like what about everybody
7 else? Why am I being picked on?
8     Q.   Any other evidence?
9     A.   No.
10     Q.   All right. Tell me what your
11 damages are.
12     A.   It is just very emotional. I put
13 27 years in the business, and it's like when my
14 grandma died, we knew it was coming. This was
15 very sudden. It was shocking. I was 19 years
16 old when I started for the company. I stuck
17 with the company. When distributors went out
18 of business, I would drive five hours down the
19 road to work for another distributor because I
20 just wanted to be a distributor. I just wanted
21 to be a supervisor one day.
22        In 27 years to all of a sudden have
23 overnight zero income? It was devastating. I
24 couldn't sleep. I lost quality of life with my
25 children. I didn't know what to do. I'm a

Page 216

1 high school dropout. All I knew was Kirby.
2     Q.   Well, to be fair, you were already
3 doing the CBD stuff at that same time, right?
4     A.   It wasn't making any money. It
5 wasn't paying -- it wasn't making any money.
6 It was barely paying the rent and employee
7 payroll to be fair.
8     Q.   I'm sorry. I didn't mean to cut
9 you off. Did you have any upfront expenses
10 with the CBD business? Like did you have to
11 pay a certain amount when you entered into the
12 franchise agreement?
13     A.   Not the franchise -- at the time
14 the franchise agreement didn't have any fees.
15     Q.   They just took royalties from the
16 sales?
17     A.   They didn't even have that. I
18 think they were a new company at the time, and
19 they weren't charging anything.
20     Q.   I'd have better questions, but I
21 don't have the agreement, so I apologize.
22     A.   I'm sorry.
23     Q.   That's okay. Did you go see a
24 professional for your emotional issues?
25     A.   No, just started drinking more. I

Page 217

1 got behind on my child support. Thanks to
2 Joyce and Amber, they didn't put me in jail.
3 They worked with me. I had to sell my car.
4     Q.   What did you -- what car did you
5 sell?
6     A.   The Maserati.
7     Q.   How much did you sell it for?
8     A.   I can't remember. It was -- I just
9 paid off what I owed on it. You know, I didn't
10 make no money on it. It was 30 grand maybe.
11 But it had a loan on it. I didn't get no
12 money. It wasn't like I got any money. I just
13 couldn't make the payments.
14     Q.   So it was you had a loan on it? It
15 wasn't a lease or anything?
16     A.   It was a lease, and I had them take
17 it in six months early.
18     Q.   And you had to pay the remaining
19 payments on it?
20     A.   Yeah. I had to pay -- I just
21 turned it in to stop paying on it for
22 insurance. It wasn't until about, and I can
23 show it to you, it wasn't until about maybe a
24 couple months ago I finally was able to pay
25 right around 3,000, the balance on that, and

Page 218

1 they were threatening collections and
2 everything on from a couple of years ago.
3 Since when COVID hit, it got lost in the mix,
4 and then it came back up what I loved Chase.
5     Q.   So I just want to make sure I
6 understand you correctly. You had a lease for
7 your Maserati?
8     A.   Yes.
9     Q.   And what was the lease payment
10 around?
11     A.   953.
12     Q.   And you said the lease was with
13 Chase?
14     A.   Chase Bank, yes, sir.
15     Q.   Do you have a copy of that lease?
16     A.   No, I don't.
17     Q.   And that lease, you voluntarily
18 chose to lease a Maserati, correct?
19     A.   When I first leased it?
20     Q.   Yeah.
21     A.   Correct.
22     Q.   It has nothing to do with the
23 business. You just wanted the Maserati?
24     A.   I would disagree with you on that.
25 We're all supposed to -- Jeez, I remember John

Page 219

1 Pedano, he's the sales manager, and I wanted to
2 buy a little -- it was right after my divorce,
3 and I wanted to buy a little Chevy Cruze, great
4 on gas mileage, to travel the division. I
5 remember talking to John Pedano. He was the
6 sales manager, a W-2 employee for the Kirby
7 Company.
8      He said, Abe, you can't do that. I
9 said, Why? He said, When you show up as a
10 supervisor, you've got to have an image. You
11 need to drive a nice car. You know, it
12 doesn't -- it doesn't have to be a Maserati,
13 but it has got to be a nice, you know,
14 Cadillac, Mercedes, a BMW. It has got to be a
15 nice car when you pull up to these locations.
16      I mean, in our division we used to
17 have, "Do you want to live like this?" And
18 they would have magazines, and even the Kirby
19 Company, the headquarters, had the Kirby
20 magazine showing supervisors and distributors
21 with Ferraris and Lamborghinis and big houses
22 and promoting the business model and promoting
23 the business model, "In Kirby you can get
24 rich."
25      So as a supervisor, they wanted me

Page 220

1 to have a nice car. It wasn't mandatory, no
2 one told me you had to do it, but we feel like
3 it's best for to you get a nice car --
4     Q.   Okay. So like you just said --
5     A.   -- and show the image.
6     Q.   -- you could have leased a BMW or
7 Mercedes if you wanted a nice car?
8     A.   It's probably the same payment
9 anyway for a Mercedes and BMW. Nine hundred
10 bucks is not much for a car these days.
11     Q.   What other damages did you have?
12     A.   My credit got bad for a while. My
13 cash flow obviously stopped overnight. The two
14 other locations, American Shaman stores, went
15 out of business shortly after that when COVID
16 hit. But asides from that, I mean, I was in a
17 huge financial bind.
18     Q.   That doesn't have anything to do
19 with Kirby, though.
20     A.   No, I understand, but losing that
21 income, going from the income I had to zero was
22 devastating.
23     Q.   Well, how do you think COVID
24 impacted Kirby when the business is going
25 door-to-door sales?

Page 221

1     A.   I don't know. I wasn't with Kirby
2 at the time. I'm sure it probably -- it
3 impacted everything, a lot of companies, yeah.
4 I mean, it still impacts companies today.
5     Q.   Agreed. What else? What other
6 damages do you have?
7     A.   Attorneys fees.
8     Q.   What have you paid in attorneys
9 fees?
10     A.   I've paid expenses. What do you
11 call it? I paid a retainer when I started, and
12 then every few months any type of expenses I
13 paid. Obviously, I paid to come up here. I
14 don't know the total, but I've spent some money
15 on it.
16     Q.   Would you say you've spent more
17 than $10,000 or less than $10,000?
18     A.   Definitely more than 10,000, yes.
19     Q.   More than 20?
20     A.   I don't think so. Maybe close to
21 it, but I don't think it's more than 20.
22     Q.   So is it fair to say between 15,000
23 to 20,000?
24     A.   Yes, sir.
25     Q.   What else?

56 (Pages 218 - 221)

Page 222

1    A.    I can't recall right now.
2    Q.    I think you said you didn't apply
3 for unemployment, correct?
4    A.    Correct.
5    Q.    Did you apply for disability?
6    A.    No.
7    Q.    How did you pay your bills?
8    A.    I had a little bit of money in
9 savings which disappeared very quickly.
10    Q.    Were you applying for jobs at this
11 time?
12    A.    Yes.  I was applying for jobs, yes,
13 sir.  I sent all that in.  Being a high school
14 dropout, it's hard to find a job paying over
15 minimum wage.
16    Q.    Did you have any interviews?
17    A.    I did some --
18    Q.    Who did you interview with?
19    A.    -- phone interviews.
20    Q.    I'm sorry.  Go ahead.
21    A.    I did a handful of phone
22 interviews.
23    Q.    Do you recall with whom?
24    A.    No, sir.
25    Q.    Did you ever have any job offers?

Page 223

1    A.    Not real ones, no.
2    Q.    What's a not real one?  What do you
3 mean?
4    A.    I'll explain.  I had a couple
5 offers on straight commission health insurance
6 or life insurance sales.
7    Q.    What company or companies offered
8 you that?
9    A.    They were like brokers or something
10 or they wanted me to be a broker.  I don't
11 recall the name of the company, but I asked
12 them directly on the phone.  I said, Listen,
13 you've got to tell me exactly what this is.
14 They said, You're going to go to people's
15 homes to sell them insurance.  If I sell no
16 insurance, what do I get paid?  He said,
17 Nothing.  I said, I'm not interested.  I did
18 that for 27 years.
19        MR. MORLEY:  All right.  Let's take
20 a short break.
21        THE VIDEOGRAPHER:  Going off the
22 record.  The time is 5:04.  This is the end of
23 media unit number four.
24        (Brief recess.)
25        THE VIDEOGRAPHER:  We are going

Page 224

1 back on the record.  The time is 5:38.  This is
2 the beginning of media unit number five.
3        MR. MORLEY:  So we did not receive
4 any of those text messages that you just gave
5 us to copy.
6        MS. GROEDEL:  I don't know.  I have
7 to talk to Christina.  I don't do it myself,
8 so.
9        MR. MORLEY:  I'm not blaming
10 anyone.  I'm just saying we don't have those.
11 We don't have the Shaman agreements.  So we're
12 going to stop for today and hold it open, and
13 I'm going to request that you and Christina
14 figure it out and please review everything that
15 you have and what has been sent to us, and
16 we're going to do the same because I'm not
17 going to be required to go forward after
18 getting stuff at 5:15 and trying to go through
19 it as quickly as possible because that's not
20 fair.
21        MS. GROEDEL:  I mean, really, it's
22 just a bunch of text messages.  I'm not making
23 him come back again, Ryan.
24        MR. MORLEY:  Well, then we can
25 discuss with the judge that we had our

Page 225

1 conference with her, she ordered the documents
2 be produced to us, they weren't produced to us,
3 we still don't have the Shaman agreements, and
4 I think she's going to side with us.
5        So you can argue with the court if
6 you want, but that's the position I'm taking.
7        MS. GROEDEL:  Okay.  Well, then
8 review it tonight, and you can ask him tomorrow
9 while he's still in town.  I'm not going to
10 have him come back.  That's unreasonable.
11        MR. MORLEY:  Are you going to have
12 all the other documents that we don't have?
13 The Shaman agreements, are we going to have
14 those by tomorrow?
15        MS. GROEDEL:  Is there more than
16 one Shaman agreement?  Is there more than one
17 Shaman agreement?
18        MR. MORLEY:  There's three
19 according to his testimony and the termination.
20        MS. GROEDEL:  Oh, there is one
21 agreement and a termination.
22        THE WITNESS:  The termination was a
23 certified letter that came in to my business
24 that I literally looked at, I said, okay,
25 great, and I ripped it up and threw it away.  I

57 (Pages 222 - 225)

Page 226

1 definitely don't have that. They never emailed
2 it to me, so I can't get that to you. They
3 were --
4        MS. GROEDEL: What else was there
5 from Shaman?
6        THE WITNESS: I only have one
7 agreement. Because I requested it at that
8 time. I said let me get my agreements. They
9 sent me one. They said they are all the same.
10 I didn't think nothing of it. I hope that's
11 okay.
12        MS. GROEDEL: What was the third
13 one that you're talking about? The termination
14 letter, the agreement, and what's the third
15 thing?
16        MR. MORLEY: I thought he said that
17 there were three different agreements because
18 there were three different stores, and I
19 thought he said that the original agreement was
20 signed in March of '21 and then subsequent
21 agreements were entered into in November of '21
22 and December of '21, but I'm going to have to
23 go through my notes, and I'm also going to go
24 through our discovery requests because I want
25 to make sure that we have everything that we

Page 227

1 have been asked and that we talked about today.
2        MS. GROEDEL: Okay.
3        MR. MORLEY: I'm not trying to be
4 difficult, Caryn. I'm really not.
5        MS. GROEDEL: Me, neither. I mean,
6 I don't do that, and I always assume that
7 Christina sends out what the clients send us.
8 But let me just see if I have the Shaman. I
9 thought I saw that.
10        THE WITNESS: I can get on my
11 computer and email stuff right now.
12        MS. GROEDEL: Let's do it later
13 today.
14        THE WITNESS: Okay.
15        MS. GROEDEL: And then you send it
16 to me. I'll call Christina and tell her to get
17 on the computer and Bates stamp it. She'll
18 Bates stamp these. You'll have them. We'll
19 find the Shaman agreement. We'll get that.
20 And then you can question him on those things
21 tomorrow because I don't think it's fair to
22 have him come back on account of one agreement
23 and a bunch of text messages.
24        MR. MORLEY: All right. We'll see
25 what we get tonight, and we'll go from there,

Page 228

1 okay?
2        MS. GROEDEL: Okay. I had a couple
3 of follow-up questions that I wanted to ask
4 him.
5        MR. MORLEY: Well, do you want to
6 wait until we're done asking him questions?
7        MS. GROEDEL: Oh, I thought you
8 were done for today. I thought you said you
9 were done.
10        MR. MORLEY: Yeah, we're done for
11 today.
12        MS. GROEDEL: Okay. I can do it
13 tomorrow. Yeah, that's fine.
14        THE VIDEOGRAPHER: Are you ready to
15 go off?
16        MR. MORLEY: Yes.
17        THE VIDEOGRAPHER: We are off the
18 record at 5:42. This concludes today's
19 deposition given by Ibrahim Sharqawi. The
20 total number of media units used was five and
21 will be retained by Veritext Legal Solutions.
22        MS. GROEDEL: He'll read.
23        (Deposition adjourned at 5:42 p.m.)
24
25

Page 229

1 Whereupon, counsel was requested to give
2 instruction regarding the witness's review of
3 the transcript pursuant to the Civil Rules.
4
5        SIGNATURE:
6 Transcript review was requested pursuant to the
7 applicable Rules of Civil Procedure.
8
9        TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.
12        Mr. Morley did not order the
13 transcript at this time.
14
15
16
17
18
19
20
21
22
23
24
25

58 (Pages 226 - 229)

Page 230

1         REPORTER'S CERTIFICATE
2 The State of Ohio, )
3            SS:
4 County of Cuyahoga. )
5
6      I, Cynthia Sullivan, a Notary
7 Public within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, IBRAHIM
10 SHARQAWI, was by me first duly sworn to testify
11 the truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19      I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

Page 231

1      I do further certify that I am not
2 a relative, counsel or attorney for either
3 party, or otherwise interested in the event of
4 this action.
5      IN WITNESS WHEREOF, I have hereunto
6 set my hand and affixed my seal of office at
7 Cleveland, Ohio, on this 16th day of
8 June, 2022.
9
10
11
12
13     *Cynthia Sullivan*
14     Cynthia Sullivan, Notary Public
15     within and for the State of Ohio
16
17 My commission expires October 17, 2026.
18
19
20
21
22
23
24
25

Page 232

1       Veritext Legal Solutions
         1100 Superior Ave
2          Suite 1820
       Cleveland, Ohio 44114
3       Phone: 216-523-1313
4
 June 16, 2022
5
 To: CARYN M. GROEDEL
6
 Case Name: Sharqawi, Ibrahim v. The Kirby Company
7
 Veritext Reference Number: 5239709
8
 Witness: Ibrahim Sharqawi   Deposition Date: 5/26/2022
9
10 Dear Sir/Madam:
11
 The deposition transcript taken in the above-referenced
12
 matter, with the reading and signing having not been
13
 expressly waived, has been completed and is available
14
 for review and signature. Please call our office to
15
 make arrangements for a convenient location to
16
 accomplish this or if you prefer a certified transcript
17
 can be purchased.
18
19 If the errata is not returned within thirty days of your
20 receipt of this letter, the reading and signing will be
21 deemed waived.
22
23 Sincerely,
24 Production Department
25
 NO NOTARY REQUIRED IN CA

Page 233

1      DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 5239709
3    CASE NAME: Sharqawi, Ibrahim v. The Kirby Company
   DATE OF DEPOSITION: 5/26/2022
4    WITNESS' NAME: Ibrahim Sharqawi
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9  Date     Ibrahim Sharqawi
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13    They signed the foregoing Sworn
     Statement; and
14    Their execution of this Statement is of
     their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
   _____
18    Notary Public
19
   _____
   Commission Expiration Date
20
21
22
23
24
25

59 (Pages 230 - 233)

Page 234

1    DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 5239709
3    CASE NAME: Sharqawi, Ibrahim v. The Kirby Company
     DATE OF DEPOSITION: 5/26/2022
4    WITNESS' NAME: Ibrahim Sharqawi
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9    I request that these changes be entered
     as part of the record of my testimony.
10
     I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____    _____
     Date        Ibrahim Sharqawi
14
     Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17   They have read the transcript;
     They have listed all of their corrections
18      in the appended Errata Sheet;
     They signed the foregoing Sworn
19      Statement; and
     Their execution of this Statement is of
20      their free act and deed.
21   I have affixed my name and official seal
22   this _____ day of_____, 20____.
23   _____
     Notary Public
24
25   Commission Expiration Date

Page 235

1    ERRATA SHEET
     VERITEXT LEGAL SOLUTIONS MIDWEST
2    ASSIGNMENT NO: 5/26/2022
3    PAGE/LINE(S) /     CHANGE     /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____    _____
20   Date        Ibrahim Sharqawi
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
     Notary Public
24
25   _____
     Commission Expiration Date

60 (Pages 234 - 235)

**&**

**&**  2:4 8:2

**0**

**00271**  1:7 7:12 9:1
**06**  44:25
**09**  44:25

**1**

**1**  4:3 136:19
170:20 171:1,5,11
190:2
**10**  24:22,24
**10,000**  221:17,17
221:18
**100**  54:21 63:20
64:9 67:1 68:1
117:9 128:12
135:14 137:21
159:20,23 178:19
**100,000**  189:14
**1099**  32:16 44:13
44:17 61:18 65:9
89:5,19 114:5,6
116:16,24,25
122:1 125:14
134:14,19 201:5,9
**1099'ed**  201:17
**1099'ing**  189:10
**10:00**  65:4 174:1
179:6 183:15,20
183:24
**10:15**  1:17
**10:16**  7:2
**10:38**  29:19
**10:40**  29:22
**11**  170:3
**1100**  232:1
**11:43**  76:5
**12**  5:3 83:12 99:19
100:21 170:3

**120**  6:1
**127**  1:21 2:15 7:14
**12:00**  183:25
**12:07**  76:9
**12:15**  82:8
**13**  5:4,5 23:11,14
24:16 99:19,19
100:21,21 101:19
**134**  5:9
**138,000**  161:14
**14**  5:6 101:19
102:9
**140**  5:10
**144**  5:11
**147**  5:12
**15**  102:10 103:7
**15,000**  202:23
221:22
**16**  70:16 232:4
**1600**  1:21 2:16
7:15
**168**  5:13
**169**  5:14
**16th**  231:7
**17**  37:22 70:16
176:12,19,20
179:25 231:17
**170**  4:3
**18**  60:11,12 152:8
178:2,9 183:14
185:25
**1820**  232:2
**1871**  47:11 68:1
159:17,19
**188**  5:15
**189**  5:16
**19**  48:6 215:15
**197**  5:17
**198**  5:18
**199**  5:19,20

**1990**  83:16 107:25
**1993**  111:8
**1994**  84:7 111:25
**1:02**  119:6
**1:20**  1:7 7:12 9:1
**1st**  115:9 132:10
176:19 178:8,8,18
178:18

**2**

**2**  3:3 44:13,22
89:6,7,18,20
116:15,22 117:2,3
117:8,22,24 118:1
125:14 175:14
197:14,24 199:1
201:24 202:16,17
219:6
**2'ed**  189:3 191:24
**20**  40:11 122:10
161:17 178:12,19
190:24 208:13
221:19,21 233:16
234:22 235:22
**20,000**  221:23
**200**  47:12 159:19
159:24 191:20
**2000**  113:16,17
**2001**  113:17 114:7
**2002**  114:9,25
115:1,3,5 117:14
164:18
**2005**  44:2 120:18
185:25
**2006**  45:1
**2008**  122:9,9 148:9
**2010**  21:22 22:21
23:2,5,7,12,17,21
37:17,24 44:2
93:16,17 94:7,12
94:16 96:1,18,24
99:11 100:19

**115:10 122:12**
130:10 131:5
136:1 180:7,13,18
180:19
**2011**  94:15 97:3,14
97:15,22,23,25
98:8 117:14
148:15 169:19
180:18,20 204:14
**2012**  97:18,25 98:8
98:10 148:20
169:19
**2013**  43:20 98:19
98:23 99:1 149:1
**2014**  33:2 53:13
80:12 99:6,11,15
102:4,7 190:24
**2015**  102:19
104:16 179:23
180:11 181:3
**2016**  80:25 81:5
103:3 104:11,13
164:16 179:24
181:6
**2017**  37:25 104:20
175:9 176:3,6,18
177:14,17 178:6,8
178:8 181:6
**2018**  17:8,11 19:20
21:22,23 22:21
23:21 25:2,4,7,18
26:23 27:3,21
29:25 37:17 38:3
38:17 39:11 41:20
52:7 56:5,10 58:4
63:5,6 66:7 67:13
68:16 69:18,20
70:1 104:23 105:1
105:2 106:6 107:4
123:6 136:5
150:14,18,21

152:24 153:3,9,13
153:25 154:10,10
154:12,15 155:7,9
161:22 174:21,23
175:3 176:2,6
177:13,15 178:21
180:1,7,11 181:7
181:11,11,15
182:7 183:18
184:3 193:4
194:16,22 205:6
205:12
**2019**   107:7,8
158:22,22 161:16
162:2,24 163:19
**2020**   107:10 159:5
161:11,12 163:25
**2021**   47:8 68:17
107:12,17 153:10
153:16 156:11
158:16 161:1
**2022**   1:16 7:3
51:10,11,12 53:4
107:14 231:8
232:4
**2026**   231:17
**204**   5:21
**205**   5:22
**206**   5:23
**208**   5:24
**209**   5:25
**21**   40:10 151:1
226:20,21,22
**216**   2:18
**216-523-1313**
232:3
**2231**   231:13
**230**   3:10
**230-3808**   2:8
**24**   122:11

**24th**   149:1
**25**   17:5
**250**   135:19 136:22
191:16 206:3
**250,000**   188:11,15
189:2,12 191:1
205:25
**26**   1:16
**26th**   7:3
**27**   208:14 215:13
215:22 223:18
**28**   213:24
**28th**   148:15
**29th**   148:9
**2:18**   120:2

**3**

**3,000**   193:2,7
217:25
**30**   106:3,6,10
161:17 168:8
179:11 217:10
**307**   93:22 94:18
**30th**   82:10
**31000**   2:6
**315**   86:15
**31st**   148:20 176:20
214:21
**32**   100:15
**32065**   86:9
**32073**   47:12
**37**   92:18
**3:21**   168:23
**3:49**   169:3

**4**

**4**   3:5
**40**   106:24 173:9
211:1
**40,0000**   37:11
**400**   143:6

**400,000**   136:20
**415**   86:5
**42**   92:15
**440**   2:8
**44114**   2:17 7:15
232:2
**44139**   2:7
**449-0000**   22:18
**45,000**   37:11
**450,000**   136:20
**46**   202:6,14,14
**49**   92:10

**5**

**5/26/2022**   232:8
233:3 234:3 235:2
**50**   191:19 210:24
211:2
**500**   178:19
**5239709**   232:7
233:2 234:2
**539**   86:8 103:10
**59**   209:14
**5:00**   172:1,9
183:25
**5:04**   223:22
**5:15**   224:18
**5:38**   224:1
**5:42**   228:18,23
**5th**   179:14

**6**

**60**   46:17 106:3,6
106:11,12 141:13
**623-6106**   2:18
**646**   161:15
**6:00**   183:25

**7**

**7**   81:16
**70**   141:13 173:10
**700**   136:18

**71**   82:10
**79**   5:7
**7:00**   65:4

**8**

**8**   3:8
**80**   5:8 64:9 137:21
141:13 173:10
191:4
**80,000**   135:24
**8:00**   173:25
183:16,21

**9**

**9**   202:5,13
**90**   141:13 167:3
173:11 188:7,7
191:4
**90,000**   135:24
**904**   22:18
**91**   110:1
**92**   110:1
**93**   111:10
**94**   112:15
**953**   218:11
**98**   84:7 112:15
**99**   112:15,17
113:16,17 128:13
**9:00**   172:1,9 179:6
179:10

**a**

**a.m.**   1:17 7:2
183:20
**abe**   9:6,8,11 70:19
75:3 82:22 120:7
131:15 132:14
136:21 139:4
142:14 169:4
173:19,20 179:5,5
179:6,7 210:10
211:17,21 212:21
212:23 213:3,4,4,5

213:11,12 214:6
214:22 215:6
219:8
**abel** 213:21
**abide** 136:4,7
**ability** 11:11,15,19
11:23 12:12
**able** 196:12
217:24
**absolutely** 134:22
147:10 205:17
**acceptable** 146:16
**accepted** 134:4
**accidental** 26:3
**accomplish** 232:16
**account** 24:12
28:3,4,4,5 165:24
193:3,6 227:22
**accountant** 107:22
162:9 197:12
199:11,12,13,15
199:23 200:20
**accounts** 159:6
166:1
**accurate** 127:19
**accurately** 11:16
11:24 12:12
**acknowledge**
233:11 234:16
**act** 43:22 233:14
234:20
**acting** 110:3
115:25 122:14
124:9
**action** 20:21 231:4
**actions** 209:9,16
**active** 137:6
**activities** 115:15
**activity** 124:22
210:3

**acts** 172:20
**actual** 208:1
**ad** 108:2,5,6 143:5
**add** 131:25 132:1
132:3 174:19
176:17 177:20
191:18
**added** 131:25
175:9,12,13
176:11 177:19,23
177:24 178:2
**address** 27:5
35:22 47:9 49:20
57:8,12,16 67:25
86:2,4,7 93:21
94:19 96:20 97:5
97:19 98:12,20,23
99:7 100:7 101:10
102:20 103:4
192:11
**adjourned** 228:23
**adjournment**
230:22
**admin** 31:24 32:7
32:15 34:21 36:4
36:6,10,17,24 38:6
38:18 87:25
102:12 105:8,15
123:6,25 134:16
134:25 172:2
189:5 191:18
194:23 195:6
196:7 205:4,6
**admin's** 202:17
**administrative**
33:17,24,25 34:4,6
34:12 37:18 38:2
89:1
**ads** 142:15,16
143:2

**advance** 106:15
**adverse** 209:9,16
**advice** 199:12
**affect** 11:5,8,11,15
11:19,23
**affiliated** 43:8
65:25 167:20
206:12
**affirmative** 34:16
**affirmatively**
140:3
**affixed** 231:6
233:15 234:21
**aforesaid** 230:12
**afraid** 61:7 62:10
62:10 63:23
164:12,14
**afternoon** 6:1
120:4
**age** 8:12
**aggravated** 148:16
**aggressive** 55:4,5
58:16
**ago** 20:11 40:24
42:3,13 46:17
50:3,5 51:9 68:14
74:5 165:8,16
214:9 217:24
218:2
**agree** 10:24
**agreed** 135:8
221:5
**agreement** 8:21
20:16,22 21:21
22:1 25:5,8,18
26:13 27:12,16,21
31:15 35:20 38:14
38:17 39:5 41:20
42:9 52:9 68:8
71:17 72:15 79:3
93:16 103:18,22

103:25 104:2
106:6,7,9,13 115:3
118:13,14,18,22
120:8,9 122:5,20
124:11 130:11
133:9,16,20,21,22
135:10,11,25
136:5 150:10,23
151:7,9,11,19,24
151:25 152:1,4,23
153:3,7,10,13,18
153:22,24 154:7
154:17,25 155:1
158:9,10,12 160:4
160:14 167:20
168:3,4 172:16
174:24 179:22
192:25 193:11
205:15,18 216:12
216:14,21 225:16
225:17,21 226:7
226:14,19 227:19
227:22
**agreements**
120:11,15 153:2,5
158:16 224:11
225:3,13 226:8,17
226:21
**ahead** 13:16 14:8
37:4 38:20 87:9
101:1 127:1
140:25 155:25
171:2 181:24,25
222:20
**ain't** 192:16
**airport** 70:8
**alabama** 130:17
**alcohol** 13:5
**alex** 2:25 7:16
**alive** 90:18 91:4

**allegation** 171:15 210:1

**allegations** 147:16 149:7,10

**allege** 58:6 60:14 63:6 65:19 69:23 69:24 72:4,9 205:18

**alleged** 60:23 72:14 170:14 179:21 209:8

**allegedly** 66:16 69:11 131:1 170:8

**alleging** 63:18 75:15 170:12

**allow** 14:4

**allowance** 193:8

**allowed** 116:14 160:15 193:5

**alten** 2:24 8:9,9

**amber** 85:6,10,15 85:23,24,25 86:17 86:25 88:7,23,25 217:2

**amend** 198:3,25

**amended** 4:3 170:21 171:11 202:6

**america** 149:10

**american** 54:15 67:10,21 111:13 150:2 151:20 152:1,23 153:2,4,8 155:4,9,16 156:12 157:5,20 158:13 159:12,17,19,22 160:11,20 161:21 162:2,14,19 163:21,22 164:13 166:9,13,23 167:5 168:18 181:12

182:6 183:12,21 220:14

**americans** 137:3 206:12 207:25 208:7

**amount** 38:13 106:23 124:7 128:16 141:9 162:10 187:22 203:14 216:11

**analysis** 197:13

**anderson** 110:21 113:2

**anderson's** 112:2 112:21 113:21

**annual** 130:21

**answer** 5:6 9:24 10:10,23 12:4,5 13:17,22,22,25 14:11 15:7 18:5 18:10 23:19 34:9 34:22 72:2 79:15 79:24,25 131:4 134:21 140:22,23 140:25 147:20,22 148:2,6 160:8 169:25 188:18 192:16 197:22 199:4,9,14,23 200:14,22 205:22 206:9

**answered** 10:12 140:22 199:16 205:22 206:9

**answering** 12:8

**answers** 9:15

**anybody** 73:9 106:22 156:20 164:14 167:5 210:14

**anybody's** 212:1,1

**anymore** 132:8 175:17

**anyway** 160:9 220:9

**apologize** 96:10 156:25 180:17,22 216:21

**app** 18:22,23

**apparently** 63:4

**appear** 233:11 234:15

**appearances** 2:1 3:3

**appended** 234:11 234:18

**apple** 39:24 40:9 40:15 41:2

**applicable** 229:7

**apply** 222:2,5

**applying** 222:10 222:12

**approved** 187:6

**approximate** 52:4

**approximately** 21:17,22 24:25 41:12 42:1 44:2 46:17 50:5 51:12 53:16 68:16 83:13 83:15 87:11 101:18 106:3 109:2 110:2 111:8 111:24 112:14 114:25 117:15 122:10 158:21 168:8 210:5

**april** 82:10 174:22

**area** 86:22,24 87:1 104:3 105:10 184:8,17 195:24

**argue** 225:5

**argued** 194:19

**arrangement** 28:24

**arrangements** 232:15

**arrested** 80:1 147:17 148:8,13 148:14,16,19,21 148:22,25 149:2 169:8 170:5

**arrests** 149:11

**arrive** 17:20

**aside** 26:2 66:9 174:3

**asides** 74:10 97:17 185:8 220:16

**asked** 12:17 15:5 18:3,9 55:21 57:15 58:8,18 59:5 61:14 64:9 64:11 66:19 71:25 77:14 92:17 96:12 97:21 99:9 111:4 131:5 140:21 169:6 173:21 197:12 202:4 203:4 205:21 206:8,14 223:11 227:1

**asking** 16:3 29:25 33:20 36:8 55:12 73:19 77:19 109:11 127:2 153:6 160:12 161:25 166:5,5 200:18 210:11 228:6

**assault** 148:16

**assigned** 131:6

**assignment** 233:2
234:2 235:2
**assist** 96:6
**assistant** 33:17,24
34:1,5,6,12 37:18
38:3
**assisted** 96:3
**associates** 2:4 8:2
**association** 107:24
**assume** 10:11
108:21 176:18
178:6 208:19
227:6
**assuming** 160:13
**at&t** 23:24 24:2
42:19
**attached** 133:9,15
234:7
**attempt** 205:16
**attend** 83:3 126:14
142:25
**attorney** 16:4,5,22
19:13 21:13 76:11
76:20,23 77:3,14
77:19 81:7,10
152:11 171:3
211:4 231:2
**attorneys** 221:7,8
**august** 60:17 63:5
63:6 64:7,16
115:1 117:14
176:18 177:24
212:19 213:20
**augustine** 86:16
86:22
**authorize** 234:11
**automatically**
205:1
**available** 186:2
232:13

**ave** 232:1
**avoid** 9:16,17
**aware** 150:6
168:19 208:24,25
**awesome** 196:4

**b**

**b** 9:4 47:17,17
83:1
**baby** 89:23
**back** 13:4 21:3
29:21 38:11 39:23
40:9 61:6 62:7
66:10,16,21,25
67:5 69:9 76:8
82:7 88:7 100:3
101:15 120:1
127:13 131:4
138:17 144:6
161:18 169:1
179:20 182:4,14
184:1 194:19
198:2,13,25 200:8
211:18,19 214:13
218:4 224:1,23
225:10 227:22
**background**
146:10,13,19
**backgrounds**
125:11 146:17,18
146:22 187:7
**backups** 25:15
**bad** 72:19 205:19
213:23 220:12
**baking** 157:9
**balance** 217:25
**bank** 218:14
**bankruptcy** 80:17
80:23 81:1,8,15,19
164:17,17
**barely** 189:14,19
216:6

**based** 106:16
116:13 139:20
142:10
**basis** 130:21
**bat** 190:15
**bates** 227:17,18
**bathroom** 184:17
**battle** 45:23
**bauhofer** 137:7
**beach** 113:15
**becoming** 115:11
204:13
**beginning** 99:18
99:19 101:19
120:3 152:8 155:6
155:9 163:25
169:2 177:21,22
210:6 213:20
224:2
**behalf** 2:3,11
**believe** 16:18
17:12 19:21 20:24
21:24 24:22 25:9
31:16 32:23 33:1
33:5 36:15,25
37:10,22 39:12
42:14 43:19 49:7
53:13,14 60:9
62:25 66:7 69:19
69:21 78:4,19
80:11,24 84:6
85:11 87:18,18
92:18 98:9,24
99:18 100:19
101:18 102:21
103:5,8 104:15
106:8 107:25
110:1 111:1 115:9
118:4 120:13,16
122:9 132:19,20
133:23 135:15

137:18 144:4
150:17 154:8,18
155:6 161:13
162:15,25 163:23
170:3 172:6 173:2
174:8 176:9,10
177:23 180:4
181:14 183:14,24
195:10 201:4,12
202:17 203:17
204:25 207:1
**believed** 160:18
**benefit** 134:18
201:14
**benefited** 201:20
**benefits** 37:14
201:8
**benefitted** 142:22
**best** 37:10 54:17
84:7 141:23
143:24 187:15
201:4 211:22
220:3
**better** 66:10,10,21
66:25 67:4 138:25
160:18 216:20
**big** 65:1 74:21
184:6 197:23
219:21
**biggest** 214:15
**bills** 222:7
**bind** 220:17
**biroschik** 95:21
**birth** 82:9
**bit** 46:10 50:12
177:22 222:8
**blaming** 224:9
**blanding** 180:21
**blatantly** 137:16
**blind** 146:7,21

blocked 170:15,17
blood 93:6
blow 214:16
blunt 141:23
bm 36:2
bmib 95:2 121:19
121:19
bmibdiv 36:2
bmibdivision
35:23
bmw 219:14 220:6
220:9
board 128:18
boat 100:6,8,14,16
100:22 101:13
189:24
bob 74:22 149:24
bonuses 138:8
books 178:20
186:16,16
born 82:11 94:15
97:23
bothered 211:24
bought 128:15
boulevard 180:22
boyd 156:7
boyfriend 57:13
boyfriend's 57:21
brand 39:13 49:19
157:19 160:20
breach 20:21
21:12 193:10
breached 171:16
171:17 172:15
break 10:21,22,23
29:23 60:5 75:9
75:11 76:3 107:1
120:8 168:21
184:17 223:20
brian 110:21
112:2

brief 29:20 45:20
49:3 76:7 168:25
223:24
bring 14:18 17:15
21:8 186:22
broker 223:10
brokers 223:9
brother 42:23,24
45:13,25 46:4
51:2 64:10 91:24
98:4
brought 15:6,8
17:25 211:6
brown 167:14
bryant 59:3 60:18
62:15
bryant's 62:1
bucks 143:6
220:10
bud 33:5 51:6,8
53:1 70:23 71:5,7
71:10,16,24 72:1,3
72:7,15,22 73:3,5
73:11,15,16 74:4
74:13,23,23 75:15
75:25 129:15
162:13,19 163:1
164:2,5,7,8,10,12
181:4 191:7,8
budz 160:19
budzburn 47:3,6
47:14,24 48:4,7
49:12,18 156:15
156:17,21 157:4,7
157:16 158:14,20
159:13,24 160:10
160:17 161:3
164:22 165:18
166:18
budzburn.com.
49:21

build 137:20
138:24
building 27:11
29:9 30:8,9,11
104:25 137:19
184:5,6,19
bumped 46:9
bunch 176:22
212:2 224:22
227:23
burden 138:19
bush 145:24 146:9
business 20:15
22:2 26:9,18 28:4
28:5 31:13 35:19
42:5,8 43:16
47:18,21 48:22
50:11 58:10 61:11
63:3 73:8 87:3,7
88:2,7 89:2,15
90:23 91:1,15,17
91:21 94:21,24
95:12 96:4,7,11
104:9 115:14,23
121:5,11,16
135:15 138:23,24
139:11 141:24
142:5,9 144:19
155:4,22 156:15
156:17,19 158:23
158:24 160:10,23
166:22 174:5,14
175:18 182:3
186:4,5,5 202:1
208:14 210:12,14
212:1,8,9,11
214:25 215:13,18
216:10 218:23
219:22,23 220:15
220:24 225:23

businesses 90:1
92:20,23 93:3,7
94:18 95:5,6,16
172:5 207:13
210:17
bust 215:2
busting 207:11
busy 107:21
buy 103:12 129:20
158:5 183:2 219:2
219:3
buying 86:18
157:16,24

**c**

ca 232:25
cadillac 219:14
calculated 177:6
calculation 162:9
calendar 134:8
187:20
call 9:8 22:6 52:15
52:16,18 59:8,21
61:6,15 65:3
70:20 75:4,13
120:24 155:23
170:9 172:4,4
179:4,5,5,7,15
187:18 188:5
195:17 200:22
207:14,17 211:13
212:4 213:13
214:7,22 215:2
221:11 227:16
232:14
called 8:12 48:12
48:19 55:10,12
58:17 59:4,17
67:6 70:19 77:13
77:15,18 120:16
128:22 132:21
133:10 163:14,15

168:16 170:14,15 170:16 178:13 191:13 210:7 211:9,19
**caller** 170:8,15
**callie** 60:19 62:24
**calling** 58:18 60:10 179:13 208:6 210:11 212:16
**calls** 22:6 55:3 207:18
**canada** 64:8 83:6 90:21 91:11 108:3 111:5
**canadian** 208:2,4
**cancellation** 151:11
**cancelled** 55:9,19
**caption** 230:21
**car** 184:6 193:23 217:3,4 219:11,15 220:1,3,7,10
**card** 184:9,16
**cards** 125:12
**care** 65:6 125:13 162:8
**cared** 167:15,15 167:16
**career** 158:13
**carefully** 19:10
**caribbean** 130:15
**carl** 46:13,14,16 46:19 48:11,16,23 51:1
**carolina** 130:16 132:8,9
**carpet** 108:6,8 143:6
**carpets** 141:8 143:7

**carry** 157:19,20 203:15
**carter** 2:14 7:24 7:24
**caryn** 2:4,5 8:1,1 12:15 13:24 14:12 19:13 57:17 76:15 76:17,20,22 77:6,9 77:12 148:1 227:4 232:5
**caryn's** 78:1,8
**case** 1:7 7:11 9:1 50:16 51:15 211:17 232:6 233:3 234:3
**cases** 131:17 132:2 196:24
**cash** 220:13
**cashes** 183:8
**cataloged** 177:6
**category** 116:10
**cause** 230:12
**caused** 196:9
**cbd** 58:22 59:6 60:23 63:1,3,7 66:24 67:8,10,21 116:3 155:22 157:1,7,9,11,18,20 159:10 166:22 167:7,19,25 168:5 174:5,12 175:2 183:5,6,6 206:13 206:16,20,25 207:4,8,13 211:13 212:7,8,10 214:19 216:3,10
**cell** 15:11,17 22:15 22:16,19 23:20 31:11 50:9 52:14 59:22 163:14,15

**cellular** 7:5 22:8,9 26:15 38:25
**center** 120:25
**ceo** 155:18
**certain** 37:2 130:22 131:8 141:12 172:12 206:23 216:11
**certificate** 3:10 230:1 234:11
**certification** 233:1 234:1
**certified** 8:15 225:23 232:16
**certify** 230:8,19 231:1
**cetera** 194:3
**cgroedel** 2:9
**chance** 161:9
**change** 130:21 131:2 140:9 143:8 143:9,11 174:17 174:18 234:8 235:3
**changed** 39:8,8 105:2 130:7,23 131:9,11,13 134:3 140:11 143:3 176:9 180:4 183:13 188:1
**changes** 117:6 233:7 234:7,9
**changing** 131:3,7 131:19
**chaos** 196:12
**chapter** 81:16
**character** 146:22
**charge** 128:14 169:13
**charged** 147:17

**charging** 216:19
**charlie** 59:1 60:18 61:22 62:14 211:11
**charlie's** 61:21 63:16
**chase** 218:4,13,14
**chat** 18:18,19
**check** 201:7
**checking** 28:3
**checkmark** 188:3 188:4
**chemo** 64:12
**chevy** 219:3
**child** 217:1
**children** 84:8,11 85:9,14 89:8 90:9 94:11 103:23,24 103:25 215:25
**choice** 33:25 34:2 35:12 105:14 138:16 139:21 140:4 142:7 158:7 160:18,22 180:23 181:2 197:5
**chops** 207:11 215:2
**chose** 35:1,10,10 139:22 142:9 218:18
**chosie** 137:7
**christina** 224:7,13 227:7,16
**citizen** 111:13
**citizenship** 208:4
**civil** 8:14 80:15,19 229:3,7 233:5 234:5
**claim** 13:1 42:17 198:2 201:2 208:21

**claimed** 121:1
**claiming** 12:23
　20:20
**claims** 76:11
**clarify** 118:15
**classified** 197:14
**clear** 33:7 58:4
　69:13,14 88:4
**clearly** 34:23
**cleveland** 1:22 2:7
　2:17 7:15 66:12
　66:14 69:25 70:6
　74:18 126:11
　231:7 232:2
**client** 16:5
**clients** 227:7
**close** 29:2 128:6
　160:16 221:20
**closed** 159:23
**closer** 34:13
**cloud** 24:10
**clubs** 128:22
**coast** 130:14
**collect** 205:11,11
　205:15,16
**collecting** 123:21
　123:22
**collections** 218:1
**combined** 178:21
**come** 13:4 62:2,7
　65:1 105:12
　131:16 142:13
　155:19 186:19
　195:21 221:13
　224:23 225:10
　227:22
**comes** 73:8
**comfortable** 61:16
**coming** 16:8 66:17
　66:19,20 69:12
　185:5 215:14

**comment** 69:24
　70:22 71:2,24
　72:2,4,8 167:23
**comments** 55:4,7
　55:25 56:3 58:1,2
　58:3,6,13 60:14
　63:25 65:19,22
　66:3 69:23 70:1
　74:14 75:14,23
**commercial** 99:12
**commission** 223:5
　231:17 233:19
　234:25 235:25
**commissioned**
　141:10 230:8
**communicate** 43:3
　45:12 46:19 49:22
　50:2,7 51:7,24
　52:12 54:5,8
**communicated**
　42:21 46:1,5 51:2
　51:19 53:6 65:11
　105:16
**communicating**
　155:8
**communication**
　18:22 22:14 26:9
　38:24 42:8
**communications**
　16:4 18:15,17
　19:12 20:15 22:3
　35:19
**comp** 204:4,7,10
**companies** 201:18
　203:1 221:3,4
　223:7
**company** 1:8 7:9
　8:8,23,23 28:8,11
　28:14 31:9 32:10
　32:12,13 33:3,16
　33:23 43:8 44:9

45:24 47:20,23
48:1 52:20 54:19
54:22 67:16 70:11
72:12,25 77:25
78:3,22 79:3
106:7 108:20
116:17 118:18
121:3 123:10
124:13,17 125:23
125:24 126:13,22
128:11,13,24
131:1 134:14
135:14 136:5
137:25 138:6
139:12 140:8
146:2,6,11 149:9
149:14 164:8
168:9 172:8,18
179:1 184:19
188:11 189:4
195:7,20 196:5
197:23 200:7,12
201:5,13,22
206:13 210:21
213:22 214:2
215:16,17 216:18
219:7,19 223:7,11
232:6 233:3 234:3
**comparison**
　177:11,17
**compensated**
　114:5 135:9
**compensation**
　203:13,16,24
　204:22,23 205:1
　205:12
**complain** 61:15
　191:5,8,12 192:7
**complained**
　167:13 191:7,15

**complaining**
　206:21
**complaint** 4:3
　71:9,13,16 170:21
　171:12 192:11
　202:6 209:15
**complaints** 54:19
**completed** 9:25
　230:22 232:13
**completely** 10:12
　187:9
**compliance**
　124:23,24,25
　125:5,7,9,19,24
　126:21 142:25
　144:9 172:8
　213:23
**compliant** 143:25
**computer** 40:8
　41:5,7 227:11,17
**concerned** 71:15
**concerning** 207:18
**concludes** 228:18
**conclusion** 127:22
**condition** 11:4,10
　11:14
**condo** 93:24
**conduct** 186:9
　210:3
**conducted** 126:12
**conference** 107:1
　164:1 225:1
**confidential** 12:9
**conflict** 156:14
**confused** 153:23
　214:1
**confusing** 32:16
**connection** 165:6
**consider** 73:2
　90:10 134:13

| | | | |
|---|---|---|---|
| **considered** 52:19 | **convictions** 149:6 | 148:4,11,23 149:2 | **court** 1:1 3:13 |
| **consistent** 174:11 | 149:8,11 169:11 | 149:3 150:22 | 7:10,17 8:3,24 |
| 174:14 175:6,8 | **convince** 138:12 | 154:2 156:13 | 9:13,22 10:15,18 |
| 176:1,25 | 143:24 | 160:1 163:3 | 12:16 14:14 |
| **consume** 13:10 | **conway** 53:10 | 166:25 175:2 | 170:11 200:15,15 |
| **consumed** 13:5 | 80:10 83:19 87:14 | 179:22 180:1 | 200:18,22 225:5 |
| **contact** 60:3,7 | 148:10 | 181:7 182:12,17 | 233:7 |
| 76:10,16 155:19 | **conway's** 148:22 | 185:10,14,17 | **courtesy** 10:1 |
| **contacted** 58:24 | **cook** 2:25 7:16 | 188:12,13 192:9 | **cover** 203:22 |
| 76:14 | **copier** 202:23 | 192:11 193:18,21 | **coverage** 131:23 |
| **content** 19:12 | **copy** 27:15 31:7 | 193:22,24,25 | 203:25 204:4,7,10 |
| **continue** 15:24 | 32:21 68:7 152:6 | 194:4,5,8,9,17 | 204:19 |
| 35:11 140:4 | 152:7,12 154:16 | 197:10 200:6 | **covered** 16:5 |
| 157:13 | 202:24 218:15 | 201:18,19,20,21 | 92:25 99:11 |
| **continued** 120:5 | 224:5 | 205:7,8 209:22,24 | 158:20 193:15,16 |
| 136:4 | **corner** 101:8 | 218:18,21 222:3,4 | **covid** 218:3 |
| **contract** 20:21 | **corp** 44:10 48:2 | 230:17 | 220:15,23 |
| 21:12 150:1,7 | 67:18,19 96:12,16 | **correction** 99:18 | **cpa** 95:17,22,23 |
| 171:16,17 | 121:20 134:19 | **corrections** 234:17 | 96:1 |
| **contracted** 90:2 | 199:3 | **correctly** 59:19 | **cracked** 42:14,15 |
| **contractor** 115:13 | **corporate** 58:11 | 180:3 182:11 | **crap** 192:16 |
| 122:2 | 179:5 189:8 | 190:13 192:6 | **creating** 95:5 |
| **control** 134:6,12 | **corporation** 95:1 | 218:6 | **credit** 220:12 |
| 171:20 172:24 | **correct** 17:18,19 | **cost** 129:21 | **criminal** 79:13,16 |
| 173:6,16 179:2,16 | 20:23 21:6,7,23 | **counsel** 7:20 168:8 | 169:11 |
| 195:11 | 30:3 33:9 34:18 | 229:1,10 231:2 | **cruze** 219:3 |
| **controlled** 190:25 | 35:3,11,15 36:4 | **count** 206:5 | **curious** 144:20 |
| 194:25 195:7 | 38:15 41:15 46:6 | **counter** 183:7 | **current** 24:21 80:5 |
| **controlling** 179:12 | 62:16,17,18 63:8 | **countersuit** 21:17 | 86:7 177:20 178:4 |
| 187:12 | 63:19,22 79:7 | **counting** 178:23 | 178:4 |
| **controls** 58:11 | 83:20 95:9 96:13 | **county** 230:4 | **currently** 13:19 |
| **controversy** | 96:14 98:2 99:4,5 | 233:10 234:15 | 39:17 40:19 41:14 |
| 128:23 | 100:22,23 104:8 | **couple** 98:5 | 83:17 84:21 |
| **convenient** 232:15 | 105:23,24 110:18 | 153:21 161:19 | 103:11 |
| **conversation** | 112:3,4 114:21 | 185:4 196:10 | **custody** 3:12 |
| 50:18 53:3 69:9 | 115:4 117:13 | 213:18 214:5 | **customers** 125:13 |
| 69:11 | 118:19,20 123:1 | 217:24 218:2 | **cut** 216:8 |
| **conversations** 7:5 | 128:8 130:9 | 223:4 228:2 | **cuyahoga** 230:4 |
| **convicted** 149:12 | 132:25 135:10 | **course** 19:5 88:22 | **cv** 1:7 7:12 9:1 |
| 149:13,15,22 | 136:1 140:5,6 | 157:15 188:19 | **cynthia** 1:25 7:18 |
| 169:7 | 142:23 143:15 | | 230:6 231:14 |

**[d - discriminated]**

**d**

**d** 47:17 155:13
  156:6
**daily** 134:6 183:20
**damaged** 25:24
**damages** 215:11
  220:11 221:6
**data** 24:5,10 26:5
  39:25 41:17
  123:21,22
**date** 7:3 67:12
  76:13 82:9 134:11
  229:11 232:8
  233:3,9,19 234:3
  234:13,25 235:20
  235:25
**dates** 203:10
**daughter** 55:19
  56:17 57:9 58:9
  65:6 207:10
**daughter's** 56:17
  56:19
**david** 67:7
**davis** 59:3 62:16
**day** 30:14,18 32:2
  76:25 77:1 102:16
  105:7 138:10
  171:25 186:17
  195:3 196:2,6
  213:10 215:21
  231:7 233:16
  234:22 235:22
**days** 17:14 46:17
  64:15 106:3,6,10
  106:11,12 126:17
  126:18,18 168:8
  187:22,23 188:7,8
  206:14 207:5
  211:19,20 214:18
  220:10 232:19

**deal** 65:1 133:11
  139:7
**dealer** 43:12,18,22
  44:15 45:3 108:19
  108:25 109:9
  110:4 111:20,23
  112:9 114:2,3
  116:16,18 141:19
  172:9
**dealers** 125:11
  140:16 141:6,22
  142:8
**dealing** 172:21
**dealings** 31:13
**deals** 165:25
**dear** 232:10
**december** 115:5
  117:13 148:9
  154:10,14 155:2
  176:20 226:22
**decide** 196:19,22
  196:25
**decided** 105:3
  136:9
**decision** 34:17,20
  35:3 140:3
**decisions** 194:2
**deed** 233:14
  234:20
**deemed** 200:10
  232:21
**defendant** 1:9
  2:11 20:23
**defendant's** 171:5
**defendants** 21:21
  209:15
**defense** 7:8
**define** 28:23 84:19
**definitely** 25:21
  61:22 130:24
  132:21 135:12

141:22 156:7
  162:21 176:8
  184:20 221:18
  226:1
**definition** 17:2
**delivery** 229:9,11
**demanding** 33:10
  191:10
**demands** 172:4
  179:4
**denise** 84:1,4,9,13
  88:4 111:12,13
**department** 125:8
  187:8 232:24
**depends** 18:6
  26:21,21 34:15
  44:14
**deposed** 8:15 80:4
**deposition** 1:11
  7:7,13 8:20,21 9:9
  10:16 12:18 14:19
  15:7,16 16:2,6
  18:14 19:7,14,25
  20:3,9,13 80:5,13
  170:20 228:19,23
  230:20 232:8,11
  233:1,3 234:1,3
**describe** 121:8
**described** 141:21
  189:2
**description** 4:2
**deshae** 32:6,7 36:3
  36:6,24 96:25,25
  97:1,2,12,13 98:14
  98:25 102:14
  105:8 122:25
  124:3,5,7 194:19
  195:1,18
**designated** 184:7
**desk** 29:2

**despite** 141:25
**detail** 206:2
**detailed** 190:21
**details** 51:16,17
  194:3
**determine** 28:14
**determined**
  198:23 200:4
**determining** 96:7
  197:10
**devastating**
  214:16 215:23
  220:22
**device** 39:3 40:1
**devices** 26:6
**diagnosed** 64:5,6
**died** 55:17,19
  215:14
**different** 54:14
  59:9,18 75:5,7,7
  82:23 106:17
  112:18 113:5
  117:7,16,16
  143:19,20 157:19
  175:25 176:5
  177:23 226:17,18
**differently** 206:22
**difficult** 227:4
**dinner** 70:17
  186:4,6,10
**direct** 38:21
**directly** 223:12
**disability** 222:5
**disagree** 218:24
**disagreed** 130:25
  142:2
**disappeared** 222:9
**discovery** 226:24
**discriminated**
  54:12 55:25 210:9
  211:16

**discriminating**
  55:4
**discrimination**
  21:18 168:16
  206:6,7
**discriminatory**
  210:2
**discuss** 50:10
  51:14 54:11 79:4
  127:25 186:4
  224:25
**discussed** 42:10
  45:19 51:16 52:17
  54:18 123:7
**discussing** 97:22
**discussion** 45:20
  45:22 82:6
**dishonesty** 79:18
**dislike** 140:8
**dissolve** 137:1,3
  138:2 180:20
**dissolved** 138:1
**dissolving** 150:11
  180:16 204:12
**distress** 12:24
**distributor** 35:15
  55:11 108:13
  110:6,15,17,24
  112:18 113:6,7
  114:10,12,18
  115:7,18 116:6,12
  118:12,18 120:9
  120:10,22 127:4,8
  127:24 128:4
  129:1,4,18 134:25
  136:21 137:14
  138:18,21 144:3
  145:25,25 165:9
  165:10 173:17
  186:2,11,20,24
  187:4,6,9 188:9

190:11 191:11,17
  191:20 192:17
  197:6 213:22
  215:19,20
**distributor's**
  126:24 173:25
**distributors** 43:21
  54:21 58:18 59:12
  60:22 109:9 121:3
  121:4 123:21
  125:10 127:2,17
  127:25 128:11,15
  128:19,21 132:9
  138:5,21 140:15
  143:17,20 155:22
  175:10 179:8
  188:3 207:13
  215:17 219:20
**distributorship**
  31:25 44:5 87:11
  87:16,22 108:23
  109:18,21,25
  111:7,23 112:2,6,9
  112:22 113:11,13
  113:22 115:3
  120:21 121:2,10
  122:16,18 125:15
  137:2,4,20,21
  138:1 142:9
  149:14,20,21
  180:14,16,20
  204:13
**distributorships**
  113:25 125:13
**district** 1:1,2 7:10
  7:11 8:24,25
**division** 1:3 7:11
  8:25 54:22 60:17
  95:2 120:17,18,19
  120:22 121:2,13
  121:19,19 122:6,8

122:11,21 124:1
  129:14 166:24
  167:4,9,10 174:19
  175:13 176:18
  178:4,12,20,24
  188:9 195:4
  211:22 214:25
  219:4,16
**divisional** 18:25
  20:16,22 21:20
  25:4,8,17 26:12
  31:14 35:20 37:16
  39:5 41:19 42:9
  66:1 78:24 79:2,6
  93:15 115:8 122:5
  122:12,14,24
  124:10,11,14
  126:3,7,10 127:21
  127:22 128:1,7,10
  129:5,9,24 130:1,1
  130:11 133:15,21
  133:24 137:13
  144:8 165:11
  166:21 172:15,19
  172:22 174:6,23
  193:10 205:14,25
**divorce** 80:8,11
  99:20 100:2
  101:17,20 219:2
**divorced** 53:12
  80:11
**docked** 100:10
**doctor** 55:18 57:2
  57:3
**document** 132:16
  132:25 133:14,23
  171:6,13
**documents** 14:18
  14:21 15:6,8 16:9
  16:11 18:13 19:6
  132:19,21 133:7

225:1,12
**doing** 48:15 61:9
  61:16 64:17 70:12
  87:24 121:6
  122:21 124:3,12
  138:14 139:7
  141:20 142:17
  144:7 150:11
  155:4 159:5
  160:20,21 173:19
  173:20,24 175:13
  175:14 182:14
  185:13,16 192:7
  211:14 212:3,20
  213:3,11,12 215:1
  216:3
**dollar** 106:23
  162:10
**dollars** 136:15
  142:19 202:9
**domestic** 74:22
  84:16,19 147:15
  147:18 148:22
  149:8 169:12
**don** 95:21
**door** 29:2 30:4
  55:18 57:2 148:1
  159:21 220:25,25
**dot** 75:1
**downtown** 27:4
  28:20 104:25
  123:7 181:20
  195:22
**dozen** 207:16,18
**dozens** 173:22,23
  206:11,11
**dps** 44:20,21,23
  117:20 201:24
**drink** 186:5
**drinking** 216:25

drinks  129:21
  186:6
drive  2:6 32:1 62:1
  86:3 93:22 94:18
  97:4,19 98:20,23
  99:7 101:16
  102:20 103:4
  196:1 197:7
  215:18 219:11
driving  61:25
  102:13 193:24
  210:24
drop  25:13 62:3
dropout  216:1
  222:14
dropped  25:16,23
  25:24 42:15 149:7
  170:10
dropping  177:1
drove  62:6 63:12
  63:13,15,15
drugs  12:1
ds  36:23 52:9
  69:25 71:16 72:15
  106:6 116:2 140:4
  143:11,15 179:22
  180:7 185:6
  204:18
dss  59:11
dt  114:10,22,23
  115:11 186:14
dts  186:14
due  149:7
duly  8:15 230:7,10
duration  22:20
duties  63:24
dying  65:8

e

e  84:3,3 85:13
  108:12,13 155:13

earlier  14:23 15:5
  18:4,9 29:3 39:1
  68:22 90:18 91:25
  96:10 154:4
  164:16 169:5
early  14:14 153:10
  156:11 186:1,20
  217:17
eastern  1:3 7:11
  8:25
easy  36:18 73:6
efforts  211:22
eight  35:24 140:5
  175:16 187:5
either  36:23 73:21
  89:3 99:12 100:20
  101:18 102:9
  155:17 158:7
  175:17 195:10
  231:2
elected  128:11
electric  38:18
electronic  39:3
elevator  184:10
eleven  54:4
ell  108:10,13,18,20
ellie  56:13,21
ellis  32:6,7 35:14
  36:3,6,19,20,24
  96:25 122:25
else's  177:16
email  33:1,9,10,13
  35:18,22 102:9,10
  132:6 152:13
  171:22 181:4,9
  191:10 227:11
emailed  226:1
emailing  127:2
emails  22:4 105:21
  172:24 173:1

emert  46:15
emotional  12:24
  49:10 215:12
  216:24
employ  194:22
employed  37:6
  87:4 92:19 116:11
employee  32:17
  37:9,14 55:10
  65:9,10 78:18,19
  89:19 97:10,15,17
  98:17 99:1 116:15
  116:23 122:25
  165:21 168:18
  172:21 174:4
  182:20,22,23
  183:8 197:15
  198:9,13,24 199:1
  200:4 205:4 216:6
  219:6
employees  89:6
  96:19 116:6,11
  121:4,24 126:14
  194:6,8 203:23
  204:16,17
employer  198:7
employment  77:4
  133:8,20 195:13
  195:16 209:9,16
enacted  32:25
ended  39:23 61:24
  108:9 122:7 150:9
  150:10 157:24
ends  48:20 189:19
engage  210:4
enrichment  21:19
  201:3
enter  30:8,11
  122:4 150:12
  152:22 153:1

entered  20:23
  21:20 30:8 77:2
  115:2 130:10
  135:25 152:1
  153:8,11,17,21
  154:7,7 216:11
  226:21 234:9
enterprises  67:17
  69:15 89:17
  150:21
entire  17:8 36:16
  102:1 178:9 233:5
  234:5
entirety  37:19,20
  179:22
entities  89:2
entity  121:12
entrance  30:6
equipment  202:20
errata  232:19
  234:7,10,18 235:1
especially  73:7
  196:10
esq  2:5,13,14,23
  2:24
estimate  41:12
estimating  178:14
et  194:3
ethical  125:12
europe  211:2,4
evening  181:20
event  231:3
eventually  143:7
  170:10
everybody  72:24
  73:7,13,24 105:21
  118:4 129:22
  138:6 178:13
  186:19,22,23
  201:8 206:18
  208:16 210:21,23

212:20 215:6
**evidence** 171:16
  171:19 172:14
  179:1 193:9 201:1
  204:22 205:19
  206:6 208:23
  209:22 215:8
**evidencing** 203:18
**ex** 53:11 83:19
  170:12
**exact** 33:14,19
  40:7 57:12 67:12
  76:12,24,25
  146:19 184:11
  203:10,14 212:3
**exactly** 23:15
  24:19 27:24 31:21
  38:10 45:9 69:17
  77:4,17 101:11
  105:25 132:20
  161:6 201:25
  202:3 223:13
**examination** 3:6
  8:13,17 120:5
**example** 125:10
  159:9 177:19
  187:17 195:11
**excellence** 120:25
**exceptions** 194:21
**exclusively** 123:13
**excuse** 106:11
  149:22 189:15
**executed** 234:10
**execution** 233:14
  234:19
**executive** 189:6
  192:3
**executives** 131:1
**exercising** 179:2
**exerting** 171:20
  172:24 173:6

**exhibit** 3:12 4:3
  133:11 170:20
  171:1,5,11
**exhibits** 3:5,13 4:1
  133:10
**exist** 175:16
**existing** 24:5
**expect** 188:19
**expected** 127:11
  188:21,23 189:1
**expense** 139:2
  193:3,6
**expenses** 135:2,4,6
  135:17,22,23
  192:16 197:1
  216:9 221:10,12
**expensive** 186:7,8
**experience** 12:22
  124:7 164:10
**expert** 12:25
**expiration** 233:19
  234:25 235:25
**expire** 68:13
**expires** 231:17
**explain** 90:6 96:8
  135:16 139:2
  141:24 223:4
**explained** 55:13
  64:18 138:25
  205:24 206:1
  210:16
**expressly** 232:13
**extend** 9:25
**extended** 210:19
**extending** 210:22
**extension** 107:22
**extent** 135:21,22
**extra** 128:14
**eye** 146:7,21

**f**

**face** 163:18,18
**fact** 35:2 149:24
  184:24 198:1
  206:14
**factory** 35:15
  43:21 59:12 60:22
  87:10 109:9
  114:17 115:2,6
  116:5,12 118:12
  118:17 120:9,10
  120:22 122:16,18
  127:4,8,17,23,24
  128:4,11,19 129:1
  129:4,18 138:4
  180:14 188:8
**fair** 37:24 38:23
  40:25 62:12 68:15
  122:13 125:17
  127:19 128:1
  174:2 212:11
  216:2,7 221:22
  224:20 227:21
**faith** 205:19
**false** 149:7
**family** 64:7 93:5
  93:11 109:4 156:1
**far** 30:18
**fast** 97:3
**father** 57:23 91:4
  91:14,18,20
**father's** 91:6
**fax** 38:18
**fd** 36:23 45:4
  110:8 115:20,22
  115:25 116:19
  117:12 118:6
  141:20 165:14
  167:8 185:15,20
  186:15 204:15

**fds** 59:10 63:7
  156:3 166:20
  188:24
**fear** 61:22 72:14
**feared** 71:12,14
**federal** 8:13 200:2
  201:10
**feel** 10:21 61:16
  65:5 73:18 210:8
  211:15 212:2,9
  220:2
**feeling** 70:24
**fees** 216:14 221:7
  221:9
**feet** 29:1
**fell** 25:25
**felon** 145:24
  149:22
**felons** 146:1
  149:12,24
**felt** 60:23 131:2
  179:12
**female** 81:12
**ferraris** 210:24
  219:21
**fetzer** 8:10,23
  118:19 120:12
  126:14
**fictional** 176:23
**field** 102:17
  124:22,24 127:12
  132:7 173:8
**fight** 61:23,23
**figure** 90:11
  224:14
**file** 42:17 95:8,11
  161:9 164:17
**filed** 7:9 8:23 21:5
  78:2,21 80:17
  81:13 107:16,22
  161:13

| | | | |
|---|---|---|---|
| **filing** 81:17,18,19 | 214:17 215:18 | **forgot** 180:22 | **front** 81:25 182:18 |
| **fill** 118:9 187:1 | 224:2 228:20 | **form** 188:17 | **frustrated** 214:21 |
| **final** 80:11 100:2 | **fix** 143:17 179:9 | 189:16 197:20 | **full** 37:3,5,5 82:17 |
| **finalized** 101:21 | 179:10 199:6 | 209:11 | 126:18 |
| **finally** 217:24 | **fleming** 93:20 | **formal** 122:20 | **fund** 128:10,17,18 |
| **financial** 49:9 | 94:19 | **formalized** 132:15 | 130:1 |
| 138:19 220:17 | **flight** 197:7 | **forth** 194:19 | **further** 230:19 |
| **financially** 134:18 | **flights** 135:6 | 214:13 | 231:1 |
| **find** 72:21 156:16 | **floor** 184:11 | **forty** 37:7 | |

| **g** |
|---|

| | | | |
|---|---|---|---|
| 206:17 222:14 | **florida** 17:18 | **forward** 97:3 | **g** 84:3 |
| 227:19 | 46:22,24,25 47:7 | 224:17 | **garbage** 39:22 |
| **finding** 76:19 | 47:12 48:21 67:24 | **found** 55:11 | **gas** 219:4 |
| **fine** 70:19 82:3 | 81:13 86:9,16 | **four** 12:23 112:13 | **general** 161:8 |
| 157:22 169:24 | 95:9,10,12 113:15 | 117:16 126:11,16 | **generating** 160:10 |
| 191:25 211:23 | 113:18,23 121:22 | 127:20 128:5 | **gentleman** 136:18 |
| 228:13 | 130:16 203:22 | 169:3 192:7 | 136:19 |
| **fines** 200:11 | **flour** 157:9,9 | 193:13 203:23 | **gentlemen** 58:25 |
| **finish** 10:5 37:4 | **flow** 220:13 | 214:17 223:23 | 61:3 |
| **finished** 180:15 | **flower** 157:8,10,20 | **frame** 37:19,21 | **george** 42:25 43:1 |
| **fire** 168:10 195:8 | 157:21 | 99:11 110:22 | 43:4,7 44:11 46:4 |
| **fired** 21:14 52:5 | **flowers** 157:10,11 | 115:17 117:11,12 | 51:2 91:25 92:16 |
| 52:11,21 54:13 | 157:11 183:3 | 174:22 175:7 | 93:1,2,10 109:6 |
| 106:4 | **fly** 64:11 131:14 | 177:9 | **georgia** 130:16 |
| **firm** 7:16 | **focus** 211:21 | **franchise** 150:10 | **getting** 12:16 |
| **first** 8:14 24:17,18 | **follow** 34:3 192:21 | 150:23 151:7,9,25 | 144:3,3 150:9 |
| 51:13 53:3 60:10 | 228:3 | 153:3 158:9,10,15 | 159:6 160:19 |
| 76:10 80:24 82:25 | **followed** 168:13 | 163:2 181:12 | 195:22 210:25 |
| 107:23 108:13 | 202:2 | 216:12,13,14 | 211:1 224:18 |
| 129:15 130:10,19 | **following** 35:6 | **franchisee** 162:20 | **girlfriend** 148:10 |
| 135:13 138:7,16 | 124:13,16 175:19 | 163:22 168:18 | **give** 36:18 106:10 |
| 143:4 151:1 | 175:25 | **franchisor** 151:8 | 136:11 158:7 |
| 153:15 156:24 | **follows** 8:16 | **frank** 129:14 | 172:10 187:17 |
| 161:22 171:15 | **food** 127:15 | **fraud** 79:17 | 189:17 229:1,10 |
| 196:10 202:1 | 129:20 194:3 | **free** 10:22 233:14 | **given** 11:2 123:10 |
| 204:11 218:19 | **foot** 100:15 | 234:20 | 228:19 230:13,18 |
| 230:10 | **forced** 31:23 32:2 | **friday** 102:18 | **glasses** 13:12 |
| **five** 17:4 41:13 | 32:8,9,12 61:18 | 183:22 | **gmail** 36:2 |
| 56:22 112:13 | 105:14 195:14 | **friend** 67:4 73:3 | **gmail.com** 35:23 |
| 114:14,15 138:13 | **foregoing** 230:16 | 74:12 | **go** 9:6,11 13:16 |
| 160:5,6 187:23 | 230:21 233:13 | **friends** 54:14,16 | 14:8,13 29:14 |
| 202:22 203:1 | 234:18 | 54:18 | 30:7,9,11,13,16 |

31:25 32:1,8,9,12
32:14 37:4 38:20
60:22 61:20,21,25
62:8,13 63:7,19,20
64:21 66:22 76:19
83:5 87:9 93:14
101:1 102:11
105:6 112:17
119:3 127:1,10
131:4,18 140:24
148:24 149:10,16
155:25 158:4
159:8 171:2
179:14 181:24,25
183:1,6 186:7,7,8
187:21,23 195:15
197:6 198:2,12,25
199:6 200:6,8
207:19 214:6,18
214:25 216:23
222:20 224:17,18
226:23,23 227:25
228:15
**goal** 139:11,12
**goes** 149:6,11
158:10 196:2
210:9
**going** 7:1 9:11
13:3,24 14:12,13
16:1 29:19 31:7
39:23 51:15 52:20
52:21 60:6 61:12
61:15 64:7,10,12
64:24 69:9 76:4
82:4 83:9 88:7
102:14,15 105:15
105:20 126:24
127:18 130:13
135:19 138:17,20
139:16 141:9
144:6 158:6,8,24

160:9,19 168:22
174:15 176:16,20
178:3,7 179:13,20
181:9 184:1,2
186:10 193:21
194:7 196:20,23
197:1 198:2,12,14
198:25 199:6,21
200:6,14,20,21
206:3,15 215:5
220:21,24 223:14
223:14,21,25
224:12,13,16,17
225:4,9,11,13
226:22,23
**good** 46:11 74:7
118:24 124:5
134:9 135:19
139:16 145:19
155:23
**google** 28:17 76:21
77:3
**gotten** 107:20
**governed** 133:23
**government**
197:25
**grade** 83:12
**graduate** 83:7
**grams** 123:20
**grand** 135:19
136:18 191:4,16
206:3 211:2
217:10
**grandchildren**
90:15
**granddaughter**
55:13,17,23 56:6
57:24 65:7 90:14
**granddaughter's**
56:11

**grandma** 215:14
**great** 121:1 173:19
173:20,22,23
194:20 195:5,18
200:25 212:20,23
213:4,11,19,20
219:3 225:25
**greet** 186:19
**grew** 111:18
**groedel** 2:4,5,9 8:1
8:1,2,5,11 12:3,8
12:14,19,21 13:15
13:21 14:1,5,10,16
19:13,23 20:2,6
29:11,16 57:15,19
79:14,16,22 80:2
81:23 134:20
136:11 139:24
140:21,24 144:23
145:1,5,7,10,13,17
145:22 147:19,21
147:24 152:14,17
152:21 168:15
169:21 188:17
189:15 190:8
197:3,20 198:20
199:8,16,19,25
200:17,24 203:4
204:1 205:21
206:8 208:3
209:11 224:6,21
225:7,15,20 226:4
226:12 227:2,5,12
227:15 228:2,7,12
228:22 232:5
**gross** 161:14,18
162:5
**ground** 9:12
**group** 18:18,18,19
59:21 212:24,25

**groups** 70:15
**growing** 160:23
**guess** 151:10
161:8 168:13
169:13 170:9
195:10 197:2,3
212:25
**guessing** 50:4
92:14
**guest** 29:13
**guy** 214:11
**guys** 35:8 61:8
62:10 138:9
155:21 161:7,24
167:3 189:8,8
190:17 191:21
198:5 214:2

**h**

**h** 9:4,5 43:2 83:1,2
85:11,13
**half** 40:24 50:5
86:1 112:13
126:18 136:14
142:18 178:15
196:1 207:17
214:25
**halle** 2:23 8:7
70:18,24 144:11
144:12,13,15,17
144:17 146:2,3,4,6
146:9
**hand** 171:2 231:6
**handbook** 124:14
172:20,23
**handed** 171:3
**handful** 222:21
**handgun** 148:16
**hands** 188:15,20
**happen** 26:1 71:12
71:14,18 72:16,18
118:11 139:17

160:15
**happened** 25:21
26:4 42:12 49:7
72:11 113:3 114:7
114:15 126:16
135:7 138:3
139:13 150:8
168:14 179:23
194:18 195:10
212:14,18
**happening** 159:3
214:20
**happens** 25:13
**happy** 136:20
211:4 213:2
**harassed** 54:19,24
59:6 207:21
214:13
**harassing** 54:25
55:2 64:23
**harassment**
148:17
**hard** 23:18 73:10
139:16 143:22
160:24 170:4
212:21 222:14
**harm** 61:7
**harris** 123:3
**hay** 210:22
**he'll** 228:22
**head** 9:17 75:1
161:7
**headquarters**
126:12,12 149:19
219:19
**health** 223:5
**hear** 10:7 144:20
**heard** 10:11 58:20
59:19
**hearing** 192:6

**heartcliff** 86:6
**heathcliff** 86:5
**heavily** 174:11
**heidi** 2:24 8:9
**held** 7:13
**hell** 64:17 138:11
**help** 95:5,15 96:15
137:25 187:6
204:3 207:10
**helped** 37:1
123:23,23 138:5,6
**hemp** 50:11
157:11,20 183:3
**hereinafter** 8:15
**hereunto** 231:5
**hey** 131:15 132:9
132:13,22
**hi** 48:14
**hickman** 109:16
109:17,22,23
110:7 111:3,5
**hickman's** 109:25
**hide** 137:16
156:19
**high** 83:3,5,6,9,11
184:10 216:1
222:13
**highest** 106:23
**hire** 33:17,23
34:17,21 35:1
38:2 142:14,16
194:7,10,11
**hired** 34:24 35:2
108:14 135:13
141:2
**hiring** 34:4,5,12
34:13 108:7,9
**hit** 218:3 220:16
**hitting** 148:9
**hold** 59:15 125:2
224:12

**holding** 185:12,19
**home** 20:7 71:20
93:23,25 94:1,12
95:2 96:19 97:8
98:12 101:16,21
101:25 180:12
**homes** 103:17,19
223:15
**honest** 144:18
**hope** 226:10
**hoping** 140:9
**horrible** 70:24
**hotel** 60:21 62:4
66:13,13 127:16
135:5
**hour** 187:5
**hours** 32:1 34:6,14
34:17,21 37:5,7
64:9 106:24
137:21 141:13
173:8,10,11
183:11,23 187:6
195:1 196:2 203:3
215:18
**house** 32:1 74:11
86:1 100:3 101:3
101:5 103:5,6,12
103:14 104:16,21
172:2 180:17
**houses** 86:18
219:21
**hp** 39:14 41:1
**huge** 138:19
176:13 210:20
220:17
**huh** 9:18
**humans** 10:3
**hundred** 220:9
**hundreds** 201:15
202:9

**hurt** 61:3 62:11
**husband** 31:24
**hypothetical**
200:19
**hysler** 85:12

**i**

**ibrahim** 1:5,12 3:6
7:7,9 8:12,17,20
8:22 9:4 82:17
120:5 228:19
230:9 232:6,8
233:3,4,9 234:3,4
234:13 235:20
**idea** 27:19
**identification**
170:23 171:4
**identified** 38:25
50:21 51:19 53:8
78:20 90:13 91:24
125:19 126:22
209:4
**identify** 7:20 8:5
31:8 69:11
**ignored** 54:20
125:1
**iied** 13:1
**illegal** 211:2
**image** 219:10
220:5
**imagine** 168:14
**immediately** 41:1
171:24 179:9,10
190:16 214:23
**impact** 99:21
**impacted** 220:24
221:3
**impacting** 174:6
**impacts** 12:12,13
221:4
**important** 9:15
63:4

**impression** 136:14
**inappropriate** 145:14
**incident** 58:2 169:18,19
**incidents** 169:5
**included** 31:6 38:12,16 205:9
**including** 202:9
**income** 115:25 160:11 200:2 215:23 220:21,21
**inconsistent** 131:10
**incorporate** 48:3
**incorporated** 69:16 114:19,21 121:18 158:21 234:12
**incorrect** 148:12
**incur** 135:17
**independent** 115:13 122:2 142:6,8,12
**index** 3:1,5 4:1 5:1
**indicating** 15:22
**individual** 30:2 68:25 81:18,20 103:21 123:9 198:12
**individually** 104:7 177:8
**individuals** 53:8 59:10,23 60:7 62:14 92:4 116:20 137:5 207:23
**infliction** 12:24
**information** 13:2 24:5 25:6,14 26:5 41:18 60:7 126:23 127:13

**injuring** 148:21
**injury** 12:25
**inside** 61:25
**insisted** 61:11
**instruct** 200:15
**instructing** 79:24
**instruction** 229:2 229:10
**instructions** 11:1 124:16,18 187:5 201:25 202:3
**insurance** 42:16 42:19 196:13,14 196:15,17,18 217:22 223:5,6,15 223:16
**intentional** 12:24
**interact** 163:13
**interactions** 163:9
**interest** 91:1 92:23 93:3,7 201:5
**interested** 156:2 223:17 231:3
**interests** 115:23
**interference** 7:6
**international** 74:21 210:18,19
**internet** 38:18
**interrupt** 29:11
**interview** 222:18
**interviews** 222:16 222:19,22
**introduce** 186:21 186:21
**invested** 207:18
**investigate** 167:11 214:19
**investigating** 155:4 206:16 211:5

**investigator** 60:25
**investment** 155:24
**invitation** 103:17 103:19
**involve** 79:17
**involved** 12:16 14:14 43:5 58:21 59:6 66:23 79:10 79:12 80:14 91:20 109:5 115:14 147:7 162:13 164:21 165:17 174:5,12 175:2 200:15,18
**involvement** 167:25 168:5
**involving** 148:17 169:5
**ipad** 41:7,9,18,24 42:2,4,12
**iphone** 23:11,14 24:15,22,24 25:3 26:8
**irrespective** 133:22 140:2
**island** 93:20 94:19 111:17
**islands** 130:15
**israel** 82:12,13
**israeli** 82:16
**issue** 20:16 143:15 143:16 206:19
**issues** 77:21,22,24 125:19 126:21 127:25 144:9,10 146:22 147:14 216:24

**j**

**j** 2:13
**jack** 91:7

**jacksonville** 27:4 28:20 44:6,19 81:12 89:2,22 100:10 101:9,12 104:25 118:23 195:22
**jacob** 145:24 146:8
**jail** 148:24 217:2
**january** 105:1,2 120:18 176:19 178:2,7,18
**jason** 32:6 35:14 36:19,20 156:6
**jax** 44:8 87:21,22 88:9 94:24
**jeez** 161:23 218:25
**jeff** 45:7 137:7 156:8
**jensen** 113:15
**jim** 137:7
**job** 33:12 60:19,25 61:1 63:24 88:18 105:15 139:3 141:10,11 165:23 173:19,20,22,23 191:22 192:3 194:20 206:4 212:20,23 213:4 213:11,19,20 222:14,25
**jobs** 115:12 222:10,12
**john** 109:16,17 218:25 219:5
**johnny** 59:3 62:15
**jon** 210:19
**jones** 132:11 179:14
**jordan** 57:22,23

**joyce** 53:10 54:5,8
80:10 83:19,23
84:13 86:10,12,13
86:21 87:10,14
88:13,14,20,25
94:10 98:1 99:15
148:10,18,21
217:2
**judge** 224:25
**july** 60:13 62:25
66:7 67:13 70:1
148:20 169:19
170:3,4 207:15
210:6,7 212:18
214:21
**jumped** 145:25
**june** 40:4,10,11
60:13 62:25 149:1
207:2 210:5,5,6
231:8 232:4

**k**

**k** 84:3 156:6,6
**kda** 128:9,10,17
128:18 129:4,25
130:4 135:4
**keegan** 84:1,5 88:4
**keep** 14:14 46:2
121:9 130:22
131:7,8 139:15
187:10 189:9
193:3,5 196:12
207:22 208:6
**kelly** 57:22
**kentucky** 176:10
176:13
**kept** 61:11 132:2
139:14
**kevin** 17:10 55:1
55:21 58:3,7
60:15 61:11 63:6
63:18,25 64:15,21

65:3,20 69:23
70:2 75:13,19,23
129:16 185:5,8
193:4,5 206:11
207:11,17 209:17
209:19,20 210:10
211:13 212:15
213:6,8
**key** 137:25 184:9
**kids** 53:17 85:2
**kill** 92:14
**kind** 71:19 121:7,8
133:11 139:14
159:20 184:11
193:20,23 200:1
**kindly** 197:25
**kirby** 1:8 7:9 8:8
8:22 32:10,11,13
33:2,16,22 42:4
43:8 45:24 50:16
52:20 60:20 61:10
64:9 65:25 77:25
78:3,21 79:3
89:10 90:2 106:7
107:24 108:1
109:5 115:3,23
116:17 118:18
120:9,11 122:21
124:12,13 126:13
128:11,13,14,16
128:21,22 131:1
134:14 137:14
141:2 146:11,20
149:4,6,9,13,25
155:21,21 164:10
164:21 165:7,14
166:12,17 167:7
167:20,21 168:3,9
168:12 171:15,17
171:19 172:15,18
174:13 177:6

187:12 188:11
189:4 190:11
195:7,19 196:5
200:7,11 201:5,22
201:23 206:12
208:16,17 210:21
214:1 216:1 219:6
219:18,19,23
220:19,24 221:1
232:6 233:3 234:3
**kirby's** 193:10
**kirbys** 146:12
191:19,20
**kitchen** 184:17
**knew** 105:21
149:20 190:13
208:15,17 210:21
210:23 215:14
216:1
**know** 10:9,15
20:25 25:13,20
28:17 34:22 37:1
39:15 40:7,7 42:2
45:3,8 58:11,15
60:1 61:9,21,22
70:17 71:18,22
72:16,20 73:17,17
73:20,21,23,24
74:20 76:24 77:18
78:2,5 79:4 81:3
82:14 90:7,13,17
91:24 93:10 95:18
95:21 105:10,21
108:12 110:12
116:14 117:7
118:10,25,25
121:8 123:24
125:25 130:13
132:4,10,20 133:4
135:21 137:7,10
138:20,21 146:4

146:24 147:1
151:14,16 156:5,7
157:6,17 158:1,3,4
159:21 160:8,19
160:23 161:4,6,25
162:16,18 163:5
166:3 167:1,5
168:17 170:2,16
171:7 172:5
173:24 174:13
175:9 176:8,9
179:4 180:4,17
184:7,14 188:5
190:15,23 195:23
197:24 199:4
200:21 203:14
207:25 208:7,10
208:11,14,19
209:7,7 211:3,21
212:8 213:1,14,14
215:25 217:9
219:11,13 221:1
221:14 224:6
**knowingly** 149:14
**knowledge** 208:23
209:4,6,7 211:5
**known** 129:23
138:25 139:6
208:12
**knows** 201:8
**kodak** 156:6,6,7

**l**

**l** 2:14 85:13,20,20
92:11 108:12,12
108:13 165:2
**la** 64:7,18
**lady** 123:5 196:11
**lamb** 61:15 67:7
206:10 207:6,7
208:22 210:7,8
211:7,8 212:6,7,14

**lamborghinis** 210:25 219:21

**lamont** 164:25 165:1,2,3,4,5 166:15 168:17

**landlord** 68:5

**lane** 86:8

**laptop** 39:6,7,7,11 39:17,19 40:15

**larry** 108:10,13,18 108:20 109:1,10

**laser** 74:24 75:1

**lasted** 21:22 37:17

**late** 213:5

**law** 116:13 203:22

**law.com** 2:9

**lawful** 8:12

**laws** 116:14 149:9

**lawsuit** 8:22 15:3 20:17,21 21:6,9 42:22 43:4,6 45:13 46:1,6 49:2 49:23 50:14,22 51:3,8,20 53:2,7 54:6,9 76:11 78:2 78:11,21 79:9

**lawyer** 77:5 209:13

**lawyer's** 77:25

**layla** 85:18,19,21 85:23

**leader** 112:10,12 114:3 116:21,22 144:5

**learn** 108:1 197:17

**learned** 145:20

**lease** 27:12,16,20 31:6,8 38:13,17 68:2,4,8,10,13 103:18,22,24 104:4,6 106:5

160:4 184:8 202:23,24 217:15 217:16 218:6,9,12 218:15,17,18

**leased** 29:25 68:16 202:21 203:9 218:19 220:6

**leases** 202:20

**leasing** 31:9

**leave** 106:12 112:17

**leaves** 186:23

**ledger** 161:8

**left** 67:6 139:21,23 162:18

**legal** 7:16,19 45:23 79:10 209:12 228:21 232:1 235:1

**legs** 71:20

**lent** 58:9

**letter** 151:12,23 225:23 226:14 232:20

**leukemia** 64:6

**level** 141:3,15 172:13

**lie** 191:2

**life** 139:10 215:24 223:6

**limitation** 5:8 80:2

**limited** 79:23

**line** 38:21,22 49:16,17 140:14 156:22,24 158:4 158:25 159:1,3,4,4 162:10 169:22 234:7 235:3

**lines** 26:17

**list** 21:11 131:24 188:1

**listed** 234:7,17

**listen** 19:10 145:11 223:12

**listing** 234:7

**literally** 196:7 225:24

**litigation** 16:22 80:15,19 150:5

**little** 50:12 68:14 75:9 162:17 163:25 177:22 219:2,3 222:8

**littler** 1:20 2:12 7:14,22,24

**littler.com** 2:19,20

**live** 17:18 48:16 56:25 85:23,25 86:10,13 90:20 91:10 93:19 94:6 94:9,11 103:25 104:5 189:24 190:2 195:23 219:17

**lived** 84:24 93:15 93:17 195:23

**lives** 57:9 64:8

**living** 57:12 84:20 97:4 98:1,20 99:6 99:22 100:5,22 101:21 102:19 113:19

**loan** 217:11,14

**local** 116:13,14

**located** 7:14 34:5 67:23 111:3 113:14

**location** 28:18,19 47:10 48:11,25 97:11,14,16 98:1 102:25 104:14,18 107:5 154:1,3,6,20

154:22 159:18 179:15 183:12 195:3 196:6,11 232:15

**locations** 48:8 153:21 154:23 159:11,13,18 175:16 176:14 178:17,17 194:1 196:20 219:15 220:14

**locked** 184:15

**log** 29:12,17

**long** 14:13 23:16 24:15,23 40:8 41:4,8 47:6 49:6 50:3 53:15 68:10 88:16 95:23 106:10 108:25 111:17 112:11 114:12 115:6 126:15 131:6 165:17 169:15 176:7 187:4

**longer** 150:6

**longmill** 86:8 103:10

**look** 16:9,11 34:15 100:12 126:2 136:17 152:17 158:1 174:19 175:25 177:7 187:7,7,8 191:22 194:19 196:3 199:10 202:5,13 212:21,21,22

**looked** 17:9,13 139:17 146:10,17 177:8 225:24

**looking** 70:23 77:3 162:10 175:20

177:15,16
**lord** 38:10 56:22
83:15
**lose** 25:12,14
105:15 151:19
194:20 196:4
**losing** 72:11
220:20
**lost** 24:12 46:9
183:18 190:6
215:24 218:3
**lot** 16:25 17:1,3,4
17:6 63:3 123:24
123:24 124:19
125:3 139:13
140:18 141:1
149:19 157:23
160:24 171:19
181:18 191:25
196:9 202:25
208:12,14 221:3
**loved** 48:25
**lower** 46:10
**loyal** 71:4,19
72:25 73:10
138:16 139:16
**lucky** 135:23
**luncheon** 119:7

**m**

**m** 2:5 9:4 83:1
165:2 232:5
**mac** 40:16 41:2
**machine** 202:22
**madam** 232:10
**magazine** 137:14
219:20
**magazines** 123:20
219:18
**main** 138:5
**majority** 25:9,10
30:19 132:3

**makarski** 113:9
**making** 125:10
136:14,18,20,23
140:3 142:18
189:12 192:16
204:23 216:4,5
224:22
**mall** 69:7
**mallory** 149:19
**mallory's** 149:20
**man** 92:7 214:2,9
**management**
123:10 184:19
**manager** 117:24
118:1 120:17,18
120:20,23 121:2
121:13 122:6,8,15
122:22 129:14
165:24,25 201:24
219:1,6
**manassas** 111:1
**mandated** 187:11
**mandates** 187:14
**mandatory** 33:10
102:11 105:6
171:24 173:13
191:10 193:12
195:20 220:1
**manipulation**
134:17
**map** 131:23
132:22
**maps** 131:21
**march** 148:15
150:14,18,21
152:23 153:2,8,13
153:25 169:18
174:22 175:3
181:11 226:20
**marcus** 54:17,20
58:25 62:14 167:2

167:4,6,8,13
211:12 214:24
**marina** 100:10,11
**mark** 137:7
**marked** 4:2
170:22,25 171:4
**marriage** 93:6
**married** 53:15
83:17,22 84:4,14
84:23 85:6,11,12
91:12 111:11
**marry** 84:25
**maserati** 189:22
217:6 218:7,18,23
219:12
**matt** 156:7
**matter** 7:8 15:9
80:20 144:25
184:24 206:13
232:12
**matters** 79:10,13
79:16 80:15
**mcbride** 74:22
149:24
**mean** 17:1,4,5,6
18:16 23:18 25:11
26:20 27:8 36:14
41:22 43:15 58:8
63:2 78:13,14
93:11 102:2 104:4
124:15 131:22
134:5,22 138:20
140:20 145:23
151:4 158:4
159:21 165:5
173:5 177:12
179:3 182:10
185:8 186:16
187:21 190:20
197:4 203:3 208:7
216:8 219:16

220:16 221:4
223:3 224:21
227:5
**meaning** 71:15
96:9
**means** 10:17 20:14
28:13,16 42:7
78:19
**media** 7:6 76:6
120:3 168:24
169:2 223:23
224:2 228:20
**medical** 11:4,10
11:14 14:5
**medication** 13:20
**medications** 11:7
11:18,22 12:1
14:9
**medicine** 12:10
**meet** 20:5 127:20
127:24 163:18
186:3 188:23
189:19 196:5
**meeting** 66:6,8,11
67:6 69:25 70:12
74:17 75:1,7
105:19 126:8
127:10,14,21,23
127:24 128:1,7
129:10,18,20,22
131:17 164:1
186:5,9,11 188:2
192:4
**meetings** 70:14
74:21 105:18
121:7 126:3,6,7,10
126:15 127:4,8
128:5,20 129:1,5,6
134:25 135:2
137:15 173:6
185:24 191:17

193:12 194:2
**melbourne** 113:23
**members** 93:5
109:5 128:18
156:1
**memorize** 146:16
**memory** 11:5,8
12:13 204:3
**mendelson** 1:20
2:12 7:14,23,25
**mentioned** 155:23
185:5
**mercedes** 219:14
220:7,9
**merge** 176:17
178:3,8
**message** 17:9
65:12,13 127:16
213:3 214:6,21
215:3
**messages** 16:12,13
16:14,16,21,24
17:16,22 18:10
19:3,17,19 20:12
20:14 35:17 55:3
64:14 172:23
173:1,18,23 179:6
212:17 213:8,9,10
224:4,22 227:23
**messaging** 179:4
212:25
**met** 48:11,24 57:6
163:23
**method** 22:1,13
26:9 38:24
**mic** 46:9
**micromanaging**
55:9
**microphones** 7:4
**mid** 181:14

**midwest** 235:1
**mike** 74:23
**mile** 86:1
**mileage** 219:4
**miley** 33:6 51:6
70:23 71:5,8,11,24
72:1,3,23 73:16
74:23 129:15
162:13 191:7
**miley's** 73:3
**military** 57:4
**million** 136:14,15
136:19,23 142:18
190:2
**millions** 201:15
**mindful** 10:6
**mine** 12:22 29:6
30:12
**minimum** 126:17
127:9 185:1
189:12 222:15
**minute** 100:13
136:12 186:17
**minutes** 20:11
55:15 110:14
179:11 214:5
**misclassification**
78:12
**misclassified**
190:14 198:1,24
200:9,10
**mislead** 135:12
191:23
**misled** 141:2,4,5
**misrepresentation**
140:19 142:2
**misrepresentatio...**
141:15 142:10
**misrepresented**
206:2

**missing** 179:7
**mississippi** 130:17
**misspeak** 176:10
**misspoken** 180:13
**misunderstanding**
182:16
**misunderstood**
15:10 182:12
**mix** 218:3
**mlcarter** 2:20
**model** 23:15 24:17
24:21 25:6 39:15
40:21,22 142:5
219:22,23
**mom** 64:4,24 65:7
90:22,25 91:12
**mom's** 65:15
**moment** 28:12
29:18
**monday** 102:18
183:22
**money** 58:9,12
107:21 128:16,20
128:25 129:3
134:15,23 135:1,3
135:5 141:9,14
172:11 191:16
192:1,14 193:1
197:8 199:6 201:7
206:2 207:10,18
207:19,20 211:14
211:25 216:4,5
217:10,12,12
221:14 222:8
**monterey** 100:15
**month** 24:19
106:9,9,15 128:17
174:16 191:19,21
193:3,7 210:24
211:2

**monthly** 27:22,23
160:4 205:9
**months** 24:18 51:9
55:20 74:5 87:11
87:23 88:18 98:5
98:10 101:14
112:23 113:1,4,8
114:14,16 122:11
138:2 154:11
161:20 165:19
173:21 180:19
196:10 217:17,24
221:12
**morena** 2:14 7:24
**morley** 2:13 3:8
7:22,22 8:18 12:6
12:11,15,20 13:3
13:24 14:2,7,12
29:14 57:17 76:2
79:20 82:2 119:2
119:4 120:6
140:23 144:25
145:3,6,9,12,15,19
147:23,25 152:19
168:20 169:24
170:25 199:18
200:23,25 223:19
224:3,9,24 225:11
225:18 226:16
227:3,24 228:5,10
228:16 229:12
**morning** 14:23
65:4 173:25
183:15 186:19
**mother** 64:19
90:18
**motives** 140:2
**mouth** 139:14
148:10
**move** 14:3 99:24
99:25 101:15

**[move - objection]**

103:9 111:9 145:4
**moved** 57:10,13
86:19 100:1,3,5
104:15 105:9
111:12 159:20
**moving** 86:14,17
98:5
**mpi** 68:6,6
**multiple** 54:10
125:9 129:5,5
143:4,19 146:1
148:4 149:24
167:17 179:17
**mutual** 150:11
158:12
**mutually** 150:11

**n**

**n** 47:17 84:3 85:11
155:13 165:2
**name** 7:15 9:2
28:10 32:5 33:19
38:11 43:1 44:4
47:13,23 53:24
56:12,14,19 57:5
57:21 59:2 65:15
67:8,15 78:1,1,9
81:11 82:18,24
83:1,1 84:2 85:7,9
85:12 87:12,15
91:6 100:11 104:6
104:9 108:11,22
109:20 110:11,12
110:24 112:5
113:10 121:15
137:12,13 143:21
149:15,18,21,22
184:18 211:3
223:11 232:6
233:3,4,15 234:3,4
234:21

**named** 230:9
**names** 82:21 188:3
**natalie** 56:20,23
84:12 89:14,21
90:2 93:10
**national** 21:18
82:15 206:6,7
208:1,18,24 209:5
209:22
**naturally** 201:8
**nature** 75:14,25
**near** 63:16 111:24
124:5 176:12
**necessarily** 176:25
**need** 10:21 29:16
41:6 64:21 134:7
169:25 179:7,9,10
187:20 197:5,6
199:13,22 203:22
213:1,12,13
214:22 219:11
**needed** 66:16
106:25 123:25
143:2 194:11,12
194:12
**negative** 178:24
**neglected** 167:14
**negotiate** 193:1
**negotiated** 193:3
**neither** 227:5
**net** 161:14 162:5
**never** 51:16 63:7
63:16,16 74:9,10
74:11,11,12 79:12
88:5,6 89:4 90:4
90:24 91:16,23
92:21 109:7
136:25 141:19
147:14,17 164:6,8
168:12 169:11
174:14,15 175:22

175:22,23 176:24
178:10 181:23,23
182:1,2,6,8,9,17
197:16 206:18
207:14,16 209:20
214:14 226:1
**new** 23:11 24:4,7
38:2 42:2 98:6
131:23,23 132:12
132:22,23 138:21
138:21,23 148:17
160:23 178:20
192:24 195:6,20
196:11 216:18
**newspaper** 108:2
**nice** 70:7 129:20
157:25 186:8
219:11,13,15
220:1,3,7
**nichols** 74:23
**nickname** 9:6
**nicole** 123:3
**night** 65:4 67:7
174:1 179:6,10
186:1
**nina** 65:16
**nine** 220:9
**nln** 67:17 69:15
89:17 150:20
**noah** 53:25 54:3
**non** 176:25 210:11
**nope** 94:5
**northern** 1:2 7:10
8:25
**notary** 230:6
231:14 232:25
233:10,18 234:15
234:23 235:23
**note** 7:3
**noted** 12:7

**notes** 226:23
**notice** 8:20 106:11
131:12,15
**november** 115:9
122:12 154:9,9,9
154:12,14 155:1
180:19 226:21
**nugent** 59:1 60:18
62:15 211:11
**number** 4:2 7:6
17:7 22:17,20
26:16 27:1 31:11
76:6 81:22 107:3
168:24 169:3
170:15,17 176:13
223:23 224:2
228:20 232:7
**numbers** 59:23
175:12 176:15,21
176:23,24 177:16
177:17 178:7,9
179:8 234:7

**o**

**o** 156:6 165:2
**oak** 93:22 94:18
97:4,19 98:20,23
99:7 101:16
102:20 103:4
**oath** 10:17 147:12
**object** 5:2 14:2
145:2,3,4,8,18,20
189:17
**objecting** 145:1
**objection** 5:1,3,4,5
5:7,9,10,11,12,13
5:14,15,16,17,18
5:19,20,21,22,23
5:24,25 12:3,6
13:15,21 79:14
134:20 140:21
144:23 147:19

168:15 169:21,23
188:17 189:16
197:20 198:20
199:8,25 204:1
205:21 206:8
208:3 209:11
**obtain**  126:22
**obvious**  137:16
**obviously**  145:12
220:13 221:13
**ocala**  31:19 102:13
103:2 105:9
181:10
**occasion**  25:24
194:21
**occasionally**  26:19
26:20
**occasions**  148:4
179:14 197:9
**occur**  56:3
**october**  47:8 103:7
154:9,12 158:22
231:17
**offer**  191:21
**offered**  223:7
**offers**  222:25
223:5
**offhand**  60:1
161:4
**office**  14:22 19:24
20:7 26:22,23
27:3,10,13,16,21
28:8,9,24 29:1,5,8
29:24 30:1,2,4,5,7
30:9,12,13,17,22
30:24,25 31:2,12
31:22 32:14 38:4
68:2,10,19,23,25
69:2 88:11 95:3
96:19 97:8 102:12
104:25 105:3,6,14

105:20,23 106:2
106:21,21,24
107:2,5,8 123:7,10
123:14 126:25
127:3 134:16
138:5 171:24
172:1 173:25
179:20,21,24
180:1,10,14,21
181:5,6,21 183:17
184:3,4,15,16,25
185:2,3 189:4
191:10,18 193:18
194:13,13 195:21
195:22 231:6
232:14
**offices**  27:7,9
60:20
**official**  171:22
233:15 234:21
**oh**  36:19 38:10
56:22 65:2 69:22
83:15 87:20 92:7
114:23 118:1
122:9 123:4
154:23 160:6
163:15 164:23
165:8,15 170:2
175:21 178:12
192:4 209:19
213:10,24 215:5
225:20 228:7
**ohio**  1:2,22 2:7,17
7:11,15 8:25
17:20 18:1 48:17
230:2,7 231:7,15
232:2
**oil**  183:5,6,6
**okay**  9:20 15:5,11
18:3 21:4,8,11
22:12 27:15 31:9

31:10 55:6 57:19
70:5 73:25 75:22
85:2 89:13,24
92:12 94:17 99:21
114:9 131:4
135:18 143:5
145:5,17 152:10
158:11 170:2
171:9 184:22
193:15 199:5
201:1 206:24
211:23 216:23
220:4 225:7,24
226:11 227:2,14
228:1,2,12
**old**  54:3 56:21,23
85:21 92:6 215:16
**once**  40:25 41:24
57:6 73:6 100:2
122:13 134:4
151:22 174:4,11
185:1 191:1,2
**ones**  117:7 223:1
**open**  67:11 161:19
181:12 224:12
**opened**  47:8 148:1
159:24 181:15
207:9
**operate**  49:13
94:17,21 95:12
**operated**  67:16
87:4 90:23 91:2
91:15,18,22
**operating**  121:12
140:4 143:14
**operations**  182:4
**operator**  163:2
**opportunity**
160:17 171:8
**opposed**  199:2

**option**  106:19,20
**options**  106:18
**orange**  46:22,24
46:25 47:7,11,12
67:24 68:6 86:5,8
87:1 159:16
180:21
**order**  229:12
**ordered**  128:15
225:1
**orders**  64:16,22
**origin**  21:18 82:15
206:6,7 208:1,18
208:24 209:5,22
**original**  152:5
153:24 226:19
**originally**  156:23
**ottawa**  111:5
**outside**  115:23
**overnight**  215:23
220:13
**overtime**  173:11
**owe**  197:18 198:9
199:1,5,20 200:5
**owed**  217:9 218:4
**owned**  87:3 89:22
90:1,23 91:1,15,18
91:21 94:3 189:25
**owner**  91:21 202:1
**ownership**  90:25
92:22 93:2,7
**owns**  47:20

**p**

**p**  85:11
**p.m.**  183:16,21
228:23
**page**  5:2 172:20
202:5,13 234:7
235:3
**paid**  27:25 31:3
44:16,21 78:16,18

105:22 106:14,23
122:1 129:17
134:24,25,25
135:4 143:6 189:4
189:5,6,12 197:19
199:2 200:5 217:9
221:8,10,11,13,13
223:16
**paki** 70:19,20 75:4
75:14,24
**pakistinian** 70:25
**palestinian** 70:25
82:16
**paperwork** 14:24
14:25 95:9,11
**paragraph** 202:6
202:14 209:14
**pardon** 146:25
151:18
**park** 46:22,24,25
47:7,12 67:24
68:6 86:5,8 87:1
159:16 180:21
184:6
**part** 16:22 20:20
35:19 38:4,13,16
41:21,23 61:1
63:23 125:12
150:4 172:4
192:20 194:23
234:9
**participated**
141:17 142:1
**particular** 30:9,12
32:11 129:25
145:24 153:25
**parties** 8:21
118:13,21
**partnership** 84:19
**partnerships**
84:16

**party** 103:22
231:3
**password** 29:12
**pay** 37:8 44:11,12
88:20 89:5,18
106:11,11,15
127:5,15,15 129:1
129:4 134:15
135:1 166:2,4,6
191:2,3,17,18
192:3,18 198:6
199:1,21 200:8
201:16 202:8,15
203:12 216:11
217:18,20,24
222:7
**paying** 38:13
106:1 188:11
192:5 197:24
201:6,10 202:11
204:7 216:5,6
217:21 222:14
**payment** 27:22,23
28:6 205:10 218:9
220:8
**payments** 24:12
204:23 217:13,19
**payroll** 202:10,10
202:15,16,17
205:2,2 216:7
**pc** 39:12
**pcs** 39:22
**pedano** 219:1,5
**pedophile** 149:13
149:15
**peers** 66:2 212:24
**penalties** 200:11
**pending** 139:25
169:12
**penny** 138:23

**people** 8:6 29:4
51:18 59:5 60:10
63:3 67:2 81:25
117:17 118:5,7,10
118:10 121:4
123:13 134:15
137:25 138:11
140:12,13 141:1
142:16 143:25
146:7,21 149:19
157:24 158:2
168:1 176:22
178:16,22 184:7
186:24 187:2,24
201:17 206:16
207:16 208:7,13
208:15,23 209:3
211:10 212:2,8,22
213:15 214:19
**people's** 58:12
146:17 167:16
223:14
**percent** 54:21
63:20 117:9
128:12,13 167:3
**perfect** 123:4
**perform** 109:24
110:8 111:6
112:18 113:8
**performance**
141:11
**performed** 109:8
110:23
**performing** 112:1
112:8,21 114:1
123:12 144:4
185:6
**period** 44:24 45:2
100:20 122:17
130:22 131:8

**permanent** 12:25
**permission** 31:25
**person** 9:23 33:19
33:19 38:9 45:14
46:5,20,20 55:5
71:4,19 72:1,4
73:7,10 85:3,5
95:18,20 98:11
116:23 117:8,21
144:18 145:23
147:8 167:19
168:3 188:7
**person's** 32:5
**personal** 12:22
15:1 74:9 106:21
135:6 139:20
144:24 169:5
184:16 210:11
211:25 213:7,9,24
**personally** 109:11
109:12 118:22
198:14 233:11
234:15
**petersburg** 195:24
**phone** 15:11,17
16:17 18:2,4,8,10
18:11,12 19:1,4
22:5,6,8,8,9,15,17
22:19,23 23:1,4,5
23:7,9,10,13,16,20
23:25 24:1,4,6,7
24:20 25:1,7,12,16
25:23 26:14,15,17
26:24 30:25 31:2
31:11,12,13,19,22
38:22,22,25 39:4
50:9 52:14 55:3,5
59:22 60:2,8 61:6
64:22 105:18
107:3 163:12,14
163:16 170:9

187:18 193:20
195:18 207:14,17
211:12 212:4
222:19,21 223:12
232:3
**phones** 26:11,17
26:22 31:17
**photocopier** 203:8
**photocopy** 202:22
**physical** 61:7
**physically** 61:4,23
63:9 86:19 96:20
97:13
**pick** 7:4 10:4
183:7 186:12
**picked** 211:16
215:7
**picture** 173:15
**pictures** 173:13,16
179:3
**pissed** 61:8 75:3
**pitched** 136:16
**place** 98:6 102:6
106:13 121:5
133:14 173:14
186:8 230:20
**placed** 169:20
176:15
**places** 143:17
**plaintiff** 1:6 2:3
209:16
**plan** 186:9,10
210:20
**platform** 212:25
**player** 73:1 137:24
**please** 7:3,20 8:4
9:2,24 10:21,22
15:21 23:3 34:10
61:16 84:19 90:6
96:8 118:15 140:1
152:19 167:22

171:1,8 184:23
189:17 190:8,8,9
190:22 198:22
224:14 232:14
**plenty** 172:23,24
**point** 24:11 25:17
31:9 43:8 62:20
69:10 73:24 74:25
100:21 105:13
110:5 136:8
138:15 160:12,13
163:20 180:24
181:1 182:7
187:25 192:19
208:15 211:9
213:14
**pointer** 74:24
**policies** 146:11
168:13 210:21
**policy** 32:13,18,22
32:24 33:8 157:16
168:9,11 188:5
195:20 203:18
204:9
**pool** 25:24 104:3
**pop** 181:19
**popped** 182:19
**position** 44:14
72:11 108:17
134:4 136:16
139:2 155:15
191:22 205:24,25
225:6
**positions** 116:19
117:18
**positive** 123:20
**possible** 9:21
25:14 224:19
**possibly** 36:11,12
45:1 50:23 124:8
133:17 176:25

**potential** 135:17
**potentially** 134:24
175:24
**powerpoint** 74:25
**practices** 187:16
**praising** 173:21
213:6,25 214:3,10
214:11
**prefer** 158:9
232:16
**preparation** 18:14
19:7,14,25 20:3
**prepare** 16:6
**prepared** 15:24
16:2
**prescribed** 13:19
13:22
**prescription** 14:8
**presence** 230:15
**present** 2:22 25:19
**presentations**
143:1
**preserve** 39:25
**preserved** 41:18
**president** 33:2
70:18 129:12
136:17 139:11
140:7,15 155:17
163:7,8,21 171:23
185:25 187:18
193:4 210:18
**pretty** 14:14 33:11
37:3 107:21
123:19,24 127:11
132:7 172:17
173:15,18 179:12
187:9 203:21
**prevented** 146:14
**previous** 62:23
**previously** 171:13
193:14

**primary** 26:8
38:24
**printed** 16:18
**prior** 24:20 48:12
50:20 53:2 67:13
69:18 96:1 115:11
143:12,13 164:10
171:10 174:17
180:9
**private** 7:5 58:12
60:25 61:10
**privilege** 16:5
**privileges** 104:3
**pro** 23:11,14 24:16
42:2
**probably** 9:13
28:17 73:23 92:13
137:6 139:3
144:18 150:19,25
160:16 190:24
204:18 210:25
220:8 221:2
**probation** 149:2
169:9,10,14,16,20
170:7
**problem** 15:22
158:11 206:17
212:10 214:7
**procedure** 8:14
188:4 229:7 233:5
234:5
**process** 86:14,17
140:3
**procured** 205:19
**produced** 19:16
115:24 150:4
225:2,2
**product** 157:3,5
159:8 183:2
**production** 232:24

**products** 49:18
157:18
**professional**
216:24
**profit** 160:25
161:15,19 162:5,6
**program** 120:23
122:8 186:13,24
186:25 210:23
**promote** 186:14
186:14 187:2
**promoted** 110:6
114:10,17 115:8
120:17 138:4
**promoting** 138:8
212:23 213:5
219:22,22
**proper** 82:25
125:14 143:25
200:9 201:6
**properly** 197:14
201:16
**property** 99:12
190:3
**protected** 210:3
**provide** 36:6,24
37:13 60:6
**provided** 8:13
16:21 26:16 31:12
32:21 38:6 172:25
**provider** 23:21
31:5
**proximity** 34:13
128:6
**public** 1:21 2:15
7:14 105:20 230:7
231:14 233:10,18
234:15,23 235:23
**puerto** 130:15
**pull** 139:15 219:15

**pulled** 66:9
**pulling** 125:11
**purchase** 24:1,4
100:18
**purchased** 232:17
**purposes** 20:13
170:22
**pursuant** 124:10
229:3,6
**pursued** 158:13
**put** 49:10 71:19
75:1 104:2 139:10
149:14,21 169:13
186:13 188:2
191:22 207:19
213:25 215:12
217:2
**putting** 26:2 64:23
174:3

**q**

**qualified** 230:8
**quality** 215:24
**quarter** 51:13
53:3 80:24 151:1
153:16
**question** 9:24 10:7
10:9,10,23 12:5,17
14:11 15:7,10
16:20 18:5,11
19:11 20:19 21:25
23:8,19 34:3,9,23
68:21 72:3 75:8
75:10,22 79:21
92:7 115:21
118:16,24 131:5
134:21 136:10
139:25,25 144:24
147:20 148:2
162:5,6 168:1
183:18,19 184:2
188:10,18 189:16

190:21 197:21
198:11 199:14,17
199:20,22,24
200:13,14 203:5
208:20 209:10,12
227:20
**questionable**
146:21
**questioning** 58:19
169:22
**questions** 11:12,20
13:16,25 16:1
145:14 210:12
211:15 216:20
228:3,6
**quick** 29:23 75:10
168:20
**quickly** 134:3
222:9 224:19
**quinn** 54:17 59:1
62:14 167:2,4,8
214:24
**quinn's** 167:6
**quit** 118:11 138:17
175:17
**quite** 41:6

**r**

**r** 9:4,5 43:2 47:17
83:1,2 85:13
92:11 155:13
**rachael** 54:17
**raised** 127:25
**rallies** 121:7
123:22,23
**rally** 185:12,19
**ran** 121:1 173:6
**rare** 45:16
**read** 228:22 233:5
233:6,12 234:5,6
234:17

**reading** 232:12,20
**ready** 228:14
**real** 223:1,2
**reality** 141:10
**realize** 135:21
190:16
**realized** 157:23
175:15 190:25
**really** 55:16 64:20
70:20 72:2 75:3
100:9 118:25
133:17 157:25
158:23 162:4,4
179:18 185:25
187:14 195:9
224:21 227:4
**reason** 48:11
73:25 78:10,20
132:5 133:2
150:17 156:10
234:8 235:3
**reasons** 21:10
**recall** 16:25 17:12
19:9,22 20:10
23:15,18 24:14
25:1,20,22 27:2,24
28:12,21,21 30:23
31:18,21 36:1
38:10 40:12 42:11
43:18,24 44:25
45:9,11,17,19 46:2
46:4 48:5,18
50:19,25 52:1,25
53:1,9 57:7,11
58:15 59:4 66:6,8
66:13 67:12 69:17
70:10,16 74:14,19
76:1,12,14,25 77:2
77:13,15,20 80:12
80:16 81:11 84:7
93:17 94:25 98:9

100:12,13 101:4
101:10 102:8
103:8 105:22,24
105:25 106:10
107:6 108:22
109:2 110:24
112:5 113:12
115:16,19 116:1
120:23 122:10
123:2 126:4 129:7
130:15,17 131:14
133:1,3,6,8 137:9
143:10,19,22
146:15,15,18
150:13,16 156:9
161:12,23 162:1
162:12 169:17
173:5 176:8
177:25 178:15
184:18,21 193:17
203:10 204:5
211:20 222:1,23
223:11
**receipt** 232:20
**receive** 131:24
224:3
**received** 131:23
207:14 211:12
**reception** 184:14
**recess** 29:20 76:7
119:7 168:25
223:24
**recollection** 180:9
**recommend** 77:11
**recommendation**
77:19
**recommendations**
187:15
**recommended**
77:6,9 143:1

**record** 7:2,21 9:3
29:15,19,22 76:5,9
81:24 82:3,5,5,6,8
119:3,5 120:2
168:23 169:2
223:22 224:1
228:18 234:9
**recorded** 7:7 9:19
**recording** 15:16
**records** 203:2
204:6,8
**recruit** 141:6
143:25
**recruited** 141:19
141:22 167:2
214:24
**recruiting** 54:20
187:8
**recruitment** 142:7
**red** 13:18
**reduced** 230:14
**reference** 232:7
233:2 234:2
**referenced** 230:13
230:18 232:11
233:11 234:15
**referred** 90:17
126:8 133:19
136:15,17 172:19
**referring** 32:4
33:8 36:22 58:23
133:20 156:4
190:21 207:22
209:19
**refile** 198:3,13
**refresh** 204:3
**refused** 61:24 62:9
**regard** 77:24
**regarding** 76:11
194:3 229:2,11

**regardless** 177:9
**registered** 121:22
**reitmeier** 16:15
17:10 18:24 55:1
63:2,4 75:13,23
105:5 129:16
179:15 184:24
206:14 207:5
208:22 213:19
214:14,17,22
**related** 15:9 142:7
197:1
**relates** 49:1 50:13
168:1 192:25
**relating** 20:21
133:7 193:10
209:21
**relation** 58:2 80:7
**relationship** 53:18
74:3,4,7,10 151:2
164:21 166:12,16
**relationships** 90:8
**relative** 231:2
**relayed** 70:2
**relentless** 58:21
**relevance** 13:16
**relevant** 166:3
**relocate** 113:18
**remaining** 86:24
86:25 217:18
**remember** 28:25
30:18 37:11,23
40:6 43:20 44:3
53:14 59:2 70:23
81:4 86:4 108:7
110:11,13 119:1
126:19 133:5,18
149:18 151:1
170:4 172:7
183:15 184:11
217:8 218:25

219:5
**remembering**
180:2
**reminds** 184:12
**remote** 194:14
**remotely** 98:15,16
99:3
**removed** 17:24
26:5
**rent** 27:10 94:1
103:14,16 105:3
159:25 216:6
**rental** 27:13
**rented** 28:8 29:8
101:3,4 104:24
123:6,14 184:3
**renting** 31:19
**repeat** 10:8 23:3
34:10 115:21
167:22
**rephrase** 10:10
**replace** 42:13
**replaced** 41:1,24
41:25
**replacement** 42:16
**report** 81:24
124:22,22,23
125:22,24 126:1
126:21 144:9,10
146:8 164:7
**reported** 63:2,2
124:25 144:12,16
144:21 146:2,4
206:10,10
**reporter** 3:13 7:18
8:4 9:13,22 10:15
233:7
**reporter's** 3:10
230:1
**reporting** 123:20
124:21 126:23

210:2
reports  127:3
  179:9
represented  81:7
request  224:13
  234:9,11
requested  226:7
  229:1,6,10
requests  226:24
required  133:4
  187:11 202:8
  224:17 232:25
requirement
  179:21
reside  103:11
residential  99:13
resign  55:21
  173:22 206:15
resigned  165:15
respectfully  58:10
responses  9:17
responsibility
  135:16 139:1
  198:18,21
responsible
  125:18,22,23
  126:21 127:5
  130:12 200:8
rest  125:16
restaurant  70:7
  186:9
resubmit  213:2,3
retail  47:1 69:4,5
  69:6 161:6 182:1
  182:2,18,21
retain  25:6 76:22
  76:24
retained  3:13
  12:25 21:13 76:25
  147:9 151:17
  168:8 228:21

retainer  221:11
retaliate  61:3
  62:11
retaliated  21:13
retaliation  21:12
  21:16,16 210:2
  212:15
retired  55:18
return  161:13
  198:7
returned  232:19
returns  107:16
  161:9,24
reveal  16:3
revealing  19:11
revenue  160:10
  161:3,14 162:7
review  17:22
  18:13 19:3,6
  127:11 171:6,8
  224:14 225:8
  229:2,6 232:14
  233:1 234:1
reviewed  17:24
  18:4 19:17 20:12
  171:9,13 187:20
reviewing  14:21
  171:10
rich  219:24
rico  130:16
rid  41:1 160:19
  215:6
ridiculous  194:15
right  15:19 19:10
  22:7,16 23:4,12
  35:8 39:10 40:8
  49:22 52:4 58:15
  59:4 60:5 62:12
  66:8 69:22 70:7
  76:2 81:24 97:3
  100:4 112:19

123:8 129:2 131:2
136:8,10 139:19
142:19 143:14
144:6 147:3 148:8
150:15 157:2
160:15,22 161:18
169:4 171:3,12,12
179:7,18 184:1
189:13 190:15
193:17 198:6,11
203:6 206:5 208:2
208:18 209:14
210:1 213:13,18
214:3,12,15 215:5
215:10 216:3
217:25 219:2
222:1 223:19
227:11,24
rights  151:6,8
ripped  225:25
river  25:25 26:1
rivercliff  86:15,15
rmorley  2:19
road  47:11 68:1
  101:8 159:16,17
  159:19 215:19
rob  51:23,24 52:22
  52:24 65:21,22,25
  69:10,24 113:9
  114:8
rob's  113:11
roberts  45:7 156:8
rodriguez  213:21
role  79:7 122:14
  133:24 163:5,8
  174:6
roles  44:18 89:1
  118:9
roof  172:3
room  29:3,7,8
  60:21 70:18 107:1

135:5
rooms  107:1
  184:14
roughly  103:7
  190:24
royalties  216:15
rpr  1:25
rula  92:8,10,10,19
  92:22
rules  8:14 9:12
  14:3 229:3,7
  233:5 234:5
rumor  189:7
run  134:19 143:5
  192:4 197:13
running  122:15,17
  125:12 127:4
  182:20,21
runnymede  83:6
ryan  2:13 7:22
  14:6 145:22
  164:25 165:1,3,4,5
  166:15 190:8
  224:23

s

s  9:5 43:2 44:8,10
  48:2 67:18,19
  83:2 85:10,11,13
  96:12,16 121:20
  134:19 155:13,13
  199:3 234:8,8
  235:3
salary  136:22
  166:2,6 173:9
  206:1
sales  117:24 121:6
  123:21,22,23
  124:22 158:4
  161:2,2 162:8
  165:24 174:10,13
  174:17 175:1,6,21

175:23,23,24
177:1,6 178:18,19
178:20,23 179:8
186:21,22 187:6
194:2 213:24
216:16 219:1,6
220:25 223:6
**salespeople** 137:22
137:23 186:12
**salesperson** 43:12
**sanders** 155:10,11
155:15,20 164:9
**sarasota** 105:10
195:24
**sat** 149:23 185:2
205:23
**saturday** 182:19
183:24 213:5
**save** 39:25 134:15
**saved** 60:2 201:7
201:14
**savings** 28:3 222:9
**saw** 160:17 164:2
213:16 227:9
**saying** 10:5 21:2
71:24 72:13 81:24
97:14 102:11
125:3 132:7
133:14 141:5,20
143:5 146:3,23
153:19 164:14
168:6 177:3,5
182:8 187:10
189:8,20 208:8,25
212:13 213:24
214:11 224:10
**says** 61:9 64:17,20
158:1 202:8
209:15 211:17,20
**scan** 184:9,10

**scandal** 147:8
**scared** 71:3,5,7,9
71:10,25 72:1,3,5
72:6,7,10,11,12
164:3,4,5,6,7,8
**schedule** 127:23
**school** 83:3,5,10
83:11 216:1
222:13
**scott** 8:10,23
118:19 120:12
126:14
**screen** 18:2 42:14
42:15
**seal** 231:6 233:15
234:21
**sean** 149:19,20
**second** 4:3 21:16
28:22 110:13
125:3 137:9
138:17 154:21
156:9 170:21
171:11 202:6
**seconds** 189:17
**secret** 156:18
**secretaries** 117:16
**secretary** 117:1,4
201:24
**security** 81:21
**see** 9:13 48:15,20
60:18 62:7 64:10
64:11 67:2 131:16
137:12,12 145:20
179:14 187:23
188:6,8 197:6
204:9 213:10
216:23 227:8,24
**seeing** 160:25
**seizure** 55:14 56:7
65:7

**seizures** 55:15
**selected** 193:18,20
193:23 194:1,6
196:17,18
**sell** 49:17 103:6
157:18 217:3,5,7
223:15,15
**selling** 146:12
157:4,7 158:2,7
159:6 191:19,20
210:24
**sells** 157:5
**send** 121:3 127:3
127:13,16 132:6,8
173:13 227:7,15
**sending** 173:12
**sends** 227:7
**sense** 34:4,11
**sensitive** 7:4
**sent** 33:1 128:17
151:10 152:10,11
152:14,16,20
161:7,24 167:11
173:19 181:4,8
191:9 212:16
222:13 224:15
226:9
**sentences** 10:5
**separate** 70:15
132:16 133:13
**separated** 70:13
**september** 103:7
104:16 132:10
158:22 177:24
178:6,8,18
**serious** 124:25
196:3
**service** 118:1
201:24
**services** 36:7,24
38:5,19 109:8,24

110:8,23 111:6
112:2,8,18,21
113:8 114:1,4
185:6 205:2,10
**session** 6:1 120:4
**set** 95:16 96:15
123:23,23 127:14
128:21 231:6
**setting** 69:7 96:3
**settled** 101:17
**seven** 56:24 138:4
165:19 175:16
**sexting** 147:7
**shaking** 9:16
**shaman** 67:10,21
150:2 151:20
152:2,23 153:2,4,8
155:5,9,16 156:12
157:5,20 158:13
159:12,17,20,22
160:11,20 161:22
162:3,14,19
163:21,22 164:13
166:9,13,23 167:5
168:18 181:12
182:6 183:12,21
220:14 224:11
225:3,13,16,17
226:5 227:8,19
**shampoo** 108:6
143:7
**shampooer** 143:6
**shampooers** 108:8
**shampooing** 141:8
**share** 127:12
**shared** 27:7,9 28:9
28:24 29:4 30:1,5
38:4,7 68:23
104:24 105:3
106:22 107:2,2,3
184:17,17

shares 106:21

sharqawi 1:5,12
3:6 7:8,9 8:12,17
8:20,22 9:4 43:2
54:1 56:15 65:17
82:17 91:8 120:5
132:11 148:18
187:19 228:19
230:10 232:6,8
233:3,4,9 234:3,4
234:13 235:20

she'll 227:17

sheet 234:7,10,18
235:1

sheets 186:25,25

shocked 203:24

shocking 215:15

shop 47:5 49:13
159:9 182:18

short 44:24 45:2
88:17,18 101:2
131:15 223:20

shortly 81:3,4
127:14 220:15

shots 18:2

show 172:9,11,11
175:12 186:1,18
195:2 217:23
219:9 220:5

showing 63:1
132:22 136:17
219:20

shrugging 9:17

shut 139:14

siblings 92:2

sic 70:25

side 182:2 210:12
210:14,17 225:4

sign 119:1 122:20
132:25 133:5,13
192:24

signature 229:5
231:13 232:14

signed 118:17
132:25 133:3
135:11 153:25
155:1,1 226:20
233:13 234:18

signing 133:6,8
232:12,20

similar 29:3 33:14
75:14,24 88:12
124:4 184:5,12

sincerely 232:23

single 17:13
129:16 186:17,17
188:7,8 195:3
196:6 213:3

sir 16:23 27:17
32:20 38:1,8
39:16 40:17,20
46:8 50:1 54:2
56:18 60:1,4
65:18,24 67:19
74:20 77:17 78:23
81:6,14 83:21
85:1 87:2 88:15
90:12,16 91:9
93:4 95:10 97:2,9
99:2,8 101:11
102:23 103:20
104:12 105:25
108:4,24 109:19
112:16 113:20
114:24 117:6
118:8 120:21
121:21,23 123:2
125:4 152:13
153:20 154:5,25
155:12 158:17
162:1 166:19
167:10 173:2

174:25 175:4
176:4 177:4 180:8
181:2 182:25
197:11,11 202:25
204:17 205:5
211:8 212:12
218:14 221:24
222:13,24 232:10

sister 92:10

sit 46:3 135:16
186:23 187:3
188:15,20 212:19

situation 64:19
99:22

situations 179:18

six 41:13 87:11,23
101:14 138:1,4
180:19 217:17

sixteen 85:22

sleep 215:24

small 125:11
172:4

sminchak 2:23 8:7
8:8

smith 132:13

smoke 47:5 49:13
157:10,11 159:9

smokeable 157:12

social 81:21

sold 103:5 104:16

solomon 210:19

solutions 7:17,19
228:21 232:1
235:1

somebody 168:10
201:8

son 42:15 53:23
86:10 94:15 97:23
98:1 99:16

son's 53:24

soon 159:2

sorry 14:6 29:11
38:20 46:23 59:16
63:14 69:22 70:9
87:13 94:16 98:7
151:24 155:25
157:13 158:19
162:1 181:24
183:18 189:18
196:3 202:12
209:1 216:8,22
222:20

sound 150:14
189:11

sounds 173:15

south 93:22
130:16 132:8,9

southeast 130:14

space 27:13,16,21
28:9 29:5,6,24
30:1 31:19 38:7
68:2,11,16,23
105:4,23 106:2
107:5,8 123:14
180:10 183:17
184:3

speak 19:12,24
20:2

speaking 213:15

specific 48:10
51:17

specifically 111:16
129:2,3

specified 230:21

speculate 72:17

spell 9:2 44:7
47:16 82:23 84:2
85:19 95:22
108:11

spelling 82:25

**spend** 55:22 135:1
135:3,5 173:8
197:1,8
**spending** 144:2
181:16 206:3
211:14
**spent** 137:19
203:3 221:14,16
**spoke** 52:23
**spouse** 186:3
**spring** 56:8,9 58:4
**square** 1:21 2:15
7:14 29:1
**ss** 230:3
**st** 86:16,22 195:24
**stamp** 227:17,18
**standard** 12:17
**standing** 138:10
169:22
**start** 12:16 22:7
92:8 131:22
136:21 155:3
158:20 160:25
212:16
**started** 60:10
64:23 95:4 99:20
102:13,14 112:1
130:18,19 143:5,8
150:20 156:15,24
157:7,16 159:1,2,6
162:23 163:1
181:9 215:16
216:25 221:11
**starting** 93:16
138:18 178:2
195:6 214:13
**state** 9:2 95:12
125:20,21 200:1
201:10 211:3
230:2,7 231:15
233:10 234:15

**statement** 37:4
127:18,20 128:2
233:13,14 234:19
234:19
**states** 1:1 7:10
8:24 111:9,12
132:1,2 143:20
176:8 177:13,14
177:20,21,25
178:1,3,4,5
**stating** 171:23
**stay** 138:13
**stayed** 134:23
**staying** 86:21,23
102:2
**steakhouse** 70:7
**stenotypy** 230:14
**step** 21:3
**stepchildren** 90:5
**stepfather** 90:11
**stick** 139:18
**stood** 182:1,17
**stop** 83:9 106:1
111:22 125:3
158:2,7 210:11
217:21 224:12
**stopped** 112:21
122:6,14 220:13
**store** 47:1,2,4,13
49:16 58:22 61:9
62:1,9,24 63:1
66:24 67:9,11,16
67:23 68:19 69:4
69:5,6 116:3
159:4,11,13 161:6
167:7,16,17,19
181:15 182:2,3,6
182:13,21 183:11
183:21 206:18,21
206:25 207:4,8,9

**storefront** 69:3
156:22 159:25
**stores** 60:23 62:14
63:7,19,21 67:2,20
157:14 159:7,10
167:12,12,17
173:12 175:21,22
178:12 206:13,17
207:14 214:19
220:14 226:18
**straight** 223:5
**strain** 49:10
**street** 70:8
**stress** 49:10 196:9
**stressful** 49:6
**strip** 69:7
**structure** 96:7
**stuck** 215:16
**stuff** 15:1 122:22
144:6 173:4
182:14 191:19
202:20 203:1
216:3 224:18
227:11
**stupid** 189:9
**subcontractor**
78:16 136:25
172:22 210:13
**subcontractors**
121:4 172:6
**subjected** 209:8
**submit** 134:8
187:2
**submitted** 16:19
64:14 172:18
**subscribed** 233:10
234:14 235:21
**subsequent** 153:18
226:20
**subsequently**
169:8

**subtract** 132:3
**sucked** 190:5
**sudden** 35:7 195:5
215:15,22
**sue** 52:21
**sued** 58:25 167:3,7
**suite** 1:21 2:16
7:15 47:11 68:1
159:19,20,23,24
232:2
**sullivan** 1:25 7:18
230:6 231:14
**summer** 48:6,6
58:5 60:11,12,13
**sunday** 173:20
182:19 183:25
213:4
**superior** 232:1
**supervisor** 20:16
20:22 21:21 25:5
25:8,18 26:13
31:14 35:20 37:17
39:5 41:19 42:9
66:2,6,8,11 70:12
70:14 74:17 78:25
79:2,6 93:16
94:23 95:1 115:9
121:9 122:5,12,24
124:10,11,14
126:3,7,10 127:10
127:21,22 128:1,7
129:6,10,15,25
130:2,11 132:11
132:13 133:15,21
133:25 135:13,13
137:13,15 140:15
142:13 144:8
165:12 166:21
172:7,16,19,22
174:7,24 190:7
193:11 203:11

204:13 205:14,25
215:21 219:10,25
**supervisors** 18:25
36:22 37:2 58:17
58:24 74:22
128:24,25 129:17
171:23 201:16
207:12 210:17
213:17,18 219:20
**supervisory**
185:24
**support** 217:1
**supposed** 125:14
133:24 173:9
188:14 191:3,3
202:13 210:13
218:25
**sure** 8:7 20:18
24:19 34:11 59:18
75:12 92:9 93:1
106:23,25 115:22
118:17 119:4
125:10 144:15
148:6 167:23
172:17 173:4,19
177:2 179:16
180:2 188:22
200:10 201:14
203:21 211:8,17
213:16 218:5
221:2 226:25
**surprised** 197:17
197:23
**surtax** 128:14
**suthpin** 85:10
**swear** 8:4
**swearing** 10:18
**switched** 40:13
**swore** 10:16
**sworn** 8:15 152:10
230:10 233:10,13

234:14,18 235:21
**syatt** 44:6,19
87:19,20,21,21
88:9,21 89:1,22
114:20,21 118:23

**t**

**t** 44:8,8 85:11
165:2
**table** 149:23
**tail** 71:20
**take** 14:9 21:3
24:5 60:21 75:8
75:11 76:3 82:2
85:8 132:1 168:20
171:5 173:14,16
176:21 178:3,7
192:15 193:2
197:25 202:5
217:16 223:19
**taken** 1:19 7:8
10:16 12:2 20:9
80:13 119:7 139:1
139:3 167:4 205:2
230:20 232:11
**takes** 138:22,23
160:24 187:4
**talk** 9:14 20:8
46:16 48:23 50:20
161:1 174:21,22
186:4,11,13,14,20
186:22 214:24
224:7
**talked** 35:17,18
46:7,13 49:4,9,11
50:6,11 74:5
105:8,19 116:3
137:11,15 164:16
193:13 202:19
207:6,12,16,20
211:1,10 212:14
227:1

**talking** 9:23 22:11
29:24 33:8 40:10
40:11 52:7 53:1
61:24 67:3 68:22
120:8 125:6
137:21 144:7
157:25 162:11
169:4 180:6 183:3
190:18,19 209:17
210:10 219:5
226:13
**tammy** 92:5,6,13
92:19,22
**tampa** 195:24
**tax** 107:16 161:9
161:24 198:3,6
200:1,2 201:10,10
**taxes** 197:13,18
198:3,6,9,13,25
199:2,6,21,21
200:1,2,5,19 201:6
201:11 202:10,10
202:15,16,18
**taxpayer** 198:12
198:19,22
**teach** 172:8
**team** 72:25 112:10
112:11 114:3
116:21,22 137:24
**tears** 196:8
**technically** 208:2
**tell** 10:18 16:7
33:16,18,23 49:4
55:6,6 62:7 70:5
72:13 78:7 82:1
108:5 124:20
127:19 141:7
144:16,17 145:7
146:5 164:9 172:9
185:18 194:10
198:21 202:12

206:24 207:3
212:20 215:10
223:13 227:16
**telling** 65:8 67:4
139:8,20 177:15
211:10
**temporary** 88:17
169:14,15
**ten** 25:22 79:17
177:13,14,20
178:16,16,17
206:14
**tendency** 10:4
**tennessee** 176:11
176:13 197:6
**term** 20:15 22:1
26:12 31:14 35:20
36:16 37:16 39:5
42:8 93:15 120:25
204:20
**terminate** 71:16
72:15 106:5
150:24 151:6,8
158:8,10
**terminated** 25:5,8
25:18 52:10 79:3
106:7 113:2 136:6
151:3,10 153:4,9
153:14 158:16,18
160:14 167:21
168:4 174:24
175:11,18 195:12
195:19 205:15
213:23 214:2,9,12
**terminating**
195:16 213:15
**termination** 41:19
151:11,23 156:11
225:19,21,22
226:13

**terminology**
209:12
**terms** 27:20 28:24
124:10 136:4
160:4 170:6,17
**terrible** 65:10
135:24 136:3
178:25
**territories** 130:7
133:7 174:17
176:3,5 177:7,9
192:25
**territory** 130:5,12
130:18,20,22
131:6,7,19 132:12
132:19,23 133:11
165:11 166:21
174:10,10,19
175:6,9,10,12,14
175:15 176:12,21
177:18,19
**terwilliger** 51:23
65:21,22
**testified** 20:11
96:9 142:18 153:9
169:8
**testify** 11:15,23
12:12 230:10
**testifying** 17:11
57:18 198:8,10
**testimony** 9:22
125:18 144:14,24
147:11 167:18
168:2 174:9
180:10 182:5
204:2 225:19
230:13,17 233:6,7
234:6,9,12
**text** 16:12,13,14
16:16,21,24 17:9
17:15 20:12 35:17

52:15 55:3 64:14
65:12,13 172:23
173:1 179:4,6
209:25 212:17,25
213:7,9 214:6,21
215:2 224:4,22
227:23
**texted** 209:21
**texting** 22:4
213:11
**thank** 8:11 35:1,14
145:6
**thanks** 29:16
145:22 217:1
**thing** 124:21 129:2
138:3 164:1
172:12 212:3
213:18 226:15
**things** 12:23 26:1
26:3 61:19 118:11
125:9 134:3
139:13,16 140:9
141:12 173:7
189:2 191:2
227:20
**think** 19:8,8 40:4
48:17 56:22 62:23
70:2 80:25 85:10
86:3,5 92:16,25
94:25 96:9 97:22
108:12 109:22
110:13,16 111:4
111:17 118:4
121:17 125:16
130:18 133:12
136:11 138:4
144:11 146:20
150:25 151:16,17
155:17 156:5
157:23 160:8
161:7,17 162:24

163:24 170:4
172:13 174:2,3,4
179:18,23 181:4,8
183:2 187:20
193:15 195:23
198:5,9 200:7
202:22 211:25
214:17 216:18
220:23 221:20,21
222:2 225:4
226:10 227:21
**third** 154:20,21
206:5 226:12,14
**thirty** 232:19
**thomas** 137:7
**thought** 32:16
36:21 61:17 65:9
96:11 138:2
152:11,14,21
182:13 190:13
194:14 206:18
226:16,19 227:9
228:7,8
**thousands** 129:21
146:17 202:9
**threatening** 218:1
**threats** 148:17
**three** 35:7 49:6
68:12 70:13,14,14
117:16 127:9
128:5 137:2,2
138:9 158:15
168:24 177:21,25
178:1,3,5 189:17
195:1 196:1 203:1
225:18 226:17,18
**threw** 39:20
151:18,22 225:25
**throw** 39:21 40:3
**thrown** 151:17

**tight** 107:21
**tim** 49:24,25 50:2
50:8,20 51:1
77:10,11 78:2
110:25,25,25,25
113:20,20
**timber** 101:8
**time** 7:2 9:23
14:13 18:24 24:8
25:17,17,25 26:4
29:19,22 30:19
31:9 33:5 35:4
37:3,5,6,19,21
43:9,17 50:3,21
52:2,6,23 53:2
55:22 57:12 62:20
66:1 69:10 70:19
74:18 75:5,8 76:5
76:9 82:8 86:4
94:3 95:24 98:12
99:10 100:20
102:1 104:5 105:9
106:16 110:22
113:1 115:17
117:5,11,12,19
118:6 120:2,10,17
122:17 130:6,8,23
131:9 134:24
135:3,22 136:8
138:24 139:21
144:2 149:5
150:19 151:21
153:15 154:24
157:6,17 160:24
162:20 163:20,23
167:22 168:23
169:3 171:6
172:10,11,12
173:7 174:22,23
175:2,7,15 176:7
176:11 177:9

178:13 180:24
181:16,18,20
182:7 183:14
187:19 191:9,17
192:15 201:23
202:1 216:3,13,18
221:2 222:11
223:22 224:1
226:8 229:13
230:20
**timeline** 18:6
26:22 36:8,9 40:7
43:23 52:5 116:9
206:23
**timelines** 37:2
59:9
**times** 30:21 50:24
54:10 59:18 74:25
124:25 126:11,13
126:16 127:9,20
128:5 129:5 143:4
185:4 196:24
210:7
**tired** 189:10
**title** 133:22 165:23
**todak** 156:6
**today** 8:19 10:24
12:2 13:6 16:3,8
19:7 20:9 21:5
22:24 46:3 137:6
168:2 221:4
224:12 227:1,13
228:8,11
**today's** 7:2 228:18
**told** 48:18 50:15
52:22 58:9 60:23
61:14 63:18,20
77:20 78:6 105:5
113:25 129:2,3,7
129:10,11,19,22
131:20 136:24,25

137:1 141:25
142:4,11 154:4
179:25 180:24
185:22 188:6
194:11 195:8
197:5 201:23
206:20 207:7
208:21 211:1,7
212:5,7 220:2
**tomorrow** 186:10
225:8,14 227:21
228:13
**tonight** 225:8
227:25
**tony** 59:1,2 60:18
62:1,8,15 210:22
211:12
**tony's** 59:2 63:14
63:15
**top** 77:4 161:6
162:10
**toronto** 64:8 83:6
90:21 91:11
108:15
**torry** 111:1,19,23
**torry's** 111:7,23
**total** 134:11,11,17
162:8 221:14
228:20
**totally** 178:10
191:23,25 195:3
**tough** 92:7 130:13
138:16 160:24
**town** 225:9
**track** 14:15
**train** 121:5 123:18
187:9 195:6
196:11
**trained** 36:25
123:19 126:2
127:4 141:6,7

201:22
**trainee** 114:11,13
115:18
**training** 110:6
116:17 121:6
137:22
**transcribe** 9:22
**transcribed**
230:16 233:7
**transcript** 3:1
229:3,6,9,11,13
232:11,16 233:5
233:12 234:5,11
**transcription**
230:17
**transfer** 24:11
**transferred** 24:6
**transition** 204:12
**travel** 30:19 55:9
55:12 65:2,8
102:16 105:11
134:9,11,16 135:1
187:21,23 188:21
192:15,18 197:1
219:4
**traveled** 60:16
196:19 214:16
215:4,5
**traveling** 102:17
103:1 105:7
134:10 171:25
187:22 206:15
212:21
**travels** 189:6
**treat** 140:16
**treated** 54:14
65:10 75:21 78:17
140:12,13,17
206:22

**treating** 55:10
**tried** 137:16
143:17 193:2
202:25
**trip** 55:19 135:3
**trips** 123:22,24
149:16,23
**trouble** 214:10
**true** 139:8 230:16
**trust** 73:15,16,22
73:22 74:1 144:3
**trusted** 73:24
**trustworthy**
144:18
**truth** 10:19 16:7
230:11,11,12
**truthful** 143:2
**truthfully** 10:12
12:13 147:11
**try** 9:25 61:3,23
156:19 193:1
205:11
**trying** 25:20 28:21
31:18 40:6 58:15
59:2 64:16 70:10
71:23 125:16
139:18 149:18
150:13 158:24
177:24 196:10
213:17 224:18
227:3
**turn** 15:20 179:11
**turned** 92:18 95:2
146:6 217:21
**turns** 146:20
**twenty** 56:24
**twice** 185:1
**two** 13:13 24:25
32:1 34:6,14,17,21
42:3,13 50:5
53:16 55:15 70:12

98:10 103:23,24
103:25 113:1,3,8
120:3 122:16
126:17,18 132:1,1
136:22 138:7,9
141:12,13 154:10
154:11,23 179:8,8
186:6 209:3
211:19,20 220:13
**type** 13:14 23:9,12
25:1 26:14 39:3,7
39:10 44:9 47:4
48:1 61:6 69:7
81:15 100:14
124:2 157:3,5
196:14,15 221:12
**types** 143:1

### u

**u** 47:17,17 85:10
85:11 92:11
**u.s.** 111:15,16
**uh** 9:18,18,18 12:4
12:4
**ultimate** 139:12
**unaware** 50:17
**uncomfortable**
60:24 62:5
**underaged** 147:8
**underneath**
129:13 167:12
**understand** 9:20
10:1,9,13,19 11:1
11:11,19 17:2
20:18 21:1 22:10
23:8 28:2 33:18
36:5 47:22 57:19
68:21 71:21 80:21
95:7 151:4 165:5
205:13 209:10
214:8 218:6
220:20

**understanding**
135:18,20 177:3
190:12 202:2
204:25
**understood** 10:11
182:11
**unemployment**
201:10 204:21,23
204:24 205:1,12
205:16 222:3
**unit** 7:6 76:6 120:3
128:14 168:24
169:3 223:23
224:2
**united** 1:1 7:10
8:24 111:9
**units** 228:20
**unjust** 21:19 201:2
**unlock** 184:16
**unreasonable**
225:10
**updegraph** 49:25
**upfront** 216:9
**upgraded** 24:1
**upset** 52:19 55:12
55:16,20 70:21,21
137:18 195:9
212:2
**use** 20:14 25:7
26:18 29:12 31:12
31:17 35:18 39:4
39:17 42:4,7
106:19 128:25
129:3 142:15
184:16 187:1
193:21

### v

**v** 232:6 233:3
234:3
**vacation** 74:12

**vacations** 128:21
**vacuum** 128:15
189:8
**vacuums** 128:16
**vance** 59:1 60:19
62:15
**vance's** 62:24
**varies** 116:9
**various** 118:6,10
**venditti** 129:14
**verbal** 131:22
**verbalize** 9:15
**verbally** 131:20
**veritext** 7:16,18
228:21 232:1,7
235:1
**versed** 157:1
182:23
**version** 40:18
**versus** 8:22
**veteran** 57:4
**vice** 210:18
**video** 5:1 7:7
**videographer** 2:25
7:1,17 8:3 29:18
29:21 46:8,12
76:4,8 82:4,7
119:2,5 120:1
168:22 169:1
223:21,25 228:14
228:17
**videotaped** 1:11
**vince** 155:10,11,15
155:20 157:25
164:9
**violate** 170:6,9
**violation** 149:2
169:9 170:18
210:20
**violence** 147:15,18
148:23 149:8

169:13
**vip** 128:22
**virginia** 110:12
111:2 113:19
**visit** 64:7,24
184:25 185:2
196:23
**visited** 178:14
**visiting** 48:21
185:5,8,15,20
**voice** 22:6
**volume** 162:8
**voluntarily** 218:17
**vs** 1:7 7:9

### w

**w** 9:5 43:2 44:13
44:22 83:2 89:6,7
89:18,20 116:15
116:22 117:2,3,8
117:22,24 118:1
125:14 189:3
191:24 197:14,24
199:1 201:24
202:16,17 219:6
**wage** 189:12
222:15
**wages** 38:12
197:24 201:6
**wait** 125:2,2
139:24,25 189:16
228:6
**waived** 232:13,21
**walk** 62:17,19
63:9 68:24 184:13
**walked** 14:22 61:5
62:24 63:17
**want** 12:15 48:13
52:1 55:22 59:18
61:2 65:5 72:20
85:7 93:1,13,14
99:17 105:12

127:12 136:9
145:16 154:19
158:3 161:8 171:5
171:6 176:9 177:2
180:2 183:1,6
186:13 187:22,23
188:5 194:20
196:4 199:11
200:22 210:14
211:21,24 214:23
215:1 218:5
219:17 225:6
226:24 228:5
**wanted** 48:14,19
60:22 62:8 63:6
140:7 210:14
214:18 215:20,20
218:23 219:1,3,25
220:7 223:10
228:3
**wants** 192:2
**warranty** 125:12
210:20,22
**watch** 66:10,10,16
66:21,25 67:4
**waterfront** 190:3
**way** 75:21 105:11
125:14,20 126:25
134:14 135:8
139:17 140:12,13
140:14,15 142:4
143:25 177:5
192:4 200:9 201:9
201:21 207:15
**ways** 82:23
**we've** 42:10 99:11
158:19 160:21
**web** 49:20
**website** 159:2
**week** 30:21 37:5
55:8 60:17 62:17

62:18 63:17 64:9
105:12 106:24,25
131:16 137:22
141:9 143:7
173:10,11 181:17
214:16,18
**weekend** 64:25
183:23
**weekends** 181:19
**weekly** 134:6
**weeks** 86:20
141:13,13 213:6
214:9
**weird** 62:4
**wells** 47:11 68:1
159:16,17,19
**went** 40:8 49:11
60:17,20 63:16
64:13 71:20 74:11
102:16 113:5
120:7 133:12
135:3 159:5
161:18 164:1
167:2,5 175:17
176:11 178:13
215:17 220:14
**whatsapp** 18:20
18:21 19:17 20:13
22:4 35:18 212:17
212:18,19 213:9
213:16 214:7
**whatsapp's** 214:1
214:4
**whereof** 231:5
**whispers** 7:5
**white** 54:15
167:16 208:9
**wholesale** 159:6
161:5 165:25
**wife** 53:11 83:19
148:17,21 170:12

**wife's** 149:15,22
**wifi** 29:13
**will's** 62:9 63:13
63:15
**willing** 196:1
**wine** 13:11,18
**wish** 196:12
**withdraw** 183:19
**withholding** 201:6
**witness** 8:4 10:18
46:11 80:5 152:16
189:18 203:6
225:22 226:6
227:10,14 230:9
230:14,15,18
231:5 232:8 233:1
233:4,11 234:1,4
234:15
**witness's** 229:2
**woman** 87:6
**women** 87:4,8
90:9
**woodall** 2:6
**word** 86:15
**words** 33:14
197:14
**work** 29:2 31:23
32:2 35:5 43:22
64:8,22 65:3 73:8
74:11 87:25 88:1
88:8,11,16 89:16
89:21 90:22 91:14
91:17 104:13
110:14 112:24
113:5 115:12
123:12,13,25
124:2 141:7,12
146:1,7 160:24
166:8,12 172:2
173:8 194:13
196:2 206:4

213:12 215:19
**worked** 37:3 60:20
72:25 87:10,23
88:5 89:9 90:2
93:9 113:9 123:15
123:16 149:25
162:17 166:22
173:10 178:10
182:2,3,18 185:2
217:3
**worker** 73:10
**workers** 203:12,15
203:24 204:4,7,10
**working** 34:19
35:6,11 64:16
88:21,25 96:18,20
96:23 97:7 98:12
98:22 99:3 101:24
102:7,24 104:17
104:20 113:20
139:15 162:19,23
163:1 166:17
173:20 180:12,15
181:20 182:7,10
182:15 212:22
213:4,5
**works** 141:24
142:5 183:9 202:2
**world** 58:11
**worried** 67:1
**worse** 75:16,17
174:20 212:15
**worst** 138:3
**wrap** 81:1
**wrist** 148:22
**written** 32:18,22
33:8 132:16
**wrong** 14:7 72:14
96:10 201:12

**[x - zero]**

| x |
|---|
| **x**   128:16 132:10 |
| 141:9 175:13 |
| 187:22 |
| **x1**   175:14 |

| y |
|---|
| **y**   44:8 85:13,20 |
| **yeah**   15:22 59:20 |
| 60:16 69:6,8,8 |
| 73:13 75:18 79:22 |
| 87:21 111:11 |
| 117:9 122:9 |
| 131:21 136:13 |
| 152:19 154:18 |
| 158:17 159:22 |
| 163:17 164:5 |
| 168:16 189:21 |
| 190:5 198:15 |
| 199:15 207:9 |
| 208:5 209:2 |
| 217:20 218:20 |
| 221:3 228:10,13 |
| **year**   17:8,10 21:17 |
| 21:18 26:21 37:12 |
| 40:5,24 42:3,13 |
| 45:9 50:5 56:4 |
| 64:5 68:14 70:10 |
| 70:11,15 81:6 |
| 83:11,13 100:1 |
| 109:3 122:16 |
| 126:11,16 127:9 |
| 127:20 128:5 |
| 131:8 132:10 |
| 135:19,24 136:15 |
| 136:18,19,20,22 |
| 136:23 138:8,22 |
| 139:7 142:19 |
| 157:15 161:22 |
| 163:25 170:5 |
| 174:16,16,20 |

175:19,20,20,25
176:16,16,19
177:21,22 180:15
185:1 188:11
189:14 191:1,4,16
202:22 204:11
205:8 206:1
**yearly**   106:13
**years**   24:25 25:22
32:7 35:7,24
38:11 39:9 41:10
41:11,13 42:3
49:7 50:5 53:16
68:12 79:17
112:13 117:6
121:17 135:14
137:19 138:9,14
140:5 142:20
143:4 146:18
160:5,6 165:8,15
173:10 174:18
183:13 188:1
189:7 190:13,18
190:19,20 192:7
198:4 201:15
202:21 203:2
208:13,14 215:13
215:15,22 218:2
223:18
**yep**   154:19 202:14
**yesterday**   13:8,10
17:21,23 18:7
20:4
**young**   123:5

| z |
|---|
| **z**   47:17 |
| **zero**   141:14 149:8 |
| 215:23 220:21 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IBRAHIM SHARQAWI | ) | CASE NO. 1:20-cv-00271 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| vs. | ) | **PLAINTIFF'S SECOND AMENDED** |
| | ) | **COMPLAINT** |
| THE KIRBY COMPANY, *et al.,* | ) | |
| | ) | **(Jury demand endorsed herein)** |
| Defendants. | ) | |

Plaintiff, Ibrahim Sharqawi, by and through counsel, for his Second Amended Complaint

against Defendants, The Kirby Company ("Kirby") and The Scott Fetzer Company ("Scott

Fetzer"), states and alleges as follows:

### PRELIMINARY STATEMENT

### Nature of Action

1.      This action arises under Title VII of the Civil Rights Act of 1964 as amended

("Title VII"), 42 U.S.C. § 2000e, *et seq.*; Civil Rights Act of 1866 as amended by the Civil Rights

Act of 1992, 42 U.S.C. §§ 1981, 1981a; the Florida Civil Rights Act of 1992 as amended

("FCRA"), Fla. Stat. § 760, *et seq.*; the Ohio Civil Rights Act as amended, Ohio Rev. Code ¶ 4112,

*et seq.*; and Florida and Ohio common law.

### PARTIES

2.      Plaintiff, of Middle Eastern descent, is a resident of the state of Florida, and was

Defendants' employee from 1991 through October 8, 2018.

3.      At all relevant times to this Complaint, Defendant Kirby was a division of Scott

Fetzer, headquartered in Cuyahoga County, conducting business throughout Ohio on a regular

basis, and Plaintiff's "employer" as the term is defined under 42 U.S.C. § 2000e, Fla. Stat. §

2



DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989

760.02(7), and Ohio Rev. Code § 4112.01(2).

4.      At all times relevant to this Complaint, Defendant Scott Fetzer was a corporation

headquartered in Cuyahoga County, conducting business throughout Ohio on a regular basis, and

was Plaintiff's "employer" as that term is defined in 42 U.S.C. § 2000e, Fla. Stat. § 760.02(7), and

Ohio Rev. Code § 4112.01(3).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as

the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens

of different States.

6.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as

part of Plaintiff's claims arise under the laws of the United States.

7.      Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a

substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

Moreover, Defendants' contract states: "This Agreement shall be construed under and governed by

the law of the State of Ohio without giving effect to the choice of law principles of any

jurisdiction." (Ex. 1 at 5.)

8.      Plaintiff fulfilled and exhausted all preliminary administrative requirements prior

to instituting this action, by filing a Charge of Discrimination with the Florida Commission on

Human Relations ("FCHR") within one year of the discrimination, for which he received a Notice

of Determination on or about November 26, 2019 (Ex. 2).

9.      On February 1, 2021, Plaintiff, through his counsel, received a Right to Sue letter

from the EEOC dated January 22, 2021 on his Title VII national origin discrimination claim.  (Ex.

3.)

10.      Compensatory damages are sought pursuant to 42 U.S.C. §2000e-5, as amended

by the Civil Rights Act ("CRA") of 1991, §102 (b)(1)(2) and (3).

11.     Costs and attorneys' fees may be awarded pursuant to 42 U.S.C. §2000e-5(k), as amended by §§ 103, 107, and 113 of the CRA of 1991.

## FACTUAL ALLEGATIONS

12.     In 1991, Plaintiff began his employment with Defendants as a Sales Representative selling Kirby vacuum cleaners.

13.     Due to his success as a Sales Representative, Defendants authorized Plaintiff to open his own Kirby distributorship, which he did in 2003, selling products he purchased from Scott Fetzer's Factory Distributors.

14.     In 2005, Defendants promoted Plaintiff to Division Manager, but allowed him to maintain his own distributorship with inventory he purchased directly from Scott Fetzer, while managing approximately 20 Kirby vacuum stores and training Factory Distributors.

15.     On November 1, 2010, Defendants promoted Plaintiff to Divisional Supervisor supervising between 25 and 45 stores, and paying him a $250,000 annual base salary, paid at regular monthly intervals, but  required him to sign a "Divisional Supervisor Agreement" ("the DSA contract" or "the contract") prepared exclusively by Defendants (Ex. 4), and dissolve his distributorship.

16.     Although the DSA contract identifies Plaintiff as an independent contractor, Plaintiff was Defendants' *employee*, as evidenced not only by Defendants' *right* to exert control over Plaintiff's employment, but by their *actual* control over nearly every facet of his employment.

17.     For example, Defendants required Plaintiff to, *inter alia*, dissolve his distributorship; rent and maintain an out-of-the-home office; organize and lead rallies, meetings, and training seminars; travel from Florida to Cleveland four times per year for Divisional

4

Supervisor meetings; visit each store he supervised at least once every three months; document his travel time; submit his calendar and travel reports to Kirby's president of North American Field Sales each month; spend specific hours working in his non-home office each day he did not travel; pay for approximately 25% to 40% of his travel and accommodation expenses; pay all costs associated with training his Sales Representatives, including training materials and conference room rental; employ an administrative assistant; pay all payroll taxes for himself and his administrative assistant; pay into the Florida unemployment and worker's compensation systems; and pay for all his travel and lodging expenses when visiting the stores he supervised.

18.    From 2005, when Plaintiff became a Division Manager, until the end of December 2017, he reported directly to Kirby's then-president of North American Field Sales, Bud Miley, and worked under Miley's supervision without incident.

19.    In January 2018, Bud Miley resigned, and Scott Fetzer hired Kevin Reitmeier to replace him, at which time Plaintiff began reporting directly to Reitmeier.

20.    Almost immediately after becoming Plaintiff's direct supervisor, Reitmeier began harassing Plaintiff by, *inter alia*, calling him between 6:00 AM and 7:00 AM nearly every morning; sending him rude, demanding, and bullying text messages between 6:00 AM and 7:00 AM nearly every morning; and demanding to know his whereabout and activities at all times.

21.    Upon information and belief, Reitmeier did not harass any non-Middle Eastern Divisional Supervisors, with excessive early morning telephone calls, demands to know their whereabouts, and/or rude, demeaning, and harassing text messages.

22.    On May 25, 2018, Plaintiff's daughter opened a cannabidiol ("CBD") store in Florida.

23.    On June 27, 2018, Reitmeier interrogated Plaintiff for more than an hour regarding his daughter's CBD store, including whether Plaintiff had loaned her money for the store, and whether Plaintiff earned income from the store.

24.     Two days later, on June 29, 2018, David Lamb, Scott Fetzer's Vice President and
General Counsel, interrogated Plaintiff by phone regarding his daughter's CBD store, expressed
concern that the CBD store was precluding Plaintiff from fulfilling his DSA contract's "best
efforts" provision, and demanded that Plaintiff provide him with information regarding other
Kirby/Scott Fetzer employees' CBD involvement.

25.     During their telephone call, Plaintiff reported to Lamb that Reitmeier was  treating
him worse than his counterparts who were not of Middle Eastern descent, and  harassing him based
on his national origin, but neither Lamb, nor anyone else from Kirby or  Scott Fetzer  initiated an
investigation into Plaintiff's report or took  prompt or effective remedial action to end the
harassment/discrimination.

26.     Almost immediately after Plaintiff reported and opposed Reitmeier's harassment
and discrimination, Reitmeier's harassment of Plaintiff increased, including more frequent  phone
calls and text messages with increased demands, including requiring Plaintiff to re-  compile and
re-submit numerous extensive reports that Plaintiff had already completed and  submitted.

27.     On July 12, 2018, Plaintiff attended a meeting in Cleveland, Ohio, during which
Reitmeier told him that he wanted all distributors and supervisors to begin informing on other
distributors and supervisors who were involved in the CBD industry.

28.     After the Cleveland meeting concluded, Reitmeier interrogated Plaintiff by phone
for approximately 45 minutes regarding various employees Reitmeier believed were involved in
the CBD industry, to which Plaintiff responded that he felt uncomfortable discussing  distributors'
and divisional supervisors' involvement in the CBD industry.

29.     Upon information and belief, Reitmeier did not subject non-Middle Eastern
Divisional Supervisors or Distributors  to such incessant calls, text messages, and/or  interrogations
regarding Kirby distributors' and supervisors' involvement in the CBD industry.

30.     Shortly after his July 12, 2018 conversations with Reitmeier, Plaintiff called Lamb and reiterated that Reitmeier was harassing and discriminating against him based on his national origin, but again, neither Lamb, nor anyone else from Kirby or Scott Fetzer, initiated an investigation, or took prompt or effective remedial action to end the harassment and discrimination.

31.     During the week of August 20, 2018, Reitmeier traveled with Plaintiff to visit four of the Factory Distributors Plaintiff supervised, during which Reitmeier spent most of the time questioning Plaintiff about distributors and supervisors who were involved in the CBD industry.

32.     In fact, three of the four Factory Distributors Plaintiff and Reitmeier visited the week of August 20, 2018, none of whom is of Middle Eastern descent, owned a CBD store, and told Plaintiff they had already disclosed to Reitmeier that they owned a CBD store, and that Reitmeier had not said it was problematic.

33.     On September 4, 2018, Reitmeier asked Plaintiff to resign in exchange for a month of severance pay.

34.     On September 17, 2018, Plaintiff retained Caryn Groedel & Associates Co., LPA for legal advice and representation in connection with the aforementioned facts, and on September 27, 2018, attorney Caryn M. Groedel sent in-house counsel for Defendants a letter informing him that she had been retained to represent Plaintiff and outlined what she perceived to be Defendants' various violations of the law.

35.     Three weeks later, on October 8, 2018, Lamb terminated Plaintiff's employment.

36.     On February 6, 2020, Plaintiff filed his Complaint in this case.

37.     On April 1, 2020, Defendants filed a Motion to Dismiss Plaintiff's Complaint, which Plaintiff opposed on April 15, 2020., and which the Court granted in part and denied in part on October 23, 2020.

38.     Two weeks later, Defendants filed their Answer to Plaintiff's Complaint and asserted a breach of contract counterclaim against Plaintiff.

## COUNT ONE
**(Breach of Contract)**

39.     Plaintiff realleges each paragraph above as if fully set forth herein.

40.     Paragraph 8 of Plaintiff's contract states that "the parties hereto are separate entities, that the Company is contracting with [Plaintiff] as an independent contractor, and that neither is the agent nor the employee of the other for any purpose." (Ex. **1** at 2.)

41.     Defendants breached paragraph 8 of the contract by, *inter alia*, exerting full control over Plaintiff's employment and treating him like an employee -- despite contractually agreeing that he would be an independent contractor, including paying him a fixed salary, which was paid on a set monthly basis; and requiring him to rent and maintain an out-of-the-home office, organize and lead rallies, meetings, and training seminars; travel from Florida to Cleveland four times per year for Divisional Supervisor meetings; visit each store he supervised at least once every three months; document his travel time; submit his calendar and travel reports to Kirby's president of North American Field Sales each month; spend specific hours working in his non-home office each day he was not traveling; pay all costs associated with training his Sales Representatives, including training materials and conference room rental; employ an administrative assistant; pay all payroll taxes for himself and his administrative assistant; pay into the Florida unemployment and worker's compensation systems; and pay thousands of dollars per month on travel and lodging expenses for the travel Defendants required of him.

42.     Defendants breached the implied covenant of good faith and fair dealing by engaging in opportunistic behavior and conduct that was beyond Plaintiff's reasonable expectations.

43.     Defendants' breach of contract reflects and demonstrates an outrageous and

8

conscious disregard for Plaintiff's rights, which had a great probability of causing, and did cause, Plaintiff to sustain substantial damages, thereby rendering Defendants liable for punitive damages.

44.     As a direct and proximate result of Defendants' breach of contract, Plaintiff has incurred economic, emotional, and other damages exceeding Seventy-Five Thousand Dollars ($75,000.00).

**COUNT TWO**
**(Unjust Enrichment)**

45.     Plaintiff realleges each paragraph above as if fully set forth herein.

46.     Defendants were unjustly enriched by misclassifying Plaintiff as an independent contractor while *requiring* him to pay hundreds of thousands of dollars of *their* expenses, including payroll taxes, an administrative assistant's salary, travel costs, training expenses, office rent and expenses, equipment leases, worker's compensation, and unemployment compensation.

47.     Defendants avoided incurring and paying these costs by misclassifying Plaintiff as an independent contractor while telling him he was an independent contractor and requiring him to pay these expenses, among others.

48.     Defendants are, and were, aware of the benefits they unjustly received as a result of misclassifying Plaintiff as an independent contractor while requiring him to pay the above-described expenses, among others.

49.     Defendants retained the benefit Plaintiff conferred upon them under circumstances where it would be unjust to do so without payment to Plaintiff.

50.     The DSA contract does not govern this dispute because it was procured in bad faith.

51.     Defendants deliberately mislabeled and misclassified Plaintiff as an independent contractor while knowing they would exert total control over the terms and conditions of his

employment and require him to pay the above-described costs, and others, which they did in order to avoid, as Plaintiff's employer, paying the costs themselves.

52.     Defendants' conduct reflects and demonstrates an outrageous and conscious disregard for Plaintiff's rights, which had a great probability of causing, and did cause, Plaintiff to sustain substantial damages, thereby rendering Defendants liable for punitive damages.

53.     As a result of Defendants' foregoing actions, Plaintiff has suffered damages, including lost wages and mental anguish, in an amount exceeding Seventy-Five Thousand  Dollars ($75,000.00).

### COUNT THREE
### (Title VII - National Origin Discrimination)

54.     Plaintiff realleges each paragraph above as if fully set forth herein.

55.     Plaintiff is a member of a protected class pursuant to Title VII, due to his national origin.

56.     During his employment with Defendants, Plaintiff was the only Divisional Supervisor of Middle Eastern descent.

57.     Plaintiff was, and is, equally and/or more qualified than his similarly situated co-workers who are not of Middle Eastern descent.

58.     Defendants subjected Plaintiff to discriminatory and disparate treatment based  on his race.

59.     Defendants took adverse employment actions against Plaintiff, and treated him worse than his similarly situated co-workers who are not of Middle Eastern descent, with  respect to the terms and conditions of employment, based, at least in part, on his national  origin, including by, *inter alia,* subjecting him to incessant calls and text messages; interrogating him regarding other employees' CBD industry involvement; requiring him to report on other  employees' CBD industry involvement; requesting he resign; and terminating his employment.

10

60.     From the beginning of his employment through the date of his termination, Defendants did not terminate, or request the resignation of, Plaintiff's similarly-situated counterparts who are not of Middle Eastern descent – even those who Defendants knew were directly involved in the CBD industry.

61.     Defendants' discriminatory conduct deprived Plaintiff of equal employment opportunities based, at least in part, on his national origin.

62.     Defendants' conduct reflects and demonstrates an outrageous and conscious disregard for Plaintiff's rights, which had a great probability of causing, and did cause, Plaintiff to sustain substantial damages, thereby rendering Defendants liable for punitive damages.

63.     As a result of Defendants' actions, Plaintiff has suffered damages, including lost wages and mental anguish, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

## COUNT FOUR
### (Retaliation for reporting discriminatory conduct)

64.     Plaintiff realleges each paragraph above as if fully set forth herein.

65.     Plaintiff engaged in the protected activity of reporting and opposing Reitmeier's discrimination and harassment to David Lamb.

66.     Defendants were aware that Plaintiff engaged in the protected activity of reporting and opposing Reitmeier's discrimination and harassment.

67.     After, and at least in part as a result of, Plaintiff reporting and opposing Reitmeier's misconduct to Lamb, Defendants retaliated against Plaintiff by, *inter alia*, calling and texting him more frequently outside regular business hours; increasing the frequency of his interrogations; requesting he resign; and terminating his employment.

68.     By retaliating against Plaintiff, Defendants violated Plaintiff's rights under Title VII.

11

69.     Defendants' conduct reflects and demonstrates an outrageous and conscious disregard for Plaintiff's rights, which had a great probability of causing, and did cause, Plaintiff to sustain substantial damages, thereby rendering Defendants liable for punitive damages.

70.     As a result of Defendants' conduct, Plaintiff has suffered damages, including lost wages and mental anguish, in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00).

## COUNT FIVE
### (Retaliation - Retaliatory Counterclaim Under Title VII)

71.     Plaintiff restates each paragraph above as if fully set forth herein.

72.     The right to pursue legal action against an employer is manifested in the United States Constitution, the Ohio Constitution, statutory law, and common law.

73.     An employer who takes adverse employment actions an employee because the employee took advantage of that right regarding his employment rights violates Title VII of the Civil Rights Act of 1964.

74.     Plaintiff met his administrative perquisites for asserting this claim by filing a Charge with the EEOC on this claim (Ex. 1), for which he received a Right to Sue letter from the EEOC on August 31, 2021, a copy of which is attached hereto as Ex. 2 and incorporated herein by reference.

75.     Defendants retaliated against Plaintiff, at least in part, because he filed suit, seeking to enforce his employment rights.

76.     Defendants lacked an overriding business justification for filing a counterclaim against Plaintiff after terminating his employment.

77.     Defendants' conduct reflects and demonstrates an outrageous and conscious disregard for Plaintiff's rights, which had a great probability of causing, and did cause, Plaintiff to sustain substantial damages, thereby rendering Defendants liable for punitive damages.

78.     As a result of Defendants' unlawful actions, Plaintiff has suffered damages,

including but not limited to lost wages and mental anguish, in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).

### COUNT SIX
**(Malicious Prosecution)**

(Not refiled due to the Court's 09/07/2021 Order (Doc. # 38)).

### DAMAGES

WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

A. Issue a declaratory judgment that the practices complained of herein are unlawful and void, and the appropriate injunctive relief to remedy the practices complained of herein;

B. Order Defendants to make Plaintiff whole by providing compensation for violation of his civil rights, emotional distress, and punitive damages, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00);

C. Award Plaintiff back pay, front pay, and reimbursement for his lost wages, in an amount to be proven at trial;

D. Award Plaintiff his attorney's fees, costs, and disbursements;

E. Award Plaintiff pre- and post-judgment interest at the statutory rate; and

F. Award such other relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Caryn M. Groedel*
Caryn M. Groedel (0060131)
*cgroedel@groedel-law.com*
Matthew Grimsley (0092942)
*mgrimsley@groedel-law.com*
CARYN GROEDEL & ASSOCIATES CO., LPA
31340 Solon Road, Suite 27
Cleveland, OH  44139Phone: Fax:
Phone:  (440) 544-1122
Fax:     (440) 996-0064

Attorneys for Plaintiff

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

*/s/ Caryn M. Groedel*_____
Caryn M. Groedel