



31340 Solon Road
Suite 27
Cleveland, OH  44139
T:  (440) 544-1122
F:  (440) 996-0064
E:  cgroedel@groedel-law.com

*Labor and Employment*

September 27, 2018

**CONFIDENTIAL**
**PROTECTED PURSUANT TO EVID. R. 408**

*by email:  patrick.peters@jacksonlewis.com*

Patrick O. Peters, Esq.
c/o Jackson Lewis P.C.
Park Center Plaza I, Suite 400
6100 Oak Tree Blvd.
Cleveland, OH  44131

Dear Patrick:

I am writing to you on behalf of Abe Sharqawi, who is in a protected class based on his national origin (Middle Eastern), and who has sought my legal advice and counsel in connection with issues that have arisen in his employment with The Kirby Company ("Kirby").

As you are undoubtedly aware, Mr. Sharqawi became Division Manager reporting to Frank Vendetti in January 2005, at which time Ray (Bud) Miley was the Regional VP.  As Division Manager, Kirby let Mr. Sharqawi maintain his distributorship, while managing approximately 20 locations (Kirby Vacuum stores) and 250 Sales Representatives ("Reps"), travelling extensively, and staging quarterly pep rallies for his 250 Reps.  He also did training at his office, and travelled to other offices to conduct training.  Interestingly, Kirby also required Mr. Sharqawi to lead corporate meetings and other training seminars for his stores on a regular basis -- **and was required to foot all the expense**s **for those corporate meetings** (his hotel costs, food for the attendees, etc.).

At that time, Kirby was paying Mr. Sharqawi monthly -- $8.00 or $8.50 each time any of the FD under his management bought a vacuum -- and he was earning approximately $90k per year.  Was he an independent contractor?  I think you'd agree he couldn't be an independent contractor with all of the job functions he was required to perform upon Kirby's instruction and demand, and within Kirby's time requirements.

In November of 2010, Mr. Sharqawi was "promoted" to Division Supervisor, at which time Kirby required him to dissolve his distributorship, and paid him a commission-based salary with a guarantee of $250,000/year.  If, at the end of the year, sales in his territory exceeded $250,000, Kirby paid him the difference.

Ex. 3

Patrick O. Peters, Esq.
September 27, 2018
Page 2

As a result of his "promotion", Mr. Sharqawi *was required* to hire an administrator, organize and lead 12 pep (sales) rallies per year, and 4 FD corporate meetings, TL meetings, DPS training seminars, DT meetings, travel from Jacksonville Florida to Cleveland 4x/year for divisional supervisor meetings, and continue his extensive travelling each month.  He was also required to send his calendar, and many other reports, to Kirby world headquarters on the 25th of each month for the following month.  Again, it's rather clear that, with the numerous requirements and restrictions Kirby placed on him, and the overall level of control it exerted over him in the performance of his job duties, **Kirby should not have paid or classified him as an independent contractor.**

In 2013, Mr. Reitmeier disciplined Mr. Sharqawi for inappropriate "sexting" with another employee.  As part of his discipline, Mr. Sharqawi was required to attend 3-4 hours of counseling, for which he had to pay for his flight and hotel, **and pay a $4,000 "penalty**."  All of these job requirements, disciplinary actions, and performance guidelines militate against, and fly in the face of, the "independent contractor relationship" Kirby was reporting to the IRS.

On January 6, 2018, Kirby terminated Bud Miley, and promoted Kevin Reitmeier to replace him as president of the company.  Mr. Reitmeier immediately began calling Mr. Sharqawi on the phone at 7:00 AM demanding to know what he was doing, though he did not call the Caucasian Divisional Supervisors (Rob Terwilliger, Dan Blaylock, Mike Lopez, Mike Licata) at that early hour, demanding to know what they were doing.

Moreover, at the beginning of this year, Mr. Reitmeier informed Mr. Sharqawi that he was required to have an office, and he had to pay for it.  Mr. Reitmeier also told Mr. Sharqawi that, on the days he wasn't traveling, he had to be at his office from 9:00 AM until *at least* 5:00 PM.  These requirements were also discussed in several division supervisor meetings, and on other occasions when CEO Robert McBride was present, all of which reflects an employer-employee relationship, rather than one of independent contractor.

In March of this year, Marcus Quinn, a white male and an FD (Factory Distributor) who has continually exhibited hostility toward Mr. Sharqawi, opened a cannabis retail ("CBD") store in Bradenton Florida named THE CBD STORE, and began soliciting distributors in Mr. Sharqawi's division to open CBD retail stores for companies other than Kirby.

In April 2018, Bud Miley became president of CBD American Shaman Franchise systems.

On May 25, 2018, Mr. Sharqawi helped his daughter open a CBD American Shaman franchise retail store.

On June 27, 2018, Kevin Reitmeier questioned Mr. Sharqawi for more than an hour about his daughter's store, asking him questions like:  "Did you lend your daughter money for a

Patrick O. Peters, Esq.
September 27, 2018
Page 3

store?", which was none of his concern, and "Do you draw profits from your daughter's store?", which was also none of his concern.  Mr. Reitmeier also threatened Mr. Sharqawi, saying he could "get in trouble" with Kirby for "being involved" in his daughter's store because Kirby prohibits its employees from being involved in outside businesses.

On June 29, 2018, David Lamb called Mr. Sharqawi to interrogate him about his daughter's store, and said, "Just be honest with me…"  Mr. Sharqawi told Mr. Lamb he knows many factory distributors ("FDs") who have opened a CBD store.  Mr. Lamb told Mr. Sharqawi that was different because Mr. Sharqawi was an executive, and Mr. Lamb was "worried" about the "best efforts" provision in his contract.  Mr. Sharqawi told Mr. Lamb there were at least 5 other Kirby executives who had side businesses, and asked him if he was going to investigate them, to which Mr. Lamb responded that he wasn't sure because he didn't know anything about those situations.

Mr. Sharqawi then shared with Mr. Lamb that he feared retaliation by other executives, and said it seemed as though Kirby was discriminating against him based on his race or national origin because he's "the little brown guy", while all the other executives are Caucasian.  At that point, Mr. Lamb told Mr. Sharqawi he'd look into the matter, but never did.

Mr. Sharqawi also requested that Mr. Lamb and Kirby stop interrogating him about who owns a CBD store.

From that point on, Mr. Reitmeier began calling Mr. Sharqawi at 7 AM **and** 11 PM -- demanding to know what he was doing.  And if Mr. Sharqawi didn't pick up the phone the moment Mr. Reitmeier called, or didn't return his call within 30 minutes, Mr. Reitmeier criticized and admonished him.

On numerous occasions Mr. Reitmeier also sent Mr. Sharaqwi text messages demanding that he respond to his messages on "what's app."  The harassing calls continued incessantly -- with interrogation-like questioning about work and which Kirby people were in the CBD business.

Once Mr. Sharqawi reported this to Mr. Lamb, he began experiencing retaliation, Mr. Reitmeier acting more aggressively toward him, as well as excessive phone calls and ever-increasing demands from Mr. Reitmeier, including demands that he re-do reports he had already completed.

On July 12, 2018, Mr. Sharqawi attended a DS meeting in Cleveland, where Mr. Reitmeier told him Kirby wanted everyone to "report" employees they knew to be involved in CBD.  After the meeting, DS Rob Terwilliger pulled Mr. Sharqawi aside and threatened him,

saying he "better watch out," that "corporate" was going to come after him, and that he "better keep things quiet," which immediately placed Mr. Sharqawi in a state of fear.

After the meeting, while driving to work, Mr. Reitmeier called Mr. Sharqawi and spent approximately 45 minutes interrogating him, including whether he had talked to Bud, and who else was opening stores.  Mr. Sharqawi said he was uncomfortable and did not want to talk about it.

A few days later, Mr. Sharqawi called several other DS employees and asked them if Mr. Reitmeier had been questioning them about their knowledge of Kirby employees' involvement in the CBD business, and they all said no.  Mr. Sharqari also learned at that time that no other DS with whom he spoke had received calls from Mr. Reitmeier at 7 a.m. or 11 p.m.

Mr. Sharqawi then called Mr. Lamb and reported that Mr. Terwilliger had threatened and harassed him, that he was afraid Mr. Terwilliger was going to cause him physical harm, and that he believed Mr. Reitmeier was discriminating against him by questioning him, but not his similarly situated Caucasian counterparts.  Reluctantly, Mr. Sharqawi also reported that FDs Charlie Nugent, Tony Bryan, Jim Chosie, and Marcus Quinn were harboring violent felons.  For example, Sean Mallard, a registered sex offender, has a distributorship in Tina Mallard's name, but Ms. Mallard is never at the store.  There are also numerous photos posted on Face Book showing Mr. Mallard working in the office and in the field.  Mr. Mallard brags that his career is solid because he had dinner with CEO Robert McBride while attending a Golden Circle company- paid trip.

Likewise, Pat Riley, a violent felon, has a distributorship under the name of Marissa Riley.

Nonetheless, Mr. Lamb declined to take any action to investigate this matter.  He also failed to take prompt or effective remedial action to end the national origin harassment toward Mr. Sharqawi .

Not-so-coincidentally, shortly after Mr. Sharqawi's phone call with Mr. Lamb, Mr. Reitmeier told Mr. Sharqawi that he'd be traveling with him the week of August 20, 2018.  As Mr. Sharqawi expected, Mr. Reitmeier spent most of the time they traveled together to interrogate Mr. Sharqawi about employees who owned/operated CBD stores.  Interestingly, three of the four FDs they visited owned a CBD store, and they all freely disclosed this information to Mr. Reitmeier.

Patrick O. Peters, Esq.
September 27, 2018
Page 5

        After each visit to an FD who owned a CBD store, Mr. Reitmeier instructed Mr. Sharqawi to drop him off at his hotel and proceed directly to the FD's CBD store to gather information and dig up dirt on the FD.

        After the third day of travelling together, Mr. Sharqawi asked Mr. Reitmeier why they were secretly investigating FDs, to which Mr. Reitmeier responded that he just needed to know who was operating CBD stores.  Mr. Sharqawi made very clear to Mr. Reitmeier that he felt uncomfortable about the entire investigation and the secrecy surrounding it; that he was afraid Mr. Terwilliger was going to physically hurt him; and that he had already told Mr. Lamb about Mr. Terwilliger's threatening comments and his fear that Mr. Terwilliger was going to hurt him. He then asked Mr. Reitmeier to terminate Marcus Quinn for violating his contract with Kirby by soliciting distributors into the CBD business, but Mr. Reitmeier refused to do so.

        August was not a good sales month for Mr. Sharqawi due to the national origin discrimination he was experiencing, the clandestine investigations Mr. Reitmeier was requiring him to conduct, the various threatening remarks made to him, and the fact that the 3 Caucasian FDs who owned CBD stores were apparently focusing their attention on their CBD business rather than vacuums, as evidenced by their failure to buy any vacuums in the month of August. Mr. Sharqawi thus renewed his request that Mr. Reitmeier terminate Mr. Quinn – this time because Mr. Quinn's actions were adversely affecting the sales in his division -- but once again Mr. Reitmeier refused.  He also failed and refused to:  (a) stop discriminating against Mr. Sharqawi, (b) admonish or discipline Mr. Terwilliger for his threatening remarks, (c) halt his demand that Mr. Sharqawi engage in stealth investigations of FDs who owned CBD stores, and (d) stop treating Mr. Sharqawi like an employee, while classifying and paying him like an independent contractor.

        On September 4, 2018, Mr. Reitmeier had the gall to ask Mr. Sharqawi -- a devoted, hard-working, and successful employee for 13 years -- to resign **in exchange for 1 month of severance pay.**  Mr. Sharqawi then called Mr. Lamb to discuss a severance package, but he refused to consider a package he suggested, and then offered to pay him 3 months of severance in exchange for his resignation, which is hereby affirmatively rejected.

        As a result of these actions on the part of Kirby and its agents, Mr. Sharqawi has viable claims against Kirby for national origin discrimination, retaliation, and violation of public policy.

        Nonetheless, Mr. Sharqawi is interested in resolving this matter amicably, and toward that end, you and I have a telephone conference scheduled for tomorrow afternoon.

Patrick O. Peters, Esq.
September 27, 2018
Page 6

In the meantime, Kirby and Fetzer have a legal obligation to take all necessary steps to preserve potentially relevant evidence in this matter, including evidence maintained electronically ("Electronically Stored Information" or "ESI"), digitally, and in document form.

Please make sure the following information is preserved in its native format until a true copy is made, and the meta data preserved, even though it may, in the event of litigation, be requested in a text, TIFF, or other user friendly, searchable form:

- All job applications, resumes, job offer letters, background searches, W-2s, 1099s, job descriptions, employment contracts, discipline-related documents, performance reviews, succession plan documents, severance agreements, documents submitted to and received from the Ohio Department of Jobs and Family Services, calendars, monthly reports, and documents reflecting benefits (bonuses, stock options, stock grants, paid time off, etc.), penalties paid to Kirby, terminations, transfers, demotions, development plans, performance plans, and commendations for Mr. Sharqawi, Kevin Reitmeier, Frank Vendetti, Ray (Bud) Miley, Marcus Quinn, Mr. Terwilliger, Dan Blaylock, Mike Lopez, Mike Licata, and all individuals who reported to Mr. Reitmeier at any and all times between January 1, 2013 and September 30, 2018;

- All electronic data created on computers utilized by the above-referenced individuals, and the servers or back-up media on which such data is held or through which it was transferred or stored;

- All documents pertaining to performance targets, performance goals, and actual performance of the above-referenced individuals at any and all times between January 1, 2013 and September 30, 2018;

- All versions of the Divisional Supervisor Handbook that has existed at any and all times between January 1, 2013 and September 30, 2018, **including all drafts and revisions;**

- All documents, notes, statements, reports, conclusions, and emails regarding any and all investigations conducted by, and/or on behalf of, Kirby, Fetzer, and/ or Mr. Sharqawi regarding Kirby employees' potential or actual involvement in one or more outside (non-vacuum-related) businesses at any and all times between January 1, 2013 and September 30, 2018;

- All job descriptions for positions in Kirby and in Scott Fetzer that exist and/or existed at any and all times between January 1, 2013 and September 30, 2018, **including drafts, amendments, updates, revisions, and supplements;**

Ex. 3

Patrick O. Peters, Esq.
September 27, 2018
Page 7

- All text messages and emails between any and all Scott Fetzer employees and officers, and any/all Kirby employees, managers, and/or officers pertaining to Mr. Sharqawi between January 1, 2013 and September 30, 2018;

- All text messages and emails between any and all Scott Fetzer employees and officers, and any/all Kirby employees, managers, and/or officers, pertaining to the investigation of Kirby employees engaged in an outside business between January 1, 2013 and September 30, 2018;

- Kirby's/Fetzer's handbooks/personnel manuals, and all documents reflecting Kirby's/Fetzer's policies on:  performance criteria, performance evaluations, CLASSIFICATION OF ITS EMPLOYEES, contracts, severance, discipline, conducting investigations of its employees, harassment, discrimination, and retaliation, **including all drafts and/or amendments,** that exist and/or existed at any and all times between January 1, 2013 and September 30, 2018;

- All documents on which Kirby/Fetzer based its decision to offer Mr. Sharqawi one month of severance pay in exchange for his resignation;

- All documents pertaining to allegations, reports, and/or complaints to Kirby and/or Fetzer regarding discrimination, harassment, retaliation, wage and hour hour violations, and/or the violation of public policy, between January 1, 2013 and September 30, 2018;

- All of Kirby's/Fetzer's documents, memos, protocols, policies, and procedures regarding harassment, discrimination, retaliation, unethical behavior/conduct, and/or unlawful behavior/conduct, **including all *drafts and revisions,*** that exist and/or existed at any and all times between January 1, 2013 and September 30, 2018;

- All documents and records of all training provided to Kirby/Fetzer employees on harassment, discrimination, and/or retaliation between January 1, 2013 and September 30, 2018, including the CVs/resumes of the presenters of each training, sign-in sheets from each training, and the materials disseminated to attendees of each training; and

- All of Kirby's/Fetzer's document retention policies, **including drafts and revisions**, which exist and/or existed at any and all times between January 1, 2013 and September 30, 2018.

As I'm sure you know, Kirby's and Fetzer's obligations include discontinuing all relevant data retention, destruction, and back-up tape recycling policies.  Please ensure Kirby/Fetzer do

Ex. 3

Patrick O. Peters, Esq.
September 27, 2018
Page 8

not destroy, erase, conceal, change, or alter any paper files, electronic files, and/or data generated by, and/or stored on, Kirby's and/or Fetzer's computers or storage media (such as hard disk drives, floppy disks, CDs, DVDs, back-up tapes, and other electronic data).  Media used to back up data that is normally rotated and overwritten after a specified date or period of time, should be pulled from rotation and preserved if it contains unsaved data from the last 5 years.

For purposes of this notice, the term "ESI" includes, but is not limited to all text files, word processing documents, presentation files, such as PowerPoint, spreadsheets, e-mail files (including "cc" and "bcc" fields and attachments), and information concerning email files including logs of e-mail, header information, and deleted files), internet history files, graphical files in any format, data bases, calendar and scheduling information, telephone logs, contact managers, computer activity logs, and all file fragments and back up files containing electronic data that exists on desktop computers, laptops, PDAs, phones (including voice mail, servers, etc.  Kirby/Fetzer must also preserve all meta data.

Kirby and Fetzer can most easily comply with their obligations by making a mirror-image bit stream back-up copy of computers and storage media (such as hard disk drives, floppy disks, CDs, DVDs, back-up tapes, or any other electronic data), which will inexpensively preserve relevant electronic and digital evidence on searchable CD-ROMs or DVD, which can then be searched later for potentially relevant evidence without imposing an undue burden on Kirby's or Fetzer's day-to-day operations.

I look forward to our telephone conference tomorrow afternoon.

Very truly yours,

Caryn M. Groedel

CMG:jm
cc:  Abe Sharqawi by email

Ex. 3