UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IBRAHIM SHARQAWI, | ) | CASE NO.  1:20-cv-00271 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) | |
| | ) | |
| KIRBY COMPANY, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

Before this Court is the motion for summary judgment filed by Defendants Kirby

Company and Scott Fetzer Company (collectively, "Kirby").  (Doc. No. 61.)  Plaintiff Ibrahim

Sharqawi opposed this motion (Doc. No. 65), and Kirby filed a reply brief in support (Doc. No.

66).  For the reasons that follow, Kirby's motion for summary judgment is GRANTED.

I.  **Background**

A.  **Relevant Factual Background**

1.  **The Parties Relationship Prior to Executing the Divisional**
    **Supervisor Agreement**

Defendant Kirby Company was an unincorporated division of Defendant Scott Fetzer

Company ("Scott Fetzer") at all times relevant to this litigation.  (Doc. No. 61-2 at 921.)[1]  Kirby

manufactures, assembles, and sells home cleaning systems and related accessories to consumers

through in-home demonstrations conducted by a network of distributors.  (*Id.* at 976.)

Plaintiff is of Middle Eastern descent.  (Doc. No. 61-3 at 1103; Doc. No. 61-1 at 867.)

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document
and PageID# rather than any internal pagination.

He was affiliated with Kirby from 1990 until October 8, 2018.  (Doc. No. 61-3 at 1112; Doc. No. 61-2 at 1040.)

In December 2002, Plaintiff and Kirby executed the Factory Distributor Agreement. (Doc. No. 61-3 at 1114-15.)  The agreement authorized Plaintiff to own and operate a Kirby distributorship.  (*Id.* at 1115.)  In 2005, Kirby promoted Plaintiff to the Division Manager role. (*Id.*)  With this new title – in addition to owning and operating his distributorship – Plaintiff helped train other distributors, distributors' employees, and subcontractors.  (*Id.*)

### 2.  The Divisional Supervisor Agreement

Plaintiff became a Divisional Supervisor on November 1, 2010.  (*Id.* at 1114.)  As part of this promotion, Plaintiff and Kirby executed the Divisional Supervisor Agreement ("DSA"). (Doc. No. 1-4.)  Kirby also required Plaintiff to dissolve his distributorship before obtaining the Divisional Supervisor title and benefits.  (Doc. No. 61-3 at 1119.)

Pursuant to the DSA, Kirby guaranteed Plaintiff $20,833 a month, which amounted to a $250,000 yearly salary.  (Doc. No. 1-4 at 27.)  Plaintiff was also entitled to commission payments if his yearly sales commissions exceeded his salary.  (*Id.*)  In another clause (hereinafter referred to as the "Provision"), the parties agreed that Plaintiff would be an "independent contractor[] and that neither is the agent nor the employee of the other for any purpose."  (*Id.* at 23, ¶ 8.)

Bud Miley originally supervised Plaintiff in this role.  (Doc. No. 65 at 1383; *see also* Doc. No. 61-2 at 911-13.)  Miley made two derogatory comments regarding Plaintiff's status as a Middle Eastern person.  (Doc. No. 61-3 at 1103-04.)  The first time Miley said, "[Plaintiff] is fine.  Just don't call him a Paki.  He gets really upset."  (*Id.* at 1103.)  The second time occurred at another divisional supervisor meeting where Miley pointed a laser at Plaintiff's head and

stated, "[Plaintiff] gets really pissed off when you call him a Paki." (*Id*. at 1104.)  On April 16, 2014, Miley sent an email (the "Office Requirement Email") stating that all Divisional Supervisors are required "to operate from a professional office location separate from their residence," which was "expected to be open for business and properly staffed at a minimum from Monday – Friday, 9am – 5pm." (Doc. No. 61-2 at 1041.)  The Office Requirement Email also explained, among other things, that Divisional Supervisors were expected to "work from the office location when [] not on the road or on vacation." (*Id.*)

### 3. Reitmeier, CBD Dispute, and Termination

In January 2018, Kevin Reitmeier replaced Miley as Plaintiff's supervisor.  (Doc. No. 65 at 1383; *see also* Doc. No. 61-2 at 963.)  Reitmeier became concerned about Plaintiff's and other Kirby workers' participation in the CBD industry.  (Doc. No. 61-3 at 1100.)  He asked Plaintiff to investigate other workers' involvement in the CBD industry.  (*Id.* at 1127.)  He also made various demands to Plaintiff via phone calls and text messages.  (*E.g.*, *id.* at 1130.)  Reitmeier called Kirby distributors to ensure that Plaintiff had visited them.  (*Id.*)

On numerous occasions, Plaintiff contacted Scott Fetzer's General Counsel, David Lamb, about Reitmeier's behavior.  (Doc. No. 61-2 at 904-05; Doc. No. 61-3 at 1102, 1138.)  Plaintiff informed Lamb that Reitmeier was mistreating him due to his ethnic background.  (Doc. No. 61-2 at 905; Doc. No. 61-3 at 1138.)  Plaintiff also told Lamb that he was merely the owner of a CBD store, which his daughter operated.  (Doc. No. 61-3 at 1137; Doc. No. 61-2 at 924-25.)

Lamb and Kirby hired a private investigator to determine Plaintiff's involvement with the CBD industry.  (Doc. No. 61-2 at 924, 929.)  The investigator followed Plaintiff on Friday, August 17, 2018, through Sunday, August 19, 2018.  (Doc. No. 61-2 at 1024.)  After doing so,

the investigator informed Kirby that Plaintiff worked at a CBD store all day on Friday and for a multi-hour period on Saturday and Sunday.  (*Id.*)

Plaintiff retained counsel.  (Doc. No. 68-11.)  On September 24, 2018, his counsel informed Lamb that Plaintiff planned on "pursuing his legal rights and remedies."  (*Id.* at 1642.)  Kirby sent Plaintiff a letter terminating the DSA on October 8, 2018.  (Doc. No. 61-2 at 1040.)

On October 23, 2018, Kirby implemented a policy requiring the termination of any "Factory Distributor who owns, or operates, or whose spouse, or significant other or immediate family member, owns or operates, a business that sells cannabinoid products including CBD."  (Doc. No. 61-2 at 1045.)

## B.  Relevant Procedural Background

### 1.  Pre-Summary Judgment

Plaintiff initiated this action against Kirby on February 6, 2020.  (Doc. No. 1.)  Kirby moved to dismiss the complaint for failure to state a claim (Doc. No. 4), which the Court granted in part and denied in part (Doc. No. 8).  Afterwards, Kirby Company filed a breach of contract counterclaim against Plaintiff.  (Doc. No. 12.)

On April 26, 2021, after receiving leave from the Court, Plaintiff filed an amended complaint.  (Doc. No. 20; 4/26/2021 Non-Document Order.)  Kirby once again moved to dismiss the complaint for failure to state a claim (Doc. No. 21), which the Court granted in part and denied in part (Doc. No. 38).  In this Order, the Court granted Plaintiff leave to amend Count Five of his amended complaint.  (*Id.* at 474.)

Plaintiff filed his second amended complaint on September 14, 2021.  (Doc. No. 39.)  The complaint contains Five Counts: breach of contract (Count One), unjust enrichment (Count Two), Title VII national origin discrimination premised on Kirby's termination decision and

4

creation of a hostile work environment (Count Three), Title VII retaliation for reporting discriminatory conduct (Count Four), and Title VII retaliation based on Kirby Company's filing of a counterclaim (Count Five). (*Id.*) Kirby moved to dismiss Count Five (Doc. No. 42), which the Court granted (Doc. No. 53).

## 2.  Summary Judgment Briefing

On June 14, 2022, Kirby moved for a month-long extension of the June 17, 2022, dispositive motion deadline. (Doc. No. 58.) The Court denied the motion. (Doc. No. 59.)

Kirby timely filed a summary judgment motion on all remaining claims in Plaintiff's operative complaint. (Doc. No. 61.)

On July 5, 2023, Plaintiff filed a motion for leave to file his summary judgment motion on the counterclaim *instanter*. (Doc. No. 63.) The Court denied this motion. (Doc. No. 64.)

Plaintiff timely opposed Kirby's summary judgment motion. (Doc. No. 65.) The opposition brief, however, was 31 pages – 11 pages over Local Rule 7.1's 20-page limitation. (*Id.* at 1411.) Plaintiff also failed to authenticate the exhibits attached to his brief. (*See id.*) Kirby moved to strike the unauthenticated exhibits and pages 21-31 of the brief. (Doc. No. 67 at 1538.) Plaintiff untimely opposed Kirby's motion to strike. (Doc. No. 68.) Plaintiff's revised opposition brief, attached to the untimely opposition to the motion to strike, was 23 pages, despite including a Local Rule 7.1 certificate of compliance. (Doc. No. 68 at 1573-74.) Two days later, Plaintiff filed a motion for leave to file a 24-page opposition brief. (Doc. No. 69.) Kirby filed a reply brief in support of its motion to strike (Doc. No. 70), and Plaintiff filed a sur-reply to this reply brief (Doc. No. 71).

The Court scheduled an in-person hearing for October 13, 2022, to address the briefs on Plaintiff's numerous attempts at filing an opposition, with lead counsels' and the parties'

attendance being mandatory. (9/8/2022 Non-Document Order.) On September 12, 2022, Kirby filed a stipulated motion to continue the hearing, which the Court granted and rescheduled for October 24, 2022. (Doc. No. 72; 9/13/2022 Non-Document Order.)

The October 24, 2022, hearing was continued to October 31, 2022, because Plaintiff and his lead counsel failed to attend. (10/24/2022 Non-Document Order.) At the hearing, the Court ordered additional briefing on the admissibility of the unauthenticated exhibits attached to Plaintiff's original opposition brief. (10/24/2022 Minutes of Proceedings.)

On October 31, 2022, the Court heard from lead counsel and determined that Plaintiff did not file an opposition brief that complied with Local Rule 7.1 despite attempting to do so three times. (*See* 10/31/2022 Non-Document Orders.) Based on the Court's findings and for the reasons stated on the record, the Court determined that it only would consider the first 20 pages of Plaintiff's original and timely submitted opposition brief (Doc. No. 65) and the exhibits attached to the brief with bates numbers indicating that that Kirby produced them. (*Id.*) The Court also determined it would not consider Exhibits 2 (Doc. No. 65-2), 3 (Doc. No. 65-4), and 4 (Doc. No. 65-4) to his opposition brief.

### 3. Additional Briefing Related to Breach of Contract Claim

On March 7, 2023, the Court ordered briefing on the following questions related to Plaintiff's breach of contract claim:

> As a matter of contract interpretation, does ¶ 8 of the Divisional Supervisor Agreement ("DSA") contain a promise from Defendants to limit their control over the manner in which Plaintiff was to perform as a Divisional Supervisor?

> Did ¶ 1 of the DSA authorize any of Defendants' actions that Plaintiff alleged were breaches of the DSA? For example, were the rules articulated in Bud Miley's 4/16/2014 email (Doc. No. 61-2 at PageID 1041-042) an exercise of the Company's right to "from time to time and at any time [] change the . . . Service Requirements in any manner whatsoever by giving written notice thereof to the Divisional Supervisor?"

6

Did Plaintiff's bankruptcy filing terminate the DSA, per ¶ 19? (Doc. No. 61-1 at
PageID 871.)

(Doc. No. 83 at 1745.)

Pursuant to this Order, Plaintiff filed a response to these questions (Doc. No. 84), which
Kirby addressed in a responsive brief (Doc. No. 85.)  Plaintiff also filed a reply to Kirby's
response.  (Doc. No. 86.)

**II.  <u>Analysis</u>**

**A.  Standard of Review**

A motion for summary judgment must be granted "if the movant shows there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed
must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B)
showing that the materials cited do not establish the absence or presence of a genuine dispute, or
that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.
56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in the light
most favorable to the nonmoving party to determine whether a genuine issue of material fact
exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is "material" only if its
resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
248 (1986).  "The ultimate question is whether the evidence presents a sufficient factual
disagreement to require submission of the case to a jury, or whether the evidence is so one-sided
that the moving parties should prevail as a matter of law."  *Payne v. Novartis Pharm. Corp.*, 767
F.3d 526, 630 (6th Cir. 2014) (citing *Anderson*, 447 U.S. at 255.)

7

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991).  Put another way, the party opposing the motion for summary judgment must present evidence supporting his claims. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.").  Thus, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment.  *See Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) ("A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant.").  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

### B.  Breach of Contract

"Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach."  *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012).[2]

---

[2] Paragraph 23 states that the DSA "shall be construed under and governed by the law of the State of Ohio . . . ."  (Doc. No. 1-4 at 26, ¶ 23.)  It is undisputed that this provision is enforceable and that Ohio law applies.

The parties both affirmatively argue that the DSA was a valid contract.  (Doc. No. 61-1 at 870; Doc. No. 65 at 1390.)  Plaintiff and Kirby dispute whether the other side breached a term in the agreement.[3]  Plaintiff argues that Kirby breached the Provision by –

> exerting full control over [his] employment and treating him like an employee – despite contractually agreeing that he would be an independent contractor, including paying him a fixed salary, which was paid on a set monthly basis; and requiring him to rent and maintain an out-of-the-home office, organize and lead rallies, meetings, and training seminars; travel from Florida to Cleveland four times per year for Divisional Supervisor meetings; visit each store he supervised at least once every three months; document his travel time; submit his calendar and travel reports to Kirby's president of North American Field Sales each month; spend specific hours working in his non-home office each day he was not traveling; pay all costs associated with training his Sales Representatives, including training materials and conference room rental; employ an administrative assistant; pay all payroll taxes for himself and his administrative assistant; pay into the Florida unemployment and worker's compensation systems; and pay thousands of dollars per month on travel and lodging expenses for the travel Defendants required of him.

(Doc. No. 39 at 481, ¶ 41.)[4]  The Provision provides:

> It is agreed: (i) that the parties hereto are separate entities, that the Company is contracting with the Divisional Supervisor as an independent contractor, and that neither is the agent nor the employee of the other for any purpose; (ii) that the Divisional Supervisor shall pay any Social Security, unemployment, workmen's compensation, or other tax upon or for himself and those persons employed by him; and (iii) that neither the Divisional Supervisor nor such persons as may be employed by him shall be deemed employees of the Company; and that the

---

[3] Kirby did not move for summary judgment on its breach of contract counterclaim.  And Plaintiff did not timely submit his motion for summary judgment on the counterclaim.  (Doc. Nos. 63 & 64.)  Accordingly, the Court only analyzes Plaintiff's breach of contract claim.

[4] In his opposition brief, Plaintiff also argues that Kirby breached Paragraph 19 of the DSA by "failing to give [him] 30 days' written notice of his termination."  (Doc. No. 65 at 1391.)  Kirby correctly notes that this allegation was not included in any of Plaintiff's complaints. (Doc. No. 66 at 1521.)  The Sixth Circuit prohibits a plaintiff from raising a theory of liability for the first time in a summary judgment opposition brief.  *E.g.*, *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (noting that permitting the plaintiff to raise a new claim in response to a summary judgment motion "would subject defendants to an unfair surprise"); *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent [the plaintiff] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal.").  Thus, the Court does not consider whether Kirby breached this provision.

Divisional Supervisor accepts exclusive liability as an independent contractor for any payroll, Social Security, unemployment, or worker's compensation tax, and for any tax imposed by any corresponding State or Federal law, with respect to his operations under this Agreement.  Divisional Supervisor will not be treated as an employee with respect to any service for federal tax purposes.

(Doc. No. 1-4 at 23, ¶ 8.)

Plaintiff contends that the Provision is ambiguous, and a reasonable interpretation of the term is that it obligated Kirby to refrain from treating him like an employee.  (Doc. No. 84 at 1747-49.)  To evaluate whether Kirby treated him like an employee, Plaintiff argues that the parties intended to impute the common law employee test.[5]  (*Id.* (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992), which described the "traditional agency law principles" for determining when an individual is an employee.).)  Kirby counters that the Provision unambiguously did not create an obligation beyond the agreement's express terms.  (Doc. No. 85 at 1756-58.)  To Kirby's mind, the Provision "contains no promise or expressed intention by [Kirby] to forbear or limit their control over Plaintiff's performance."  (*Id.* at 1757.)

---

[5] The Supreme Court has summarized the common law test:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.  Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989) (footnotes omitted).  "Since the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer, all of the incidents of the relationship must be assessed and weighed with no one factor being decisive."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992) (cleaned up).

Before analyzing the parties' arguments, the Court notes that Plaintiff's breach of contract theory appears to be self-refuting.  By alleging that Kirby breached the contract by "treating him like an employee" because it "[paid] him a fixed salary," Plaintiff is claiming that Kirby breached the DSA by complying with the DSA's pay schedule.  (Doc. No. 39 at 481, ¶ 41.)  If Kirby stopped paying him his salary, Plaintiff would have rightfully brought a breach of contract action against Kirby to recover unpaid wages.  But, by paying him his guaranteed salary and avoiding such a lawsuit, under Plaintiff's theory, Kirby placed itself at risk for a different type of breach of contract claim.  If the parties had intended for the DSA to put Kirby in such a double bind, they would have explicitly stated so in the text of the agreement.  But the DSA does not affirmatively impute the common law test.  At the outset, Plaintiff's claim is strained.

Nonetheless, the Court applies Ohio law on interpreting contested contract terms and caselaw analyzing similar independent contractor terms and finds that the Provision unambiguously does not require Kirby to follow the common law test with respect to its treatment of Plaintiff.

## 1.  Contract Interpretation

The Court's primary objective is to "ascertain the intent of the parties."  *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 875 N.E.2d 561, 566 (Ohio 2007).  The parties' intent "is presumed to reside in the language they choose in their agreement."  *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996).  Accordingly, "a court must give effect to the parties' expressed intentions; unexpressed intentions are deemed to have no existence."  *Covington v. Lucia*, 784 N.E.2d 186, 189 (Ohio Ct. App. 2003) (citing *Aultman Hosp. Ass'n. v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 922-923 (Ohio 1989).

To adhere to contract interpretation principles, courts must first determine whether the disputed term is ambiguous.  *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). "Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington*, 784 N.E.2d at 190 (quotations omitted).  Courts cannot use extrinsic evidence in making ambiguity determinations.  *Id.* (citing *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996)).  Instead, Courts must stick to the four corners of the agreement, construe the contract as a whole, and give reasonable effect to every provision in the agreement.  *Tri-State Grp., Inc. v. Ohio Edison Co.*, 782 N.E.2d 1240, 1246 (Ohio Ct. App. 2002); *Stone v. Nat'l. City Bank*, 665 N.E.2d 746, 752 (Ohio Ct. App. 1995).  Whether a term is ambiguous is a question of law to be decided by the court.  *GHU Invs., LLC v. Myocare Holdings, LLC*, No. 1:21-cv-00510, 2022 WL 5160828, at *7 (N.D. Ohio Oct. 4, 2022).

To resolve this dispute, the Court must evaluate the parties' interpretations and determine whether there is "uncertain[ty] as to which of [the] two . . . meanings advanced by the parties represent[] the parties' true intention." *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, No. 1:02-cv-00013, 2005 WL 6778678, at *8 (N.D. Ohio Feb. 22, 2005).  If there is no such uncertainty, then the contract is not ambiguous.  The Court cannot look at the Provision in isolation to evaluate these arguments.  *Beasley v. Monoko, Inc.*, 958 N.E.2d 1003, 1011-12 (Ohio Ct. App. 2011).  Instead, it must look to other terms in the contract to elucidate intent.

Start with the DSA's prefatory language.  The DSA defines Kirby's business as engaging in the "manufacture, assembly, and sale of vacuum cleaners and related devices, parts and attachments for use by consumers in the home."  (Doc. No. 1-4 at 22.)  It then states that Plaintiff's obligation as a Divisional Supervisor is to "place new Distributors for [Kirby's]

12

Products in various localities." (*Id.*)  Further, the DSA tasks Plaintiff with "educating, training, and maintaining" Kirby's distributors.  (*Id.*)  From this language, there can be no doubt that Plaintiff's role was an essential part of Kirby's day-to-day business, which under the common law test, indicates that Plaintiff was Kirby's employee.  *See NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 259 (1968) (noting that performing "functions that are an essential part of the company's normal operations" is typically the role of an employee, not an independent contractor).

Consider the fact that the DSA runs for an indefinite term.  Under the common law test, "hired parties are more likely to be deemed employees where they 'have a permanent working arrangement with the company under which they continue as long as their performance is satisfactory." *Merritt v. Mountain Laurel Chalets, Inc.*, 96 F. Supp. 3d 801, 814 (E.D. Tenn. 2015) (quoting *United Insurance Co. of America,* 390 U.S. at 259).  That is the exact type of working relationship the parties contemplated – and did, in fact, have – pursuant to the DSA.

Look at the DSA's noncompete clause.  Paragraph 11 states that, for one year after the DSA terminates, regardless of the termination reason, Plaintiff shall not "directly or indirectly, himself or through any entity, compete with Kirby."  (Doc. No. 1-4 at 24, ¶ 11.)  According to the Ohio Supreme Court, noncompetition obligations undermine the notion that a person is an independent contractor under the common law test.  *State ex rel. Ugicom Enters., Inc. v. Morrison*, 203 N.E.3d 683, 689-90 (Ohio 2022); *see also Bell v. Atl. Trucking Co.*, No. 309-cv-406-J-32MCR, 2009 WL 4730564, at *6 (M.D. Fla. Dec. 7, 2009) (finding that the plaintiff was an employee under the common law test "particularly" because of the non-compete clause in his contract), *aff'd*, 405 F. App'x 370 (11th Cir. 2010); *Alexander v. Avera St. Luke's Hosp.*, 768

13

F.3d 756, 762 (8th Cir. 2014) (noting the fact that employee was "never bound by a non-compete agreement" strongly suggests she was an independent contractor under common law test).

Finally, account for the fact that Plaintiff was paid a salary under the DSA.  Under the common law test, if the worker is paid a salary – rather than having payment be determined on a per-job basis – he is being treated like an employee.  *State ex rel. Ugicom Ents., Inc. v. Buehrer*, 2014-Ohio-4942, 2014 WL 5768565, at *1 (Ohio Ct. App. 2014); *see also Marie v. Am. Red Cross*, 771 F.3d 344, 354 (6th Cir. 2014) ("[E]mployees generally receive a salary.").  The parties do not dispute that Plaintiff was guaranteed a salary of $20,833 a month per Paragraph 3 and Exhibit B to the DSA.  (Doc. No. 1-4 at 23, 27.)

These provisions show that Plaintiff's interpretation is unreasonable.[6]  The DSA's plain language provides numerous indicators that Plaintiff may be an employee under the common law test.  Plaintiff's theory amounts to an argument that Kirby was, at the very least, close to breaching the DSA by merely agreeing to the terms of the DSA.  Making such a finding would offend the Ohio law maxim for courts to avoid manifestly absurd interpretations of contracts, such as finding a party in breach of a contract merely by agreeing to the terms in the same contract.  *See Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 150 N.E.3d 28, 33 (Ohio 2019).  At the very least, Plaintiff's argument that the common law test applies "runs contrary to

---

[6] The Court ordered additional briefing on whether Paragraph 1 of the DSA authorized much of Kirby's conduct that Plaintiff alleges amounts to a breach of the DSA.  (Doc. No. 83 at 1745.) Paragraph 1, in part, provides: "The Company shall have the right from time to time and at any time to change the Territory and Service Requirements in any manner whatsoever by giving written notice thereof to the Divisional Supervisor."  (Doc. No. 1-4 at 22.)  In response, Plaintiff notes that the term "Service Requirements" was meant to be a defined term as evidenced by its capitalization, but the definition is nowhere to be found in the DSA.  (Doc. No. 84 at 1752-53.) Thus, to Plaintiff, the Court cannot determine that Paragraph 1 authorized any of Kirby's actions as a matter of law.  (*See id.*)  This argument is well-taken, and this term does not factor into the Court's analysis.  Nonetheless, a bevy of other unambiguous provisions lead to the conclusion that Plaintiff's interpretation is unreasonable.

the requirement that contracts should be read as a whole, and that the provisions should be construed in harmony with one another." *Kent State Univ. v. Bradley Univ.*, 136 N.E.3d 774, 785 (Ohio Ct. App. 2019).

Plaintiff's opposition brief solidifies the unreasonableness of his position. Like he did in his complaint, he acknowledges, "[p]er the DSA, Kirby paid [him] a salary." (Doc. No. 65 at 1395.) But he states that Kirby's compliance with the DSA's salary requirement supports his claim of breach because "[b]eing paid a salary on a regular pay day is strong indicia of an employer-employee relationship." (*Id.*) He also emphasizes that the DSA required him to "at [Kirby's] request . . . promptly furnish to [Kirby] all information reports, answer to questionaries, and other data." (Doc. No. 65 at 1382; Doc. No. 1-4 at 23, ¶ 7.) The motion further highlights that the duration of the DSA was for "8+ years" to support of breach. (Doc. No. 65 at 1393.) The upshot is that Plaintiff uses Kirby's compliance with the DSA to support his assertion that Kirby breached the DSA – including complying with provisions that were for his benefit, like indefinitely paying him a $250,000 yearly salary. This is not a theory of breach capable of being presented to a jury.

For these same reasons, Kirby's contention that the parties did not intend to impute the common law test to the DSA is reasonable, as it is consistent with other terms in the DSA. It is also consistent with how other courts have interpreted similar provisions.

In *CompuSpa*, the district court evaluated a dispute between the plaintiff, a supplier of computer engineers, and the defendant, an entity that procured computer engineers to complete government contracts. *CompuSpa, Inc. v. Int'l Bus. Machines Corp.*, 228 F. Supp. 2d 613, 617 (D. Md. 2002). The plaintiff claimed that the defendant breached a term in the parties' agreement that stated that the plaintiff was an independent contractor, and the agreement did not

15

"create an agency partnership, or joint venture" between the parties. *Id.* at 620-21. The plaintiff alleged that the defendant breached this term by "assuming responsibility over [the plaintiff's computer engineers] and treating them like employees when in fact they were merely independent contractors." *Id.* at 620. The court held that the provision "simply establishe[d] the relationship between the parties . . . ." *Id.* at 621. It contained no "language prohibiting [the defendant] from assuming responsibility for [the computer engineers] and treating them like employees." *Id.* Notably, the court looked to another term in the contract that authorized the defendant to assume some level of control and responsibility over the plaintiff's computer engineers. *Id.* Because of this contract language, the court held that the plaintiff's breach of contract claim failed, as it was premised on the defendants engaging in conduct that was, in part, authorized by the agreement. *Id.*

The *Takedine* court evaluated a breach of contract claim like the one analyzed in *CompuSpa*. The plaintiff alleged that "[the defendant] failed to treat him as an independent contractor as required under the [parties' agreement] by, *inter alia*, forcing [him] to sell products that he did not order and interfering with [his] management of his staff and communicating directly to [his] staff in a harmful ways" *Takiedine v. 7-Eleven, Inc.*, No. CV 17-4518, 2020 WL 1149546, at *2 (E.D. Pa. Mar. 5, 2020). The allegedly breached provision provided:

> You [Mr. Takiedine] and we [7-Eleven] agree that this Agreement creates an arm's-length business relationship and does not create any fiduciary, special or other similar relationship. You agree: (a) to hold yourself out to the public as an independent contractor; (b) to control the manner and means of the operation of the Store; and (c) to exercise complete control over and responsibility for all labor relations and the conduct of your agents and employees, including the day-to-day operations of the Store and all Store employees. You and your agents and employees may not: (i) be considered or held out to be our agents or employees or (ii) negotiate or enter any agreement or incur any liabilities in our name, on our behalf, or purporting to bind us or any of our or your successors-in-interest. Without in any way limiting the preceding statements, we do not exercise any

16

discretion or control over your employment policies or employment decisions.  All employees of the Store are solely your employees, and you will control the manner and means of the operation of the Store.  No actions you, your agents or employees take will be attributable to us or be considered to be actions obligating us.

*Id.*  Like the *CompuSpa* court, the court accepted the defendant's argument that the section did not "impose any obligation on [the defendant].  Rather . . . it contain[ed] an acknowledgement by the parties that they have an arms-length business relationship and set[] forth duties imposed on [the plaintiff] to conduct his business as an independent contractor."  *Id.* at *3.

In *Moholt*, the plaintiff alleged breach of an oral independent contractor agreement because application of the common law test meant he should be considered an employee. *Moholt v. Dooney & Bourke, Inc.*, 63 F. Supp. 3d 1289, 1310 (D. Or. 2014).  The court rejected the notion that the misclassification amounted to a breach of the parties' agreement to recognize an independent contractor relationship.  *Id.* at 1311.  In doing so, the court noted that the distinction between an independent contractor and an employee was important in other areas of the law – such as third-party tort liability as well as state and federal wage and hour laws – where courts often employ common law principles.  *Id.* at 1310-11.  But the court held that it did not necessarily follow that being considered an employee in these contexts would give rise to a breach of contract claim.  *See id.*  Instead, the plaintiff was required to point to a specific contract term that entitled him to the damages he sought.  *See id.* at 1310.  The plaintiff's reliance on the parties' agreement that he was an independent contractor was insufficient.  *Id.*

Notably, the *Moholt* court agreed that the plaintiff might have been an employee under the common law test by denying summary judgment on an Oregon law wage and hour claim because there was a triable issue as to whether the plaintiff was an employee under the common

17

law test and thus covered under the statute.[7]  *Id.* at 1302-05.  But the defendant's potential misclassification did not create a triable issue as to whether the defendant breached the contract. *Id.* at 1311.

Like the *CompuSpa*, *Takiedine*, and *Moholt* courts, this Court finds that the Provision does not include a covenant requiring Kirby to avoid treating Plaintiff like an employee.  Part (i) states the parties' intent to create an independent contractor relationship.  (Doc. No. 1-4 at 23, ¶ 8.)  Parts (ii) and (iii) explain the duties that flow from the creation of such a relationship.  And, like the *Takiedine* term, all obligations in the Provision are owed by Plaintiff, not Kirby.  *See* 2020 WL 1149546, at *2.  Plaintiff agreed to pay social security, unemployment, workman's compensation, and other taxes on behalf of himself and his employees.  (Doc. No. 1-4 at 23, ¶ 8.) Plaintiff contracted to accept exclusive liability over his employees and acknowledged that they are his employees, not Kirby's.  (*Id.*)  Put another way, Parts (ii) and (iii) cabin the scope of the obligations resulting from that parties' agreement to form an independent contractor relationship; Kirby following the common law test is not within that scope.  (*See id.*)

The DSA's other terms solidify this interpretation of the Provision.  Just as the *CompuSpa* court determined that the contract's authorization of the defendant to have some level of control and responsibility over the engineers undermined the notion that it was contractually prohibited from treating those workers like employees, here too the Court finds that other terms in the DSA undermine Plaintiff's claim.  *See* 228 F. Supp. 2d at 621.  Because the DSA expressly (a) guarantees Plaintiff a salary, (b) runs for an indefinite term, (c) contemplates

---

[7] In applying the common law test, Oregon courts appear to focus on four factors: "(1) direct evidence of the right to, or exercise of, control; (2) the furnishing of tools and equipment; (3) the method of payment; and (4) the right to fire."  *Moholt*, 63 F. Supp. 3d at 1302 (quotations and citations omitted).

Plaintiff performing work central to Kirby's business, and (d) imposes noncompete obligations on Plaintiff, it cannot be found to require Kirby to obey the common law's strictures of independent contractor relationships.  (Doc. No. 1-4.)

The common law test, however, is not wholly irrelevant to the parties' relationship.  As explained in *Moholt*, the distinction between an independent contractor and an employee is relevant in various contexts under federal and state law.  63 F. Supp. 3d at 1310-11.  If Plaintiff believed that Kirby violated a duty owed to him under a state or federal statute, he had every right to bring a claim under the applicable statute.  *See id.*  Plaintiff chose to bring a breach of contract claim instead.  *See id.*  But he failed to point to any contract term that provides him with the rights he claims to have been breached.  *See id.*  Plaintiff's breach of contract claim thus fails as a matter of law.  *See id.*

### 2. Waiver

Even if the Court accepted Plaintiff's interpretation of the Provision, Plaintiff's breach of contract claim fails for another reason: waiver.

In its motion for summary judgment and reply brief, Kirby highlights that, in 2014 and around the same time Miley sent the Office Requirement Email, Plaintiff testified that he realized that Kirby misclassified him.  (Doc. No. 61-1 at 876; Doc. No. 66 at 1519; Doc. No. 61-3 at 1133.)  To Kirby, Plaintiff is prohibited from bringing a breach of contract claim premised on his ostensible misclassification because Plaintiff continued to perform and accept payment under the contract until his termination on October 8, 2018.  (Doc. No. 61-1 at 876; Doc. No. 66 at 1519; Doc. No. 61-2 at 959.)  Plaintiff offered no response to this argument.  He did not object to Kirby's application of cases analyzing waiver under Ohio law.  Nor did he attempt to point to

record evidence that could lead a jury to reasonably conclude that he did not waive his ability to bring this claim.[8]

The party moving for summary judgment is initially responsible for informing the court of the basis for its motion. *Celotex*, 477 U.S. at 323. When the moving party bears the burden of proof at trial, its "initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012) (citations and quotations omitted). Waiver is an affirmative defense for which the defendant bears the burden of proof at trial. *E.g.*, *Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 953-54 (S.D. Ohio 2001); *Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F. Supp. 2d 827, 829 (N.D. Ohio 2006); *Gomez v. Huntington Tr. Co.*, 129 F. Supp. 2d 1116, 1129-30 (N.D. Ohio 2000).

---

[8] Kirby asks the Court to dismiss Plaintiff's breach of contract claim solely because Plaintiff failed to address the waiver argument. Kirby claims this failure amounted to an abandonment of the claim. (Doc. No. 66 at 1517.) However, the cases Kirby cites in support of this proposition did not find abandonment when, like here, the nonmovant only failed to respond to one specific argument. *Ok Yeon Yoon v. K-Ltd. Carrier, Ltd.*, No. 3:17-cv-2517, 2020 WL 1031486, at *7 (N.D. Ohio Mar. 3, 2020) ("[P]laintiffs failed to defend their claim in their reply brief."); *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (plaintiff failed to respond to multiple arguments advanced in the movant's summary judgment brief); *see also Brown v. VHS of Mich., Inc*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (collecting cases). Moreover, in *Clark* – the only case where the nonmovant seemingly did not completely fail to address the claim in opposition to summary judgment – the court also stated that summary judgment was appropriate because "he failed to meet his Rule 56 burden." 178 F. Appx. at 525. With this in mind, the Court considers whether summary judgment is appropriate under Fed. R. Civ. P. 56 as opposed to solely on abandonment grounds. This approach aligns with the Sixth Circuit's instructions to district courts analyzing unopposed motions for summary judgment. *E.g.*, *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden.")

Kirby correctly notes that, under Ohio law, "where a party to a contract has defaulted and is in breach, and the nondefaulting party, with knowledge of the breach, accepts payments in the performance of the contract, his acceptance of those payments will constitute a waiver of that breach." *In re Tetirick*, 84 B.R. 505, 507 (Bankr. S.D. Ohio 1988); *see also, e.g.*, *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 856 N.E.2d 1008, 1016 (Ohio Ct. App. 2006) ("[B]y failing to complain of or exercise its rights under the contract at the time these deadlines were allegedly breached, [the party] waived any rights to enforce those deadlines."); *Alfa-Laval, Inc. v. Cow Supply, Inc.*, No. 3-88-18, 1990 WL 61743, at *5 (Ohio Ct. App. May 8, 1990) ("Defendants waived any right to damages for plaintiff's breach thereof because they failed to treat the contract as breached but instead continued to operate thereunder.").

By way of example, the Sixth Circuit, applying Ohio law, held that an employee waived her ability to sue an employer for its failure to comply with contractually specified payment terms. *Kendell v. Phoenix Home Health Care Servs., Ltd*, 720 F. App'x 249, 252-53 (6th Cir. 2017). The court noted that the employee's "undisputed conduct" of accepting the employer's incorrect payments for seven years "was inconsistent with a legal claim for breach of the [contract], and [the employer] would suffer economic detriment if required to pay [the employee] for the damages she [sought]." *Id.* The court, therefore, affirmed the lower court's grant of summary judgment in favor of the employer. *Id.*

Kirby also directs the Court to record evidence supporting a finding that Plaintiff waived his ability to bring a misclassification breach of contract claim under Ohio law. Kirby notes that Plaintiff testified that he "realized" he was misclassified under the DSA in "roughly probably

about [] 2014."[9]  (Doc. No. 61-3 at 1133.)  Kirby also cites evidence establishing that Plaintiff

continued to perform and accept his $250,000 a year salary pursuant to DSA until his termination

on October 8, 2018.  (Doc. No. 61-3 at 1133; Doc. No. 61-2 at 959.)  Under Ohio law, such

behavior is, as a matter of law, "inconsistent with a legal claim for breach" of the Provision.[10]

*Kendell*, 720 F. App'x at 252-53.  Thus, Kirby met its summary judgment burden.  *See id.*

      After the moving party meets its burden, the burden shifts to the nonmovant to "offer[]

some competent evidence that could be presented at trial showing that there is a genuine dispute

as to a material fact."  10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and

Procedure* § 2727.2 (4th ed. Updated Apr. 2023).  By not responding to Kirby's waiver

argument, Plaintiff did not meet his burden under Fed. R. Civ. P. 56.  *Byrne v. CSX Transp., Inc.*,

541 F. App'x 672, 675 (6th Cir. 2013) (court may grant summary judgment if movant meets its

initial burden and nonmovant fails to respond).  The Court is not required to sift through the

record and craft arguments to help Plaintiff meet his burden.  Fed. R. Civ. P. 56(c)(1)(3) ("The

court *need* consider only the cited materials, but it *may* consider other materials in the record."

(emphasis added)); *see also Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405 (6th Cir.

1992) ("Nothing in either the Rules or case law supports an argument that the trial court must

---

[9] According to his deposition testimony, Plaintiff "complained" to Miley about the amount of
money he was making after paying for expenses.  (Doc. No. 61-3 at 1133.)  He expressed that he
felt "misled."  (*Id.*)  He also stated that if he was "W-2ed, it would have been totally fine."  (*Id.*)
However, during this conversation, Plaintiff did not inform Kirby it was breaching the DSA by
treating him like an employee.  Instead, he asked Kirby for more money.  (*Id.*)

[10] Although not cited by Kirby, the Court notes that many of Kirby's actions that Plaintiff cites in
support of his breach of contract claim occurred after 2014.  For example, the Divisional
Supervisor Handbook – which Plaintiff complained about being subjected to – was revised on
January 13, 2015.  (Doc. No. 61-2 at 1054.)  Reitmeier's controlling behavior – such as calling to
scrutinize his travel habits (Doc. No. 61-3 at 1099, 1130) and yelling at him for taking time off
work (*id.* at 1101) – undisputedly occurred after January 2018.  (Doc. No. 65 at 1383.)  Thus,
according to Plaintiff, Kirby's misclassification only got worse after 2014 – yet he still chose not
to assert his rights under the DSA.

conduct its own probing investigation of the record.").  That obligation rests with Plaintiff.
Plaintiff neither argued against nor directed the Court to evidence rebutting the argument that he
waived his breach of contract claim.

Plaintiff's breach of contract theory is in direct conflict with the terms of the DSA.  But
even if Plaintiff presented a valid theory, his claim fails because he waived his right to bring such
a claim.  For these reasons, Kirby is entitled to judgment as a matter of law.[11]

### C.  Remaining Claims

The Court's October 31, 2022, Order announcing that pages 21-31 of Plaintiff's
opposition to summary judgment would not be considered dooms Plaintiff's remaining claims.
(10/31/2022 Non-Document Order.)

Plaintiff largely defended his remaining claims in pages beyond the authorized page
limit, leaving them mostly unopposed.  He has not advanced a single argument in opposition to
Kirby's summary judgment motion regarding his Title VII retaliation and unjust enrichment
claims.  He has not provided any reasoning as to why there are triable issues as to his ability to
prove the final two elements of a *prima facie* case for national origin discrimination.  And he
fails to raise a single argument regarding his ability to prove that Kirby's legitimate reason for
his termination was a pretext for discrimination or retaliation.  Plaintiff bears the burden of proof
at trial on all these issues.

The fact that the moving party's summary judgment record is uncontested is insufficient
to grant summary judgment.  *Stough v. Mayville Cmty. Sch.,* 138 F.3d 612, 614 (6th Cir. 1998)

---

[11] The Court notes that Plaintiff's complaint references the covenant of good faith and fair
dealing.  (Doc. No. 39 at 481, ¶ 42.)  However, Plaintiff's opposition brief does not mention this
allegation – let alone establish how the covenant of good faith and fair dealing is relevant to the
breach of contract claim.  Thus, the covenant of good faith and fair dealing does not factor into
the Court's analysis.

("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded") (internal citation and quotation omitted).  Instead, the Court must determine whether the movant has discharged their Fed. R. Civ. P. 56 burden.  *E.g.*, *Delphi*, 418 F. App'x at 381.  If this burden is met, the Court may grant summary judgment in favor of the movant because it "does not have the responsibility to search the record *sua sponte* for genuine issues of material fact."  *Winter v. City of Westlake*, No. 1:16-cv-1753, 2018 WL 838283, at *3 (N.D. Ohio Feb. 13, 2018) (citing *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996) & *Guarino*, 980 F.2d at 404-06); *see also Byrne*, 541 F. App'x at 675.

Kirby moves for summary judgment on Plaintiff's unjust enrichment, discrimination, retaliation, and hostile work environment claims.  (Doc. No. 61.)  The Court has reviewed Kirby's arguments relating to these claims and finds that the arguments are supported by law and record evidence.  Further, even if the Court allowed the 31-page opposition brief to stand, Kirby is still entitled to summary judgment on all Plaintiff's claims.  The Court's explanation follows.

### D.  Unjust Enrichment

Kirby argues that Plaintiff cannot seek relief under both a breach of contract claim and an unjust enrichment claim.  (Doc. No. 61-1 at 877-76; Doc. No. 66 at 1521-22.)  Plaintiff counters that "several courts have allowed a plaintiff to plead unjust enrichment in the alternative to [] breach of contract where there is a dispute as to the existence or enforceability of the contract." (Doc. No. 65 at 1411.)

There are two problems with Plaintiff's argument.  First, the Court is not testing the sufficiency of Plaintiff's pleadings at this point.  Second, there is no dispute regarding the existence or enforceability of the DSA.  Kirby states that it was a valid, enforceable agreement. (Doc. No. 61-1 at 870 ("Here, there is no disputing [Kirby] and Plaintiff were parties to a

contract.").)  Plaintiff agrees.  (Doc. No. 65 at 1390 ("There is no question that [Plaintiff] and Kirby entered into a contract.").)

Because "a party pursuing relief for breach of contract cannot at the same time seek equitable relief for unjust enrichment[,]" Kirby's motion is granted as it relates to Plaintiff's unjust enrichment claim.  *Sterling Constr., Inc. v. Alkire*, 2014-Ohio-2897, 2014 WL 2987324, at *5 (Ohio Ct. App. 2014) (citations and quotations omitted); *see also Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) ("Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates *in the absence of an express contract or a contract implied in fact* to prevent a party from retaining money or benefits that in justice and equity belong to another." (quoting *Beatley v. Beatley,* 828 N.E.2d 180, 192-93 (Ohio Ct. App. 2005)).

### E.  Discrimination and Retaliation

Title VII discrimination and retaliation claims based on circumstantial evidence are evaluated under the *McDonnell Douglas* burden-shifting framework.[12]  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009).  *McDonnell Douglas* first requires the employee to establish a *prima facie* case for discrimination or retaliation.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  When established, the burden of production then shifts to the employer to articulate a legitimate reason for the adverse employment action.  *Id.* at 253.  Should the employer carry this burden, the employee must prove that the stated justification is a pretext for discrimination or retaliation.  *Id.*  Throughout this process, the burden of persuasion remains

---

[12] Incorporating its breach of contract misclassification arguments, Kirby asserts that Plaintiff is not an employee under Title VII and thus not entitled to any protections under the law.  (Doc. No. 61-1 at 878.)  The Court need not address this issue because it finds that Plaintiff's Title VII claims all fail on the merits.

on the employee to demonstrate that the defendant intentionally discriminated or retaliated against him. *Id.*

These claims are resolved at the pretext stage. Kirby only responds to Plaintiff's arguments regarding pretext in its reply brief. (*See* Doc. No. 66 at 1526-31.) And Plaintiff does not argue that Kirby failed to meet its burden of proffering a legitimate rationale for termination. (*See* Doc. No. 65 at 1397-410.) Notwithstanding, the Court explains Plaintiff's theories of liability for his discrimination and retaliation claims and finds that Kirby met its slight burden of articulating a legitimate reason. (Doc. No. 65 at 1397-98, 104-05; Doc. No. 61-1 at 868-69.) The Court then moves to pretext.

### 1. National Origin Discrimination and Retaliation Theories of Liability

#### a. National Origin Discrimination

The *prima facie* case for a national origin discrimination claim requires the employee to show that "(1) he is a member of a protected class; (2) he was terminated; (3) he was qualified for the position; and (4) he was replaced by a person outside a protected class or was treated differently than a similarly situated, non-protected employee." *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007).

Plaintiff claims he has established this burden. He is a Middle Eastern man – specifically of Palestinian descent. (Doc. No. 65 at 1397-98.) He was subjected to an adverse employment action when Kirby terminated him from his Divisional Supervisor role – a role for which he was objectively qualified. (*Id.* at 1398.) Further, to Plaintiff, similarly situated Caucasian and American Divisional Supervisors conducted themselves in the same manner but were not terminated. (*Id.* at 1398-99.)

26

### b. Retaliation

To establish a *prima facie* case for a Title VII retaliation claim, the employee must produce evidence showing that (1) he engaged in protected activity, (2) the employer was aware of the protected activity, (3) the employer took an action that was materially adverse to the employee, and (4) there is a causal connection between the plaintiff's protected activity and the employer's adverse action. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343-44 (6th Cir. 2021).

Here, Plaintiff states he engaged in two forms of protected activity. First, he reported to Scott Fetzer's General Counsel, David Lamb, that Reitmeier was harassing him because of his protected status. (Doc. No. 65 at 1404-05.) Second, he retained counsel to address the harassment he reported to Lamb. (*Id.* at 1405.) Kirby was aware of this protected activity because of Plaintiff's conversations with Lamb – a Kirby representative – and the letter his attorney sent to Lamb. (*Id.*) Plaintiff claims a causal connection between this protected activity and the alleged adverse action because his termination occurred just two weeks after Lamb received the letter. (*Id.* at 1405-06.)

### 2. Kirby has proffered a legitimate reason for Plaintiff's termination.

Kirby's burden at this stage is far from onerous. The employer must "clearly set forth, through the introduction of admissible evidence, the reasons for the [adverse action]." *Burdine*, 450 U.S. at 255. Importantly, this does not mean that the employer must "persuade the Court that it was actually motivated by the proffered reasons . . . ." *Campbell v. Norfolk S. Corp.*, 876 F. Supp. 2d 967, 982 (N.D. Ohio 2012) (citing *Burdine*, 450 U.S. at 254). Rather, the employer's burden is satisfied if it simply "explains what [it] has done" or "produces evidence of legitimate nondiscriminatory reasons." *Burdine*, 450 U.S. at 256 (citations and quotations

27

omitted); *see also Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) ("It is important to note that the defendant need not prove a nondiscriminatory reason for not promoting [the employee] but need merely *articulate* a valid rationale.")

Kirby asserts that its legitimate reasons for terminating Plaintiff was that he was involved in the CBD industry, he lied about said involvement, and his sales division was underperforming. (Doc. No. 61-1 at 868-69; Doc. No. 66 at 1531.) In support, Kirby directs the Court to four pieces of evidence.

The first piece of evidentiary support is the termination letter. (Doc. No. 61-1 at 868.) The letter explains that Plaintiff's termination was due to his breach of Paragraphs 6, 12, and 13 of the DSA. (Doc. No. 61-2 at 1040.) Paragraph 6 includes a clause requiring Plaintiff to devote his "best efforts[,]" "[his] energies[,]" and "whatever efforts are necessary to achieve the highest level of [] performance" in carrying out his duties as a Divisional Supervisor. (Doc. No. 1-4 at 23, ¶ 6.) Paragraph 12 demands that Plaintiff not solicit, recruit, or contract with specified Kirby employees and independent contractors or any Kirby customer during the DSA's term. (*Id.* at 24, ¶ 12.) Paragraph 13 informs Plaintiff that he was not to "take any action, which disparages or defames the Company, its management, employees, independent contractors, distributors, products and/or its practices." (*Id.* at 25, ¶ 13.)

Kirby also relies on Lamb's deposition testimony. (Doc. No. 61-1 at 868-69.) Lamb testified that Kirby hired a private investigator to determine Plaintiff's involvement in the CBD industry. (Doc. No. 61-2 at 924, 929.) The investigator found that Plaintiff's contention that "he was not really involved [in the CBD industry] . . . turned out not to be true." (*Id.* at 924-25.) Lamb also recalled that "the sales for [Plaintiff's] division were pretty low" around the time of his termination. (*Id.* at 931.) Lamb explained that, based on prior dealings, Reitmeier's

allegedly harassing behavior towards Plaintiff was based on the division's low sales.  (*Id.* at 906.)

Third, Kirby points to Plaintiff's testimony admitting that he opened a CBD store while under contract as a Divisional Supervisor.  (Doc. No. 61-3 at 1137; Doc. No. 61-1 at 868.)

Finally, Kirby provides the Court with emails supporting that it investigated Plaintiff's involvement with a CBD store.  (Doc. No. 61-1 at 868.)  In one email, a private investigator states that he followed Plaintiff for three days and found that Plaintiff remained at a CBD store all day on Friday, August 17, 2018, and was there for a multi-hour period on Saturday, August 18, 2018, and Sunday, August 19, 2018.  (Doc. No. 61-2 at 1024.)  Lamb forwarded this email to Reitmeier.  (*Id.* at 1023.)

In the end, Kirby has proffered a legitimate reason for terminating Plaintiff.  *See Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 794 (6th Cir. 2006) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) for the proposition that the employer need not prove its legitimate reason for termination but only direct the court to statements in the record articulating the legitimate reason).

### 3.  Insufficient Evidence of Pretext.

To prove pretext, the employee must introduce admissible evidence demonstrating that the employer's legitimate reason is untrue – and, instead, discriminatory or retaliatory animus motivated the decision.  *See Myers v. U.S. Cellular Corp.*, 257 F. App'x 947, 954 (6th Cir. 2007).  To do so, the employee may show that the employer's reason for the adverse action either: (a) has no basis in fact, (b) did not actually motivate the employer's actions, or (c) was an insufficient motivator for the employer's actions.  *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).  "The three-part test need not be applied rigidly.  Rather, '[p]retext

is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'"
*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400
n.4.  "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could
reasonably reject [the employer's] explanation of why it fired her.'"  *Brown v. Kelsey-Hayes Co.*,
814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400) (bracketed language
omitted).

Plaintiff presents numerous arguments as to why Kirby's legitimate reason for his
termination was a pretext to cloud its discriminatory or retaliatory intent.  (Doc. No. 65 at 1406-
10.)  The Court addresses all of them and finds that they all fail to show how a jury could
reasonably doubt Kirby's explanation.  *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557,
572 (6th Cir. 2021).

### a.  There is unrefuted evidence that Plaintiff was involved in the CBD industry and misrepresented his involvement.

Plaintiff attempts to meet his pretext burden by arguing that a reasonable jury could find
that Kirby's proffered termination reason has no basis in fact.  (*See* Doc. No. 65 at 1386.)

Plaintiff first argues that there is a triable issue as to whether he lied when asked about
his involvement in the CBD industry.  (*Id.*)  In support of this point, Plaintiff cites his deposition
testimony in which he told Lamb that he "opened a [CBD] store to help [his] daughter make
money."  (Doc. No. 61-3 at 1137.)  In the next sentence, however, Plaintiff admits that he also
informed Lamb that he never went into the store.  (*Id.* ("I'm not in there.").)  Lamb's testimony
is consistent with Plaintiff's testimony on this point.  (Doc. No. 61-2 at 924-25.)  Plaintiff's
testimony regarding his involvement in the CBD business reflects dishonesty at worst, or
inconsistency at best.  (*Compare* Doc. No. 61-3 at 1137 *with* Doc. No. 61-2 at 924-25, 1024.)
That Lamb's testimony is in line with Plaintiff's leads to one conclusion: a reasonable jury could

only conclude that Plaintiff gave Lamb conflicting or inconsistent information about a point – his involvement in the CBD business – that motivated Kirby to terminate its relationship with Plaintiff.

Next, Plaintiff claims that a jury could reasonably find that Kirby did not investigate Plaintiff's involvement with the CBD industry.  (Doc. No. 65 at 1386.)  However, in the very next sentence of his brief, Plaintiff admits that Kirby "hire[d] a private investigator to investigate [him]."  (*Id.*)  Hiring an investigator is evidence that Kirby investigated his involvement in the CBD industry.  Plaintiff's assertion that Lamb testified that he did not investigate is not supported by the record.  Lamb made no such representation, and Kirby's record citations establish that Lamb communicated with a private investigator hired to examine Plaintiff's involvement with his CBD store.  (Doc. No. 61-2 at 1024; *see also id.* at 905-06 (record citation Plaintiff provided to establish that Lamb never investigated his involvement in the CBD industry).)

Finally, Plaintiff claims that there is a triable issue of fact as to whether Kirby had "significant involvement" in the CBD industry.  (Doc. No. 65 at 1386-87.)  Plaintiff argues that the private investigator's email does not establish this point, and Lamb's self-serving deposition testimony is insufficient to establish this fact.  (*Id.* at 1386.)  Regarding the investigator's email, Plaintiff speculates that he could have been on vacation on the Friday he was followed and states that the other days should not count because they were on the weekend.  (*Id.* at 1387.)

This argument is insufficient to create a genuine dispute on this issue because it is not supported by any evidence.  To start, Plaintiff's speculation that he may have been on vacation on the Friday he was followed cannot be used to create an issue of fact.  *Jennings v. Cnty. of Monroe*, 630 F. App'x 547, 555 (6th Cir. 2015) ("[S]peculation, however, is insufficient to

defeat summary judgment.").  Lamb's testimony, however, can and should be considered by the Court.  *Perez v. Mich. State Police Dep't*, No. 1:19-cv-666, 2020 WL 7060216, at *1 (W.D. Mich. Dec. 2, 2020) ("Indeed, all testimony by a party supporting their own position – including Defendants' testimony – is inherently self-serving, but that does not mean the Court can ignore it.").  All in all, Kirby has provided evidence that it reasonably understood Plaintiff to have been significantly involved in the CBD industry.  And Plaintiff introduced no evidence to the contrary.

Plaintiff's attempt to show that a jury could reasonably find that Kirby's legitimate reasons are pretextual is legally insufficient.

### b.  It is Plaintiff's burden to provide evidence that casts doubt on Kirby's legitimate reason.

Instead of providing evidence that casts doubt on Kirby's reasons for termination, Plaintiff argues that Kirby's lack of evidence supporting its decision to terminate him is evidence of pretext.  (Doc. No. 65 at 1407-08.)  In doing so, he asserts that Kirby's failure to provide sales reports or any other evidence of his declining sales establishes that Kirby's statements regarding his lackluster sales were pretextual.  (*Id.* at 1407.)

But it is *Plaintiff* who has an affirmative duty to provide evidence establishing pretext; he cannot not merely point to Kirby's lack of evidence once the burden of articulating a legitimate reason was met.  *Joostberns*, 166 F. App'x at 794 (6th Cir. 2006) (noting that the employee "misse[d] the point" when arguing that the employer did not prove its legitimate reason because it is the employee who "must offer" evidence that the reason is false); *see also Wortham v. Integrated Health Servs.*, 302 F. Supp. 2d 854, 859 (N.D. Ohio 2004) ("[P]laintiff has *the burden of presenting evidence* that would enable the jury to find that the articulated reasons were not defendant's real reasons, but are instead a pretext to conceal a discriminatory animus." (emphasis added)); *Jara v. Tennessee State Univ.*, No. 3:20-cv-00131, 2022 WL 331276, at *22 (M.D.

Tenn. Feb. 3, 2022) (noting to defeat summary judgment at the pretext stage, the "plaintiff *must produce sufficient evidence* from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." (emphasis added)); *cf. Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (noting that an employee's "bare assertion that the employer's proffered reason has no basis in fact" is insufficient to establish pretext).

The cases Plaintiff cites do not support his improper burden-shifting arguments.  (Doc. No. 65 at 1407-08.)  Instead, each case reaffirms Plaintiff's burden to provide evidence of pretext.  *Laxton v. Gap Inc.*, 333 F.3d 572, 581 (5th Cir. 2003) (evidence provided that the employee did not violate rules she was alleged to have violated); *Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476, 481-82 (6th Cir. 2012) (employee showed that employer contradicted itself with its position on whether he was a temporary employee).[13]  Moreover, in *Gaglioti*, the only Sixth Circuit case cited, the court found the lack of evidence bolstering the employer's contention that the employee inadequately performed was relevant because the employer only stated that poor performance was its justification for termination after litigation had commenced. 508 F. App'x at 482.  Here, there is no contention that Kirby only raised issues surrounding his inadequate sales until after Plaintiff filed this case.[14]

---

[13] The Court declines to consider *Baker v. Plymouth County Sheriff's Department*, 2009 WL 635606 (Massachusetts Commission Against Discrimination, March 5, 2009).  In this case, the state administrative body was applying Massachusetts law and assessing the credibility of witnesses to make findings of fact.  *Id.* at *13.  Moreover, the judicial body did not analyze the employee's pretext burden; it dismissed the case after determining the employer did not produce credible evidence of a legitimate reason for its decision to take an adverse employment action. *Id.*

[14] In fact, the texts Reitmeier sent to Plaintiff, which are attached to Plaintiff's opposition brief, strongly suggest that Plaintiff was aware that Reitmeier was unhappy with his sales before his

Lamb's testimony establishes that Plaintiff's sales were an issue around the time Kirby attempted to terminate him.  (Doc. No. 61-2 at 906, 931.)  Plaintiff's argument that Kirby should have produced more to support this point cannot create a genuine dispute on whether Kirby's justification was pretextual – an issue that Plaintiff bears the burden of production and persuasion at trial.  *Joostberns*, 166 F. App'x at 794; *see also Celotex*, 477 U.S. at 323-24.

### c.  Plaintiff's comparator evidence is insufficient to establish pretext.

In support of pretext, Plaintiff also argues that Kirby's stated reason for his termination could not have been the true reason because similarly situated employees behaved similarly and were not summarily terminated.[15]  (Doc. No. 65 at 1408-09.)  Plaintiff states:

> [He] and the other Divisional Supervisors at Kirby performed the same job duties, reported to the same manager, operated under the DSA contract, and engaged in the same or similar conduct, yet [Kirby] treated [him] significantly worse than the Caucasian/American Divisional Supervisors who were involved in the CBD business in their off time.
>
> For example: (a) Only [he] was terminated for being involved in the CBD industry before the 'no CBD involvement' policy was implemented (Defs' MSJ Ex., Sharqawi Dep. at 168, PageID # 1127); (b) Even after the "no CBD involvement" policy was implemented, certain Caucasian/American Divisional Supervisors were permitted to be involved in the CBD industry, including Charlie Nugent, who remained contracted with Kirby for a month after the policy was implemented (Ex. 9, Nugent 11/28/18 termination letter), and Robert Terwilliger, with whom [Kirby]

---

termination.  (Doc. No. 65-2.)  The letter from Plaintiff's attorney sent to Kirby also indicates that Plaintiff's sales were an issue prior to his termination.  (Doc. No. 65-3 at 1453.)

[15] Additionally, Plaintiff makes two arguments related to his comparator argument – both of which fail.  *First*, he argues that Kirby treated him differently due to his national origin because it sought his personal information, including his home address and social media photos, but did not do so for Caucasian/American employees.  (Doc. No. 65 at 1409.)  This assertion is unpersuasive because Plaintiff failed to cite (a) anything in the record establishing that Plaintiff was the only employee who faced this treatment and (b) caselaw teaching that this fact, if true, would have any relevance at all at the pretext stage.  *Second*, Plaintiff claims that Kirby's justification that it fired him because it lied about his involvement in the CBD industry is undermined by the fact that Kirby allows convicted felons to remain employed.  (*Id.*)  The fact that an employer allows convicted felons to remain employed does not preclude that employer from enforcing policies about all employees being honest with each other at work.

> spoke on multiple occasions regarding his CBD involvement (Ex. 10, Sminchak notes re: Terwilliger).  [Kirby] continued to converse with Terwilliger about his store until *at least* December 2018 (Ex. 10) . . . .

(*Id.* at 1398-99; *see also id.* at 1408-09 (reiterating the same allegations in pretext section of brief).)

Comparator evidence can establish pretext.  *E.g.*, *Gunn v. Senior Servs. of N. Kentucky*, 632 F. App'x 839, 847-48 (6th Cir. 2015).  But –

> [u]nder this method of establishing pretext, plaintiff must demonstrate that other employees outside of her protected class were not fired, even though they were similarly situated and engaged in substantially identical conduct to that which the employer contends motivated its decision.  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000).  To be similarly situated, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  Although exact correlation is not required, 'the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects.'  *Smith*, 220 F.3d at 762 (quotation marks omitted).

*Id.* (full citations added).

Plaintiff's comparator evidence is inadequate.  Without any evidentiary support, Plaintiff proclaims that other Divisional Supervisors were "similar in all relevant aspects" but treated significantly better than him.  (Doc. No. 65 at 1398-99.)  Plaintiff provides the names of Charlie Nugent and Robert Terwilliger.  (*Id.* at 1399.)  However, he only cites to a letter from Kirby terminating Nugent, which does not provide any basis on which to conclude that Nugent is an adequate comparator.  (Doc. No. 65-9.)  What is more, Plaintiff testified that Nugent was not a Divisional Supervisor.  (Doc. No. 61-3 at 1100.)  His record citation to support Robert Terwilliger as a proper comparator similarly misses the mark.  Specifically, this exhibit appears to be a Kirby employee's handwritten notes detailing meetings with Terwilliger.  (Doc. No. 65-

10.)  These notes do not provide a basis for finding that Terwilliger is a proper comparator.  (*See id.*)

Plaintiff's comparator arguments fail.  Although he establishes that other Kirby workers were involved in the CBD business and may not have been terminated in the same fashion, he fails to show that these employees also (a) had the same supervisor, (b) were subject to the same standards, and (c) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's differentiating treatment.[16]  *Ercegovich*, 154 F.3d at 352.

### d.  Plaintiff has not shown that Kirby provided shifting justifications for its termination decision.

Plaintiff argues that Kirby offered shifting justifications for its decision to terminate him.  (Doc. No. 65 at 1406-07.)  In support, Plaintiff points out that all Kirby stated in its termination letter was that Plaintiff violated three provisions in the DSA.  (*See id.*)  But, in their motion for summary judgment, Kirby states that it terminated him for his significant involvement in the CBD industry and the impact it had on his sales.  (*Id.* at 1406-07.)  This inconsistency is evidence of pretext according to Plaintiff.  (*See id.*)

In the Sixth Circuit, "an employer's shifting termination rationales are evidence that the proffered rationale may not have been the true motivation for the employer's actions."  *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 890 (6th Cir. 2020).  However, Sixth Circuit case law provides that offering "*additional*, non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications."  *Id.* at 891 (quoting

---

[16] For the same reason, Plaintiff has failed to establish a *prima facie* case of national origin discrimination.  *See, e.g.*, *Colvin v. Veterans Admin. Med. Ctr.*, 390 F. App'x 454, 460 (6th Cir. 2010) (finding that employee could not establish a *prima facie* case of discrimination because he failed to identify a comparator that was similar in all relevant aspects).

*MacDonald-Bass v. J.E. Johnson Contracting, Inc.*, 493 F. App'x 718, 726 (6th Cir. 2012))
(emphasis in original; quotations omitted).

Plaintiff has only shown that Kirby offered additional, non-conflicting justifications for
the termination.  *See id.*  In its termination letter, Kirby states that Plaintiff was being terminated
because he breached the best efforts, non-disparagement, and non-solicitation provisions.  (Doc.
No. 61-2 at 1040.)  Lamb's explanation that Plaintiff was fired for operating a CBD business,
misrepresenting his involvement in the business, and having unsatisfactory sales does not
conflict with the notion that Kirby believed these provisions to have been violated. (Doc. No. 61-
2 at 906, 924-25, 931.)  In fact, Lamb's testimony aligns with the notion that Plaintiff was not
using his best efforts to fulfill his duties outlined in the DSA.  To Kirby, he was dedicating time
and effort to a business that sold products to potential Kirby customers that were illegal under
federal law at the time.[17]  Moreover, based on the evidence provided by Plaintiff, it is clear
Reitmeier communicated to Plaintiff his belief that involvement in the CBD industry hindered
workers from fulfilling their obligations to Kirby.  (Doc. No. 65 at 1400-01.)

There is no evidence that Kirby offered shifting or contradictory justifications for its
decision to terminate Plaintiff.

### e.  Offering subjective justifications is not evidence of pretext.

Plaintiff posits that "[Kirby's] subjective view of [his] 'best efforts' is insufficient for
summary judgment purposes."  (Doc. No. 65 at 1408.)  Not so.  "[A] subjective qualification
assessment does not convert an otherwise legitimate reason into an illegitimate one."  *Brown v.
Ohio State Univ.*, 616 F. Supp. 2d 740, 751 (S.D. Ohio 2009) (quotation and citations omitted)

---

[17] Plaintiff does not dispute that the products his CBD business sold were illegal under federal
law at the time of his termination.  (*See* Doc. No. 65 at 1387.)

(granting summary judgment to an employer when the employer stated that it terminated an employee, in part, because of her "failure of day to day decision making" and "lack of personal ownership"), *aff'd*, 385 F. App'x 486 (6th Cir. 2010); *see also Wortham*, 302 F. Supp. 2d at 859 ("The use of subjective criteria in evaluating articulated reasons is not per se illegal in rebutting a plaintiff's prima facie case.") (granting employer summary judgment after employer justified termination because the employee "was not a team player and a leader").

Also, Kirby's determination that Plaintiff was not using his best efforts to perform under the DSA is not without objective evidentiary support. Kirby provides evidence of Plaintiff's involvement with a CBD business – including working there on a weekday – to bolster its assertion that Plaintiff did not use his best efforts. (Doc. No. 61-2 at 1024.) Plaintiff's subjectivity argument is not well-taken.

Given that Plaintiff has not met his burden of establishing that Kirby's legitimate reason was a pretext for discrimination or retaliation, the Court grants Kirby's motion as it relates to the Title VII discrimination and retaliation claims.

### F. Hostile Work Environment

To succeed on a Title VII hostile work environment claim, Plaintiff must demonstrate: (1) he belonged to a protected group, (2) he suffered unwelcome harassment, (3) the harassment was based on his protected characteristic, (4) the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (5) Kirby "knew or should have known" and did nothing. *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011); *see also Choulagh v. Holder*, 528 F. App'x 432, 436-37 (6th Cir. 2013) (stating the same elements in the national origin hostile work environment context). Regarding the fourth element, harassment must be objectively and subjectively offensive based

on the totality of the circumstances.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999).  Plaintiff has not established the third and fourth elements.

### 1. Miley's comments cannot form the basis of a hostile work environment claim standing alone.

There is no dispute that Plaintiff is of Middle Eastern descent and is a member of a protected group.  (Doc. No. 61-1 at 867.)  A Kirby employee made two hostile comments based on his protected characteristic.  Plaintiff testified that Miley – his direct supervisor from November 2010 to January 2018 – joked about his sensitivity surrounding his national origin on two separate occasions.  (Doc. No. 65 at 1383; Doc. No. 61-3 at 1103-04, 1114.)  The first occurred at a divisional supervisor meeting in 2016 or 2017 when Miley said, "[Plaintiff] is fine. Just don't call him a Paki.  He gets really upset."  (Doc. No. 61-3 at 1103.)  The second one occurred at another divisional supervisor meeting and consisted of Miley pointing a laser at Plaintiff's head and stating, "[Plaintiff] gets really pissed off when you call him a Paki."  (*Id.* at 1104.)  Miley made this comment in the presence of domestic and international Kirby affiliates. (*Id.*)

As a matter of law, Miley's conduct was not "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."  *Williams*, 643 F.3d at 511.  "[I]solated incidents (unless extremely serious)[18]  will not amount to discriminatory

---

[18] Plaintiff does (and could not) contend that Miley's comments were of such a severe nature that they amount to a hostile work environment despite their isolated nature.  This is so because the Sixth Circuit has found that isolated incidents are actionable only for extremely severe conduct. *Okojie v. Metro. Nashville Hosp. Auth.*, 584 F. Supp. 3d 543, 558-59 (M.D. Tenn. 2022) (collecting Sixth Circuit cases finding isolated incidents altered terms and conditions of employment and noting they involved the use of the n-word, sexual assault, or threats of physical violence).  While the Court credits Plaintiff's testimony that Miley's comments were unwelcome

changes in the 'terms and conditions of employment.'"  *Williams*, 643 F.3d at 512 (quoting

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  "Thus, occasional offensive

utterances do not rise to the level required to create a hostile work environment because to hold

otherwise would risk changing Title VII into a code for workplace civility."  *Phillips v. UAW*

*Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (cleaned up).

   To determine whether hostile acts are isolated incidents, courts look at the duration of the

plaintiff's employment and evaluate the number of alleged hostile acts that occurred during the

employment period.  For example, the Sixth Circuit held that being subjected to "three relatively

isolated incidents over a period of approximately two and a half years" did not alter the terms

and conditions of the plaintiff's employment.  *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341,

351 (6th Cir. 2005).  In *Gomes*, the court held that being subjected to two hostile sexual

comments in a sixth-month span did not constitute an objectively hostile working environment.

*Gomes v. Prime Design, Inc.*, 85 F. App'x 421, 423 (6th Cir. 2003).  Similarly, in *Bourini*, the

court found that "eight alleged incidents [that] were spread out over a period of five years . . .

[were] relatively infrequent and . . . thus [were] insufficient to constitute discriminatory changes

in the terms and conditions of employment."  *Bourini v. Bridgestone/Firestone N. Am. Tire, LLC*,

136 F. App'x 747, 751 (6th Cir. 2005) (comments were related to the plaintiff's status as a

Muslim and Middle Eastern man).

   Plaintiff was affiliated with Kirby for decades and held his position as a Divisional

Supervisor for approximately eight years.  (Doc. No. 61-3 at 1094, 1112-14; Doc. No. 61-2 at

1040.)  For this period, Plaintiff provides evidence of two prior incidents that could constitute

---

and made him feel uncomfortable, case law establishes that these comments were not severe
enough to be considered actionable absent additional harassing conduct.

harassment based on his protected status.  (Doc. No. 65 at 1400; Doc. No. 61-3 at 1103-04.) These isolated incidents alone did not alter "terms and conditions of [his] employment" as a matter of law.[19]  *Faragher*, 524 U.S. at 788.  Based on the number of incidents and the length of Plaintiff's employment with Kirby, Miley's behavior is significantly more isolated than that directed at the *Clark*, *Gomes*, and *Bourini* employees.

### 2. There is no evidence that Reitmeier's behavior was motivated by Plaintiff's national origin.

Apparently, recognizing that Miley's comments are neither severe nor pervasive enough to alter the terms and conditions of his employment, Plaintiff attempts to paint all of Reitmeier's (his other supervisor) allegedly improper conduct as being motivated by Plaintiff's national origin and thus actionable under Title VII.  But Plaintiff provides absolutely no evidence that Reitmeier's conduct is related to the two derogatory comments made by Miley.  Plaintiff provides no reason to believe that Reitmeier and Miley ever interacted with each other – let alone that Reitmeier was aware of Miley's comments about Plaintiff's ethnicity.  Nor does Plaintiff allege that Reitmeier ever made a hostile comment regarding Plaintiff's national origin.

Instead, he merely notes:

Reitmeier called [Plaintiff] and sent him nasty/rude text messages very early in the morning and late at night, including demanding that [Plaintiff] call 'corporate' and/or asking '[W]hat are you doing, Abe?  You need to work more.  You need to call me right now.'

Reitmeier called Distributors [Plaintiff] was scheduled to visit to see if [Plaintiff] was there when he said he was going to be there.

Reitmeier sent [Plaintiff] to **spy** on other Divisional Supervisors to determine if they were involved in the CBD industry, he did not require any other DS to do that.

---

[19] This is true even if the Court assumes that Plaintiff was subjected to more unwelcome comments from Miley, which may have led to Miley's understanding that Plaintiff was being sensitive to being called a "Paki" – an inference that Plaintiff has not asked this Court to draw. (Doc. No. 61-3 at 1103-04.)

> Reitmeier condemned [Plaintiff] for flying to Los Angeles to visit his ailing mother, demanding to know, "What the hell are you in doing in LA?"
>
> Reitmeier asked [Plaintiff] – but not his Caucasian or American comparators – about his private finances, including demanding to know how much money he lent his daughter for a CBD store – even before Kirby implemented an anti-CBD policy.

(Doc. No. 65 at 1400-01 (record citations omitted; emphasis in original).)

An employee may prove that harassment was based on a protected characteristic with either (1) direct evidence of the use of national origin-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of the workplace not belonging to the plaintiff's protected group.  *Id.*  As stated above, there is no direct evidence. Plaintiff must therefore establish that Reitmeier treated similarly situated, non-Middle Eastern employees differently.  *See id.*

In an attempt to meet this burden, Plaintiff testified:

> When [Reitmeier] was being aggressive with me, I called other supervisors and distributors and asked them if he was calling them questioning them, and they said no, they hadn't heard from him, and he was being relentless about my – if I was involved in a CBD store.

(Doc. No. 65 at 1401.)  In that same deposition, Plaintiff provided the names of the comparators:

> Marcus Quinn, Charlie Nugent, Will Vance . . . Tony Bryant, Johnny Davis, and there is others.  I just don't recall now.  But I called all these people and asked them if they were being harassed about being involved in CBD, and they said no.

(*Id.*)

There are at least three reasons why this testimony is insufficient to create a genuine dispute about whether Reitmeier's conduct was motivated by Plaintiff's national origin.  First, immediately after Plaintiff stated the names of the comparators at his deposition, Plaintiff admitted that they were not Divisional Supervisors.  (Doc. No. 61-3 at 1100.)  There is no evidence that these people are proper comparators.  (*See id.*)  Second, Plaintiff undermines his

position that these workers were not subject to Reitmeier's CBD-related ire when he also testified that Reitmeier asked him "to go to these factory distributors' alleged CBD stores" to investigate their activities.  (*Id.* at 1100-01.)[20]  This proves that Reitmeier was not only concerned about Middle Eastern employees' involvement with the CBD industry.  (*See id.*)  Third, Plaintiff's deposition testimony only goes towards Plaintiff's knowledge that Reitmeier did not treat other employees similarly concerning CBD-related issues.  There is no evidence that the ostensible comparators were not subject to Reitmeier's other harassing conduct.

In the end, Plaintiff has produced no evidence from which a jury could reasonably find that Reitmeier's conduct was motivated by national origin-related animus.  This leaves Plaintiff's hostile work environment claim with only two isolated comments for support.  The law is clear: these two comments, made during a 20+ year-long employment period, are insufficient to constitute severe or pervasive harassment.  Plaintiff did not establish a *prima facie* case for a hostile work environment claim.[21]  Accordingly, Kirby's motion is granted as it relates to Plaintiff's hostile work environment claim.

---

[20] More specifically, Plaintiff testified that Reitmeier asked him to investigate Tony Bryant's, Charlie Nugent's, Will Vance's, and Callie Vance's involvement with the CBD industry.  (Doc. No. 61-3 at 1100.)

[21] Because Plaintiff failed to establish a *prima facie* case for a hostile work environment claim, the Court need not address Plaintiff's arguments in his pretext section specifically related to his hostile work environment claim.  *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706-08 (6th Cir. 2007) (noting that the *McDonnell Douglas* burden-shifting analysis may apply to a hostile work environment claim but not addressing pretext because the plaintiff failed to provide evidence that she was subject to severe or pervasive harassment).

### III. __Conclusion__

For the reasons stated herein, Kirby's motion for summary judgment is GRANTED.


**IT IS SO ORDERED.**

_____
BRIDGET MEEHAN BRENNAN
**Date**: May 30, 2023                                           UNITED STATES DISTRICT JUDGE

44